**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| AMERICAN FRIENDS SERVICE COMMITTEE; CENTER FOR CONSTITUTIONAL RIGHTS; HUMAN RIGHTS WATCH; and OPEN SOCIETY INSTITUTE,<br><br>　　　　　Plaintiffs,<br><br>　　v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States;<br><br>UNITED STATES DEPARTMENT OF STATE;<br><br>MARCO A. RUBIO, in his official capacity as Secretary of State;<br><br>UNITED STATES DEPARTMENT OF THE TREASURY;<br><br>SCOTT K. H. BESSENT, in his official capacity as Secretary of the Treasury;<br><br>UNITED STATES DEPARTMENT OF JUSTICE;<br><br>TODD BLANCHE, in his official capacity as United States Attorney General;<br><br>OFFICE OF FOREIGN ASSETS CONTROL; and<br><br>BRADLEY T. SMITH, in his official capacity as Director, Office of Foreign Assets Control,<br><br>　　　　　Defendants. | Civil Action No. 26-cv-6830 |

**<u>COMPLAINT</u>**

**INTRODUCTION**

1.   Plaintiffs American Friends Service Committee ("AFSC"), Center for Constitutional Rights ("CCR"), Human Rights Watch ("HRW"), and Open Society Institute ("OSI") (collectively, "Plaintiffs") are leading U.S.-headquartered, international human rights and humanitarian organizations dedicated to upholding and advancing human rights and the rule of law.   They bring this action to challenge the lawfulness of Executive Order 14,203, *Imposing Sanctions on the International Criminal Court,* 90 Fed. Reg. 9369 ("EO 14,203" or "Executive Order" or "Order"), issued by President Donald J. Trump on February 6, 2025.

2.   The Executive Order authorizes draconian sanctions, often described as the "financial death penalty," for those who the Secretary of State finds provide support for certain investigations and prosecutions by the International Criminal Court ("ICC") that are opposed by the Trump administration.   Under the Order, the administration has sanctioned ICC judges, prosecutors, and prominent human rights organizations.   The administration has also sanctioned the United Nations Special Rapporteur on the situation of human rights in Palestinian Territory occupied since 1967. Those who provide support for sanctioned individuals or organizations, including education, advice, training, information, analysis, legal representation, and other services to or for their benefit, face up to 20 years of imprisonment, if a U.S. person, and risk themselves being sanctioned, if a non-U.S. person.

3.   This is an unlawful abuse of power constituting a frontal attack on the rule of law, the independence of judges, prosecutors, and lawyers, basic precepts undergirding the international legal order, and the principle of equal access to justice.   The effect is to cause grave damage to the ability to bring to justice the perpetrators of genocide, war crimes, and crimes against humanity. Moreover, the Executive Order does so not just where the administration disagrees with the ICC's accountability efforts, but in *all* ICC proceedings, including those concerning crimes committed

1

in Ukraine, Darfur, Myanmar, and elsewhere, where the United States *supports* the ICC's vital work.

4. EO 14,203, its implementing regulations, and the sanctions designations made thereunder (collectively, "Sanctions Regime") stand in marked contrast to the United States' tradition of advancing the cause of international criminal justice. For nearly a century, spanning both Republican and Democratic administrations, the United States has held itself out as being at the forefront of establishing a rules-based international order. The criminalization of the worst abuses known to humankind lies at the heart of that project.

5. This global accountability effort, which the United States helped lead in the aftermath of World War II and the horrors of the Holocaust, included the creation of rules of international law that form the bedrock of the international legal order. Among them are the prohibition on genocide, as set out in the Convention on the Prevention and Punishment of the Crime of Genocide of 1948, and the codification of war crimes in the Geneva Conventions of 1949. The United States ratified those international treaties and has adopted domestic legislation to give them effect. The effort also included enshrining the obligation to investigate, prosecute, and punish these crimes in those treaties and in parallel customary international law rules. Similar obligations are set forth in the United Nations Convention Against Torture, adopted in 1984, which the United States ratified and adopted domestic civil and criminal legislation to give it effect.

6. In 1998, following in the tradition of support that the United States provided for the prosecution of Nazi war criminals at the Nuremberg Tribunal, and the U.S.-backed war crimes tribunals of the early 1990s which addressed mass atrocities in the former Yugoslavia and Rwanda, the international community chose to give effect to those legal obligations by creating a permanent court, the ICC. The court currently has 125 member countries, including many of the United

States' closest allies. Its establishment anchors a broad ecosystem of justice in which diverse stakeholders, including not only the ICC and its States Parties, but also other States, domestic judicial authorities, the U.N. Security Council, INTERPOL, victims and their lawyers, and civil society organizations, work to fight impunity for the most serious international crimes through the impartial adjudication of individual criminal responsibility and to provide victims with access to justice.

7. The United States' historical commitment to the rule of law more broadly runs even deeper. It is based on the fundamental premise, dating to the nation's founding, that judges, prosecutors, and other public servants, must base their decisions on the facts and law, free from political or other improper interference. Moreover, the United States has long understood access to justice to be an essential component of the rule of law, rooted in the belief that all persons must have equal access to justice and accountability, with due process and respect for the rights of the accused before an impartial court. But with the issuance of EO 14,203, the United States abandoned and, indeed, undermines and weakens, these foundational rules, rights, and principles.

8. The Sanctions Regime targets the personal—including financial— interests of judges, prosecutors, and U.N. officials, in the service of pressuring them into making decisions contrary to what the facts and law otherwise dictate, and punishing them when they fail to rule or act in accordance with the administration's preferences. It penalizes human rights organizations for providing evidence regarding alleged international crimes and advocating for and supporting victims in their pursuit of justice. And, because the Order threatens those who provide services and funding to those organizations with penalties, the Sanctions Regime seeks to isolate and defund them.

9. The Sanctions Regime does all this under the guise of a pseudo "national emergency" that consists of nothing more than the normal operation of the machinery of international criminal law that the United States itself helped to create. Specifically, in issuing EO 14,203, President Trump claimed that any effort by the ICC to investigate or prosecute alleged violations of international criminal law committed by nationals of the United States or certain other countries that, like the U.S., have not ratified the ICC's governing treaty, constitutes a national emergency, even when the alleged crimes were committed on the territory of countries that have ratified that treaty (and referring specifically to the ICC's Afghanistan and Palestine situations). He invoked the National Emergencies Act ("NEA"), 50 U.S.C. §§ 1601 *et seq*., and the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§ 1701 *et seq*., to support his claim that he is authorized to designate and sanction specific individuals and groups because of their purported engagement with the ICC, and then prosecute or levy heavy fines against those who provide any benefit to, or derive any benefit from, sanctioned individuals or entities.

10. The administration has already invoked EO 14,203 to sanction eight ICC judges and the three most senior ICC prosecutors for carrying out their duties as officers of the Court; a United Nations expert for recommending that serious violations of international law be referred to the ICC for investigation; and three well-respected human rights organizations—Al-Haq: Law in the Service of Man, Al Mezan Center for Human Rights, and Palestinian Center for Human Rights—for supporting justice and accountability at the ICC when the jurisdictional requirements of the Court have been met.

11. The Sanctions Regime has been exceptionally disruptive to the international justice system as a whole and caused serious harm to the global human rights community. Individuals and organizations, including Plaintiffs, have been forced to cease engaging as they had before with

the ICC or the designated individuals and organizations because of the risk of severe civil or criminal penalties, or in the case of non-U.S. citizens, designation for sanctions themselves. The regime has caused profound and irreparable harm not only to the designated individuals and organizations but also to Plaintiffs.

12. Plaintiffs bring this action to seek permanent enjoinment of the Sanctions Regime, which is manifestly unlawful.

13. *First and foremost*, the Sanctions Regime is *ultra vires* because there is no national emergency under its governing statute, IEEPA. The national emergency provisions of that statute are intended to allow the President to act in response to a national emergency where there is no time for Congress to authorize such action through legislation. There is no such emergency in relation to the work of the ICC.

14. There is nothing new about the ICC, the scope of its jurisdiction, or its efforts to end impunity for international crimes (including its investigations concerning Afghanistan and Palestine). The United States, including Congress, has long been aware that the ICC has jurisdiction over crimes allegedly committed on the territory of States Parties to the Rome Statute of the International Criminal Court ("Rome Statute") even when the alleged perpetrator is a national of a State that is not a party to that treaty. More than two decades ago, in 2002, Congress enacted legislation to address that concern. And, with respect to the two investigations identified in the Executive Order as being of particular concern, the only known investigation related to U.S. nationals for alleged crimes in Afghanistan more than twenty years ago was "deprioritized," *i.e.*, effectively shelved in 2021. The investigation and related legal proceedings regarding alleged crimes in Palestine have been ongoing, albeit slowly—and deliberately—for nearly twelve years, with Israel actively participating in the legal proceedings, which include appellate review. Indeed,

5

the ICC is a long-standing criminal court which guarantees the rights of all parties to due process, and does not present a national emergency in any serious or meaningful sense, and certainly not within the meaning of IEEPA.

15. The Sanctions Regime is also *ultra vires* because it conflicts with the legislative scheme that Congress enacted in the American Servicemembers' Protection Act ("ASPA"), 116 Stat. 899 (codified at 22 U.S.C. §§ 7421 *et seq.*), to address the very scenarios that are the basis for EO 14,203: the possibility that the ICC could exercise jurisdiction in respect of crimes allegedly committed on the territory of States that are parties to the Rome Statute by nationals of States which are not parties. Congress specified the particular measures to be taken, having regard to this possibility. Sanctions are *not* one of them. Indeed, ASPA expressly forbids the Executive from utilizing inducements to influence ICC decision-making of the sort that EO 14,203 uses, even in the extreme circumstance of an American being held in detention by the ICC. The Sanctions Regime is further *ultra vires* because it violates numerous rules of international law even though Congress has not authorized the Executive to do so.

16. *Second*, the designations made under EO 14,203 violate the Administrative Procedure Act ("APA") because they are arbitrary and capricious, contrary to law, and an abuse of discretion. The designations are arbitrary and capricious because they rest on factors Congress did not intend the Executive to consider. They are an abuse of discretion because their evident purpose is to target the personal and financial interests of judges, prosecutors, and U.N. officials to pressure them into disregarding their oaths of office and to punish civil society groups and lawyers for helping victims of grave international crimes access justice. This object is irreconcilable with a sanctions apparatus designed to target terrorists, narcotics traffickers, weapons proliferators, and human rights abusers. The designations are contrary to law for the reasons described above and

because they regulate the exchange of personal communications and informational materials that IEEPA's Information Exceptions, 50 U.S.C. § 1702(b)(1), (3), place beyond the President's regulatory authority.

17. *Third*, the Sanctions Regime violates the First Amendment. Plaintiffs have each been forced to stop, alter, or cease to consider engaging in speech and expressive conduct that they otherwise would have undertaken, either independently or jointly with others. Both on its face and as applied, the regime reflects unlawful content and viewpoint discrimination that unconstitutionally burdens the rights to speech and association and to engage in expressive grant-making. These content- and viewpoint-based restrictions cannot survive strict scrutiny, as multiple district courts have already held. *See, e.g.*, *Rona v. Trump*, 797 F. Supp. 3d 278, 282, 292-93 (S.D.N.Y. 2025); *Smith v. Trump*, 791 F. Supp. 3d 90, 97-98 (D. Me. 2025); *Open Soc'y Justice Initiative v. Trump*, 510 F. Supp. 3d 198, 212-13, 212 n.7 (S.D.N.Y. 2021).

18. *Fourth,* the Sanctions Regime violates the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. §§ 2000bb *et seq*. as applied to AFSC, a Quaker faith-based organization. AFSC's human rights advocacy and humanitarian work in the Occupied Palestinian Territory directly exercises the Religious Society of Friends' religious testimonies of peace, equality, community, integrity, and the just stewardship of resources. The Sanctions Regime substantially burdens that religious exercise by threatening AFSC with civil and criminal penalties for continuing its decades-long partnerships with the designated Palestinian organizations, forcing AFSC to abandon planned collaborations integral to its religiously motivated peacebuilding and advocacy work. Defendants cannot demonstrate that this burden furthers a compelling governmental interest or that the Sanctions Regime is the least restrictive means of furthering any such putative interest.

19. *Fifth*, the Sanctions Regime is unconstitutionally vague.  EO 14,203 imposes civil and criminal liability on any person who provides "services to, or for the benefit of" a designated person.  However, neither the Executive Order nor its implementing regulations defines that operative phrase.  As a result, Plaintiffs cannot determine with confidence which of their advocacy, information-sharing, legal-representation, and other expressive activities involving designated entities expose them to enforcement.  The unconstitutional failure to provide the required notice as to what is proscribed is especially serious given that the result is to chill speech that is protected by the First Amendment.

20. For any and all these reasons, the Sanctions Regime must be declared unlawful and permanently enjoined.

## JURISDICTION AND VENUE

21. The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, 28 U.S.C. §§ 2201-02, and 5 U.S.C. § 706.

22. The Court has authority to grant declaratory and injunctive relief pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 *et seq*.; 5 U.S.C. § 702; and the Court's inherent equitable powers.  *See also* Fed. R. Civ. P. 57, 65.

23. Venue is proper in this District under 28 U.S.C. § 1391(e)(1)(C) because Plaintiffs CCR, HRW, and OSI reside in the Southern District of New York.

## PARTIES

24. **Plaintiff American Friends Service Committee** is a faith-based Quaker organization founded in 1917 and headquartered in Philadelphia, Pennsylvania.  AFSC is incorporated as a nonprofit corporation and is tax-exempt under Section 501(c)(3) of the Internal Revenue Code.  AFSC's human rights advocacy and humanitarian activities are a direct exercise of the religious convictions of the Religious Society of Friends ("Quakers"), animated by a core set of religious

8

beliefs, known as "testimonies," that include the obligations to promote peace, equality, community, integrity, simplicity, and the just stewardship of resources. These religious commitments compel Quakers to bear "social witness" in the world through peacebuilding, humanitarian service, and the promotion of human dignity. AFSC has engaged in human rights advocacy with respect to, and carried out humanitarian work in, the Occupied Palestinian Territory since 1948, resulting in an interdependent and decades-long partnership with human rights organizations in the Occupied Palestinian Territory.

25. **Plaintiff Center for Constitutional Rights** is a legal, educational, and advocacy organization founded in 1966 and headquartered in New York, New York, incorporated as a nonprofit organization and tax-exempt under Section 501(c)(3) of the Internal Revenue Code. CCR is dedicated to advancing and protecting the rights guaranteed by the United States Constitution and international law. Working in coalition and in support of movements, CCR has a storied history of litigating cases on behalf of victims and survivors of international law violations in U.S., foreign, and international courts, including the landmark human rights case, *Filártiga v. Peña-Irala*, 630 F.2d 876 (2d Cir. 1980). CCR has long engaged with the ICC, including by serving as legal counsel for Palestinian victims and victims of U.S. torture.

26. **Plaintiff Human Rights Watch** is a research and advocacy organization founded in 1978 and headquartered in New York, New York, incorporated as a nonprofit corporation that is tax-exempt under Section 501(c)(3) of the Internal Revenue Code. It operates in over 100 countries investigating and exposing violations and abuses of international human rights and humanitarian law, including in Afghanistan, and Israel and Palestine. It carries out advocacy to governments and other actors to press for changes or the enforcement of laws, policies, and practices to end human rights abuses and secure justice. HRW partners with other organizations

9

across the globe to achieve these goals.  It was a leading advocate for the establishment of the ICC. Since the ICC's establishment, HRW has carried out research and advocacy with the aim of supporting the delivery of independent, impartial, and meaningful justice by the ICC.

27. **Plaintiff Open Society Institute** was incorporated in 1979 as a private foundation and charitable trust under Section 501(c)(3) of the Internal Revenue Code and headquartered in New York, New York.  For more than four decades, OSI has provided funding and direct support to charitable endeavors at home and abroad, aiming to build vibrant and inclusive democracies whose governments are accountable to their people.  OSI operates through its programs, which engage in grant-giving, strategic litigation, research, advocacy, and organization of convenings.  The Open Society Justice Initiative ("OSJI") is a program of OSI.  It is a public interest law center dedicated to advancing human rights and the rule of law through litigation, advocacy, grant-giving, and convening.  OSJI's work focuses on promoting international justice, deepening democratic practice, and addressing the threats that economic power may pose to open societies.  For many years, it has engaged directly with the ICC.

28. **Defendant Donald J. Trump** is President of the United States and is sued in his official capacity.

29. **Defendant United States Department of State** is a United States agency headquartered in Washington, D.C.

30. **Defendant Marco A. Rubio** is the United States Secretary of State and is sued in his official capacity.

31. **Defendant United States Department of the Treasury** is a United States agency headquartered in Washington, D.C.

32. **Defendant Scott K. H. Bessent** is the United States Secretary of the Treasury and is sued in his official capacity.

33. **Defendant United States Department of Justice** is a United States agency headquartered in Washington, D.C.

34. **Defendant Todd Blanche** is the Attorney General of the United States and is sued in his official capacity.

35. **Defendant Office of Foreign Assets Control** is a United States agency headquartered in Washington, D.C.

36. **Defendant Bradley T. Smith** is the Director of the Office of Foreign Assets Control and is sued in his official capacity.

**FACTUAL ALLEGATIONS**

**I.   The Global System for Addressing Violations of International Criminal Law**

***International Accountability and the United States***

37. The movement for international criminal justice emerged from the aftermath of World War II and the horrors of the Holocaust.  The United States was a driving force behind the effort to hold that era's war criminals to account through the Nuremberg Tribunal and the International Military Tribunal for the Far East.

38. In the years that followed, international law rapidly developed through treaties and custom to clarify the laws of war and resulting obligations to investigate and prosecute such crimes. In 1948, the United Nations General Assembly unanimously adopted the Genocide Convention, which the United States signed and ratified, implementing it domestically through the Genocide Convention Implementation Act, 18 U.S.C. § 1091.  The Genocide Convention provides that individuals who commit genocide or other enumerated acts "shall be punished, whether they are constitutionally responsible rulers, public officials or private individuals." Convention on the

11

Prevention and Punishment of the Crime of Genocide, Dec. 9, 1948, 78 U.N.T.S. 277, art. IV. It further obligates State parties to prevent and punish such crimes. The obligations set out in the Genocide Convention are also rules of customary international law.

39. A year later, in 1949, the Geneva Conventions were adopted, codifying the principle of individual criminal responsibility for grave breaches of international humanitarian law. The Geneva Conventions, which have been universally ratified, obligate States to enact legislation penalizing grave breaches, to search for individuals alleged to have committed those violations, and to bring alleged perpetrators to trial.[1]

40. The incorporation of these international law obligations into domestic law wholly accords with the Founders' understanding of the role of international law as part of the U.S. law, and the Supreme Court's consistent recognition of it as such. *See* U.S. Const. art. VI, cl. 2; *The Paquete Habana*, 175 U.S. 677, 686-714 (1900) (applying customary international law directly as rule of decision); *id*. at 700 ("International law is part of our law. . ."). *See also* U.S. Dep't of Defense, Law of War Manual § 1.7 (June 2015) (updated July 2023) ("Under international law, a treaty is binding upon States that are Parties to it."). The United States is constrained by its international law obligations, and its domestic law must be construed consistently with international law. *See Murray v. The Schooner Charming Betsy*, 6 U.S. 64, 118 (1804) ("[A]n act of Congress ought never to be construed to violate the law of nations if any other possible construction remains.").

---

[1] Geneva Convention for the Amelioration of the Condition of the Wounded and Sick in Armed Forces in the Field of August 12, 1949, art. 49, 75 U.N.T.S. 31-32; Geneva Convention For the Amelioration of the Condition of Wounded, Sick and Shipwrecked Members of Armed Forces at Sea of August 12, 1949, art. 50, 75 U.N.T.S. 85-86; Geneva Convention Relative To The Treatment of Prisoners of War of August 12, 1949, art. 129, 75 U.N.T.S. 135-136; Geneva Convention Relative to the Protection of Civilian Persons in Time of War of August 12, 1949, ("Fourth Geneva Convention") art. 146, 75 U.N.T.S. 287-288. *See* War Crimes Act, 18 U.S.C. § 2441(c)(1); *see also* Anti-Torture Statute, 18 U.S.C. § 2340.

41. Throughout the latter half of the 20th century, as mass atrocities unfolded in Cambodia, the former Yugoslavia, Rwanda, Sierra Leone, and other conflict zones, the United States supported the creation of international criminal tribunals to provide accountability for such crimes. Civil society organizations, including some of the Plaintiffs, actively supported and worked towards the creation of a permanent court to provide victims with justice not available at the national level and to end impunity for the most serious crimes.  These efforts to codify international criminal law culminated in 1998 with the adoption of the Rome Statute.

42. Civil society organizations, particularly acting through the Coalition for the International Criminal Court ("CICC"), played a pivotal role in advocating for the establishment of the ICC, mobilizing political support, shaping key provisions of the Rome Statute, and ensuring that the Court's mandate reflected principles of accountability and justice for the most serious international crimes.  Since the ICC's inception, civil society has continued to, *inter alia*, monitor proceedings, facilitate victim participation (including by some of its members serving as legal counsel for victims), conduct outreach in affected communities, and advocate for States Parties to cooperate with the Court's investigations, prosecutions, and enforcement of its decisions.

43. When President Clinton signed the Rome Statute in 2000, he noted the United States' "long history of commitment to the principle of accountability, from our involvement in the Nuremberg tribunals that brought Nazi war criminals to justice, to our leadership in the effort to establish the International Criminal Tribunals for the former Yugoslavia and Rwanda."  Statement on the Rome Treaty on the International Criminal Court, 37 Weekly Comp. Pres. Doc. 4, Dec. 31, 2000.

### *The International Criminal Court*

44. The ICC is a permanent court, based in The Hague, The Netherlands.  It is governed by the Rome Statute, which currently has 125 States Parties from every region of the world.  Thirty NATO members are States Parties to the Rome Statute.

### *The ICC's Jurisdiction*

45. The ICC may exercise jurisdiction over the investigation and prosecution of individuals accused of serious international crimes, including war crimes, crimes against humanity, and genocide.  Under the principle of complementarity, the ICC may exercise jurisdiction only if a State where the alleged crimes could otherwise be investigated and prosecuted does not (or cannot) conduct genuine proceedings.  Rome Statute of the International Criminal Court, arts. 5, 17(a), July 17, 1998, 2187 U.N.T.S. 90.  The principle of complementarity ensures that the ICC remains a court of last resort.

46. States that ratify or accede to the Rome Statute, or otherwise accept the jurisdiction of the Court, consent to the investigation and prosecution of crimes within the ICC's jurisdiction that are alleged to have occurred in their territory or by their nationals.  *Id.*, art. 12.

47. A State Party may refer a "situation" in which crimes within the ICC's jurisdiction appear to have been committed to the ICC Prosecutor for investigation and prosecution.  *Id.*, art. 13(a), 14.  The ICC may also exercise jurisdiction over situations referred to the ICC Prosecutor by the U.N. Security Council pursuant to a resolution adopted under Chapter VII of the U.N. Charter.  *Id.*, art. 13(b).  It can also exercise jurisdiction in situations where the ICC Prosecutor has opened an investigation *proprio motu*, subject to judicial review and authorization.  *Id.*, arts. 13(c), 15.

### *The ICC's Judicial Divisions*

48. The ICC's Judicial Divisions, which conduct judicial proceedings, constitute one of the organs of the Court.  There are three divisions: the Pre-Trial Division, the Trial Division, and the Appeals Division.  *Id.*, art. 34.

49. The Judicial Divisions comprise judges who are elected by the Assembly of States Parties to the Rome Statute ("ASP") following their nomination by a State Party.  *Id.*, art. 35.  To qualify as a judge, one must demonstrate "high moral character, impartiality and integrity" and "possess the qualifications required in their respective State[] for appointing to the highest judicial offices."  *Id.*, art. 36.

50. The Rome Statute mandates that judges "shall be independent in the performance of their duties" and "shall not engage in any activity which is likely to interfere in their judicial functions or to affect confidence in their independence."  *Id.*, art. 40.

51. Before undertaking their respective duties, all ICC judges make a solemn undertaking in open court:

> I solemnly undertake that I will perform my duties and powers as judge of the [ICC] honourably, faithfully, impartially and conscientiously, and that I will respect the confidentiality of investigations and prosecutions and the secrecy of deliberations.

Rome Statute, art. 45; ICC Rules of Procedure and Evidence, Rule 5 (adopted Sept. 9, 2002).

52. In addition to their solemn undertaking, the judges must abide by a Code of Judicial Ethics, which enshrines their judicial independence, impartiality, integrity, the confidentiality of their consultations and deliberations, the diligence in exercising their duties, and their conduct during proceedings.[2]

---

[2] International Criminal Court, Code of Judicial Ethics, arts. 3-8, ICC-BD/02-01-05 (Mar. 9, 2005).

53. Three of the Court's judges make up the Presidency, a separate organ of the ICC that, *inter alia*, coordinates judicial matters such as assigning judges, situations, and cases to divisions. Members of the Presidency are elected by an absolute majority of the judges. The current President of the ICC is Judge Tomoko Akane, a national of Japan.

54. The Presidency of the Court assigns judges to one of the three aforementioned divisions, with each judge's assignment being based on the function of each division and the relevant qualification and experience of each judge. Rome Statute, art. 39.

55. Judges are assigned to specific situations or cases, with three judges composing panels at the Pre-Trial and Trial levels, and five judges (one of whom is the ICC President) at the Appeals level. *Id.*

56. The Pre-Trial Chamber addresses jurisdictional challenges and determines whether the Prosecution's evidence is sufficient to proceed to trial, among other issues. The Trial Chamber oversees the trial and sentencing of an accused person, as well as any award of reparations to eligible victims. *See id.*, art. 75. All parties may appeal or seek leave to appeal any decisions of the Pre-Trial and Trial Chambers. *See id.*, art. 81.

### *The ICC's Office of the Prosecutor*

57. The ICC's Office of the Prosecutor ("OTP") is responsible for examining situations in which international crimes under the jurisdiction of the ICC are alleged to have been committed; carrying out investigations of such situations; and prosecuting individuals who are allegedly responsible for those crimes. The OTP "shall act independently." *Id.*, arts. 42, 54. The OTP may not delegate its investigative and prosecutorial functions to external parties or other departments and is obligated to investigate incriminating and exonerating circumstances equally. *See id*, arts. 42, 54.

16

58. In all aspects of its work, the OTP must fully respect the rights accorded to persons under investigation or subject to prosecution, which include the right not to incriminate themselves; the right not to be subjected to coercion, duress, threat or torture; the right not to be subjected to arbitrary arrest or detention; and the right to be informed of the right to remain silent and to have legal counsel of their choosing, including legal assistance provided without payment if warranted. *Id.*, arts. 54(1)(c) and 55.

59. The OTP is led by the Prosecutor and Deputy Prosecutors, who must be persons of "high moral character"; "be highly competent … and have extensive practical experience"; and cannot "engage in any activity which is likely to interfere with his or her prosecutorial functions or to affect the confidence in his or her independence." *Id.*, art. 42. They are supported by advisors and staff, who can "represent [the Prosecutor or a Deputy Prosecutor] in the exercise of his or her functions," but to whom he or she may not delegate certain "inherent powers," ICC Rule of Proc. and Evid. 11, such as the power to "initiate an investigation," Rome Statute, art. 53.

60. Before taking up their offices, the Prosecutor, Deputy Prosecutors, and their staff must "make a solemn undertaking" to exercise their functions "impartially and conscientiously," *id.*, art. 45; ICC Rules of Proc. and Evid., Rule 6. The Prosecutor and Deputy Prosecutors take their oath in open court, stating:

> I solemnly undertake that I will perform my duties and exercise my powers as [Prosecutor or Deputy Prosecutor] of the International Criminal Court honourably, faithfully, impartially and conscientiously, and that I will respect the confidentiality of investigations and prosecutions.

ICC Rules of Proc. and Evid., Rule 5.

61. In conducting preliminary examinations, investigations, and prosecutions, the OTP seeks and obtains information and assistance from a range of state and non-state actors and

17

individuals, including victims and their legal representatives and members of civil society, all of whom may submit information to the OTP.

62. In the investigation stage, the OTP often sends investigators, cooperation advisers, and prosecutors to relevant countries with the consent of the relevant domestic authorities to collect evidence of alleged crimes.

### *The Role of Victims before the ICC*

63. The ICC provides for a robust and direct role for victims of crimes within the jurisdiction of the court. Where the personal interests of victims are affected, they are permitted to present their "views and concerns ... at stages of the proceedings determined to be appropriate by the Court." Rome Statute, art. 68(3). Victims, which may include individuals as well as organizations and institutions that have suffered harm as a result of the alleged commission of a crime within the ICC's jurisdiction, can be represented by legal counsel known as "legal representatives of victims" ("LRVs"). *Id.*; ICC Rules of Proc. and Evid., Rules 85, 90. In cases that lead to convictions, victims may also seek reparations, including restitution, compensation, and rehabilitation. Rome Statute, art. 75.

64. LRVs are lawyers admitted to practice before the ICC and bound by the ICC's Code of Professional Conduct for Counsel. This requires, *inter alia*, that counsel act independently and do not allow their integrity or freedom to be compromised by external pressure. Nor may they engage in discrimination towards any person, including clients, of any kind, including on the basis of race, ethnicity, ethnic or national origin, or political opinion. ICC Code of Professional Conduct for Counsel, arts. 6, 9 (adopted Dec. 2, 2005).

65. Civil society organizations, including some of Plaintiffs, support and supplement the role of victims and their counsel, including by providing information to the OTP or by seeking leave to appear before the Chambers as *amicus curiae*.

### *The Stages of ICC Proceedings and their Safeguards*

66. Matters before the ICC proceed in several stages, including:

    a. *preliminary examination*, involving an initial assessment by the OTP of available information, including public reporting as well as submissions from victims, civil society organizations, United Nations experts and fact-finding missions, among other sources. This information is assessed against various preconditions to a formal investigation, including jurisdictional criteria, the quality and quantity of information regarding alleged crimes, the gravity of the alleged crimes, the interests of justice and victims, as well as an initial review of whether the matter is being addressed in genuine proceedings in a national system that would normally exercise jurisdiction over the alleged crimes;

    b. *investigation*, involving evidence-gathering, identification of possible suspects, and the issuance of arrest warrants or summonses to appear;

    c. *pre-trial*, involving a determination by the ICC judges of whether there is sufficient cause to take the case to trial and on what charges, following submissions by the OTP, defense, and victims, including during a dedicated hearing;

    d. *trial*, during which the OTP, defense, and victims may present evidence, and which requires proof of guilt beyond a reasonable doubt by the OTP before the ICC may convict and impose a sentence;

    e. *appeals*, in which the OTP, the accused, and victims can participate;

19

      f.   *reparations*, in which the Trial Chamber, after submissions, awards and oversees the implementation of reparation orders that benefit victims of the crimes of which the accused was found guilty; and

      g.   *enforcement* of any sentence in a country that has agreed to enforce ICC sentences.

67. To authorize a formal investigation, following a request by the ICC Prosecutor under Article 15 of the Rome Statute, the Pre-Trial Chamber must verify that the Rome Statute's preconditions to an investigation are satisfied, including that the case appears to fall within the ICC's temporal, territorial, and subject-matter jurisdiction, and that there is a reasonable basis to proceed to a formal investigation. Victims, through their LRVs (including Plaintiff CCR attorneys), have participated in such legal review proceedings. The Pre-Trial Chamber has the power to reject the Prosecutor's request to initiate an investigation.

68. When a situation has been referred to the Prosecutor by a State Party or the Prosecutor has initiated an investigation, the Prosecutor must notify relevant States who could exercise jurisdiction over the crimes concerned in the first instance. Within a set period of time, a State may inform the Court that it is investigating individuals over whom the State has jurisdiction for criminal acts that relate to the information provided in the Prosecutor's notification. If it does, and the State so requests, the Prosecutor is required to defer its investigation in favor of the national proceedings, unless the Pre-Trial Chamber, on the application of the Prosecutor, decides there is good cause to authorize the investigation. Rome Statute, art. 18.

69. Throughout, the ICC must satisfy itself of its jurisdiction. An accused person or any State with jurisdiction over a case may challenge the ICC's exercise of jurisdiction. *Id.*, art. 19.

70. The Prosecutor may apply for an arrest warrant, which the Pre-Trial Chamber must review to determine whether "[t]here are reasonable grounds to believe that the person has

committed a crime within the jurisdiction of the Court." *Id.*, art. 58(1)(a). The ICC has no independent enforcement power and relies on States to arrest individuals who are named in its arrest warrants. *Id.*, arts. 59, 89. Non-States Parties, including the United States, have provided critical assistance in facilitating the transfer of suspects to ICC custody.

71. To date, the ICC has issued public arrest warrants and/or summonses to appear for at least 70 individuals suspected of crimes falling within its jurisdiction. The ICC has conducted 12 trials, resulting in the conviction of 13 defendants. Four defendants have been acquitted.

72. Pursuant to Rule 103 of ICC Rules of Procedure and Evidence, a Chamber adjudicating a case may invite or entertain *amicus curiae* submissions by a State or non-States Party (like the United States), organization, or person. These have been filed, including by certain of the Plaintiffs, in the contexts of adjudicating, *inter alia*, matters of jurisdiction and admissibility and the issuance of arrest warrants.

73. Once an accused person is transferred to the ICC and has a first appearance in a language the person understands, the Pre-Trial Chamber sets a date for a confirmation of charges hearing where the accused person may object to the charges, challenge the Prosecution's evidence, and present their own evidence. Victims, through their LRVs, may participate in these proceedings. If the Pre-Trial Chamber confirms some or all of the charges, upon a finding that there is sufficient evidence to establish that the person committed the crimes charged, then the case is sent to trial. Rome Statute, art. 61.

74. Defendants are afforded fair trial and due process rights, including the presumption of innocence; the right to counsel and adequate time for the preparation of their defense; the rights to be informed in detail of the charges and to be tried without undue delay; the right not to be compelled to testify; and the rights to examine witnesses and to disclosure of exculpatory or

21

mitigating evidence.  *See generally id.*, arts. 64, 66, 67.  An accused person may be convicted only if the charges are proven beyond a reasonable doubt.  *Id.*, art. 66(3).

### *The United States and the ICC*

75. The United States played a key role in drafting the Rome Statute.  The United States signed the treaty but subsequently stated its intention not to become a party thereto.  On May 6, 2002, the United States wrote a letter to the Secretary-General of the United Nations that stated, in material part, "the United States does not intend to become a party to the [Rome Statute]. Accordingly, the United States has no legal obligations arising from its signature on December 31, 2000."[3]

76. Nonetheless, over the last twenty-five years, both Democratic and Republican administrations have supported some of the Court's investigations and prosecutions as well as its overarching mission.

77. The United States has a long-standing objection to the ICC's potential jurisdiction over nationals of non-States Parties to the Rome Statute, albeit one that it has not uniformly pressed, as detailed below in regard to the situations in Ukraine, Libya, and Sudan, among others.

78. In 2002, Congress enacted the American Servicemembers' Protection Act ("ASPA"), 116 Stat. 899 (codified at 22 U.S.C. §§ 7421, *et seq.*), to address the risk of U.S. persons "being detained or imprisoned by, on behalf of, or at the request of the International Criminal Court."  22 U.S.C. § 7427.

79. Congress permitted the United States to support ICC investigations under certain circumstances: "Nothing in this [subchapter] shall prohibit the United States from rendering

---

[3] Press Statement, U.S. Dep't of State, International Criminal Court: Letter to UN Secretary General Kofi Annan (May 6, 2002), https://2001-2009.state.gov/r/pa/prs/ps/2002/9968.htm.

assistance to international efforts to bring to justice Saddam Hussein, Slobodan Milosovic [sic], Osama bin Laden, other members of Al Queda [sic], leaders of Islamic Jihad, and other foreign nationals accused of genocide, war crimes or crimes against humanity." *Id.* § 7433(a).  Congress later added the following language: "or from rendering assistance to the International Criminal Court to assist with investigations and prosecutions of foreign nationals related to the Situation in Ukraine." *Id.*

80. The ASPA specifically directs what actions the President is authorized to take when the ICC seeks to investigate or prosecute a U.S. or allied person, authorizing the President "to direct any agency of the United States Government to provide" the following: "legal representation and other legal assistance," "exculpatory evidence on behalf of that person," and "defense of the interests of the United States through appearance before the International Criminal Court pursuant to Article 18 or 19 of the Rome Statute." *Id.* § 7427(c).  Sanctions under IEEPA are not among the processes Congress authorized in the ASPA.

81. In situations where a U.S. or allied person is "being detained or imprisoned by" the ICC, which is not the present case, the "President is authorized to use all means necessary and appropriate to bring about the release" of that person, except paying bribes or "other such incentives to induce" release. *Id.* § 7427(a), (d).

82. Congress has enacted legislation supporting the work of the ICC:

    a. In 2008, Congress authorized military assistance to States Parties of the ICC. *See* National Defense Authorization Act for Fiscal Year 2008, 122 Stat. 3 § 1212.

    b. Congress has authorized the State Department to offer monetary rewards to individuals who provide information that facilitates the arrest of foreign individuals

wanted by the ICC.  *See* Department of State Rewards Program Update and Technical Corrections Act of 2012, 126 Stat. 2492.

c.  As described in paragraphs 88-89, 95, and 99, Congress has endorsed the work of the ICC in several joint and chamber-specific resolutions.

83. In 2024, Congress appropriated funds to support the ICC directly.  This included "not less than $2,500,000 as a contribution to the [ICC's] Trust Fund for Victims."  Congress appropriated an additional $2,500,000 for "Assistance to International Efforts" that include supporting the ICC's investigations and prosecutions of foreign nationals related to the situation in Ukraine.  *See* Public Law 118-47, Section 7034(r).

84. In late 2024 and January 2025, Congress considered, but did not pass, legislation that would have authorized the President to impose sanctions on foreign ICC personnel or those individuals or entities that support the ICC.  *See* Illegitimate Court Counteraction Act, H.R. 23, 119th Cong. § 3 (2025).  This bill failed to pass the Senate in January 2025.  *See* 171 Cong. Rec. S410 (January 28, 2025).

85. In October 2024, in a statement to the United Nations General Assembly, the Legal Advisor to the United States Mission stated: "The United States remains steadfast in its commitment to international justice and promoting accountability for violations of international humanitarian law … The work of the International Criminal Court is vital to this mission, and we welcome the ICC's continued efforts … to deliver justice in situations where atrocities have been committed with impunity, including in Ukraine, Darfur, and the Central African Republic."  Mark Simonoff, United States Mission to the U.N., October 28, 2024.

86. U.S. courts have cited the Rome Statute and the work of the ICC to interpret international law, *see, e.g.*, *Jesner v. Arab Bank, PLC*, 138 S. Ct. 1386, 1401 (2018); *Nahl v.*

24

*Jaoude*, 968 F.3d 173, 188 (2d Cir. 2020); *Simon v. Republic of Hungary*, 812 F.3d 127, 143 (D.C. Cir. 2016), *vacated*, 604 U.S. 115 (2024); *Hamdan v. United States*, 696 F.3d 1238, 1250 (D.C. Cir. 2012), overruled on other grounds by *Al Bahlul v. United States*, 767 F.3d 1 (D.C. Cir. 2014); *Doe v. Exxon Mobil Corp.*, 391 F. Supp. 3d 76, 90 (D.D.C. 2019), and to evaluate applications for asylum, *see, e.g.*, *Wanjiru v. Holder*, 705 F.3d 258, 260 (7th Cir. 2013).

### *United States Support for ICC Investigations and Prosecutions*

87. Both Democratic and Republican administrations have supported ICC investigations and prosecutions, including providing direct support for those investigations. Notably, that support has not turned on whether the targets of the investigation are nationals of States Parties or whether the State on whose territory the alleged crimes occurred is a State Party to the ICC's Rome Statute. The United States has supported investigations in both scenarios. These include the following:

### *United States Support for ICC Investigations and Prosecutions of Nationals of State Parties*

88. **Uganda**: In December 2003, the Government of Uganda (a State Party to the Rome Statute) referred the situation in its territory concerning the Lord's Resistance Army ("LRA") to the ICC, consisting of alleged war crimes and crimes against humanity, including enlistment of children, sexual enslavement, and rape occurring since it ratified the Rome Statute in 2002. In July 2004, the OTP opened an investigation.

    a. In January 2015, the United States played a leading role in facilitating the transfer to the ICC of Dominic Ongwen, a commander of the LRA. The State Department stated that "[t]he United States welcomes [Ongwen's] transfer … by Central African authorities to the International Criminal Court" and that the surrender "give[s] hope—to the survivors, to the four countries affected by the

LRA, and to their partners around the world—that the nightmare of the LRA can be brought to an end."[4]

b.  Upon his conviction for 61 counts of crimes against humanity and war crimes, in February 2021, the State Department "welcome[d] the verdict" against Ongwen as a "a significant step for justice and accountability for atrocities committed by the LRA."[5]

c.  In December 2022, the State Department "welcomed" the "judgment affirming [Mr. Ongwen's] conviction" and expressed "hope" that the "judgment demonstrates that justice must and will be done" for "the thousands of abducted young women and girls subjected to horrific sexual violence, torture, and forced labor in the Lord's Resistance Army."[6]

d.  Congress has endorsed the ICC's investigation in Uganda.  *See* S.Con.Res.16, 153 Cong. Rec. S2540 (2007) (Joint resolution citing the ICC's work to condemn the LRA in Uganda); S. Res. 402, 158 Cong. Rec. S6007 (2012) (reiterating the Senate's support for the prosecution of Joseph Kony).

89. **Democratic Republic of the Congo**: In March 2004, the Government of the Democratic Republic of the Congo (a State Party to the Rome Statute) referred the situation in its territory to the ICC, consisting of alleged war crimes and crimes against humanity, including the recruitment of child soldiers, rape, and murder.  In June 2004, the OTP opened an investigation.

---

[4] U.S. Dep't of State, *Transfer of Dominic Ongwen to the International Criminal Court* (Jan. 20, 2015), https://2009-2017.state.gov/r/pa/prs/ps/2015/01/236142.htm.

[5] U.S. Dep't of State, *Welcoming the Verdict in the Case Against Dominic Ongwen for War Crimes and Crimes Against Humanity* (Feb. 4, 2021), https://2021-2025.state.gov/welcoming-the-verdict-in-the-case-against-dominic-ongwen-for-war-crimes-and-crimes-against-humanity/.

[6] U.S. Dep't of State, *Judgment in the Appeal of Dominic Ongwen at the International Criminal Court* (Dec. 15, 2022), https://2021-2025.state.gov/judgment-in-the-appeal-of-dominic-ongwen-at-the-international-criminal-court/.

26

a. One of the defendants, Bosco Ntaganda, surrendered himself to the U.S. Embassy in Rwanda in March 2013.  The United States facilitated the transfer of Mr. Ntaganda to the ICC.  The State Department stated that it "welcome[d] the removal of one of the most notorious and brutal rebels in the Democratic Republic of the Congo, Bosco Ntaganda … to the International Criminal Court."[7]  In November 2013, the State Department stated that the United States had "played a key role in the surrender of Bosco Ntaganda to the ICC."[8]

b. This action was unanimously endorsed in a resolution by the Senate. S. Res. 144, 159 Cong Rec. S5302 (2013).

90. **Central African Republic**: The Government of the Central African Republic (a State Party to the Rome Statute) made two referrals to the ICC, the first in December 2004 for alleged international crimes committed during an armed conflict between 2002 and 2003, and in May 2014, for alleged international crimes committed in the context of renewed violence in the country since August 2012.  As a result, the Prosecutor opened two separate investigations: one in May 2007, into alleged war crimes and crimes against humanity, including mass rapes and killings, committed in Central African Republic in 2002 and 2003, and the other in September 2014, into alleged war crimes and crimes against humanity, including murder, rape, forced displacement, committed in the context of renewed violence in Central African Republic since 2012.

a. In March 2016, the State Department expressed the United States' support for "the ICC's investigations in the Central African Republic [(CAR)]" and stated

---

[7] U.S. Dep't of State, *Bosco Ntaganda's Expected Surrender to the International Criminal Court* (Mar. 22, 2013), https://2009-2017.state.gov/secretary/remarks/2013/03/206556.htm.

[8] U.S. Dep't of State, *Statement of the U.S. at the Twelfth Session of the Assembly of States Parties of the International Criminal Court* (Nov. 21, 2013), https://2009-2017.state.gov/j/gcj/us_releases/remarks/2013/218069.htm.

that "we commend CAR's commitment to ensuring accountability for serious crimes, including through its cooperation with the ICC in this matter."[9]

91. **Mali:** In July 2012, the Government of Mali (a State Party to the Rome Statute) referred the situation regarding alleged international crimes occurring during the armed conflict in its territory to the ICC.  In January 2013, the Prosecutor opened an investigation into alleged war crimes committed in Mali since January 2012, including with regard to the destruction of cultural heritage sites in the city of Timbuktu.

    a. In October 2015, the State Department stated: "We welcome the announcement by the Prosecutor of the International Criminal Court (ICC) that Ahmad Al Faqi Al Mahdi … has been surrendered to the Court by Nigerien authorities.  This is an important step toward holding accountable those responsible for serious crimes in Mali."[10]  Mr. Al Mahdi later admitted guilt for the war crime of destroying historical and religious monuments in Timbuktu.

    b. The State Department further stated: "The United States strongly condemns the destruction of Muslim shrines and other religious and historic sites in Timbuktu by extremist militants.…  We are outraged by the destruction of these World Heritage Sites.  These are assaults not just on Mali and its people, but on the common cultural heritage of all humankind, and those responsible for these acts—and all those responsible for atrocity crimes—should face justice.…  We

---

[9] U.S. Dep't of State, *ICC Convicts Jean-Pierre Bemba Gombo of War Crimes and Crimes against Humanity* (Mar. 22, 2016), https://2009-2017.state.gov/r/pa/prs/ps/2016/03/254958.htm.

[10] U.S. Dep't of State, *ICC Announces Case on Destruction of Cultural Sites in Mali* (Oct. 1, 2015), https://2009-2017.state.gov/r/pa/prs/ps/2015/10/247741.htm.

Case 1:26-cv-06830   Document 1   Filed 08/11/26   Page 30 of 102

commend Mali's commitment to ensuring accountability for serious crimes and its cooperation with the ICC in this matter."[11]

c. In September 2016, the State Department stated: "The United States supports efforts by the ICC and Malian authorities to provide justice for these serious crimes committed in Mali. We commend Mali for its cooperation with the ICC in this matter, and we encourage continued national and international efforts to bring to justice senior extremist leaders who led the campaign to terrorize northern Mali and destroy symbols of its rich history of tolerance and cultural pluralism."[12]

92. **Venezuela:** In 2018, six States Parties to the Rome Statute referred the situation in Venezuela, a Party to the Rome Statute, to the ICC. This includes allegations of crimes against humanity—including arbitrary detention, torture, rape and sexual violence, and persecution—committed by the government of Venezuela led by former-President Nicolás Maduro against its political opponents. In November 2021, the Prosecutor requested authorization to open an investigation, which the Pre-Trial Chamber granted.

a. In December 2022, the U.S. Ambassador-at-Large for Global Criminal Justice announced the United States' support for the investigation.[13]

b. In October 2023, the U.S. Mission to the United Nations "welcomed the Prosecutor's announcement" of the ICC's investigation in Venezuela, noting

---

[11] *Id*.

[12] U.S. Dep't of State, *ICC Judgment in Mali Cultural Destruction Case* (Sep. 27, 2016), https://2009-2017.state.gov/r/pa/prs/ps/2015/10/247741.htm.

[13] U.S. Amb.-at-Large for Glob. Crim. Just., *Building Justice: Criminal Accountability and the Road to Peace, Questions on Justice in Libya and Beyond* (Dec. 1, 2022), https://2021-2025.state.gov/building-justice-criminal-accountability-and-the-road-to-peace-questions-on-justice-in-libya-and-beyond.

that "[v]ictims of these atrocities continue to demand justice."[14]   The U.S. Ambassador reiterated the United States support in December 2023, along with progress in a host of other OTP investigations and prosecutions.[15]

93. **Philippines:** In September 2021, the ICC's Pre-Trial Chamber authorized the Prosecutor to investigate alleged crimes against humanity committed in the Philippines between November 2011 and March 2019 (during the time that the Philippines was a State Party to the Rome Statute), in the context of the Philippines' "war on drugs" campaign.  Following a request by the Philippines for a deferral of the investigation, in January 2023, the Pre-Trial Chamber confirmed that the Prosecutor could continue the investigation.

    a.  In May 2024, a spokesperson for the U.S. State Department said that "[t]he United States is aware of the ICC's decision to continue their inquiry in the Philippines," adding that the United States "appreciates the openness" of current President Marcos to that investigation.[16]

    b.  In March 2025, following an application by the Prosecutor, the ICC's Pre-Trial Chamber issued an arrest warrant against former President Rodrigo Duterte for the crime against humanity of murder, which led to his arrest and surrender to the ICC a few days later.

---

[14] U.S. Dep't of State, *Digest of the United States Practice in International Law* (2023), p. 102, https://2021-2025.state.gov/wp-content/uploads/2024/12/2023-Digest-of-United-States-Practice-in-Internation-Law-Full.pdf.

[15] U.S. Amb.-at-Large for Glob. Crim. Just., *Statement of the United States at the 22nd Session of the Assembly of States Parties of the International Criminal Co*urt (Dec. 8, 2023), https://2021-2025.state.gov/statement-of-theunited-states-at-the-22nd-session-of-the-assembly-of-states-parties-of-the-international-criminal-court.

[16] Lian Buan, *US 'appreciates openness' of Marcos to ICC drug war probe*, Rappler (May 14, 2024), https://www.rappler.com/philippines/us-state-department-statement-openness-marcos-icc/.

*United States Support for ICC Investigations and*
*Prosecutions of Nationals of Non-State Parties*

94. The United States has welcomed the opening of investigations and the issuance of arrest warrants in situations where crimes are alleged to have been committed by a non-State Party national on the territory of an ICC State Party.  These include:

95. **Ukraine**: Ukraine accepted the ICC's jurisdiction over alleged crimes occurring on its territory beginning on November 21, 2013, and subsequently ratified the Rome Statute in 2024. In March 2022, following Russia's full-scale invasion of Ukraine, 43 ICC States Parties referred the situation in Ukraine to the ICC.  The Prosecutor opened an investigation that encompasses allegations of war crimes, crimes against humanity, and genocide committed on the territory of Ukraine, which includes alleged crimes committed by Russian nationals, even though Russia is not a State Party.  The ICC has issued arrest warrants for six persons in the Ukraine situation, including Vladimir Putin, President of the Russian Federation, and Maria Lvova-Belova, Commissioner for Children's Rights in the Office of the President.  The international crimes for which arrest warrants for these individuals have been issued include the forcible transfer and deportation of children from occupied areas of Ukraine to Russia.

      a. On April 27, 2022, the U.S. Ambassador-at-Large for Global Criminal Justice stated that "[t]he United States welcomes the opening of the investigation by the ICC into atrocity crimes committed in Ukraine, and we intend to engage with all stakeholders to achieve our common objectives in ensuring justice."[17]

---

[17] U.S. Mission to U.N., *Remarks at a UN Security Council Arria-Formula Meeting on Ensuring Accountability for Atrocities Committed by Russia in Ukraine* (Apr. 27, 2022), https://web.archive.org/web/20220509175804/https://usun.usmission.gov/remarks-at-a-un-security-council-arriaformula-meeting-on-ensuring-accountability-for-atrocities-committed-by-russia-in-ukraine/

b.  In March 2022, the Senate unanimously passed a bipartisan resolution supporting the ICC's investigation of alleged crimes committed by Russian nationals in Ukraine. The resolution stated that the ICC "is an international tribunal that seeks to uphold the rule of law, especially in areas where no rule of law exists, by investigating and trying individuals charged 'with the gravest crimes of concern to the international community: genocide, war crimes, crimes against humanity and the crime of aggression.'"  The Senate resolved to "encourage[] member states to petition the ICC or other appropriate international tribunal to take any appropriate steps to investigate war crimes and crimes against humanity committed by the Russian Armed Forces and their proxies and President Putin's military commanders, at the direction of President Vladimir Putin."[18]

c.  In December 2022, Congress passed the FY 2023 Consolidated Appropriations Act, which expanded the authority of the United States to assist the ICC.  The Act provides that the United States may "render[] assistance to the International Criminal Court to assist with investigations and prosecutions of foreign nationals related to the Situation in Ukraine, including to support victims and witnesses."  H.R. 2617, 117th Cong. § 7073(b) (2023).

d.  On May 31, 2023, the U.S. Ambassador-at-Large for Global Criminal Justice stated that "[w]e are grateful for the bipartisan legislation Congress has enacted to support the ICC's investigation in Ukraine."[19]  The Ambassador further stated

---

[18] S. Res. 546, 117th Cong. (2022) (enacted) (internal quotation marks omitted)

[19] *Accountability for Russian Atrocities in Ukraine: Hearing Before the S. Comm. on Foreign Rels.*, 118th Cong. 6 (2023) (statement of Beth Van Schaack, Ambassador-at-Large for Global Criminal Justice, U.S. Dep't of State).

32

that "[h]olding Russia to account for its war crimes and other atrocities within Ukraine and against its people is foundational to the defense of U.S. values and the maintenance of a peaceful, just, and secure world."[20]

e. In 2024, then-President Joseph Biden stated that the arrest warrants, including for President Putin, were "justified."[21] President Biden ordered the U.S. to share evidence of Russian war crimes with the OTP to aid its investigation, a move supported by Senators of both parties.

96. **Republic of Georgia:** In January 2016, the ICC's Pre-Trial Chamber authorized the Prosecutor to investigate alleged war crimes and crimes against humanity committed in Georgia, a State Party to the Rome Statute, in the context of Russia's invasion of Georgia in 2008. In June 2022, the ICC issued arrest warrants for three individuals, including two Russian nationals, for allegedly committing, *inter alia*, unlawful confinement, torture, and hostage taking.

a. In August 2022, the U.S. Mission to the United Nations expressed its approval of the "decisions of the International Criminal Court of June 2022 to issue arrest warrants for war crimes committed during Russia's invasion in 2008."[22]

97. **Democratic Republic of Congo:** In the context of the DRC investigation (discussed *supra* paragraph 89), the ICC issued arrest warrants for leaders of the Democratic Forces for the Liberation of Rwanda, Callixte Mbarushimana and Sylvestre Mudacumura, who are Rwandan nationals, for crimes committed in the DRC, even though Rwanda is not a State Party.

---

[20] *Id.*, at 7.

[21] Jeff Mason and Simon Lewis, *Biden says Putin committed war crimes, calls charges justified*, Reuters (March 18, 2023), https://www.reuters.com/world/europe/us-says-no-doubt-russia-is-committing-war-crimes-ukraine-after-iccissues-putin-2023-03-17/.

[22] U.S. Mission to the U.N., *Joint Statement by UN Security Council Members following an AOB on Georgia* (Aug. 15, 2022), https://web.archive.org/web/20220922092959/https://usun.usmission.gov/joint-statement-by-un-securitycouncil-members-following-an-aob-on-georgia-2/

a. In October 2010, the U.S. State Department welcomed the arrest of Mr. Mbarushimana and expressed support for the ICC's ongoing investigations into atrocities committed in the DRC.

98. **Bangladesh/Myanmar:** In November 2019, the ICC's Pre-Trial Chamber authorized the Prosecutor to investigate the alleged crimes against humanity of deportation and persecution committed against the Rohingya population in Myanmar, on the ground that the crimes were partially committed in Bangladesh (a State Party to the Rome Statute), even though Myanmar is not a State Party. In November 2024, the ICC Prosecutor filed an application for an arrest warrant for President Min Aung Hlaing, former Commander-in-Chief of the Myanmar Defense Services, for the alleged crimes against humanity of deportation and persecution.

a. In March 2022, U.S. Secretary of State Antony Blinken "determined that members of the Burmese [Myanmar] military committed genocide and crimes against humanity against Rohingya."[23]  The United States has stated it is "committed to justice for victims, survivors and their families, and to accountability for those responsible for past atrocities."[24]  In August 2022, the U.S. State Department indicated it would "support a [] referral of the situation in Burma [Myanmar] to the [ICC]."[25]

99. **Sudan**: In March 2005, the U.N. Security Council, of which the United States is a Permanent Member, referred the situation in the Darfur region of Sudan (not a State Party to the

---

[23] U.S. Dep't of State, *Secretary Antony J. Blinken on the Genocide and Crimes Against Humanity in Burma* (Mar. 21, 2022), https://2021-2025.state.gov/secretary-antony-j-blinken-at-the-united-states-holocaust-memorial-museum/.

[24] U.S. Dep't of State, *2022 Report to Congress Pursuant to Section 5 of the Elie Wiesel Genocide and Atrocities Prevention Act of 2018 (P.L. 115-441)* (July. 15, 2022), https://2021-2025.state.gov/2022-report-to-congresspursuant-to-section-5-of-the-elie-wiesel-genocide-and-atrocities-prevention-act-of-2018/.

[25] U.S. Dep't of State, *Marking Five Years Since the Genocide in Burma* (Aug. 24, 2022), https://2021-2025.state.gov/marking-five-years-since-the-genocide-inburma/.

Rome Statute) to the ICC; the U.S. abstained from, rather than vetoing, the resolution referring the matter to the Court.  In June 2005, the Prosecutor opened an investigation into alleged genocide, war crimes, and crimes against humanity committed in Darfur.

    a.  In 2007, a State Department spokesperson stated that the United States "fully support[s] bringing to justice those responsible for crimes and atrocities … that have occurred in Darfur.  We are at a point in the process now where we would call upon the Sudanese Government to cooperate fully with the ICC under the aegis of UN Security Council Resolution 1593.  So, it is now incumbent upon the Government of Sudan, we believe, to cooperate with the ICC."[26]

    b.  Congress has supported the ICC's Darfur investigation and prosecution through resolutions. *See, e.g.*, S. Res. 188, 165 Cong. Rec. S4736 (Senate resolution approving of the work of the ICC in prosecuting former Sudanese president Al-Omar Al-Bashir).

    c.  In November 2024, the United States House of Representatives passed, by a super-majority voice vote, a resolution to "support[] tribunals and international criminal investigations to hold the [Sudanese Rapid Support Forces] and allied militias accountable for war crimes, crimes against humanity, and genocide."[27] The ICC is the only international tribunal currently mandated to hold such individuals responsible, and the OTP is conducting the only international criminal investigation into these matters.

---

[26] U.S. Dep't of State, *Daily Press Briefing* (Feb. 27, 2007), https://2001-2009.state.gov/r/pa/prs/dpb/2007/feb/81127.htm.

[27] Recognizing the Actions of the Rapid Support Forces and Allied Militias in the Darfur Region of Sudan Against Non-Arab Ethnic Communities as Acts of Genocide, H.Res. 1328 (November 20, 2024).

d. During a U.N. Security Council Briefing by the Prosecutor that took place on January 27, 2025, the U.S. Chargé d'affaires ad interim to the United Nations stated: "Those responsible for these terrible crimes must be held accountable. Many responsible for atrocities over 20 years ago in Sudan remain at large. We urge the international community to work to bring those individuals to trial so they can be publicly held to account for their alleged crimes."[28]

100.    **Libya**: In February 2011, the United States voted in favor of U.N. Security Council resolution 1970, which referred the situation in Libya (not a State Party to the Rome Statute) to the ICC. In March 2011, the Prosecutor opened an investigation into alleged war crimes and crimes against humanity committed in Libya, including widespread and systematic killings and disappearances.

a. Speaking on the occasion of the unanimous U.N. Security Council referral to the ICC, the U.S. Permanent Representative to the United Nations stated: "[T]he Security Council has responded to the Libyan people's cry for help. The Council's purpose is clear—to protect innocent civilians."[29] The Permanent Representative added: "for the first time ever, the Security Council has unanimously referred an egregious human rights situation to the International Criminal Court."[30]

---

[28] U.S. Mission to the U.N., *Remarks by Ambassador Dorothy Shea, Chargé d'Affaires ad interim, at a U.N. Security Council Briefing by the ICC Prosecutor for Sudan* (Jan. 27, 2025), https://usun.usmission.gov/remarks-byambassador-dorothy-shea-charge-daffaires-ad-interim-at-a-un-security-council-briefing-by-the-icc-prosecutor-forsudan/.

[29] U.S. Mission to Int'l Orgs. in Geneva, *UNSC Resolution on Libya Authorizes Use of Force, Including No-Fly Zone* (Mar. 18, 2011), https://geneva.usmission.gov/2011/03/18/no-fly-zone/.

[30] U.S. Dep't of State, *Remarks In an Explanation of Vote on Resolution 1970 on Libya Sanctions* (Feb. 26, 2011), https://2009-2017.state.gov/p/io/rm/2011/157390.htm.

b. In a subsequent Security Council session, the United States stated that the referral to the ICC "reflected the importance that the international community attaches to ensuring that those responsible for the widespread and systematic attacks against the Libyan people are held accountable."[31] The United States commended the OTP, stating that the United States "welcomes the swift and thorough work of the Prosecutor…. The spectre of ICC prosecution is serious and imminent, and should serve as a warning to those around [former Libyan leader Muammar] Al-Qadhafi of the perils of continuing to tie their fate to his."[32]

### *The Disfavored ICC Investigations*

101. There are two long-running ICC situations that the United States has opposed: the investigation of alleged crimes committed on the territories of Afghanistan and Palestine, both ICC States Parties. The U.S. opposition has focused on the fact that the crimes under investigation include not only those alleged to have been committed by nationals of ICC member States, but also nationals of two countries that are not State Parties of the ICC, namely the United States and Israel.

### Afghanistan

102. Afghanistan became a State Party to the Rome Statute in February 2003, with the ICC's jurisdiction over the territory of Afghanistan or over Afghan nationals beginning on May 1, 2003. At that time, there was an active armed conflict taking place on Afghanistan's territory.

---

[31] U.N. Sec. Council, 66th Sess., 6528th mtg., U.N. Doc. S/PV.6528, at p. 12 (May 4, 2011), https://www.securitycouncilreport.org/atf/cf/%7B65BFCF9B-6D27-4E9C-8CD3-CF6E4FF96FF9%7D/Libya%20S%20PV%206528.pdf.

[32] *Id.*

The parties to that conflict included the Taliban and other armed groups; the International Security Assistance Force ("ISAF"), of which the United States was the leading member; and the Afghan Government, which was supported by the ISAF.

103.    In 2007, it became public that the Prosecutor had opened a preliminary examination into crimes alleged to have been committed on the territory of Afghanistan, including the killing of civilians by the Taliban, torture by various parties to the armed conflict, and recruitment of child soldiers by insurgent groups and Afghan forces. The basis for initiating that preliminary examination was the submission of 56 communications to the OTP under Article 15 of the Rome Statute, which generally came from victims and human rights organizations.

104.    In 2013, the OTP reported that its preliminary examination included allegations concerning conduct during detainee interrogations.  Subsequent OTP reports drew upon, *inter alia*, U.S. declassified materials to identify this conduct, including by U.S. armed forces during 2003-2008, as an area of preliminary examination.

105.    In 2015, the OTP provided further information regarding its preliminary examination into alleged crimes committed by various actors, including members of the Taliban and their affiliates, Afghan government forces, and international forces, including U.S. personnel. The OTP indicated it was assessing the gravity of the alleged crimes and engaging with relevant States to assess, *inter alia*, the existence of national proceedings.

106.    In 2017, the Prosecutor requested authorization from the Pre-Trial Chamber to open an investigation into crimes allegedly committed in Afghanistan, including by the Taliban, Afghan security forces, and U.S. personnel.

107.    Upon receiving the Prosecutor's request, the Pre-Trial Chamber issued an order setting forth the process for victims to participate in the proceedings and present their views on the

38

requested investigation, including its scope and whether allowing it to proceed would be in the interest of justice. In response, the ICC's Registry received 699 victim representations, including on behalf of two alleged victims of U.S. torture submitted through their LRV, an attorney at Plaintiff CCR.

108.    In 2019, the Pre-Trial Chamber denied the request to open an investigation, finding that an investigation would not serve the interests of justice. Both the Prosecutor and victims, through their LRVs, appealed that decision.

109.    In 2020, the Appeals Chamber reversed that ruling and unanimously authorized the Prosecutor to proceed with all aspects of the investigation, including of U.S. nationals. In that appeal, the Appeals Chamber had the benefit of written and oral submissions from, *inter alia*, Afghanistan and victims, through their LRVs, including an attorney at Plaintiff CCR, as well as an *amicus curiae* brief by human rights organizations that included Plaintiff HRW. The Appeals Chamber also heard an oral intervention by former U.S. Ambassador-at-Large for War Crimes, David Scheffer, as *amicus curiae*.

110.    In April 2020, the Prosecutor notified the Pre-Trial Chamber of Afghanistan's request that the OTP defer its investigation and paused it. Victims, through their LRVs, including an attorney at Plaintiff CCR, made legal submissions to the Pre-Trial Chamber regarding the deferral request.

111.    In September 2021, the Prosecutor requested authorization from the Pre-Trial Chamber to resume the investigation. In making the request, the Prosecutor expressed his decision "to focus my Office's investigations in Afghanistan on crimes allegedly committed by the Taliban

39

and the Islamic State – Khorasan Province ('IS-K') and to deprioritise other aspects of this investigation," a reference to the investigation of alleged crimes by Afghan and U.S. forces.[33]

112.    The Prosecutor has never announced the resumption of an active investigation into U.S. personnel and no applications for arrest warrants have ever been announced for U.S. personnel.

113.    In November 2024, six States Parties referred the situation in Afghanistan ("*Situation in Afghanistan*") to the ICC, expressing concern and requesting an investigation for crimes committed against women and girls after the Taliban takeover in 2021.  In January 2025, applications for arrest warrants were announced for senior members of the Taliban for the crime against humanity of persecution on gender grounds committed against women, girls, and members of the LGBTQI+ community since the Taliban takeover.  The arrest warrants were issued in July 2025.

**Palestine**

114.    In January 2015, Palestine acceded to the Rome Statute and accepted the ICC's jurisdiction over its territory ("the occupied Palestinian territory, including East Jerusalem") and its nationals since June 13, 2014.  Two weeks later, the Prosecutor opened a preliminary examination into the situation ("*Situation in Palestine*").

115.    During the preliminary examination, victims and human rights organizations, including Al-Haq, Al Mezan and PCHR, to which Plaintiff CCR provided legal support and advice, submitted information and potential evidence to the Prosecutor, in support of establishing that there existed a reasonable basis to open an investigation.

---

[33] Int'l Crim. Ct*., Statement of the Prosecutor of the International Criminal Court, Karim A. A. Khan QC, following the application for an expedited order under article 18(2) seeking authorisation to resume investigations in the Situation in Afghanistan* (Sep. 27, 2021), https://www.icc-cpi.int/news/statement-prosecutor-international-criminalcourt-karim-khan-qc-following-application.

40

116.    In May 2018, Palestine referred the situation to the Prosecutor for alleged crimes committed in the Occupied Palestinian Territory since June 13, 2014.  In November 2023, five States Parties submitted an additional referral, and in January 2024, two more States submitted a referral to the Prosecutor.

117.    In December 2019, the Prosecutor filed a request under Article 19(3) of the Rome Statute for the Pre-Trial Chamber to confirm the ICC's jurisdiction in this situation.  In January 2020, the Pre-Trial Chamber issued an order on the procedure for submissions, if any, from Palestine, Israel, other States, victims, *amicus curiae* or other persons and organizations who may seek to make observations on the request.

118.    The Pre-Trial Chamber received written submissions from victims, including from attorneys at Plaintiff CCR acting as LRVs; more than 30 *amicus curiae* briefs, including from both the Israeli and Palestinian Bar Associations, human rights organizations, legal scholars, as well as former high-level officials in the U.S. State Department; and eight States or groups of States.

119.    In February 2021, the Pre-Trial Chamber issued its decision recognizing that the territory of Palestine falls with the ICC's jurisdiction for investigative purposes.

120.    In March 2021, following confirmation by the Pre-Trial Chamber that jurisdiction was proper, the Prosecutor opened an investigation into the *Situation in Palestine*.

121.    In May 2024, the ICC Prosecutor announced that he had submitted applications for arrest warrants in the *Situation in Palestine* for three Palestinian nationals who held senior positions in Hamas, and two Israeli nationals, Prime Minister Benjamin Netanyahu and former Minister of Defense Yoav Gallant.

122.    Following the announcement of the arrest warrant applications, the United Kingdom sought to challenge the ICC's jurisdiction over the Palestine situation through a Rule

41

103 *amicus* request.  The Pre-Trial Chamber subsequently received over 60 *amicus curiae* submissions, including from the United States and Plaintiffs OSI and HRW.  Victims sought, and were granted leave, to file submissions as participants in the proceedings on the question of the ICC's jurisdiction and related views on the arrest warrant applications.  Such views were filed by multiple victims.  Plaintiff CCR attorneys, in their role as LRVs, made submissions to the ICC on behalf of Palestinian victims in July and August 2024.

123.     On November 21, 2024, the ICC issued an arrest warrant for Mohammed Al-Masri (commonly known as Mohammed Deif), the highest commander of the military wing of Hamas, for the alleged international crimes of murder, extermination, torture, rape and other forms of sexual violence, hostage-taking, and outrages upon personal dignity.  The arrest warrant was terminated in February 2025, following confirmation of Mr. Al-Masri's death.  The Prosecutor also had requested arrest warrants for Ismail Haniyeh and Yahya Sinwar, two other senior leaders of Hamas; those requests were withdrawn upon confirmation of their deaths.[34]

124.     Also on November 21, 2024, the ICC issued arrest warrants for Benjamin Netanyahu, Prime Minister of Israel, and Yoav Gallant, former Minister of Defense of Israel, for the alleged war crimes of starvation as a method of warfare, intentionally directing an attack against the civilian population, and the alleged crimes against humanity of murder, persecution, and other inhumane acts.

---

[34] Israel has acknowledged killing all three men. *See* Ian Aikman, *Israel confirms it killed Hamas leader Haniyeh in Tehran*, BBC (Dec. 23, 2024), https://www.bbc.com/news/articles/c0ewr870z23o; James Mackenzie, Nidal Al-Mughrabi, and Samia Nekhoul, *Hamas leader Sinwar killed by Israeli troops in Gaza, Netanyahu says war will go on*, Reuters (Oct. 17, 2024), https://www.reuters.com/world/middle-east/16-dead-israeli-strike-lebanese-municipality-building-2024-10-16/; Melanie Lidman and Samy Magdy, *Israel says it killed the chief of Hamas' military wing in a July strike in Gaza*, PBS News (Aug 1, 2024). https://www.pbs.org/newshour/world/israel-says-it-killed-the-chief-of-hamas-military-wing-in-a-july-strike-in-gaza.

125.    Israel has long expressed its position opposing the ICC's Palestine investigation, including through the publication of legal memoranda. At least since 2024, Israel has directly raised several challenges to the ICC's Palestine investigation through legal submissions to the ICC's Pre-Trial and Appeals Chambers.

126.    Israel lodged a jurisdictional challenge pursuant to Article 19(2) of the Rome Statute, which permits a State that has jurisdiction over a case to challenge the ICC's exercise of jurisdiction on the ground that, *inter alia*, the State is investigating or prosecuting the same conduct or has investigated or prosecuted it. In addition to the Prosecutor's response, LRVs, including attorneys at Plaintiff CCR, submitted briefing in October 2024 setting forth victims' opposition to the jurisdictional challenge.

127.    In November 2024, the Pre-Trial Chamber denied the challenge as "premature." In April 2025, the Appeals Chamber remanded to the Pre-Trial Chamber for further consideration and a ruling on the substance of Israel's jurisdictional challenge, while not setting aside the arrest warrants. Victims were invited to make submissions as participants in the proceedings; although other LRVs made submissions, Plaintiff CCR did not make any submissions in the matter nor did any other Plaintiff, as the Sanctions Regime was in place. This matter is pending before the Pre-Trial Chamber.

128.    Israel filed a separate challenge asking the Prosecutor to issue a new or revised notice under Article 18(1) of the Rome Statute, so as to re-open Israel's ability to seek a deferral of the investigation, along with a request to have the arrest warrants against Israeli nationals vacated or withdrawn. The Pre-Trial Chamber denied the request to withdraw or vacate the arrest warrants. In December 2025, the Appeals Chamber rejected Israel's Article 18(1) appeal.

129.    Israel has also sought the Prosecutor's disqualification or recusal.

43

**II. The Statutory Authority Executive Order 14,203 Invokes**

130.    On February 6, 2025, President Trump issued Executive Order 14,203.  The Executive Order invokes authority Congress delegated to the President in, *inter alia*, the National Emergencies Act ("NEA"), 50 U.S.C. §§ 1601 *et seq.* and IEEPA, 50 U.S.C. §§ 1701 *et seq.*  EO 14,203, Preamble.  These statutes were designed to limit presidential abuses of emergency authorities.

### *The National Emergencies Act*

131.    The NEA provides the framework for declarations of national emergencies.  It "establish[es] clear procedures and safeguards for the exercise by the President of emergency powers conferred upon him by other statutes." *United States v. Frade*, 709 F.2d 1387, 1400 (11th Cir. 1983) (quoting Report of the Committee on Government Operations: National Emergencies Act, S. Rep. No. 94-1168 at 3 (Aug. 26, 1976)).

132.    The NEA was enacted in 1976 to address "[r]evelations of how [emergency] power has been abused by high government officials" and "concern about the [p]otential exercise, unchecked by the Congress or the American people, of this extraordinary power."  Final Report of the Special Committee on National Emergencies and Delegated Emergency Powers, S. Rep. 94-922 at 18 (May 28, 1976).  Prior open-ended grants of emergency power "often … led to a situation in which the use of an Act belie[d] the purposes for which it was enacted." *Id.* at 12.

133.    In the face of such abuses, Congress intended the NEA to "make it possible for our Government to function in accordance with regular and normal provisions of law rather than through special exceptions and procedures which were intended to be in effect for limited periods during specific emergency conditions."  H.R. Rep. No. 94-238, at 2 (1975).  The NEA thus aims to prevent the President from "rul[ing] the country without reference to normal constitutional

44

process" and to ensure that emergency powers "will be utilized only in time of genuine emergency." S. Rep. 94-922 at 18.

134.    The NEA was "not intended to enlarge or add to Executive power." S. Rep. No. 94-1168, at 3 (1976). It explicitly disclaims granting the President any substantive authority that can be exercised to address a national emergency, instead requiring that "[w]hen the President declares a national emergency, no powers or authorities made available by statute for use in the event of an emergency shall be exercised unless and until the President specifies the provisions of law under which he proposes that he, or other officers will act." 50 U.S.C. § 1631.

### *The International Emergency Economic Powers Act*

135.    One of the statutes through which Congress has authorized the President to exercise emergency power is IEEPA, enacted in 1977. Under IEEPA, the President may "block … regulate … void, prevent or prohibit, any acquisition, holding, withholding, use, transfer, withdrawal, … dealing in, or exercising any right, power or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest by any person, or with respect to any property, subject to the jurisdiction of the United States." 50 U.S.C. § 1702(a)(1)(B).

136.    The circumstances when the President may wield the authority Congress delegated through IEEPA are limited. The powers delegated to the President thereunder "*may only be exercised to deal with an unusual and extraordinary threat with respect to which a national emergency has been declared for purposes of this [chapter] and may not be exercised for any other purpose*." 50 U.S.C. § 1701(b) (emphases added).

137.    The national emergency in relation to which IEEPA powers may be exercised must concern an "unusual and extraordinary threat, which has its source in whole or substantial part

45

outside the United States, to the national security, foreign policy, or economy of the United States." 50 U.S.C. § 1701(a).

138.    The "purpose" of IEEPA was to "revise and delimit the President's authority to regulate international economic transactions during wars or national emergencies."  S. Rep. No. 95-466 at 2, reprinted in 1977 U.S.C.C.A.N. 4540, 4541 (1977).  In enacting IEEPA, Congress chiefly sought to limit the non-wartime powers that the President had been delegated under the Trading with the Enemy Act of 1917 ("TWEA").  H.R. Rep. No. 95-459, at 3-9 (1977); *see id.* at 9 (quoting congressional testimony by Assistant Secretary of the Treasury C. Fred Bergsten) ("[T]he authority of … section [5(b) of TWEA] is so broad that this administration strongly believes that the powers should only be used on a truly emergency basis.").

139.    In enacting IEEPA, Congress underscored that Presidential "authority for *routine, nonemergency regulation* of international economic transactions which has heretofore been conducted under [TWEA] should be transferred to other legislation," and that nonemergency regulation is *not* permitted under IEEPA.  H. R. Rep. No. 95-459, at 11 (1977) (emphasis added).

140.    Congress intended the requirement of a national emergency to be a meaningful constraint on the President's IEEPA power.  The "main … substantive restriction[]" on the exercise of IEEPA authority "stems from a recognition that emergencies are by their nature rare and brief, and are not to be equated with normal ongoing problems."  H.R. Rep. No. 95-459, at 10 (1977). Congress explained that "[a] national emergency should be declared and emergency authorities employed only with respect to a specific set of circumstances which constitute *a real emergency, and for no other purpose*."  *Id*.  (emphasis added).  "A national emergency should not be a normal state of affairs."  *Id.*

*The Information Exceptions to IEEPA*

141.    IEEPA, in its original form, limited the President's authority to regulate "any postal, telegraphic, telephonic, or other personal communication, which does not involve a transfer of anything of value."  50 U.S.C. § 1702(b)(1).  In 1988, Congress enacted the so-called Berman Amendment to IEEPA, which amended the statute to withdraw the President's "authority to regulate or prohibit, directly or indirectly, the importation from any country, or the exportation to any country, whether commercial or otherwise, of publications, films, posters, phonograph records, photographs, microfilms, microfiche, tapes, or other informational materials."  50 U.S.C. § 1702(b)(3).

142.    Congress premised the Berman Amendment on a 1985 resolution by the American Bar Association's House of Delegates, which declared that "no prohibitions should exist on imports to the United States of ideas and information if their circulation is protected by the First Amendment."  H.R. Rep. No. 40, 100th Cong., 1st Sess., pt. 3, at 113 (1987); *see also Cernuda v. Heavey*, 720 F. Supp. 1544, 1548 (S.D. Fla. 1989).

143.    The Free Trade in Ideas Act of 1994 ("FTIA") expanded the Berman Amendment, broadly exempting from regulation "any information or informational materials," "regardless of format or medium of transmission."  The FTIA's legislative history confirms the First Amendment basis for the Berman Amendment.  *See* H.R. Conf. Rep. No. 482, 103rd Cong., 2nd Sess., 1994 U.S.C.C.A.N. 398, 483 ("[The Berman Amendment] established that no embargo may prohibit or restrict directly or indirectly the import or export of information that is protected under the First Amendment.").

47

### III. Executive Order 14,203

144.    President Trump declared eleven national emergencies in the first year of his second term.   Eight national emergencies were declared in the first 100 days, more than any other President in the same period since the passage of the NEA.

145.    Executive Order 14,203 declares a national emergency with respect to "any effort by the ICC to investigate, arrest, detain, or prosecute protected persons," defined as "any United States person, unless the United States provides formal consent to ICC jurisdiction over that person or becomes a state party to the Rome Statute" and "any foreign person that is a citizen or lawful resident of an ally of the United States that has not consented to ICC jurisdiction over that person or is not a state party to the Rome Statute."  EO 14,203, Preamble & Sec. 8(d).

146.    The Executive Order asserts that the ICC has "engaged in illegitimate and baseless actions" because it has "without a legitimate basis, asserted jurisdiction over and opened preliminary investigations concerning personnel of the United States and certain of its allies, including Israel, and has further abused its power by issuing baseless arrest warrants targeting Israeli Prime Minister Benjamin Netanyahu and Former Minister of Defense Yoav Gallant."  EO 14,203, Preamble.  The Executive Order further asserts that the "ICC has no jurisdiction over the United States or Israel, as neither country is party to the Rome Statute or a member of the ICC." *Id*.

147.    The Executive Order declares this putative national emergency despite the fact that the Rome Statute authorizes the ICC to exercise territorial jurisdiction where crimes are committed by non-State Party nationals on the territory of an ICC State Party.  And, the Executive Order does so notwithstanding the fact that the United States has, in numerous cases, supported ICC investigations into and prosecutions of crimes allegedly committed by nationals of States that are not party to the Rome Statute or members of the ICC.  The Executive Order moreover purports to

treat the ICC's exercise of territorial jurisdiction as an unusual and extraordinary threat, despite the facts that the specific examinations and investigations it identifies have been ongoing for many years and that the United States has long been aware of the issue.

148.    That awareness is reflected in numerous official statements by the United States. For example:

 a. In January 2026, the United States expressly recognized that its "concerns" regarding the prospect of jurisdiction being asserted with respect to nationals of "the United States or any U.S. ally that has not consented to ICC jurisdiction" are not "*new; indeed, the United States has been making the same point for nearly three decades*."[35]

 b. In June 2026, Attorney General Todd Blanche acknowledged the ICC's "asserted jurisdiction over non-consenting countries" and confirmed "Congress has made the United States' position unmistakably clear *since 2002*, when it passed [] the American Servicemembers' Protection Act."[36]

 c. In July 2026, the United States stated in a briefing to the United Nations that the ICC's "attempts to encroach on the sovereignty of states" was a "*decades-old concern*."[37]

---

[35] U.S. Mission to the United Nations, *Remarks at a UN Security Council Briefing on the International Criminal Court's Investigation of the Situation in Darfur, Sudan* (Jan. 19, 2026), https://usun.usmission.gov/remarks-at-a-un-security-council-briefing-on-the-international-criminal-courts-investigation-of-the-situation-in-darfur-sudan/ (emphasis added).

[36] Letter from Todd Blanche, Att'y Gen., U.S. Dep't of Justice, to Judge Tomoko Akane, President, Int'l Crim. Ct. (June 29, 2026), https://www.justice.gov/ag/media/1450826/dl?inline (emphasis added).

[37] U.S. Representative for U.N. Mgmt. & Reform, Remarks at a U.N. Security Council Briefing on the International Criminal Court's Investigation of the Situation in Darfur, Sudan (July 15, 2026), https://usun.usmission.gov/remarks-at-a-un-security-council-briefing-on-the-international-criminal-… (emphasis added).

149.    Pursuant to Section 1(a)(ii) of EO 14,203, the Secretary of State is authorized to designate any foreign person who the Secretary of State, in consultation with the Secretary of the Treasury and the Attorney General, determines to meet the criteria provided in the Executive Order.[38]  Designation results in the designated person's inclusion on the Specially Designated Nationals List ("SDN List") maintained by the United States Department of the Treasury's Office of Foreign Assets Control ("OFAC").

150.    It is unlawful to violate an Executive Order issued under IEEPA that prohibits dealing in a designated person's property or interests in property.  50 U.S.C. § 1705(a); *see also* EO 14,203, Sec. 3.  Those who violate such orders are subject to a civil penalty of the greater of $307,922 or twice the value of the blocked transaction.  *See id.*; 31 C.F.R. § 520,701; 85 F.R. 19884 (2020).  They are also subject to criminal fines up to $1,000,000 and if a natural person, up to 20 years of imprisonment.

### *Persons Designated Under EO 14,203*

151.    Four categories of foreign persons have since been designated: (1) judges of the ICC, (2) senior officials of the ICC's Office of the Prosecutor, (3) foreign human rights organizations, and (4) a United Nations Human Rights Special Rapporteur.  Nonetheless, the State Department has not presented substantial evidence that any designated foreign person has "directly

---

[38] Section 1(a)(ii) authorizes the Secretary of State to designate any additional foreign person whom the Secretary of State, in consultation with the Secretary of the Treasury and the Attorney General, determines:

(A)    to have directly engaged in any effort by the ICC to investigate, arrest, detain, or prosecute a protected person without consent of that person's country of nationality;

(B)    to have materially assisted, sponsored, or provided financial, material, or technological support for, or goods or services to or in support of, any activity in subsection (a)(ii)(A) of this section or any person whose property or interests in property are blocked pursuant to this order; or

(C)    to be owned or controlled by, or to have acted or purported to act for or on behalf of, directly or indirectly, any person whose property or interests in property are blocked pursuant to this order.

EO 14,203 § 1(a)(ii).

engaged in any effort by the ICC to investigate, arrest, detain, or prosecute a protected person without consent of that person's country of nationality" within the meaning of Section 1(a)(ii)(A) of the Executive Order. Nor, upon information and belief, does the State Department possess such evidence with respect to persons falling under categories (1), (3) and (4).

### A. Judges of the International Criminal Court

152.    Secretary of State Marco Rubio has designated eight Judges of the ICC pursuant to Section 1(a)(ii)(A) of EO 14203.

### 1. *Judges Designated for Participating in Judicial Proceedings Concerning the Situation in Afghanistan*

153.    Secretary of State Rubio designated three judges for participating in judicial proceedings regarding the ICC's investigation into the *Situation in Afghanistan*. Those judges are Judge Kimberly Prost, Judge Solomy Balungi Bossa, and Judge Luz del Carmen Ibáñez Carranza.

154.    **Judge Kimberly Prost** was elected as an ICC judge in December 2017 by the Assembly of States Parties after being nominated by the Government of Canada. She began her judicial service in March 2018 and sits on the Court's Trial Division. She previously served as the Ombudsperson for the U.N Security Council Al-Qaida Sanctions Committee, the body responsible for sanctioning associates of Al-Qaida (and now ISIL or Da'esh), having been appointed to that position by the U.N. Secretary-General. Judge Prost's prior judicial service includes having been elected by the U.N. General Assembly to serve as a judge of the International Criminal Tribunal for the former Yugoslavia ("ICTY"), the ad-hoc court established by U.N. Security Council to prosecute international crimes committed during the conflicts in present-day Croatia, Bosnia and Herzegovina, Serbia, Kosovo, and Macedonia. Her distinguished career in law enforcement includes serving as Chief of the Legal Advisory Section of the U.N. Office on Drugs and Crime and as Head of Criminal Law and the Deputy Director of the Legal and Constitutional Affairs

51

Division of the Commonwealth Secretariat.  She also spent 18 years as a federal prosecutor in Canada's Department of Justice.

155.    On August 20, 2025, Secretary of State Rubio designated Judge Prost pursuant to Section 1(a)(ii)(A) of EO 14,203.  The State Department contemporaneously stated that Judge Prost was "designated for ruling to authorize the ICC's investigation into U.S. personnel in Afghanistan."

156.    **Judge Solomy Balungi Bossa** was elected as an ICC judge in December 2017 by the Assembly of States Parties after being nominated by the Government of Uganda.  She began her judicial service in March 2018 and sits on the Appeals Chamber.  Judge Bossa previously served as a judge on the East African Court of Justice, where she was the first woman to serve on the bench; on the Court of Appeal of Uganda; and on the African Court on Human and Peoples' Rights.  She also was elected to serve as a judge on the International Criminal Tribunal for Rwanda ("ICTR"), the international court established by the U.N. Security Council to prosecute persons responsible for committing genocide and other international crimes in the Rwandan genocide, and on the U.N. Mechanism for International Criminal Tribunals.  Judge Bossa has served as Vice-Chairperson of the International Bar Association Human Rights Institute; founding President of the East African Law Society; and the first woman President of the Uganda Law Society.

157.    On June 5, 2025, Secretary of State Rubio designated Judge Bossa pursuant to Section 1(a)(ii)(A) of EO 14,203.  The State Department contemporaneously stated that Judge Bossa was designated because she "ruled to authorize the ICC's investigation against U.S. personnel in Afghanistan."

158.    **Judge Luz del Carmen Ibáñez Carranza** was elected as an ICC judge in December 2017 by the Assembly of States Parties after being nominated by the Government of

52

Peru. She began her judicial service in March 2018 and sits on the Appeals Chamber. Prior to her election, Judge Ibáñez Carranza served as a Senior National Prosecutor in Peru's specialized system for the prosecution of terrorism, grave violations of human rights, and crimes against humanity. In this capacity, she acted as the Coordinator of 17 prosecutorial agencies responsible for addressing such crimes in Peru. She was also a law professor for over two decades, teaching criminal law, criminal procedure, and human rights law.

159. On June 5, 2025, Secretary of State Rubio designated Judge Ibáñez Carranza pursuant to Section 1(a)(ii)(A) of EO 14,203. The State Department contemporaneously stated that Judge Ibáñez Carranza was designated because she "ruled to authorize the ICC's investigation against U.S. personnel in Afghanistan."

### 2. *Judges Designated for Participating in Judicial Proceedings Concerning the Situation in Palestine*

160. Secretary of State Rubio designated five judges under Section 1(a) of the Executive Order for their having participated in judicial proceedings regarding the ICC's investigation into the *Situation in Palestine*. Those judges are Judge Reine Adélaïde Sophie Alapini-Gansou, Judge Beti Hohler, Judge Nicolas Yann Guillou, Judge Gocha Lordkipanidze, and Judge Erdenebalsuren Damdin.

161. **Judge Reine Adélaïde Sophie Alapini-Gansou** was elected to the ICC by the Assembly of States Parties in December 2017 after being nominated by the Government of Benin. She currently serves as the Court's Second Vice-President, having been elected to that position by her fellow members of the ICC bench. She began her judicial service in March 2018 and sits on both the Pre-Trial Chamber and the Trial Chamber. She was the President of the Pre-Trial Division from 2019 to 2020. Prior to her ICC judgeship, Judge Alapini-Gansou served for 12 years as a Commissioner of the African Commission on Human and Peoples' Rights, including as Chair of

53

the Commission and Special Rapporteur on the situation of human rights defenders in Africa. Judge Alapini-Gansou also served on the U.N. Commission of Inquiry on Côte d'Ivoire, which was established by the U.N. Human Rights Council to investigate the facts and circumstances surrounding allegations of serious abuses and violations of human rights committed in Côte d'Ivoire following the presidential election of November 28, 2010, and on the U.N. Commission of Inquiry on human rights violations in Burundi, established by the U.N. Human Rights Council to investigate human rights violations and abuses in that country since April 2015.

162.    On June 5, 2025, Secretary of State Rubio designated Judge Alapini-Gansou pursuant to Section 1(a)(ii)(A) of EO 14,203.  The State Department contemporaneously stated that Judge Alapini-Gansou was designated because she "ruled to authorize the ICC's issuance of arrest warrants targeting Israeli Prime Minister Benjamin Netanyahu and former Minister of Defense Yoav Gallant."  EO 14,203, Preamble.

163.    **Judge Beti Hohler** was elected as an ICC judge in December 2023 by the Assembly of States Parties after being nominated by the Government of Slovenia.  She began her judicial service in March 2024 and sits on both the Pre-Trial Chamber and Trial Chamber.  Prior to her judgeship on the ICC, she served for nine years as a Trial Lawyer in the ICC's OTP.  Judge Hohler previously worked for the EU Rule of Law Mission in Kosovo, where she advised international judges in complex criminal cases and facilitated the establishment of the International Judges' Unit at the Court of Appeals for Kosovo.

164.    On June 5, 2025, Secretary of State Rubio designated Judge Hohler pursuant to Section 1(a)(ii)(A) of EO 14,203.  The State Department contemporaneously stated that Judge Hohler was designated because she "ruled to authorize the ICC's issuance of arrest

54

warrants targeting Israeli Prime Minister Benjamin Netanyahu and former Minister of Defense Yoav Gallant."

165.    **Judge Nicolas Yann Guillou** was elected as an ICC judge by the Assembly of States Parties in December 2023 after being nominated by the Government of France. He began his judicial service in March 2024 and sits on both the Pre-Trial Chamber and Trial Chamber. Prior to his election, Judge Guillou served as a Pre-Trial Judge at the Kosovo Specialist Chambers, a hybrid international criminal tribunal established to investigate, prosecute, and try international crimes committed during the armed conflict in Kosovo, and as *Chef de Cabinet* to the President of the Special Tribunal for Lebanon, an independent court established by the U.N. Security Council with a mandate to prosecute persons responsible for a 2007 bombing in Beirut, Lebanon. He previously served as Liaison Prosecutor at the U.S. Department of Justice, where he facilitated judicial cooperation between the United States and France in criminal and civil matters, including in the fields of counterterrorism, international crimes, and organized crime. Judge Guillou has held senior positions in the French Ministry of Justice, including serving as Deputy Head of the Commercial Law Section and as Adviser to the Minister of Justice on Criminal Affairs. He previously served as an investigating magistrate judge in France.

166.    On August 20, 2025, Secretary of State Rubio designated Judge Guillou pursuant to Section 1(a)(ii)(A) of EO 14,203. The State Department contemporaneously stated that Judge Guillou was designated because he "ruled to authorize the ICC's issuance of arrest warrants targeting Israeli Prime Minister Benjamin Netanyahu and former Minister of Defense Yoav Gallant."

167.    **Judge Gocha Lordkipanidze** was elected as an ICC Judge by the Assembly of States Parties in December 2020 after being nominated by the Government of Georgia. He began

his judicial service in March 2021 and sits on the Appeals Chamber, serving as the President of the Appeals Division from March 2024 to April 2025. Prior to his ICC judgeship, Judge Lordkipanidze served as Minister of Justice and Deputy Minister of Justice of the Republic of Georgia. Judge Lordkipanidze taught at Columbia University's School of International and Public Affairs. He was a Fulbright Visiting Scholar at Columbia Law School and the recipient of a NATO Research Fellowship.

168. On December 18, 2025, Secretary of State Marco Rubio designated Judge Lordkipanidze pursuant to Section 1(a)(ii)(A) of EO 14,203. The State Department contemporaneously stated that Judge Lordkipanidze was designated for allegedly having "directly engaged in efforts by the ICC to investigate, arrest, detain, or prosecute Israeli nationals, without Israel's consent, including voting with the majority in favor of the ICC's ruling against Israel's appeal on December 15" in the *Situation in Palestine*.

169. **Judge Erdenebalsuren Damdin** was elected as an ICC judge in December 2023 after being nominated by the Government of Mongolia. He began his judicial service in March 2024 and sits on the Appeals Chamber. In 2025, Judge Damdin was elected President of the Appeals Division. Prior to his ICC judgeship, Judge Damdin served as a Justice of the Supreme Court of Mongolia—the highest judicial office in Mongolia—for 12 years. He has also served as the Chief Prosecutor and Head of the Foreign Affairs and Cooperation Department in the Prosecutor General's Office of Mongolia, and taught at the National University of Mongolia.

170. On December 18, 2025, Secretary of State Rubio designated Judge Damdin pursuant to Section 1(a)(ii)(A) of EO 14,203. The State Department contemporaneously stated that Judge Damdin was designated for allegedly having "directly engaged in efforts by the ICC to investigate, arrest, detain, or prosecute Israeli nationals, without Israel's consent, including voting

56

with the majority in favor of the ICC's ruling against Israel's appeal on December 15" in the *Situation in Palestine*.

171.    Upon information and belief, the threat of designations under Section 1(a) of the Executive Order was and is intended to influence the decisions of the judges of the ICC.

172.    Upon information and belief, the designations under Section 1(a) of the Executive Order of Judge Alapini-Gansou, Judge Bossa, Judge Damdin, Judge Guillou, Judge Hohler, Judge Ibáñez Carranza, Judge Lordkipanidze, and Judge Prost were and are intended to influence or punish them for their judicial decisions and those of other judges of the ICC.

B. **Prosecutors of the International Criminal Court**

173.    Three senior prosecutors of the ICC have been designated under Section 1(a) of EO 14,203.

174.    On February 6, 2025, President Trump designated the then-Prosecutor of the ICC, Mr. Karim Asad Ahmad Khan KC.

175.    On August 20, 2025, Secretary of State Rubio designated both of the ICC's Deputy Prosecutors pursuant to Section 1(a)(ii)(A) of EO 14,203: Ms. Nazhat Shameem Khan and Mr. Mame Mandiaye Niang.

176.    **Mr. Karim Asad Ahmad Khan KC** was elected Prosecutor of the ICC in 2021 by the Assembly of States Parties, having been nominated by the United Kingdom. Immediately prior to his election, Mr. Khan served as the Special Adviser and Head of the U.N. Investigative Team to Promote Accountability for Da'esh/ISIL Crimes ("UNITAD"), where he oversaw the collection of evidence of war crimes, crimes against humanity, and genocide committed by ISIL in Iraq. Mr. Khan previously had a distinguished career as both a prosecutor and defense counsel in international criminal courts and tribunals, including the ICTY; the Special Tribunal for Lebanon; the Extraordinary Chambers in the Courts of Cambodia (a hybrid international tribunal responsible

57

for prosecuting senior leaders of the Khmer Rouge); the Special Court for Sierra Leone (a tribunal responsible for prosecuting serious violations of committed during the Sierra Leone civil war); and the U.N. Special Panel for Serious Crimes in East Timor (a hybrid international court responsible for prosecuting crimes committed in East Timor in 1999).  Mr. Khan was recently removed as Prosecutor due to an unrelated internal investigation.  The Deputy Prosecutors, described below, have undertaken his functions.

177.    **Ms. Nazhat Shameem Khan** was elected Deputy Prosecutor of the ICC in 2021 by the Assembly of States Parties.  Prior to joining the OTP, she served as President of the U.N. Human Rights Council.  Ms. Khan also served Fiji's Permanent Representative to the United Nations in Geneva and Vienna; as its first female High Court judge; and as a prosecutor in Fiji, including as the country's Director of Public Prosecutions.

178.    On August 20, 2025, Secretary of State Rubio designated Ms. Khan pursuant to Section 1(a)(ii)(A) of EO 14,203.  The State Department contemporaneously stated that Ms. Khan was designated "for continuing to support illegitimate ICC actions against Israel, including upholding the ICC's arrest warrants targeting Prime Minister Netanyahu and former Defense Minister Gallant since [she] assumed leadership for the ICC's Office of the Prosecutor."

179.    **Mr. Mame Mandiaye Niang** was elected Deputy Prosecutor of the ICC in 2021 by the Assembly of States Parties.  Prior to joining the OTP, Mr. Niang had extensive international experience within the United Nations system, having served in various positions at the ICTR, ICTY, and as the Regional Representative of the U.N. Office on Drugs and Crime in Southern Africa.  He also served as the Prosecutor-General of the Appeals Court of Saint Louis, Senegal and Director of Criminal Affairs and Pardons at the Senegalese Ministry of Justice.

180.    On August 20, 2025, Secretary of State Rubio designated Mr. Niang pursuant to Section 1(a)(ii)(A) of EO 14,203.  The State Department contemporaneously stated that Mr. Niang was designated "for continuing to support illegitimate ICC actions against Israel, including upholding the ICC's arrest warrants targeting Prime Minister Netanyahu and former Defense Minister Gallant since [he] assumed leadership for the ICC's Office of the Prosecutor."

### C.  Human Rights Organizations

181.    On September 4, 2025, Secretary of State Rubio designated three human rights organizations pursuant to Section 1(a)(ii)(A) of EO 14,203: Al-Haq: Law in the Service of Man ("Al-Haq"); Al Mezan Center for Human Rights ("Al Mezan"); and the Palestinian Centre for Human Rights ("PCHR").  All three organizations are globally recognized leaders in the field of human rights and international law, and each enjoys consultative status with the United Nations Economic and Social Council, which requires approval of 19 member States, through which they have a formal role in U.N. deliberations.

182.    **Al-Haq** was established in 1979 in Ramallah, West Bank.  It is an independent non-governmental organization dedicated to protecting and promoting human rights and the rule of law in the Occupied Palestinian Territory.  The organization documents human rights violations on the ground and engages in human rights advocacy before national and international courts and bodies, including the United Nations, the International Court of Justice, and the ICC.  Al-Haq participates in coalitions of international NGOs, including the CICC and the International Federation for Human Rights ("FIDH"), and is the West Bank affiliate of the International Commission of Jurists, an organization composed of 60 eminent judges and lawyers who are experts in international human rights law.

183.    In recognition of Al-Haq's work in promoting human rights, the organization has been awarded the Human Rights Prize of the French Republic, the Danish PL Foundation Human

59

Rights Award, the Gwynne Skinner Human Rights Award, and the Bruno Kreisky Prize for Human Rights, and was co-recipient of the Middle East Studies Association Academic Freedom Award, among other awards.  Its Secretary General, Shawan Jabarin, has received the Reebok Human Rights Award, among other honors, in recognition of his decades of work as a human rights defender.

184.   On September 4, 2025, Secretary of State Rubio designated Al-Haq pursuant to Section 1(a)(ii)(A) of EO 14,203.  The State Department contemporaneously stated that Al-Haq was designated because it "directly engaged in efforts by the International Criminal Court (ICC) to investigate, arrest, detain, or prosecute Israeli nationals, without Israel's consent."

185.   **Al Mezan** is an independent non-governmental organization founded in 1999 and based in Gaza.  It promotes and protects human rights, including economic, social, and cultural rights, in the Occupied Palestinian Territory.  The organization carries out on-the-ground real-time documentation and monitors human rights conditions and international law violations, provides legal assistance to victims of human rights violations, pursues strategic litigation, and engages with international human rights mechanisms, including United Nations bodies and the ICC.  Al Mezan is a member of international coalitions, including the CICC and FIDH.

186.   Al Mezan has been recognized for its documentation of human rights abuses and commitment to international humanitarian law.  Its Director-General, Issam Younis, was awarded the Weimar Human Rights Award and the Franco-German Prize for Human Rights and the Rule of Law, among other honors in recognition of his decades of work as a human rights defender.

187.   On September 4, 2025, Secretary of State Rubio designated Al Mezan pursuant to Section 1(a)(ii)(A) of EO 14,203.  The State Department contemporaneously stated that Al Mezan

was designated because it "directly engaged in efforts by the International Criminal Court (ICC) to investigate, arrest, detain, or prosecute Israeli nationals, without Israel's consent."

188.    **PCHR** is an independent non-governmental organization founded in 1995 and headquartered in Gaza.  It is dedicated to protecting human rights, supporting the rule of law, and upholding democratic principles in the Occupied Palestinian Territory.  The organization's work encompasses legal aid and litigation, including under the principle of universal jurisdiction, on-the-ground documentation of human rights violations and preparation of case files, research, and advocacy before Palestinian, Israeli, and international bodies, including the United Nations and the ICC.  PCHR is a member of international coalitions, including the CICC and FIDH.

189.    PCHR has been awarded the Human Rights Prize of the French Republic, the Bruno Kreisky Prize for Human Rights, the International Service Human Rights Award, and the Honorary Human Rights Award by the Association for Human Rights for Spain, among other awards.  Its founder and General Director, Raji Sourani, is a Human Rights Laureate of the Robert F. Kennedy Center for Human Rights and received the Right Livelihood Award, in recognition of his decades of work as a human rights defender.

190.    On September 4, 2025, Secretary of State Rubio designated PCHR pursuant to Section 1(a)(ii)(A) of EO 14,203.  The State Department contemporaneously stated that PCHR was designated because it "directly engaged in efforts by the International Criminal Court (ICC) to investigate, arrest, detain, or prosecute Israeli nationals, without Israel's consent."

### D.  United Nations Human Rights Special Rapporteur

191.    **Ms. Francesca Paola Albanese** is an Italian international lawyer serving as the U.N. Special Rapporteur on the situation of human rights in the Palestinian Territory occupied since 1967.  Ms. Albanese was appointed to this position by the United Nations Human Rights Council in 2022.

61

192.    Special Rapporteurs are independent experts appointed by the U.N. Human Rights Council to examine, monitor, and report on human rights situations in specific countries or on thematic issues.  The independence of these mandate holders is essential to the functioning of the international human rights system and is guaranteed under multiple U.N. instruments.  Special Rapporteurs are bound by a Code of Conduct that requires impartiality and adherence to international human rights standards.[39]

193.    Ms. Albanese's mandate requires her to investigate and report on human rights conditions in the Occupied Palestinian Territory, and her reports and statements have been made in direct furtherance of this mandate.  Ms. Albanese is not an employee or official of the ICC.

194.    On July 9, 2025, Secretary of State Rubio designated Ms. Albanese pursuant to Section 1(a)(ii)(A) of EO 14,203.  The State Department contemporaneously stated that Ms. Albanese was designated for having "directly engaged with the [ICC] in efforts to investigate, arrest, detain, or prosecute nationals of the United States or Israel, without the consent of those two countries."

\*

195.    The 15 designations under EO 14,203—encompassing eight judges, three prosecutors, three highly respected human rights organizations, and a U.N. Special Rapporteur—represent an unprecedented campaign of coercion directed at core institutions and actors in the international legal order.  That campaign undermines the broader international justice system that exists to provide access to justice for the victims of the most serious crimes.

---

[39] All Special Rapporteurs are bound by the Code of Conduct established under Human Rights Council Resolution 5/2, which requires mandate holders to act in an independent capacity, exercise their functions through a professional and impartial assessment of facts based on internationally recognized human rights standards, and uphold the highest standards of efficiency, competence, and integrity—including probity, impartiality, equity, honesty, and good faith—while neither seeking nor accepting instructions from any government, individual, or pressure group.

**IV. The Sanctions Regime Violates the United States' Obligations under International Law**

196.    The Sanctions Regime violates international law.  As such, it is *ultra vires* under IEEPA, which did not delegate to the President the authority to violate international law.

197.    *First*, the Sanctions Regime violates the United States' international legal obligations with respect to the investigation, prevention, and punishment of international crimes because the Executive Order and designations issued thereunder are intended to, and in fact do, interfere with efforts by other States to investigate, prosecute, and punish those crimes.

198.    The United States' obligation not to interfere with efforts by other States to investigate, prosecute, and punish international crimes derives from its obligations to investigate and punish international crimes and to cooperate with other States to bring to an end serious violations of peremptory norms of international law.  Those obligations are based on, *inter alia*:

   a. The 1949 Geneva Conventions, pursuant to which the United States has "undertake[n] to respect and ensure respect for the [Conventions] in all circumstances." *E.g.*, Fourth Geneva Convention, art. 1, Aug. 12, 1949, 6 U.S.T. 3516, 75 U.N.T.S. 287.   This duty to ensure respect for the Geneva Conventions entails an obligation to prevent violations thereof and stop ongoing violations by other High Contracting Parties to the Conventions.  Measures to ensure respect for the Geneva Conventions by other States include supporting international efforts to bring suspected perpetrators of serious violations of the Conventions to justice, including through the ICC, as States are obligated to do under Article 129(2) in respect of those suspected of committing grave breaches of the Conventions. Protocol Additional to the Geneva Conventions of 12 August 1949, and Relating to the Protection of Victims of International Armed Conflicts (Protocol I) art. 129(2), June 8, 1977, 1125 U.N.T.S. 3.

63

b. The customary international law obligation on all States to prevent and punish international crimes, including genocide, crimes against humanity, and war crimes. That obligation entails a duty to cooperate with other States to prevent and punish international crimes and ensure accountability, derived notably from the U.N. Charter.

c. The customary international law obligation of all States to cooperate with other States to bring to an end serious violations of peremptory norms of international law, *i.e.*, violations of a *jus cogens* nature. The prohibition of genocide, torture, crimes against humanity, and serious violations of human rights and international humanitarian law are all peremptory norms of international law, prohibitions that are reinforced by the Genocide Convention and the Convention Against Torture, which requires its States Parties to prosecute or extradite.

199. These obligations include the obligation not to interfere with efforts by other States to investigate and punish those crimes because, under customary international law, treaty obligations must be interpreted and performed in good faith. The obligations to prevent and punish international crimes and to cooperate in good faith include the obligation not to take measures that hinder efforts by other States to investigate, prosecute, and punish such crimes.

200. One hundred twenty-five States implement their obligation to investigate, prosecute, and punish international crimes in part through the work of the ICC. However, the Sanctions Regime seeks to prevent the ICC from being able to "investigate, arrest, detain, or prosecute" persons alleged to have committed crimes. EO 14,203, Preamble. By designating judges and prosecutorial staff, in particular, and by continuing to threaten to do so, the Sanctions Regime hinders such efforts not only in respect of the two investigations singled out by the Order,

64

but *all* ICC investigations and prosecutions, including not only those currently underway but also any that might be commenced in the future.  As such, it breaches the United States' obligations with respect to the prevention and punishment of international crimes.

201.    *Second*, the Sanctions Regime violates international law because it targets the personal—including financial—interests of international civil servants, including judges, prosecutors, and U.N. experts, to try to influence through improper means their official decision-making.  This contravenes a foundational general principle of law that forms part of the *corpus* of international law: respect for judicial and prosecutorial independence, the independence of lawyers, and U.N. expert independence.  Article 38(c) of the Statute of the International Court of Justice establishes that general principles of law recognized by nations are a source of international law.

202.    The requirement that the independence of judges, prosecutors, lawyers, and U.N. experts be respected, including the prohibition on seeking to improperly influence their official decision-making, is a general principle of law and thus binding upon the United States under international law.  It is enshrined in the vast majority of domestic legal systems.  It unquestionably applies in the United States.  In the words of the Supreme Court, this "constitutional principle" is "widely esteemed and . . . vital to our system of government." *Evans v. Gore*, 253 U.S. 245, 259 (1920).

203.    The principle is also reflected in a multitude of treaties and other international instruments, including:

     a. The International Covenant on Civil and Political Rights, Dec. 16, 1966, 999 U.N.T.S. 171, Article 14(1) of which provides that "everyone shall be entitled to a fair and public hearing by a competent, *independent and impartial tribunal*."

b. The American Convention on Human Rights, Nov. 22, 1969, 1144 U.N.T.S. 123, Article 8(1) of which provides that "[e]very person has the right to a hearing, with due guarantees and within a reasonable time, by a competent, independent, and impartial tribunal."

c. The Convention for the Protection of Human Rights and Fundamental Freedoms, Nov. 4, 1950, 213 U.N.T.S. 221, Article 6(1) of which provides that "everyone is entitled to a fair and public hearing within a reasonable time by an independent and impartial tribunal established by law."

d. The Universal Declaration of Human Rights, G.A. Res. 217 A (III), U.N. Doc. A/810 (Dec. 10, 1948), Article 10 of which provides that "[e]veryone is entitled in full equality to a fair and public hearing by an independent and impartial tribunal."

204. The U.N. Commission on Human Rights established the mandate of a Special Rapporteur on the independence of judges and lawyers in 1994, which continues to the present, in recognition that "an independent and impartial judiciary and an independent legal profession are essential prerequisites for the protection of human rights and for ensuring that there is no discrimination in the administration of justice." U.N. Comm'n on Hum. Rts., Report on the Fiftieth Session, at 135, U.N. Doc. E/CN.4/1994/132 (Mar. 4, 1994).

205. The obligation to respect judicial, prosecutorial, and U.N. expert independence, and not seek to improperly influence official decision-making, applies with full force to international courts and tribunals, including the ICC. Article 40 of the Rome Statute codifies that "judges shall be independent in the performance of their functions" and "shall not engage in any activity which is likely to interfere with their judicial functions or to affect confidence in their independence." Article 70 of Rome Statute criminalizes "[i]mpeding, intimidating or corruptly influencing an

66

official of the… Court for the purpose of forcing or persuading the official not to perform, or to perform improperly, his or her duties." Rome Statute, arts., 40, 70.

206.    The Sanctions Regime violates this bedrock principle of law. The purpose of the Executive Order and the designations is to exert pressure on judges, prosecutors, and experts to influence their official decision-making and to cause them to make official decisions based on their personal interests, not on the basis of the law and facts.

207.    *Third*, the Sanctions Regime violates the United States' obligation to respect privileges and immunities to which ICC and U.N. officials are entitled under treaty and customary international law.

208.    The United States must respect the ICC's privileges and immunities and those of its officials, even as a non-party, because the ICC is a universal international organization that enjoys privileges and immunities under customary international law that must be respected by all States. By targeting and threatening the ICC's judges and prosecutorial staff, each a senior official of the ICC, the Sanctions Regime impermissibly interferes with the ICC's functions. As such, it violates the privileges and immunities that are owed to the ICC and its personnel.

209.    The United States must respect the United Nations' privileges and immunities under Article 105(1) of the U.N. Charter and as provided under Article II of the 1946 Convention on the Privileges and Immunities of the United Nations ("General Convention"), to which the United States is party. In addition, Article VI, § 22 of the General Convention mandates that U.N. experts on missions, like U.N. Special Rapporteur Francesca Albanese, "shall be accorded such privileges and immunities as are necessary for the independent exercise of their functions during the period of their missions," including "[i]n respect of words spoken or written and acts done by them in the course of the performance of their mission, immunity from legal process of every

67

kind." Convention on the Privileges and Immunities of the United Nations, art. VI, § 22, Feb. 13, 1946, 21 U.S.T. 1418, 1 U.N.T.S. 15. Ms. Albanese's designation seeks to interfere with the independent exercise of the functions assigned to her by the United Nations, in violation of the General Convention and the U.N. Charter.  Moreover, by sanctioning her for her acts and words spoken or written in the course of the performance of her mission, the designation violates Ms. Albanese's immunity from any form of legal process under the General Convention.  *See* General Convention, art. VI, § 22(b).

210.    Because the designations also prevent designated individuals, including Ms. Albanese, from traveling to the U.N. Headquarters in New York, they violate the United States' obligations to allow the unimpeded transit of officials and experts on official business at the U.N. Headquarters.  These obligations arise from Article 105 of the Charter, Section 11 of the 1947 Agreement Regarding the Headquarters of the United Nations between the United States and the United Nations, as well as Section 22 of the 1946 Convention.

211.    *Fourth*, the Sanctions Regime violates the United States' obligations to cooperate with the United Nations and to abide by Security Council decisions under Articles 2 and 25 of the U.N. Charter.  The U.N. Security Council has referred the situations in Sudan and Libya to the ICC pursuant to the Council's powers under Chapter VII of the U.N. Charter to adopt binding measures to maintain international peace and security.  *See* S.C. Res. 1593, ¶ 1, U.N. Doc. S/RES/1593 (Mar. 31, 2005); S.C. Res. 1970, ¶ 4, U.N. Doc. S/RES/1970 (Feb. 26, 2011).  However, the sanctions impede the work of the ICC, including with respect to the investigation and prosecution of the Sudan and Libya situations.  In doing so, the sanctions directly interfere with the implementation of the Security Council's binding resolutions. They thus violate the

68

United States' obligation to cooperate with the United Nations and abide by U.N. Security Council resolutions.

## V. The Impact of the Executive Order and Subsequent Designations

212. Besides the impact on the ICC, its officials and staff, and designated individuals and organizations, the sanctions are harming the broader international justice ecosystem. The sanctions affect civil society organizations—including Plaintiffs—working in a range of areas in support of the Court's mandate, including documenting international crimes and collecting evidence, including in areas its investigators are unable to access; identifying and supporting victims and witnesses; providing technical and contextual expertise; and conducting advocacy, both individually and collectively, to strengthen the Court's work.

213. A recent report authored by the Secretariat of the CICC on the impact of the sanctions noted that "US nationals interviewed for the report consistently mentioned the constant feeling of uncertainty, not knowing how or if they would be able to continue to do their work safely and to engage with the Court and those unlawfully designated in the course of their work." The report details the chilling effect that has also reached non-U.S. organizations, some of which have taken steps to "prevent their US staff from working with the designated organisations and individuals" and to reconsider initiatives linked to them, to "shield themselves against risk and ensure their own continuity."[40]

214. The Sanctions Regime has resulted in an environment of fear and uncertainty, chilling the freedom of association. U.S. and non-U.S. civil society organizations have "stopped attending meetings and events with designated individuals and organisations, taking part in votes,

---

[40] Secretariat of the Coal. for the Int'l Crim. Ct., *Criminalising Accountability: The US Lawfare Against the International Justice System* 56, 57, 61 (Apr. 2026), https://www.courthousenews.com/wp-content/uploads/2026/04/cicc-2026-report-criminalising-accountability-the-us-lawfare-against-the-international-justice-system.pdf.

or discussing strategies when those organisations are present."[41]  For example, in December 2025, at the annual Assembly of States Parties, while some "U.S. civil society organizations attended and spoke at meetings where designated entities were present; some attended and did not speak; some avoided such meetings; while others did not attend the Assembly at all."[42]

215.    The individual and collective chilling effect of the Sanctions Regime has directly impacted all four Plaintiffs.

*American Friends Service Committee*

216.    AFSC's human rights advocacy and humanitarian work is a direct exercise of the religious convictions of the Religious Society of Friends (Quakers).  The Quaker faith is animated by core religious testimonies, including peace, equality, community, integrity, simplicity, and the just stewardship of resources.  These religious commitments compel Quakers to bear "social witness" in the world, including peacebuilding, humanitarian service, and the promotion of human dignity.  AFSC sincerely regards its work—including programmatic peace and social justice work in and concerning the Occupied Palestinian Territory—as an exercise of Quaker religious convictions.

217.    AFSC operates programs and initiatives focused on a range of issues, including immigrant rights, mass incarceration, economic justice, peacebuilding, and international human rights.  AFSC has been internationally recognized for its humanitarian efforts, including by receiving the Nobel Peace Prize in 1947, jointly with the British Friends Service Council and on behalf of Quakers worldwide, for its relief work during and after World War II.

218.    AFSC has exercised its religious mandate in the Occupied Palestinian Territory since 1948, when the organization was asked by the United Nations to respond to the needs of

---

[41] *Id.*, at 59.

[42] *Id.*, at 58.

70

those displaced at that time. Over the last nearly 80 years, AFSC has continued its humanitarian work in Jerusalem, Ramallah, and Gaza in partnership with local nongovernmental organizations, with the aim of coordinating the best community-informed responses that cover the broadest range of affected communities.

219.    During the current crisis in Gaza, arising in the aftermath of the October 7, 2023 attacks, AFSC has provided lifesaving assistance to over one million displaced Palestinians, including providing food parcels, drinking water, hygiene kits, and other critical supplies.

220.    AFSC's human rights advocacy and humanitarian work in the Occupied Palestinian Territory depends on its close partnerships with Palestinian civil society organizations with the local credibility, institutional knowledge, and on-the-ground expertise that AFSC, as a U.S.-based organization, does not itself always possess. These partnerships are rooted in the Quaker religious testimonies of community and integrity, which demand that AFSC's work be grounded in a true understanding of conditions on the ground in the communities it serves.

221.    Among the most important of AFSC's partnerships were Al-Haq, in the West Bank, and Al Mezan, in Gaza.

222.    Prior to Al-Haq's designation under EO 14,203, AFSC had maintained an ongoing relationship with the organization for over 20 years. AFSC staff frequently met with Al-Haq representatives. During such meetings, AFSC obtained information used in its research and advocacy work. AFSC also obtained introductions to others in the West Bank.

223.    AFSC likewise maintained a close relationship with Al Mezan for approximately 20 years. Prior to Al Mezan's designation under EO 14,203, AFSC staff routinely met with Al Mezan representatives. During such meetings, AFSC obtained information concerning the human rights situation in Gaza.

71

224. Prior to the designations of Al-Haq and Al Mezan under EO 14,203, AFSC relied on those organizations for research and assistance in connecting with other organizations and individuals in the Occupied Palestinian Territory. AFSC also engaged in advocacy campaigns with Al-Haq and Al Mezan. Among other things, AFSC's partnerships with those organizations included, *inter alia*, the following:

    a. Organizing conferences with the designated organizations, including, *inter alia*, a conference on economic activism as a nonviolent tactic for social change at which Al Mezan staff gave a presentation.

    b. Collaborating on reports and exchanging research between AFSC and the designated organizations, including, *inter alia*, collaboration with Al-Haq to write a report on corporate activity in the Atarot settlement industrial zone in East Jerusalem.

    c. Participating in meetings coordinated by the designated NGOs, including, *inter alia*, meeting business and human rights experts convened by Al-Haq to coordinate advocacy and submissions to the U.N. Database of Business Enterprises Pursuant to U.N. Human Rights Council Resolutions 31/36 and 53/25.

    d. Participating in coalitions of human rights organizations including the designated NGOs to advance shared goals, including, *inter alia*, participating in a coalition with Al-Haq as part of a global effort to advocate for an international treaty that would regulate transnational corporations.

    e. Organizing educational workshops on the Occupied Palestinian Territory which hosted staff members of the designated NGOs.

225.    Prior to her designation under EO 14,203, AFSC maintained a working relationship with Francesca Albanese, the U.N. Special Rapporteur on the situation of human rights in the Palestinian territories occupied since 1967.  AFSC's relationship with Ms. Albanese began in 2023 and was connected to AFSC's work on corporate accountability and human rights in the Occupied Palestinian Territory.

226.    AFSC's interactions with Ms. Albanese included the following:

a.    Responding to a Call for Input published by Ms. Albanese seeking information to be included in a report she was preparing on the impact of business enterprises on violations of international law and human rights in the Occupied Palestinian Territory.  Between August and September of 2023, AFSC liaised with Al-Haq to prepare a submission for that report.

b.    Helping to coordinate a meeting between Ms. Albanese and an Israeli human rights organization.  To assist with preparations for that meeting, AFSC shared research and reports with Ms. Albanese that AFSC prepared on corporate complicity in human rights abuses in the Occupied Palestinian Territory.

c.    Relying on Ms. Albanese to facilitate introductions between AFSC staff and Chris Sidoti, a Commissioner of the U.N. Office of the High Commissioner for Human Rights' Commission of Inquiry into the Occupied Palestinian Territory.  AFSC thereafter submitted materials to Mr. Sidoti in connection with the preparation of a Commission of Inquiry report entitled "Legal analysis of the conduct of Israel in

73

Gaza pursuant to the Convention on the Prevention and Punishment of the Crime of Genocide," which was published on September 16, 2025.[43]

d. Meeting with Ms. Albanese and members of her staff and providing her with research and information as a contribution to her report to the U.N. Human Rights Council's 59th Session (June 2, 2025) entitled "From Economy of Occupation to Economy of Genocide."[44]

227.    The threat of enforcement of civil and criminal penalties under EO 14,203 and the designations of Al-Haq, Al Mezan, and Ms. Albanese thereunder, has seriously disrupted AFSC's ability to carry out its spiritually-based programmatic work.  AFSC has discontinued activities it was previously performing before those persons were designated, and abandoned or reconsidered acts that AFSC had planned to undertake.

228.    Acts that AFSC had planned to undertake, but which it has discontinued, abandoned, or reconsidered in light of the Executive Order and the designations of Al-Haq, Al Mezan, and Ms. Albanese, include the following:

a. Engaging or collaborating with the designated NGOS or Ms. Albanese in any capacity, significantly hindering AFSC's religious mission and preventing it from being able to benefit from research prepared by Al-Haq or Al Mezan, or from the expertise and networks of Ms. Albanese, particularly in its advocacy efforts.

b. Planning initiatives and hosting events in collaboration with Al-Haq or Al Mezan. For example, AFSC coordinated an event that was intended to be hosted in

---

[43] Indep. Int'l Comm'n of Inquiry on the Occupied Palestinian Territory, Including East Jerusalem, and Israel, *Legal Analysis of the Conduct of Israel in Gaza Pursuant to the Convention on the Prevention and Punishment of the Crime of Genocide*, U.N. Doc. A/HRC/60/CRP.3 (Sept. 16, 2025).

[44] Francesca Albanese (Special Rapporteur on the Situation of Human Rights in the Palestinian Territories Occupied Since 1967), *From Economy of Occupation to Economy of Genocide*, U.N. Doc. A/HRC/59/23 (July 2, 2025).

74

conjunction with Al-Haq in New York on September 12, 2025, to coincide with a meeting of the U.N. General Assembly, but Al-Haq was unable to participate in the event.

c.  Continuing to interact and coordinate with other human rights organizations, human rights defenders, and victims of human rights violations, as a result of refraining from engaging with Al-Haq and Al Mezan, who acted as liaisons with such persons and organizations. The inability to maintain these connections hampers AFSC from fulfilling the Quaker religious obligation of bearing informed, spirit-led witness to conditions on the ground in the communities it serves.

d.  Collaborating with Ms. Albanese and contributing research and information for inclusion in her reports to the U.N. Human Rights Council, a significant loss to AFSC's advocacy capabilities.

### *Center for Constitutional Rights*

229.    CCR works to advance and defend constitutional and human rights through litigation, advocacy, and narrative communications strategies. It has long advocated for a strong system of accountability for violations of international law, which it has done through, *inter alia*, litigating cases on behalf of victims and survivors of international law violations in U.S. courts, foreign courts, before United Nations treaty bodies, and in regional courts and international tribunals, including the ICC. CCR participated in the Preparatory Committee on the Establishment of the International Criminal Court through the CICC, and has actively engaged with the ICC for at least the last 15 years.

230.    CCR's engagement with the ICC has centered around its legal advice and support to, and representation of victims of international crimes. Attorneys at CCR are admitted to practice

75

before the ICC, and beginning in 2011, CCR attorneys have served as counsel to victims and made

legal submissions on their behalf to the OTP and to ICC judges.  In relation to its work in the

*Situation in Palestine*, much of CCR's work was done in close coordination with, and in some

cases directly on behalf of or drawing on information provided by Al-Haq, Al Mezan, and PCHR.

Prior to the issuance of EO 14,203, in the context of representing victims of international crimes

at the ICC, CCR, *inter alia*:

a.  Met with and exchanged information with victims and potential victims, including through intermediaries, including Al-Haq, Al Mezan, and PCHR;

b.  Counseled victims on ICC jurisdiction, procedures, opportunities to engage the Court and participate in proceedings, and legal developments;

c.  Served as counsel to represent victims as an LRV in ICC proceedings in the Palestine and Afghanistan situations;

d.  Gathered factual information from clients in anticipation of meetings with, or making submissions to, the ICC, including the OTP;

e.  Made legal filings and oral submissions on behalf of client victims to the ICC Pre-Trial Chambers and Appeals Chambers, including submissions that support the position of the OTP in the Afghanistan and Palestine situations;

f.  Shared legal analysis and factual information with the OTP in support of its investigations and prosecutions and to advocate for additional investigations;

g.  Discussed, where appropriate, legal arguments and investigations with the OTP, including regarding the facilitation of victim statements or testimony in support of OTP's investigations and prosecutions;

h. Advised the OTP, including the Prosecutor, of real-time or time-sensitive developments in potential or ongoing examinations and investigations, in efforts to prompt the issuance of a statement or action seeking to prevent human rights violations or to prompt legal action, such as submitting an application for arrest warrants or to preserve evidence;

i. Advanced the position of clients or potential clients in public fora where members of the OTP, including the Prosecutor, were present;

j. Worked with other legal representatives of victims and civil society groups, often among them Al-Haq, Al Mezan, and PCHR, including by engaging in joint advocacy, to advance the views, concerns, and interests of clients and potential clients; and

k. Advocated for and made factual and legal submissions supporting and calling for the investigation and, where appropriate, the prosecution of U.S. and Israeli nationals for the commission of alleged crimes falling within the jurisdiction of the ICC.

231. Prior to the issuance of EO 14,203, CCR regularly engaged with members of the OTP and judges of the ICC. This included, *inter alia*, attending meetings and roundtables organized and hosted by the OTP or the Court; providing expert input on thematic, strategic, and policy documents drafted by the OTP; and participating in roundtables organized by NGOs on the activities and policies of the ICC, which included members of the OTP and/or ICC judges.

232. Prior to the designations of Al-Haq, Al Mezan, and PCHR under EO 14,203, CCR enjoyed a close and decades-long relationship with all three designated organizations. Among other things, CCR attorneys regularly met with staff of Al-Haq, Al Mezan, and PCHR to discuss,

develop, and execute litigation strategies and joint advocacy to achieve accountability for grave violations of international law using domestic and international fora, including the ICC; on occasion, CCR covered expenses for joint activities. CCR issued joint public statements with all three designated organizations and partnered with them to seek accountability for international crimes. All three designated organizations served as liaisons between CCR and victims to facilitate CCR attorneys' representation of those victims at the ICC and helped CCR prepare submissions to the ICC.

233. CCR contributed to or made joint legal submissions with all three designated organizations and represented some as legal counsel in various capacities. For example, CCR and PCHR partnered in U.S. federal litigation concerning human rights in the Occupied Palestinian Territory, including *Matar v. Dichter* in the Southern District of New York (USDC SD NY, Case No. 05-cv- 10270-WHP) and the Second Circuit (USCA 2nd Cir., Case No. 07-2579); *Abu-Zeineh v. Federal Laboratories, Inc*. in the Western District of Pennsylvania (USDC WD PA, Case No. 91-2148-WLS); and *Corrie v. Caterpillar, Inc*. in the Western District of Washington (USDC WD WA, Case No. 05-cv-5192-FDB) and the Ninth Circuit (USCA 9th Cir., Case No. 05-36210). CCR represented Al-Haq as legal counsel in *Defense for Children International-Palestine v. Biden* in the Northern District of California ((USDC ND CA, Case No. 23-cv-05829-JSW) and in the Ninth Circuit (USCA 9th Cir., Case No. 24-704).

234. Prior to their designations, CCR attorneys acted as counsel for Al-Haq and Al Mezan before the ICC. In the capacity of LRV, CCR provided Al-Haq and Al Mezan with legal advice and, in April 2025, registered those organizations as victims with the ICC's Registry.

235. Prior to the designation of Ms. Albanese, CCR engaged with the individual holding the mandate of U.N. Special Rapporteur on the situation of human rights in the Palestinian

78

Territory occupied since 1967 as part of CCR's litigation and advocacy strategies.  Among other things, CCR made submissions to, held bilateral meetings with, and appeared on panels alongside the mandate holder of this Special Rapporteurship.  Since her appointment in May 2022, and prior to her designation under the Executive Order, this engagement was with Ms. Albanese.

236.    The threat of enforcement of civil and criminal penalties under IEEPA has caused CCR to discontinue activities and to abandon or to reconsider acts it had planned to undertake and would otherwise engage in, and to forego opportunities for new work.  Among other things:

a.  At the time EO 14,203 was issued, CCR attorneys were serving as counsel to victims in the *Situation in Afghanistan* and the *Situation in Palestine.*  The issuance of EO 14,203 and the designations of the ICC judges, members of the OTP, and the three designated organizations thereunder have caused CCR's attorneys to withdraw as counsel or cease actively representing their clients at the ICC and to otherwise refrain from making submissions to the Court.  CCR has also foregone opportunities to represent new clients at the ICC and otherwise expand its work at the ICC.

b.  CCR attorneys have stopped engaging with the OTP, including ceasing attending meetings with OTP staff, providing factual information, or making submissions to or in support of positions taken by the OTP.

c.  CCR attorneys withdrew as LRVs for Al-Haq and Al Mezan in the *Situation in Palestine*.  Indeed, CCR attorneys refrained from seeking leave of the Court to withdraw, as required by Regulation 82 of the Regulations of the ICC, because the judges in Pre-Trial Chamber had themselves been designated.  The notice of

79

withdrawal explained that the failure to seek leave was due to the extraordinary circumstances created by EO 14,203.

d. CCR has ceased participating in discussions, including with other legal representatives and the designated organizations, about legal strategy and related advocacy concerning the representation of victims in the *Situation in Palestine.* Since their withdrawal, CCR attorneys have ceased providing legal counsel, advice, or other services to Al-Haq and Al Mezan.

e. Due to the designations of the judges assigned to the Appeals Chamber adjudicating the *Situation in Palestine*—CCR's attorneys have refrained from making submissions on matters currently before that Chamber.

f. CCR has stopped engaging in communications with Al-Haq, Al Mezan, and PCHR that it understands may be prohibited by EO 14,203 and no longer works with them to prepare legal cases or represent the organizations as legal counsel.  In particular, CCR has, *inter alia*, ceased making joint filings with PCHR attorneys on behalf of victims at the ICC; stopped accepting—and seeking—referrals of Palestinian plaintiffs from the designated organizations for cases to be litigated by CCR in U.S. courts; ended years-long collaborations with the designated organizations concerning ongoing litigation and advocacy; ceased working with the designated organizations and foregone opportunities to work with them to seek justice and accountability for Palestinian victims of international crimes; ceased participating in joint strategy sessions with the three designated organizations; ceased inviting the designated organizations to participate in advocacy efforts on any topic— including those unrelated to the ICC; and ceased reposting or otherwise amplifying

80

social media posts or advocacy from the designated organizations, regardless of whether the content is related to the ICC.

g. CCR has ceased providing Ms. Albanese with information on human rights violations in the Occupied Palestinian Territory.

237. CCR's programmatic resources have been diverted as a result of the sanctions, to instead focus on navigating the sanctions regime and advocacy or litigation efforts to challenge it.

238. CCR's long-established reputation and widely recognized work on behalf of Palestinian rights, human rights, and the rule of law more broadly has been severely and negatively harmed as a result of the foregoing, impeding it from fully fulfilling its mission of supporting justice for victims of serious international crimes and human rights violations.

### *Human Rights Watch*

239. As a prominent international human rights organization dedicated to investigating and exposing abuses around the world, HRW was a leading advocate for the establishment of the ICC. HRW actively participated in the diplomatic negotiations concerning the Rome Statute, contributing policy analysis and legal expertise, and advocating for its creation as a permanent international criminal court with the capacity to hold individuals accountable for genocide, war crimes, and crimes against humanity. From the ICC's establishment in 2002 until EO 14,203's issuance, HRW carried out research and advocacy with the aim of supporting the delivery of independent, impartial, and meaningful justice by the ICC.

240. Prior to the issuance of EO 14,203, HRW regularly engaged in dialogue with OTP staff, including regarding the OTP's investigations. Such engagement included, *inter alia*:

a. Engaging in consultations with OTP staff and the Prosecutor's special advisors for the development of thematic policies. This included participating in meetings or

submitting written comments on draft OTP policy papers, including, most recently, the OTP's *Policy on Children* (2023), *Policy on Complementary and Cooperation* (2023), and *Policy on Cyber-Enabled Crimes under the Rome Statute* (2025);

b. Communicating with OTP staff to, *inter alia*, receive updates and share information relevant to the OTP's investigations and preliminary examinations and discuss the OTP's investigative priorities; and

c. Participating in joint NGO meetings with OTP staff, including periodic roundtables organized for NGOs and ICC staff, including from the OTP, to share information and discuss topics of mutual interest. Topics covered in such meetings included, *inter alia*, the work of the OTP in specific investigations and preliminary examinations, cooperation on arrests, and the ICC's budget.

241. Prior to the issuance of EO 14,203, HRW interacted with ICC judges, including by, among other things:

a. Participating in periodic roundtables organized for NGOs and ICC staff, including judges, to share information and discuss topics of mutual interest;

b. Submitting *amicus curiae* briefs in ICC proceedings. These included, *inter alia*, an *amicus* brief in the *Situation in Afghanistan* in November 2019 and an *amicus* brief in the *Situation in Palestine* in August 2024; and

c. Organizing, participating in, or attending panel discussions or other events that include ICC judges among the speakers.

242. Prior to the designations of Al-Haq, Al Mezan, and PCHR pursuant to EO 14,203, HRW maintained close relationships with each organization. HRW's interactions with them included, among other things:

82

a. Working in close partnership with all three organizations, as fellow members of the CICC, to advocate for policy and practical changes relevant to the ICC's operations and for strengthened support for the Court from its State Parties;

b. Participating in joint strategic meetings with the organizations and other partners in the movement, coordinating advocacy efforts with them, as well as promoting each other's work on social media, and appearing together at private and public events; and

c. Liaising with, and obtaining information, including local insights and victim interviews, from the organizations, to facilitate HRW's reporting and on-the-ground research on human rights issues in the Occupied Palestinian Territory.

243. Prior to the designation of Ms. Albanese pursuant to EO 14,203, HRW maintained ongoing relationships with her and her predecessors.  HRW's interactions with the U.N. Special Rapporteur included, among other things, briefing Ms. Albanese and her predecessors on HRW's research to inform their reports to the U.N. Human Rights Council.

244. The threat of enforcement of IEEPA's civil and criminal penalties has caused HRW to discontinue activities it was previously performing before the designations and to abandon or reconsider activities that HRW planned to undertake.

245. Acts that HRW had planned to undertake, but which it discontinued, abandoned, or reconsidered in light of EO 14, 203 and the designations thereunder, include:

a. Engaging substantively with OTP staff on its investigations and preliminary examinations, including those unrelated to the situations in Palestine or Afghanistan.

b. Accepting invitations to events hosted by the OTP (*e.g*., in the context of its structured dialogue with NGOs) and the three designated NGOs or that include among the panelists representatives of the designated NGOs, designated ICC officials, or Ms. Albanese.

c. Hosting side events at the annual session of the ICC Assembly of States Parties in December 2025 or attending side events where representatives of any of the designated NGOs or designated individuals could be present. HRW's reputation with stakeholders who attended the session, including representatives of other human rights organizations and States Parties, suffered as a result of the foregoing;

d. Briefing U.N. Special Rapporteur Francesca Albanese on HRW's research to inform her reports to the U.N. Human Rights Council.

e. Attending joint meetings described above in paragraphs 240-242. During the June 2026 ICC-NGO roundtable, HRW's representatives were unable to attend sessions concerning the substantive work of the OTP or in the presence of designated ICC officials; or coordinate advocacy in advance of or during the roundtable with representatives of the three designated NGOs, which also limited opportunities to coordinate with other organizations, all of which would have been routinely part of HRW's participation in past roundtables.

f. Collaborating with the three designated NGOs, including undertaking joint research and coordinating victim/witness interviews, joint statements, advocacy meetings, and public appearances.

g. Obtaining the three designated NGOs' assistance in facilitating HRW's research.

h.  Participating in activities where OTP staff members participate, including strategy discussions with other human rights organizations, on topics including campaigns for the arrest of individuals sought by the ICC.

i.  Participating in other activities where the three designated NGOs participate, including strategy discussions during the ASP annual sessions, and advocacy meetings coordinated by the CICC.

246.  In addition, HRW has diverted resources from planned programming to instead focus on advocacy and compliance related to the imposition of sanctions pursuant to EO 14, 203 and subsequent designations thereunder.  This includes, for example, suspending the conduct of research on the interaction between the court and domestic judicial authorities for the purpose of publishing findings and recommendations aimed at addressing shortcomings and maximizing the positive impact of the ICC on national justice efforts.

### *Open Society Institute*

247.  For more than four decades, OSI has provided funding and direct support to charitable endeavors at home and abroad, aiming to build vibrant and inclusive democracies whose governments are accountable to their people.

248.  OSJI is a program of OSI that acts as a United States-based public interest law center dedicated to advancing human rights and the rule of law around the world through litigation, advocacy, grant-giving, and convening.  OSJI's work focuses on issues of international justice, democratic practice, and economic power.  OSJI litigates on behalf of itself and others to provide justice to victims and survivors of transnational and international legal violations; provides grants and technical assistance to individuals and organizations engaged in strategic litigation and associated activities; consults with interested parties about issues of international concern, such as

85

international justice for the commission of grave crimes; and speaks publicly about these international issues, including through participation in letter-writing campaigns, appearances in the media, and publication of articles and op-eds. OSJI is a member of and participates in the broader advocacy efforts of the CICC.

249. As part of its work combatting international crimes, OSJI has engaged with the ICC on a broad range of issues since the Court's founding. OSJI has provided advice to various organs of the ICC, including the Presidency of the Court, the OTP, and the Registry. OSJI has also undertaken advocacy directed at, and provided recommendations to, States Parties to the Rome Statute. These activities have addressed issues ranging from, *inter alia*, prosecutorial strategy, the implementation of ICC arrest warrants, and witness protection, to the development of performance indicators and revisions to the process for judicial elections.

250. OSJI's work required regular engagement with the ICC and its officials, including judges, OTP staff, and the Registry, in addition to local and international civil society organizations engaged in the same issues. Examples of OSJI's engagement with the ICC over the years include:

a. Advising the OTP on prosecutorial strategy and the use of emerging technologies to analyze evidence of international crimes.

b. Organizing meetings with ICC judges and other officials to advise on the development of performance indicators for the ICC, and issuing a briefing paper on the topic.

c. Meeting with ICC staff, including from the OTP and judicial chambers, to assist the ICC in improving its communications to strengthen its effectiveness and public support.

d. Contributing to the process known as the "ICC review," organized by the ASP, aimed at improving the Court's operations and effectiveness.

e. Engaging in discussions with ICC officials and civil society partners about ICC arrest warrants, including making public statements regarding the issuance of arrest warrants and publishing a briefing paper calling on States to promote cooperation with the ICC through multilateral bodies.

f. Filing a brief as *amicus curiae* in August 2024 in ICC proceedings in the *Situation in Palestine* regarding the ICC's jurisdiction.

g. Engaging with the OTP regarding its investigation into the *Situation in Afghanistan*, with a specific focus on the Taliban's systematic perpetration of crimes against Afghan women and girls.

h. Attending and actively participating in roundtables organized by the ICC, including the annual ICC-NGO Roundtable, as well as roundtables organized by others about the activities and policies of the ICC, which included members of the OTP and/or ICC judges.

i. Participating in the annual meeting of the ASP, including co-sponsoring side-events and engaging in civil society strategy meetings among other activities.

251. OSJI has advised civil society organizations on topics such as the documentation of evidence of international crimes, filing communications with the ICC, and strategic engagement with the Court. OSJI's role as an adviser to and convenor of civil society over the years has included:

a. Contributing to the development of the OTP's *Documenting International Crimes and Human Rights Violations for Accountability Purposes: Guidelines for Civil*

87

*Society Organizations*, including through participation in an expert consultation. OSJI had previously trained civil society actors and gathered feedback on NGO documentation through a series of workshops held in Africa, Asia, Central America and the Middle East.

b.  Organizing an expert gathering on international crimes committed in the Occupied Palestinian Territory. The meeting brought together Palestinian civil society organizations, including the two of the designated organizations, Al-Haq and PCHR, and international law experts and professors, as well as staff from the OTP.

c.  Organizing gatherings involving international civil society organizations from different regions to facilitate experience-sharing about their engagement with different organs of the ICC.

d.  Facilitating participation of representatives from civil society organizations from various ICC situation countries in the annual ICC-NGO roundtables.

e.  Providing strategic advice on ICC procedures to civil society organizations and facilitating contacts with ICC officials working on Rome Statute crimes concerning various countries.

f.  Training and supporting civil society organizations that assisted victims in making submissions to the ICC regarding the opening of an investigation into the *Situation in Afghanistan*.

g.  Hosting a fellow in The Netherlands from Afghan civil society to facilitate learning about, and engaging in exchanges with, the ICC.

h.  For more than a decade, operating an initiative known as the "International Justice Monitor," which provided regular and balanced monitoring of select trials in the

88

ICC with an aim to expand public awareness and make ICC trials more accessible to local media and affected communities.

i. Following Russia's full-scale invasion of Ukraine, co-hosting the Ukraine Accountability Collaboration Platform, which brought together Ukrainian and international civil society organizations to coordinate and exchange information on the documentation of crimes committed in Ukraine, with a view to support case-building for prosecution domestically in Ukraine, at the ICC, and in third states under the principle of universal jurisdiction.

j. Participating as an active member of CICC and attending events led by CICC, including for the purpose of advocacy coordination with other members of the CICC.

k. Publishing articles, op-eds, briefing papers, and other publications pertaining to ICC procedures, situations, and specific cases.

252. OSI has given grants to organizations that independently collect information from, *inter alia*, victims of international crimes to present to the ICC or other international bodies, as well as to organizations that assist victims with participating in proceedings that affect them or with presenting their cases to the ICC.

253. Since the beginning of its work in the Middle East and North Africa in 2001, OSI has prioritized accurate, field-based documentation and legal analysis of human rights violations across the region. This includes support to Israeli and Palestinian organizations documenting Israel's violations of Palestinian rights as well as human rights abuses committed by the Palestinian Authority and Hamas.

254.    Among the many entities to which OSI gave philanthropic grants prior to September 2025 are Al Mezan and PCHR.  These two entities, as well as Al-Haq, are widely recognized and respected human rights organizations dedicated to advancing the cause of justice and international human rights, including through the documentation of human rights abuses in the Occupied Palestinian Territory.  Some of these grants enabled Al Mezan and PCHR to document international crimes and, among other activities, advocate for accountability, including—but not only—at the ICC.  As with all other entities to which OSI makes grants, this support was issued only after completion of OSI's rigorous vetting process, designed to ensure compliance with all applicable laws.  In connection with these grants, and more generally, programs of OSI routinely engaged with representatives of the three designated organizations, including through bilateral meetings and larger convenings.

255.    Prior to the issuance of EO 14,203, OSJI conducted a training with the staff of Al-Haq about the Rome Statute, ICC procedures, strategic choices facing NGOs engaging with the ICC, and methodology to document atrocities.  OSJI also provided input on one of Al-Haq's submissions to the OTP regarding alleged crimes committed in the West Bank.

256.    Starting in 2023, as part of its exploration of potential strategic litigation concerning alleged crimes committed in the Occupied Palestinian Territory, OSJI held ongoing discussions with Al-Haq.  In 2024, during the ASP, OSJI also participated in a strategy session focused, in part, on the possibility of securing legal redress for these alleged crimes.  All three designated organizations were present.  Prior to their designation, OSJI was actively considering partnering with Al-Haq and Al Mezan on litigation opportunities not involving the ICC, which could have included funding to pursue such work.

90

257.　Prior to her designation under the Executive Order, OSJI engaged with Ms. Albanese in her capacity as the mandate holder of the U.N Special Rapporteurship on "the situation of human rights in Palestinian territory occupied since 1967" as part of its work concerning the Occupied Palestinian Territory.　This engagement included a call with Ms. Albanese to discuss potential strategic litigation opportunities to address human rights abuses in the Occupied Palestinian Territory.

258.　OSI has been severely impaired by the promulgation of EO 14,203 and the designations thereunder.　The threat of enforcement of civil and criminal penalties under IEEPA has caused OSI to discontinue activities it was performing before the Executive Order was issued and designations made thereunder, and to abandon or to reconsider acts it had planned to undertake.

259.　The acts which OSI had planned to undertake through OSJI, but which it has discontinued, abandoned, or reconsidered in light of the Executive Order include the following:

    a.　Initiating or accepting potential meetings with the Prosecutor or the Deputy Prosecutors or anyone operating directly under their control or acting for them or on their behalf.

    b.　Taking part in meetings between civil society and the ICC when those are likely to lead to substantial interactions with the Prosecutor or the Deputy Prosecutors, or anyone operating directly under their control or acting for them or on their behalf, including limiting its participation in the annual ICC-NGO Roundtables.

    c.　Restricting its participation in the annual session of the ASP, including abstaining from attending any side events that could involve a significant number of staff

operating directly under the control or acting for or on behalf of a designated individual.

d. Sharing legal resources and analysis with lawyers and local civil society groups for the purpose of facilitating implementation of ICC arrest warrants.

e. Participating in and supporting local partners in making submissions to the OTP regarding alleged atrocity crimes committed.

f. Providing strategic advice on victim participation and support to victim lawyers regarding certain situations under ICC investigation.

g. Filing briefs as *amicus curiae* in ICC proceedings relating to any ICC situations.

260. OSI severed its connections to and communications with Al-Haq, Al Mezan, and PCHR, in accordance with the Executive Order and its implementing regulations. The acts which OSI, including through OSJI, had planned to undertake, but which it discontinued, abandoned, or reconsidered in light of the designations include:

a. Recommending potential grants to Al-Haq and Al Mezan.

b. Engaging in discussions with Al-Haq about potential collaboration on strategic litigation opportunities concerning the Occupied Palestinian Territory and potential related funding.

c. Engaging with Al-Haq and Al Mezan on advocacy related to accountability for human rights violations occurring in the Occupied Palestinian Territory.

d. In the context of the ASP annual session, attending and speaking at strategy sessions and events involving representatives from the designated organizations, including any events sponsored by those organizations or convened by the CICC.

92

e. Participating in advocacy meetings or activities under CICC that require or may require interaction with the designated entities.

261. OSJI canceled, at great financial cost, a convening of civil society groups working on strategic litigation concerning the Occupied Palestinian Territory—including in forums other than the ICC—that included representatives from the three designated organizations among the invited participants.  OSJI subsequently rescheduled the convening and excluded those organizations from participating, which deprived OSJI and other participants of those organizations' unique expertise and ability to incorporate the views of affected communities into strategic planning.

262. Upon the designation of Ms. Albanese, OSI discontinued engagement with her. The acts which OSI had planned to undertake, but which it discontinued, abandoned, or reconsidered in light of her designation, include engaging in communications or meetings with Ms. Albanese.

263. OSI programmatic resources have been diverted as a result of the sanctions.  OSJI, in particular, has dedicated resources to responding to the Executive Order, including by serving as *pro bono* counsel to plaintiffs in two cases filed in the U.S. District Court for the Southern District of New York.  OSI has thus expended, and continues to expend, significant time and resources that might otherwise have been dedicated to addressing other urgent human rights crises around the world.

264. OSI has suffered reputational harm as a result of its withdrawal from the forums and spaces it regularly occupied before EO 14,203 was issued.  OSJI's absence from these spaces has diminished its visibility and influence within the international justice community.  It has deprived it of access to timely information concerning ICC cases and institutional

93

developments, and undermined its ability to produce informed analysis and strategies and carry out effective advocacy on issues core to its mandate. The disruption of relationships with ICC staff and officials as well as civil society partners has further weakened OSI's network and reduced its capacity to both benefit from and contribute to collective knowledge and advocacy efforts.

***

265. All Plaintiffs have discontinued, abandoned or reconsidered acts that would have involved the transmission of information or informational materials from the United States to a foreign country.

266. If the Sanctions Regime were enjoined, each of the Plaintiffs would resume activities they have discontinued or abandoned, and would proceed with the activities they had planned to undertake but reconsidered, as described above.

**CAUSES OF ACTION**

**COUNT I**

***Ultra Vires* Action under IEEPA, 50 U.S.C. §§ 1701 *et seq.***

(All Plaintiffs Against All Defendants)

267. Plaintiffs repeat the allegations set forth above as if fully set forth herein.

268. Congress enacted IEEPA to limit presidential abuses of emergency authorities.

269. The President's authority under IEEPA "may only be exercised" to "deal with any unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States, if the President declares a national emergency with respect to such threat." 50 U.S.C. §§ 1701 (a), (b).

270. The President's authority under IEEPA "may not be exercised for any other purpose." 50 U.S.C. §§ 1701 (b).

94

271.    The Sanctions Regime is *ultra vires* because the Executive Order is not based on a national emergency with respect to an unusual and extraordinary threat, as required by IEEPA.

## COUNT II

### *Ultra Vires* **Action under IEEPA, 50 U.S.C. §§ 1701** *et seq.*

(All Plaintiffs Against All Defendants)

272.    Plaintiffs repeat the allegations set forth above as if fully set forth herein.

273.    The Sanctions Regime is *ultra vires* because it conflicts with other acts of Congress, including, *inter alia*, ASPA, 22 U.S.C. §§ 7421 *et seq.*

## COUNT III

### *Ultra Vires* **Action under IEEPA, 50 U.S.C. §§ 1701** *et seq.*

(All Plaintiffs Against All Defendants)

274.    Plaintiffs repeat the allegations set forth above as if fully set forth herein.

275.    Congress delegated to the President a limited grant of authority to regulate foreign commerce under IEEPA.

276.    Congress did not vest the President with authority to violate international law in exercising authority under IEEPA.

277.    In the absence of a clear and unequivocal Congressional statement to the contrary, courts are under a duty to interpret statutes in a manner consonant with international law.  There is no such statement in IEEPA.

278.    The Sanctions Regime is *ultra vires* under IEEPA because it conflicts with international law and the obligations of the United States thereunder.

## COUNT IV

## Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A).

(Plaintiffs HRW, CCR, and OSI (with regard to all designated entities) and Plaintiff AFSC (with regard to Ms. Albanese, Al Mezan, and Al-Haq) Against Defendants United States Department of State, Marco A. Rubio, United States Department of the Treasury, Scott K. H. Bessent, United States Department of Justice, Todd Blanche, Office of Foreign Assets Control, Bradley T. Smith)

279.    Plaintiffs repeat the allegations set forth above as if fully set forth herein.

280.    The designations administered by the State Department and OFAC pursuant to Executive Order 14,203 violate the Administrative Procedure Act because they are arbitrary; capricious; an abuse of discretion; and are otherwise not in accordance with law, including international law, the Berman Amendment, and the Free Trade in Ideas Act of 1994.  5 U.S.C. § 706(2)(A).

## COUNT V

## Violation of the First Amendment to the U.S. Constitution:
## Unconstitutional Burden on Plaintiffs' Freedom of Speech
(All Plaintiffs Against All Defendants)

281.    Plaintiffs repeat the allegations set forth above as if fully set forth herein.

282.    The Sanctions Regime violates the First Amendment by barring Plaintiffs from engaging in speech in furtherance of their missions and in support of designated individuals and entities, by subjecting Plaintiffs to the prospect of civil or criminal penalties for engaging in that speech.

## COUNT VI

## Violation of the First Amendment to the U.S. Constitution:
## Unconstitutional Burden on Plaintiffs' Expressive Association

(All Plaintiffs Against All Defendants)

283.    Plaintiffs repeat the allegations set forth above as if fully set forth herein.

96

284.    The Sanctions Regime violates the First Amendment by barring Plaintiffs from engaging in expressive association with designated individuals and entities, and by subjecting Plaintiffs to the prospect of civil or criminal penalties for engaging in that expressive association.

285.    The Sanctions Regime also violates the First Amendment by creating a bar to Plaintiffs engaging in expressive association with non-designated individuals and entities necessary for Plaintiffs to fully enjoy their First Amendment rights, including U.S. citizens, U.S.-based organizations or entities, non-U.S. organizations or entities with U.S. citizen staff, and non-U.S. citizen individuals and organizations or entities, who fear their own punishment for engaging with Plaintiffs in associational activities, including vis-à-vis designated individuals and entities or in furtherance of certain justice work including at the ICC.

## COUNT VII

### Facial Violation of the First Amendment to the U.S. Constitution

(All Plaintiffs Against All Defendants)

286.    Plaintiffs repeat the allegations set forth above as if fully set forth herein.

287.    The speech restrictions imposed by the Sanctions Regime facially violate the First Amendment by prohibiting a substantial amount of protected expressive activity relative to any purportedly legitimate sweep, for which there is none.

## COUNT VIII

### Violation of the Religious Freedom Restoration Act, 42 U.S.C. §§ 2000bb *et seq.*
(Plaintiff American Friends Service Committee Against
All Defendants)

288.    Plaintiff AFSC repeats the allegations set forth above as if fully set forth herein.

289.    The Sanctions Regime substantially burdens AFSC's exercise of religion, in violation of 42 U.S.C. § 2000bb-1, by subjecting AFSC to the prospect of civil or criminal penalties for engaging in religiously motivated conduct.

290.    Defendants cannot demonstrate that the burden is in furtherance of a compelling governmental interest or that the Sanctions Regime is the least restrictive means of furthering any such interest.  The Sanctions Regime therefore violates RFRA, 42 U.S.C. §§ 2000bb *et seq*.

## COUNT IX

**Violation of the Due Process Clause of the Fifth Amendment to the U.S. Constitution**
(All Plaintiffs Against All Defendants)

291.    Plaintiffs repeat the allegations set forth above as if fully set forth herein.

292.    Executive Order 14,203's term "services by, to, or for the benefit of" violates the Fifth Amendment because it provides no notice as to what acts are prohibited and permits arbitrary enforcement of the Executive Order and is thus facially vague.

## COUNT X

**Declaratory Judgment Act, 28 U.S.C. §§ 2201 *et seq*.**

(All Plaintiffs Against All Defendants)

293.    Plaintiffs repeat the allegations set forth above as if fully set forth herein.

294.    Under 28 U.S.C. § 2201, this Court "may declare the rights and other legal relations of any interested party seeking such declaration."  As set forth above, the Sanctions Regime is *ultra vires* under IEEPA; violates the Administrative Procedure Act; and violates Plaintiffs' First and Fifth Amendment rights, on their face and as applied.

## COUNT XI

**Declaratory Judgment Act, 28 U.S.C. §§ 2201 *et seq*.**

(Plaintiff American Friends Service Committee Against All Defendants)

295.    Plaintiff AFSC repeats the allegations set forth above as if fully set forth herein.

98

296.    Under 28 U.S.C. § 2201, this Court "may declare the rights and other legal relations of any interested party seeking such declaration."  As set forth above, the Sanctions Regime violates the Religious Freedom Restoration Act.

## COUNT XII

### Declaratory Judgment Act, 28 U.S.C. §§ 2201 *et seq.*

(Plaintiff Open Society Institute Against All Defendants)

297.    Plaintiff OSI repeats the allegations set forth above as if fully set forth herein.

298.     Under 28 U.S.C. § 2201, this Court "may declare the rights and other legal relations of any interested party seeking such declaration."  As set forth above, the Sanctions Regime violates Plaintiff OSI's First Amendment Rights with respect to its expressive grantmaking activities.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

A.    Declare that the Sanctions Regime is *ultra vires* under IEEPA;

B.    Declare that the designations issued pursuant to Executive Order 14,203 are arbitrary and capricious, an abuse of discretion, and contrary to law in violation of the Administrative Procedure Act;

C.    Declare that the Sanctions Regime violates the First Amendment to the United States Constitution facially and as applied to all Plaintiffs;

D.    Declare that the Sanctions Regime violates the Fifth Amendment to the United States Constitution facially and as applied to all Plaintiffs;

E.    Declare that the Sanctions Regime violates the Religious Freedom Restoration Act, 42 U.S.C. §§ 2000bb *et seq.*, as applied to Plaintiff AFSC;

99

F.      Enjoin Defendants from enforcing the designations issued pursuant to Executive Order 14,203 and IEEPA's civil or criminal penalties and from issuing any additional designations pursuant to Executive Order 14,203;

G.      Award Plaintiffs their costs and reasonable attorneys' fees incurred in this action; and

H.      Grant such other relief as the Court may deem just and proper.


Dated: August 11, 2026                          Respectfully submitted,

                                                **AMERICAN FRIENDS SERVICE COMMITTEE,**
                                                **CENTER FOR CONSTITUTIONAL RIGHTS,**
                                                **HUMAN RIGHTS WATCH, and**
                                                **OPEN SOCIETY INSTITUTE,**

                                                By their attorneys,

                                                /s/ Nicholas M. Renzler
                                                Andrew B. Loewenstein (*pro hac vice* to be submitted)
                                                Amir Farhadi (*pro hac vice* to be submitted)
                                                FOLEY HOAG LLP
                                                Seaport West
                                                155 Seaport Boulevard
                                                Boston, MA 02210
                                                617-832-1000
                                                aloewenstein@foleyhoag.com
                                                afarhadi@foleyhoag.com

                                                Nicholas M. Renzler (NR1608)
                                                Christina N. Hernsdorf (5641931)
                                                Hannah E. Sweeney (6202584)
                                                FOLEY HOAG LLP
                                                1301 Avenue of the Americas
                                                New York, NY 10019
                                                212-812-0400
                                                nrenzler@foleyhoag.com
                                                chernsdorf@foleyhoag.com
                                                hsweeney@foleyhoag.com

Rawda Fawaz (*pro hac vice* to be submitted)
FOLEY HOAG LLP
1717 K Street N.W.
Washington, DC 20006
202-223-1200
rfawaz@foleyhoag.com

*Counsel for Plaintiffs*

101