**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| AMERICAN FRIENDS SERVICE COMMITTEE, CENTER FOR CONSTITUTIONAL RIGHTS, HUMAN RIGHTS WATCH, and OPEN SOCIETY INSTITUTE,<br><br>Plaintiffs,<br><br>v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States; UNITED STATES DEPARTMENT OF STATE; MARCO A. RUBIO, in his official capacity as Secretary of State; UNITED STATES DEPARTMENT OF THE TREASURY; SCOTT K. H. BESSENT, in his official capacity as Secretary of the Treasury; UNITED STATES DEPARTMENT OF JUSTICE; TODD BLANCHE, in his official capacity as Attorney General; OFFICE OF FOREIGN ASSETS CONTROL; and BRADLEY T. SMITH, in his official capacity as Director of the Office of Foreign Assets Control,<br><br>Defendants. | Civil Action No. 26-cv-6830-JMF |

**MEMORANDUM OF LAW IN SUPPORT OF**
**PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

INTRODUCTION .......... 1

BACKGROUND .......... 5

I. The International Criminal Court .......... 5

A. The ICC's Structure and Jurisdiction .......... 6

B. The United States and the ICC .......... 8

II. The Sanctions Regime .......... 15

A. The Executive Order and Its Purported Exercise of Presidential Authority .......... 15

B. The Designations .......... 18

III. Plaintiffs' Interactions with the ICC and Sanctioned Persons .......... 20

A. American Friends Service Committee .......... 20

B. Center for Constitutional Rights .......... 21

C. Human Rights Watch .......... 24

D. Open Society Institute .......... 25

ARGUMENT .......... 28

I. Plaintiffs Are Likely to Succeed on the Merits .......... 28

A. The Sanctions Regime Is *Ultra Vires* under IEEPA .......... 29

1. There Is No "National Emergency" .......... 30

2. The Sanctions Regime Conflicts with Acts of Congress. .......... 34

3. IEEPA Does Not Authorize the Violation of International Law. .......... 39

B. The Designations Violate the Administrative Procedure Act .......... 51

1. The Designations Are Arbitrary and Capricious .......... 51

2. The Designations Are an Abuse of Discretion .......... 53

3. The Designations Are Contrary to Law .......... 55

C. The Sanctions Regime Violates the First Amendment .......... 57

1. The Sanctions Regime Imposes an Unconstitutional Burden on Plaintiffs' First Amendment Rights. ........ 58

2. The Speech Prohibitions Are Facially Overbroad. ........ 70

D. The Sanctions Regime Violates the Religious Freedom Restoration Act as to AFSC....... 71

E. The Sanctions Regime Violates the Fifth Amendment. ........ 72

II. The Sanctions Regime Is Causing Irreparable Harm. ........ 74

III. The Balance of the Equities and Public Interest Decidedly Favor Plaintiffs. ........ 78

SCOPE OF INJUNCTIVE RELIEF ........ 79

CONCLUSION ........ 81

## TABLE OF AUTHORITIES

**Cases**

*Abdullahi v. Pfizer, Inc.*,
562 F.3d 163 (2d Cir. 2009)....................41

*Agudath Isr. v. Cuomo*,
983 F.3d 620 (2d Cir. 2020)....................75

*Al Haramain Islamic Foundation, Inc. v. U.S. Dep't of the Treasury*,
686 F.3d 965 (9th Cir. 2012) ....................51

*Am. Civil Liberties Union v. Ashcroft*,
322 F.3d 240 (3d Cir. 2003)....................79

*Ams. for Prosperity Found. v. Bonta*,
594 U.S. 595 (2021)....................70

*Ashcroft v. ACLU*,
542 U.S. 656 (2004)....................69

*Bantam Books, Inc. v. Sullivan*,
372 U.S. 58 (1963)....................57, 63

*Biden v. Nebraska*,
600 U.S. 477 (2023)....................39

*Blanco v. U.S.*,
775 F.2d 53 (2d Cir. 1985)....................50

*Boy Scouts of Am. v. Dale*,
530 U.S. 640 (2000)....................66

*Bradley v. Fisher*,
80 U.S. 335 (1871)....................54

*Bronx Household of Faith v. Bd. of Educ.*,
331 F.3d 342 (2d Cir. 2003)....................75

*Brown v. Entm't Merchs. Ass'n*,
564 U.S. 786 (2011)....................63, 64

*Buckley v. Valeo*,
424 U.S. 1 (1976)....................68

*Burwell v. Hobby Lobby Stores, Inc.*,
573 U.S. 682 (2014)....................72

*Califano v. Yamasaki*,
442 U.S. 682 (1979)....................81

*Cath. Charities Bureau, Inc. v. Wis. Lab. & Indus. Review Comm'n*,
605 U.S. 238 (2025)....................63

*Cheung v. U.S.*,
213 F.3d 82 (2d Cir. 2000)....................40, 50

*Chiles v. Salazar*,
607 U.S. 627 (2026)....................58, 59, 60, 62

*Chubb & Son, Inc. v. Asiana Airlines*,
214 F.3d 301 (2d Cir. 2000)....................46, 47

*Citizens Against Rent Control v. City of Berkeley*,
454 U.S. 290 (1981)....................66

*Citizens United v. FEC*,
558 U.S. 310 (2010)....................74

*Clark v. Suarez Martinez*,
543 U.S. 371 (2005)....................29

*Conn. Dep't of Envtl. Protection v. OSHA*,
356 F.3d 226 (2d Cir. 2004)....................74

*Democracy for the Arab World Now, Inc. v. Trump*,
No. 1:26-cv-5957 (S.D.N.Y. Aug. 13, 2026)....................56

*Estras v. U.S.*,
606 U.S. 185 (2025)....................36

*Evans v. Gore*,
253 U.S. 245 (1920)....................48

*Farrell v. Burke*,
449 F.3d 470 (2d Cir. 2006)....................70

*FCC v. Fox TV Stations, Inc.*,
567 U.S. 239 (2012)....................72

*FDA v. Brown & Williamson Tobacco Corp.*,
529 U.S. 120 (2000) ....................33, 34

*Fighting Finest, Inc. v. Bratton*,
95 F.3d 224 (2d Cir. 1996)....................67

*Filártiga v. Peña-Irala*,
630 F.2d 876 (2d Cir. 1980)....39, 40

*Filtration Dev. Co., LLC v. U.S.*,
60 Fed. Cl. 371 (2004)....31

*In re Gartside*,
203 F.3d 1305 (Fed. Cir. 2000)....53

*Hamdan v. Rumsfeld*,
548 U.S. 557 (2006)....39, 40

*Harmelin v. Michigan*,
501 U.S. 957 (1991)....31

*Hoffman Estates v. Flipside, Hoffman Estates*,
455 U.S. 489 (1982)....73

*Holder v. Humanitarian Law Project*,
561 U.S. 1 (2010)....58

*Holy Land Foundation for Relief & Development v. Ashcroft*,
333 F.3d 156 (D.C. Cir. 2003)....51

*Huminski v. Corsones*,
386 F.3d 116 (2d Cir. 2004)....54

*INS v. St. Cyr*,
533 U.S. 289 (2001)....29, 79, 80

*Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am. v. Nat'l Right to Work Legal Def. & Ed. Found., Inc.*,
590 F.2d 1139 (D.C. Cir. 1978)....60

*Jacoby & Meyers LLP v. Presiding Justs. of the First, Second, Third & Fourth Departments, App. Div. of the Supreme Ct. of New York*,
852 F.3d 178 (2d Cir. 2017)....67, 69

*Jenner & Block LLP v. U.S. Dep't of Justice*,
784 F. Supp. 3d 76 (D.D.C. 2025)....62

*Karem v. Trump*,
960 F.3d 656 (D.C. Cir. 2020)....78

*Kennedy v. Bremerton Sch. Dist.*,
597 U.S. 507 (2022)....71

*Khan v. Holder*,
584 F.3d 773 (9th Cir. 2009) ....................................................................................50

*Kleindienst v. Mandel*,
408 U.S. 753 (1972)..................................................................................................58

*Knight First Amendment Inst. at Columbia Univ. v. Trump*,
928 F.3d 226 (2d Cir. 2019)......................................................................................59

*Kravitz v. Purcell*,
87 F.4th 111 (2d Cir. 2023) .......................................................................................72

*L.C. v. Trump*,
No. 26-688 (RJL), 2026 U.S. Dist. LEXIS 106000
(D.D.C. May 13, 2026) ...................................................................................20, 52, 81

*League of Women Voters of United States v. Newby*,
838 F.3d 1 (D.C. Cir. 2016) .......................................................................................78

*Learning Res., Inc. v. Trump*,
607 U.S. 229 (2026)............................................................................................29, 30

*Loon v. Dep't of Treasury*,
No. 1:23-CV-312-RP, 2025 U.S. Dist. LEXIS 80108
(W.D. Tex. Apr. 28, 2025)..........................................................................................79

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024)...................................................................................................54

*Ma v. Ashcroft*,
257 F.3d 1095 (9th Cir. 2001) ....................................................................................50

*Madison Ltd. v. Ludwig*,
82 F.3d 1085 (D.C. Cir. 1996) .............................................................................53, 54

*Marbury v. Madison*,
5 U.S. (1 Cranch) 137 (1803).....................................................................................29

*Martin v. Struthers*,
319 U.S. 141 (1943)...................................................................................................58

*McCulloch v. Sociedad Nacional De Marineros De Honduras*,
372 U.S. 10 (1963).....................................................................................................50

*Medellin v. Texas*,
552 U.S. 491 (2008)...................................................................................................79

*Mendaro v. World Bank*,
717 F.2d 610 (D.C. Cir. 1983)....................42

*Minnesota v. Mille Lacs Band of Chippewa Indians*,
526 U.S. 172 (1999)....................79

*Moody v. NetChoice, LLC*,
603 U.S. 707 (2024)....................70

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983)....................51, 53

*Murray v. The Charming Betsy*,
6 U.S. 64 (1804).................... *passim*

*N.Y. Progress & Prot. PAC v. Walsh*,
733 F.3d 483 (2d Cir. 2013)....................78

*NAACP v. Alabama ex rel. Patterson*,
357 U.S. 449 (1958)....................66, 81

*NAACP v. Button*,
371 U.S. 415 (1963)....................60, 69

*NAACP v. Claiborne Hardware Co.*,
458 U.S. 886 (1982)....................81

*New York v. Noem*,
812 F. Supp. 3d 321 (S.D.N.Y. 2025)....................78

*New York v. U.S. Dep't of Homeland Sec.*,
408 F. Supp. 3d 334 (S.D.N.Y. 2019)....................57

*New York v. U.S. Dep't of Homeland Sec.*,
969 F.3d 42 (2d Cir. 2020)....................28

*Nichols v. Village of Pelham Manor*,
974 F. Supp. 243 (S.D.N.Y. 1997) ....................73

*Nken v. Holder*,
556 U.S. 418 (2009)....................28

*NRA of Am. v. Vullo*,
602 U.S. 175 (2024)....................57, 59, 62

*Open Soc'y Justice Initiative v. Trump*,
510 F. Supp. 3d 198 (S.D.N.Y. 2021).................... *passim*

*Papachristou v. Jacksonville*,
405 U.S. 156 (1972)....................73

*Phila. Yearly Meeting of the Religious Soc'y of Friends v. United States Dep't of Homeland Sec.*, No. 25-1512, 2026 U.S. App. LEXIS 24886 at *9, 26 (4th Cir. Aug. 18, 2026) ....................71

*Perkins Coie LLP v. U.S. Department of Justice*,
783 F. Supp. 3d 105 (D.D.C. 2025)....................78

*In re Primus*,
436 U.S. 412 (1978)....................67

*R.A.V. v. City of St. Paul*,
505 U.S. 377 (1992) ....................60

*Ragbir v. Homan*,
923 F.3d 53 (2d Cir. 2019)....................59

*Reed v. Town of Gilbert*,
576 U.S. 155 (2015)....................58, 61, 63

*Reno v. ACLU*,
521 U.S. 844 (1997)....................69, 73, 74, 80

*Republican Party v. White*,
536 U.S. 765 (2002)....................63

*Riley v. Nat'l Fed'n of the Blind, Inc.*,
487 U.S. 781 (1988)....................67

*Roberts v. U.S. Jaycees*,
468 U.S. 609 (1984)....................66, 69

*Roman Cath. Diocese v. Cuomo*,
520 U.S. 14 (2020)....................74

*Rona v. Trump*,
797 F. Supp. 3d 278 (S.D.N.Y. 2025).................... *passim*

*Rosenberger v. Rector and Visitors of Univ. of Va.*,
515 U.S. 819 (1995)....................59, 71

*Rumsfeld v. Forum for Academic and Institutional Rights, Inc.*,
547 U.S. 47 (2006)....................66, 69

*Sabir v. Williams*,
52 F.4th 51 (2d Cir. 2022) ....................71

*Sessions v. Dimaya*,
584 U.S. 148 (2018)........................................................................................72

*Smith v. Trump*,
791 F. Supp. 3d 90 (D. Me. 2025) ............................................................ *passim*

*Star Fruits S.N.C. v. U.S.*,
393 F.3d 1277 (Fed. Cir. 2005)..........................................................................53

*Stump v. Sparkman*,
435 U.S. 349 (1978)..........................................................................................54

*Susman Godfrey LLP v. Exec. Office of the President*,
789 F. Supp. 3d 15 (D.D.C. 2025)......................................................................79

*Tabbaa v. Chertoff*,
509 F.3d 89 (2d Cir. 2007)..........................................................................66, 67

*The Paquete Habana*,
175 U.S. 677 (1900)............................................................................................2

*TikTok Inc. v. Garland*,
604 U.S. 56 (2025)............................................................................................58

*Estate of Tov v. United Nations Relief & Works Agency*,
807 F. Supp. 3d 208 (S.D.N.Y. 2025)...............................................................46

*Travis v. Owego-Apalachin School Dist.*,
927 F.2d 688 (2d Cir. 1991)..............................................................................59

*Trump v. CASA, Inc.*,
606 U.S. 831 (2025)......................................................................................79, 81

*U.S. v. Amirnazmi*,
645 F.3d 564 (3d Cir. 2011)..............................................................................30

*U.S. v. Clemente*,
640 F.2d 1069 (2d Cir. 1981)............................................................................38

*U.S. v. Dhafir*,
461 F.3d 211 (2d Cir. 2006)..............................................................................30

*U.S. v. Kattar*,
840 F.2d 118 (1st Cir. 1988).............................................................................38

*U.S. v. Lisinski*,
728 F.2d 887 (7th Cir. 1984) ............................................................................38

*U.S. v. Palestine Liberation Org.*,
695 F. Supp. 1456 (S.D.N.Y. 1988)....................40, 50

*U.S. v. Playboy Entm't Grp.*,
529 U.S. 803 (2000)....................61

*U.S. v. Russo*,
708 F.2d 209 (6th Cir. 1983)....................38

*U.S. v. Schulte*,
436 F. Supp. 3d 747 (S.D.N.Y. 2020)....................72

*U.S. v. Sturm*,
870 F.2d 769 (1st Cir. 1989)....................38

*U.S. v. Williams*,
553 U.S. 285 (2008)....................72

*U.S. v. Yoshida Int'l, Inc.*,
526 F.2d 560 (C.C.P.A. 1975)....................32

*V.O.S. Selections, Inc. v. U.S.*,
772 F. Supp. 3d 1350 (Ct. Int'l Trade 2025)....................30, 32

*V.O.S. Selections, Inc. v. Trump*,
149 F.4th 1312 (Fed. Cir. 2025)....................30

*Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council*,
425 U.S. 748 (1976)....................58

*Van Loon v. U.S. Dep't of the Treasury*,
122 F.4th 549 (5th Cir. 2024)....................79

*VIP of Berlin, LLC v. Town of Berlin*,
593 F.3d 179 (2d Cir. 2010)....................73

*Washington v. Reno*,
35 F.3d 1093 (6th Cir. 1994)....................78

*Weinberger v. Rossi*,
456 U.S. 25 (1982)....................39

*Widmar v. Vincent*,
454 U.S. 263 (1981)....................71

*Winter v. NRDC, Inc.*,
555 U.S. 7 (2008)....................28

*Xiaomi Corp. v. Dep't of Defense*,
No. 21-280 (RC), 2021 U.S. Dist. LEXIS 46496
(D.D.C. Mar. 12, 2021)....................79

*Youngstown Sheet & Tube Co. v. Sawyer*,
343 U.S. 579 (1952)....................29, 30, 79

*Ziglar v. Abbasi*,
137 S. Ct. 1843 (2017)....................78

**Statutes**

18 U.S.C. § 1503....................54

Administrative Procedure Act, 5 U.S.C. §§ 551 *et seq*.................... *passim*

American Servicemembers' Protection Act, 22 U.S.C. §§ 7421 *et seq*.................... *passim*

Consolidated Appropriations Act, 2023, Pub. L. No. 117-328....................34, 35

Food, Drug, and Cosmetic Act, 21 U.S.C. §§ 301 *et seq.* ....................34

Foreign Narcotics Kingpin Designation Act, 21 U.S.C. §§ 1901 *et seq*.....................54

Foreign Operations, Export Financing, and Related Programs Appropriations Act,
2005, Pub. L. No. 108-447....................34

Foreign Relations Authorization Act, Fiscal Years 1994 and 1995, Pub. L. No.
103-236, 108 Stat. 382, (1994) ....................5

Further Consolidated Appropriations Act, 2024, § 7034(r), Pub. L. No. 118-47,
138 Stat. 460 (2024) ....................35

Genocide Convention Implementation Act, 18 U.S.C. § 1091....................5

Global Magnitsky Human Rights Accountability Act, Pub. L. No. 114-328....................55

International Emergency Economic Powers Act, 50 U.S.C. §§ 1701 *et seq.* .................... *passim*

National Emergencies Act, 50 U.S.C. §§ 1601 *et seq.* ....................15

Religious Freedom Restoration Act, 42 U.S.C. §§ 2000bb *et seq*....................4, 71, 72

Trading With the Enemy Act, 50 U.S.C. §§ 4301 *et seq.*....................16

Uniform Code of Military Justice, 10 U.S.C. §§ 801 *et seq.* ....................39

War Crimes Act, 18 U.S.C. § 2441....................5

**Regulations**


31 C.F.R. § 528 (2025) ........................................................................................1, 56

31 C.F.R. § 548.701 (2026) ........................................................................................18


**Constitutional Authorities**


U.S. Const. Art. II ........................................................................................29

U.S. Const. amend. I ........................................................................................ *passim*

U.S. Const. amend. V........................................................................................72


**Legislative Authorities**


H.R. 2617, 117th Cong. § 7073(b) (2023) ........................................................35, 65

H.R. Rep. No. 94-238 (1975)........................................................................................16

H.R. Rep. No. 95-459 (1977)........................................................................16, 30, 31

H.R. Rep. No. 103-482 (1994)........................................................................................55

Illegitimate Court Counteraction Act, H.R. 23, 119th Cong. (2025) ...............................37

S. Res. 546, 117th Cong. (2022)........................................................................................35


**Treaties**


Agreement Regarding the Headquarters of the United Nations, U.S.-U.N., June 26, 1947, 11 U.N.T.S. 11 ........................................................................................44

Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, Dec. 10, 1984, 1465 U.N.T.S. 85 ..............................................................5

Convention on the Prevention and Punishment of the Crime of Genocide, Dec. 9, 1948, 78 U.N.T.S. 277 ........................................................................................5

Convention on Privileges and Immunities of the United Nations, Feb. 13, 1946, 21 U.S.T. 1418........................................................................................44

Geneva Convention (IV) Relative to the Protection of Civilian Persons in Time of War, Aug. 12, 1949, 6 U.S.T. 3516 ...........................................................................5, 45

International Covenant on Civil and Political Rights, Dec. 16, 1966, 999 U.N.T.S. 171 ........................................................................................49

Negotiated Relationship Agreement between the International Criminal Court and the United Nations, Sept. 13, 2004, 2283 U.N.T.S. 195 ....................43

Rome Statute of the International Criminal Court, July 17, 1998, 2187 U.N.T.S. 90 .................... *passim*

U.N. Charter....................41, 42, 44

Vienna Convention on the Law of Treaties, May 23, 1969, 1155 U.N.T.S. 331 ....................46

**Foreign and International Authorities**

*Applicability of Article VI, Section 22, of the Convention on the Privileges and Immunities of the United Nations, Advisory Opinion,* I.C.J. Reports 1989 (Dec. 15, 1989) ....................45

G.A. Res. 3074 (XXVIII), annex, U.N. Doc. A/RES/3074(XXVIII) (Dec. 3, 1973)....................46

G.A. Res. 67/1, U.N. Doc. A/RES/67/1 (Nov. 30, 2012) ....................46

Human Rights Committee, General Comment No. 32, U.N. Doc. CCPR/C/GC/32 (23 Aug. 2007)....................49

ICC Rules of Procedure and Evidence....................7

International Law Commission, Draft Articles on Prevention and Punishment of Crimes Against Humanity, with Commentaries, U.N. Doc. A/74/10 (2019)....................46

Int'l Comm. of the Red Cross, Commentary on Geneva Convention IV (2025) ....................45

*Iran–United States Claims Tribunal v. AS*, 94 ILR 321, 329 (Neth. 1985)....................43

Statute of the International Court of Justice ....................47

S.C. Res. 1970, U.N. Doc. S/RES/1970 (Feb. 26, 2011)....................9, 41

S.C. Res. 1894, U.N. Doc. S/RES/1894 (Nov. 11, 2009)....................46

S.C. Res. 2419, U.N. Doc. S/RES/2419 (June 6, 2018) ....................46

*ZM v. Permanent Delegation of the League of Arab States to the U.N.*, 116 ILR 643 (Switz. 1993) ....................43

**Other Authorities**

*Black's Law Dictionary* (rev. 4th ed. 1968)....................31

*Black's Law Dictionary* (11th ed. 2019)....................53

*Webster's New Collegiate Dictionary* (9th ed. 1976) ....................32

Executive Order 13,382, *Blocking Property of Weapons of Mass Destruction Proliferators and Their Supporters*, 3 C.F.R. 170 (2005) ....................55

Executive Order No. 13,224, *Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten To Commit, or Support Terrorism*, 3 C.F.R. 786 (2001) ....................54

Executive Order No. 14,203, *Imposing Sanctions on the International Criminal Court*, 90 Fed. Reg. 9369 .................... *passim*

Int'l L. Comm'n, *Second Rep. on General Principles of Law*, U.N. Doc A/CN.4/741 (Apr. 9, 2020)....................47, 48

James Crawford, *Brownlie's Principles of Public International Law* (9th ed. 2019)....................42

Restatement (Third) of Foreign Relations Law (Am. L. Inst. 1987) ....................40, 50

Restatement (Fourth) of Foreign Relations Law (Am. L. Inst. 2018) ....................31

**INTRODUCTION**

Plaintiffs American Friends Service Committee ("AFSC"), Center for Constitutional Rights ("CCR"), Human Rights Watch ("HRW"), and Open Society Institute ("OSI"), each a leading U.S.-headquartered human rights non-governmental organization dedicated to upholding and advancing human rights and the rule of law, bring this action to challenge the lawfulness of the Executive branch's International Criminal Court ("ICC") sanctions regime, comprising Executive Order No. 14,203, *Imposing Sanctions on the International Criminal Court*, 90 Fed. Reg. 9369 ("EO 14,203" or "Order"), issued by President Donald J. Trump on February 6, 2025; the designations thereunder of judges and prosecutors of the ICC, foreign human rights organizations, and a United Nations Special Rapporteur; and the Order's implementing regulations, 31 C.F.R. § 528 (2025) (together, "Sanctions Regime").

The Sanctions Regime is an unprecedented attack on the rule of law; the independence of the ICC's judges and prosecutors; and access to justice for victims of genocide, war crimes, and crimes against humanity. It effectuates this attack through multiple, mutually reinforcing means. It punishes sanctioned persons for promoting accountability for these crimes. It targets victims and other members of civil society, including Plaintiffs, who support and participate in legal proceedings at the ICC or otherwise provide education, advice, training, information, analysis, legal representation, and other services to or for the benefit of sanctioned persons, by threatening them with draconian civil and criminal penalties under the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§ 1702 *et seq*. It targets the personal—including financial—interests of ICC judges and prosecutors and U.N. officials to induce them to make decisions based on factors other than the facts and law. And it attacks the religious freedoms of faith-based organizations that express their beliefs through their commitment to human rights and

humanitarianism. For the reasons set forth below, the Sanctions Regime should be preliminarily enjoined.

*First*, Plaintiffs are likely to succeed on the merits. The Sanctions Regime is *ultra vires.* There is no "national emergency" within the meaning of IEEPA, which is a prerequisite for unlocking Congress' delegated sanctioning authority. The ICC's ability to exercise jurisdiction over nationals of countries that are not parties to the treaty that created the ICC, when they are alleged to have committed crimes on the territory of States that are parties to that treaty, has existed since the Court's establishment in 2002. How those powers have been exercised is neither recently changed nor newly known. Congress has been aware for decades and legislated accordingly. The situation is thus neither "unusual" nor "extraordinary," as IEEPA requires.

The Sanctions Regime also conflicts with the legislative scheme that Congress enacted in the American Servicemembers' Protection Act ("ASPA"), 116 Stat. 899, 22 U.S.C. §§ 7421 *et seq*., which codifies Congress' decision as to how the concerns that animate EO 14,203 are to be addressed. Congress chose to prohibit the ICC from carrying out certain activities in the U.S. on the one hand, and to authorize the President to use enumerated legal avenues vis-à-vis the ICC on the other, such as providing "legal representation and other legal assistance," "exculpatory evidence," and "defense … through appearance before the [ICC]." ASPA does not authorize the President to impose sanctions. Indeed, ASPA *forbids* employing incentives to induce actions by ICC officials, 22 U.S.C. § 7427(d). However, the Sanctions Regime does precisely what Congress directed the Executive branch *not* to do, as forbearance from inflicting economic harm is a classic incentive of the type prohibited by ASPA.

The Sanctions Regime is *ultra vires* for still another reason. As explained in the Expert Declaration of Harold Hongju Koh, the former Dean of Yale Law School and its Sterling Professor

of International Law—who served as Legal Adviser of the United States Department of State—the regime violates the U.S.'s international legal obligations. These include violating the Charter of the United Nations; the privileges and immunities of ICC judges and prosecutors and U.N. officials; obligations concerning the investigation and prosecution of suspected international crimes that are found in the Geneva Conventions as well as the Genocide and Torture Conventions, each of which the U.S. has ratified, and parallel customary rules; and foundational rules concerning judicial independence and the right to a fair trial. The *Charming Betsy* doctrine requires that IEEPA, the Sanctions Regime's governing statute, be interpreted consistently with international law barring a clear congressional decision to the contrary. Congress, however, has made no such authorization.

Beyond these defects, the designations of persons under EO 14,203 violate the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551 *et seq.*, because they are arbitrary and capricious, abuses of discretion, and contrary to law. The designations are arbitrary and capricious because they rest on factors Congress did not intend the Executive to consider. They are an abuse of discretion because their evident purpose is to target the personal and financial interests of judges, prosecutors, and U.N. officials to pressure them into disregarding their oaths of office and to punish civil society groups and lawyers for helping victims of international crimes access justice, an object irreconcilable with a sanctions apparatus designed to target terrorists, narcotics traffickers, weapons proliferators, human rights abusers, and the like. The designations are contrary to law for the reasons described above and because they regulate the exchange of personal communications and informational materials that IEEPA places beyond the President's authority.

The Sanctions Regime also violates the First Amendment. Plaintiffs have been forced to stop, alter, or cease to consider engaging in speech and expressive conduct, either independently

or jointly with others. Both facially and as applied, the regime imposes content and viewpoint discrimination that unconstitutionally burdens Plaintiffs' rights to speech and association. These restrictions cannot survive strict scrutiny, as multiple district courts have already held. *Rona v. Trump*, 797 F. Supp. 3d 278, 282, 292-93 (S.D.N.Y. 2025); *Smith v. Trump*, 791 F. Supp. 3d 90, 97-98 (D. Me. 2025); *Open Soc'y Justice Initiative v. Trump*, 510 F. Supp. 3d 198, 212-13, 212 n.7 (S.D.N.Y. 2021).

The Sanctions Regime is also unconstitutionally vague in violation of the Fifth Amendment. EO 14,203 imposes civil and criminal liability on those who provide "services to, or for the benefit of" a designated person (or the receipt of such services therefrom). That ambiguous phrase is undefined. Plaintiffs thus cannot determine what activities expose them to enforcement, an inability that further chills constitutionally protected speech.

The Sanctions Regime also violates the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. §§ 2000bb *et seq*., as applied to AFSC, a Quaker faith-based organization. AFSC's human rights advocacy and humanitarian work in the Occupied Palestinian Territory constitute an exercise of the Quakers' foundational tenets of peace, equality, community, integrity, and just stewardship of resources. In violation of RFRA, the regime substantially burdens that religious exercise by threatening AFSC with penalties for continuing its partnerships with the designated organizations, forcing AFSC to abandon collaborations integral to its religiously motivated peacebuilding and advocacy work.

*Second*, Plaintiffs are irreparably harmed by the deprivation of their constitutional and statutory rights.

*Third*, the balance of equities and public interest decisively favor a preliminary injunction. There is substantial public interest in the government abiding by the law, and there is no legitimate interest in maintaining unconstitutional and otherwise unlawful sanctions.

## BACKGROUND

### I. The International Criminal Court

The ICC is the culmination of the post-World War II movement for international criminal justice. The U.S. was a driving force behind that effort. This was marked by the criminalization of humanity's worst abuses—including genocide, war crimes, and crimes against humanity—and the legal obligation, incumbent on all countries, to prosecute and punish those crimes. This obligation is found in such seminal treaties as the Geneva Conventions and the Genocide Convention. The U.S. ratified the former in 1955, "undertak[ing] to respect and ensure respect for the [Conventions] in all circumstances,"[1] and the latter in 1988, likewise obligating it to prevent and punish the crime of genocide.[2] The U.S. is also subject to parallel customary international law obligations to prevent and punish international crimes, and to cooperate with other States to bring to an end violations of peremptory norms (or *jus cogens*) of international law.

One hundred twenty-five countries, including many of the U.S.'s closest allies, among them 30 NATO members, have chosen to fulfill these obligations through the Rome Statute of the International Criminal Court ("Rome Statute"), July 17, 1998, 2187 U.N.T.S. 90, the treaty creating the ICC. Though the U.S. has not yet ratified the treaty, when it signed the Rome Statute

[1] Geneva Convention (IV) Relative to the Protection of Civilian Persons in Time of War art. 1, Aug. 12, 1949, 6 U.S.T. 3516; War Crimes Act, 18 U.S.C. § 2441(c)(1).

[2] Convention on the Prevention and Punishment of the Crime of Genocide, Dec. 9, 1948, 78 U.N.T.S. 277 (entered into force Jan. 12, 1951; ratified by the United States Nov. 25, 1988); Genocide Convention Implementation Act, 18 U.S.C. § 1091. *See also* Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment art. 1, Dec. 10, 1984, 1465 U.N.T.S. 85; Pub. L. No. 103-236, § 506, 108 Stat. 382, 463–64 (1994).

in 2000, President Clinton invoked the U.S.'s "long history of commitment to the principle of accountability, from our involvement in the Nuremberg tribunals that brought Nazi war criminals to justice, to our leadership in the effort to establish the International Criminal Tribunals for the former Yugoslavia and Rwanda." Statement on the Rome Treaty on the International Criminal Court ("Statement on Rome Treaty"), 37 Weekly Comp. Pres. Doc. 4 (Dec. 31, 2000).

**A. The ICC's Structure and Jurisdiction**

The ICC is a permanent court, based in The Hague, the Netherlands. States that ratify or accede to the Rome Statute consent to and empower the ICC to investigate and prosecute crimes within the court's jurisdiction alleged to have occurred in their territories or by their nationals. Rome Statute, arts. 12-13. The ICC may also exercise jurisdiction over crimes referred to its Prosecutor by the U.N. Security Council pursuant to a resolution adopted under Chapter VII of the U.N. Charter. *Id.* art. 13(b). The ICC has jurisdiction over serious international crimes, including war crimes, crimes against humanity, and genocide. It is a court of last resort. The ICC may exercise jurisdiction only if a State where the alleged crimes could otherwise be investigated and prosecuted is "unwilling or unable to do so." *Id.* arts. 5, 17(a).

The Rome Statute requires that ICC judges demonstrate "high moral character, impartiality and integrity" and "possess the qualifications required in their respective States for appointment to the highest judicial offices." *Id.* art. 36. Judges must "be independent in the performance of their functions" and "shall not engage in any activity which is likely to interfere with their judicial functions or to affect confidence in their independence." *Id.* art. 40.

The ICC's Office of the Prosecutor ("OTP") is responsible for examining situations where international crimes are alleged to have occurred, carrying out investigations, and prosecuting individuals allegedly responsible. The OTP must "act independently." *Id.* art. 42(1). The OTP undertakes its own investigations, including taking witness statements, collecting documents, and

examining crime scenes. It seeks information and assistance from States and non-State actors, including witnesses, victims, and civil society organizations, who may submit information and evidence, including oral and written testimony. *Id.* arts. 15(2), 54.

Victims may participate at all stages of the proceedings. *Id.* art. 53. They can be represented by legal counsel known as "legal representatives of victims" ("LRVs"), who may make legal submissions alongside those made by the OTP or the defense, and in some circumstances, call witnesses or provide testimony. *Id.*; ICC Rules of Procedure and Evidence, Rules 85-86, 90. Victims can seek reparations and make legal submissions through counsel in support of their claims. Rome Statute, art. 75(3). Civil society organizations, such as Plaintiffs, may provide information to the OTP and seek leave to appear as *amicus curiae*.

ICC proceedings are characterized by robust procedural safeguards to protect the rights and interests of accused persons and relevant States. For example, if the Prosecutor wishes to initiate an investigation over alleged crimes committed in the territory of a State Party without a State Party referral, the Prosecutor must request authorization from the Pre-Trial Chamber. *Id.* art. 15. An accused person, a State claiming jurisdiction over a case, and a State from which acceptance of jurisdiction is required, may challenge the ICC's exercise of jurisdiction. *Id.* art. 19. Arrest warrants requested by the Prosecutor are subject to review by the Pre-Trial Chamber. *Id*. art. 58(1). Prior to trial, the Pre-Trial Chamber must hold a hearing to determine whether to confirm the charges. *Id*. art. 61. Defendants are afforded fair trial rights and due process, including the presumption of innocence. *Id.* arts. 66-67. A Trial Chamber may convict only if the charges are proven beyond a reasonable doubt. *Id.* arts. 64, 66, 67. There is an appeal process available for decisions on jurisdiction, admissibility, conviction, and sentencing, among other matters, before a five-judge Appeals Chamber. *Id.* arts. 39, 81-82. To date, the ICC has issued public arrest

warrants and/or summonses to appear for at least 70 individuals; conducted trials resulting in 13 convictions; and entered four acquittals. Compl. ¶71.

### B. The United States and the ICC

Despite not having ratified the Rome Statute, the U.S. has for over two decades supported ICC investigations and prosecutions, including by providing evidence and other practical assistance, facilitating transfers and surrenders, and welcoming convictions. Compl. ¶¶76, 82-83, 87-100. For example, the U.S. played a leading role in facilitating the transfer to the ICC of Dominic Ongwen, a top commander of the Lord's Resistance Army, after **Uganda** referred the situation on its territory to the Court. *Id.* ¶88(a). The State Department welcomed his transfer and conviction, stating that it hoped the ICC's "judgment demonstrates that justice must and will be done" for "the thousands of abducted young women and girls subjected to horrific sexual violence, torture, and forced labor in the Lord's Resistance Army." *Id.* ¶88(c). Similarly, regarding the ICC proceedings concerning crimes committed in the **Democratic Republic of the Congo**, a State Party that twice referred its situation to the Court, the U.S. facilitated the transfer of Bosco Ntaganda, who was later convicted of war crimes and crimes against humanity. *Id.* ¶89(a). The State Department "welcome[d] the removal of one of the most notorious and brutal rebels ... to the International Criminal Court" and praised the U.S.' "key role in [his] surrender" to "the ICC." *Id.*

The U.S. likewise supported the ICC's work in the **Central African Republic**, **Mali**, and **Venezuela**, all States Parties to the Rome Statute. The Central African Republic referred to the ICC international crimes, including mass rapes and killings, allegedly committed on its territory since 2012; the State Department supported "the ICC's investigations" there and "commend[ed]" the country's "commitment to ensuring accountability for serious crimes, including through its cooperation with the ICC." *Id.* ¶91(a). Mali referred alleged international crimes on its territory—including murder, mutilation, torture, rape and intentionally directing attacks against protected

objects—to the ICC, and the State Department expressed support for "efforts by the ICC and Malian authorities to provide justice for these serious crimes" and "commend[ed] Mali for its cooperation with the ICC." *Id.* ¶91(c). And, after six States Parties referred to the ICC the situation in Venezuela concerning alleged crimes against humanity, including torture and extrajudicial killings, the U.S. "welcomed" the "Prosecutor's investigation." *Id.* ¶92(b).

The U.S. has also supported ICC investigations resulting from U.N. Security Council referrals. During the George W. Bush administration, the Security Council, of which the U.S. is a permanent member, referred the situation in the **Darfur region of Sudan**, a non-State Party to the Rome Statute, to the ICC. At the time, mass atrocities had caused hundreds of thousands of deaths and displaced millions. The State Department "fully support[ed] bringing to justice those responsible for crimes and atrocities" and "call[ed] upon the Sudanese Government to cooperate fully with the ICC." *Id.* ¶99(b). After the ICC issued an arrest warrant for then-President Omar al-Bashir, the National Security Council stated that the U.S. "strongly supports international efforts to bring those responsible for genocide and war crimes in Darfur to justice and believes that there cannot be a lasting peace in Darfur without accountability."[3] The U.S. has continued to support ICC efforts following the resumption of violence. Compl. ¶¶99(c), 99(d).

The Security Council unanimously referred to the ICC the situation in **Libya**, also a non-State Party to the Rome Statute, "condemning the violence and use of force against civilians" and "deploring the gross and systematic violation of human rights."[4] The U.S. said the referral "reflected the importance that the international community attaches to ensuring that those

---

[3] *US urges Sudan cooperation on Bashir arrest warrant*, Reuters (Jul. 13, 2010), https://www.reuters.com/article/world/africa/us-urges-sudan-cooperation-on-bashir-arrest-warrant-idUSN13260228/.

[4] S.C. Res. 1970, pmbl., U.N. Doc. S/RES/1970 (Feb. 26, 2011); *see also* Compl. ¶100(a).

responsible for the widespread and systematic attacks against the Libyan people are held accountable" and "welcome[d] the swift and thorough work of the Prosecutor." *Id.* ¶100(b).

U.S. support has extended to the prosecution of nationals of countries that are not parties to the Rome Statute. In the **Republic of Georgia**, a State Party, the Court authorized an investigation into alleged war crimes during Russia's invasion, and the U.S. praised subsequent "decisions of the International Criminal Court" to issue arrest warrants for nationals of the Russian Federation notwithstanding that it is not a party to the Rome Statute. *Id.* ¶96. In **Bangladesh/Myanmar**, the Court authorized an investigation into the alleged crimes against humanity of deportation and persecution committed against the Rohingya population, on the ground that the crimes partially occurred in Bangladesh, even though Myanmar is not a State Party. The State Department "support[ed] a referral of the situation in Burma [Myanmar] to the [ICC]." *Id.* ¶98(a). The Court's Prosecutor subsequently requested an arrest warrant for a Myanmar national, Senior General Min Aung Hlaing, the former Commander-in-Chief of the Myanmar Defense Services, for those alleged crimes. *Id.* ¶98.

Most recently, in **Ukraine**, after 43 States Parties referred the situation to the Court, the ICC Prosecutor opened an investigation into alleged crimes committed by Russian nationals, even though Russia is not a State Party to the Rome Statute. *Id.* ¶95. The U.S. Ambassador-at-Large for Global Criminal Justice said: "[t]he United States welcomes the opening of the investigation by the ICC into atrocity crimes committed in Ukraine, and we intend to engage with all stakeholders to achieve our common objectives in ensuring justice." *Id.* ¶95(a). After the ICC issued arrest warrants for Russian nationals Vladimir Putin and Maria Lvova-Belova, the U.S. Mission to the U.N. stated: "we believe the warrants are justified. The United States supports that

investigation, as well as a range of other situations before the Court."[5] Congress then enacted bipartisan legislation supporting U.S. cooperation with the investigation, which the State Department welcomed, noting that "[h]olding Russia to account for its war crimes and other atrocities within Ukraine and against its people is foundational to the defense of U.S. values and the maintenance of a peaceful, just, and secure world." *Id.* ¶95(d).

Beyond these expressions of support, in a speech to the ICC's Assembly of States Parties ("ASP"), the U.S. described its practice of "providing practical assistance to the OTP across a range of its investigations," including "helping the [ICC] track fugitives across several situations" through "offering rewards for their arrest" and "providing input and commentary on the OTP's policy papers."[6] *Id.* ¶87. The U.S. has also convened meetings to identify practical solutions to challenges including witness protection, insider witnesses, and cybersecurity. In a statement to the U.N. General Assembly, the U.S. reiterated its support for the ICC's efforts "to deliver justice in situations where atrocities have been committed," including "in Ukraine, Darfur, and the Central African Republic." *Id.* ¶85.

The U.S. has not supported two ICC investigations. The first disfavored investigation is the *Situation in the Islamic Republic of Afghanistan* ("*Situation in Afghanistan*"), which has been before the ICC for nearly twenty years. **Afghanistan** became a State Party to the Rome Statute on May 1, 2003, at which time there was an armed conflict on its territory in which the U.S. was a participant. Compl. ¶101. In 2007, it became public that the Prosecutor had opened a preliminary

---

[5] Calvin Smyre, U.S. Mission to the U.N., United States Statement on Agenda Item 74: Report of the International Criminal Court, U.N. G.A.O.R., 78th Sess., at 2 (Oct. 30, 2023), https://estatements.un.org/estatements/10.0010/20231030150000000/9pqKoEEGe5ct/u0JIQkuQxAWb_en.pdf.

[6] U.S. Amb.-at-Large for Glob. Crim. Just., *Statement of the United States at the 22nd Session of the Assembly of States Parties of the International Criminal Court* (Dec. 8, 2023), https://2021-2025.state.gov/statement-of-the-united-states-at-the-22nd-session-of-the-assembly-of-states-parties-of-the-international-criminal-court.

examination into alleged crimes committed in Afghanistan; in 2013, the OTP reported that the examination included allegations of torture, including allegedly by U.S. nationals. *Id.* ¶¶104, 107.

In 2017, the Prosecutor requested that the Pre-Trial Chamber authorize an investigation into crimes allegedly committed in Afghanistan, including by the Taliban, Afghan forces, and U.S. nationals. *Id.* ¶106. Victims were permitted to participate in those proceedings, and an attorney at Plaintiff CCR, in the role of LRV, made submissions on their behalf. *Id.* ¶107; Declaration of Katherine Gallagher ("CCR Decl.") ¶12. In 2019, the Pre-Trial Chamber denied the Prosecutor's request to authorize an investigation. The Prosecutor and victims, including through Plaintiff CCR, appealed that decision. Compl. ¶108. In that appeal, the Appeals Chamber received submissions from, *inter alia*, Afghanistan and victims, through their LRVs, including an attorney from Plaintiff CCR, *id.* ¶109; CCR Decl. ¶12, as well as an *amicus curiae* brief by human rights organizations, including Plaintiff HRW. Compl. ¶109; Declaration of Elizabeth Evenson ("HRW Decl.") ¶16(b). The U.S. could have, but did not, participate.

In 2020, the ICC's Appeals Chamber unanimously authorized an investigation into crimes allegedly committed in Afghanistan, including those allegedly committed by the Taliban, Afghan security forces, and U.S. personnel. Compl. ¶109. Afghanistan asked the Prosecutor to defer the investigation; in September 2021, the Prosecutor sought leave to resume the investigation, while indicating his decision to focus on crimes allegedly committed by the Taliban and the Islamic State-Khorasan Province and to "deprioritise other aspects of this investigation"—understood to refer to the investigation of alleged crimes by U.S. and Afghan forces. *Id.* ¶111.

The Prosecutor has never announced the resumption of an investigation into U.S. personnel. *Id.* ¶112. In January 2025, applications for arrest warrants were announced for senior members of the Taliban for the crime against humanity of persecution on gender grounds. *Id.*

¶113. The arrest warrants were issued in July 2025. No applications for arrest warrants have been announced for U.S. personnel. *Id.* ¶112.

The U.S. has also not supported the ICC investigation into the *Situation in the State of Palestine* ("*Situation in Palestine*"), which has been before the ICC for over a decade. **Palestine** acceded to the Rome Statute in January 2015 and accepted the ICC's jurisdiction over its territory and nationals since June 13, 2014. *Id.* ¶114. The Prosecutor announced the opening of a preliminary examination in January 2015. *Id.* Palestine also referred the situation to the Prosecutor, and in 2023 five States Parties submitted an additional referral. *Id.* ¶116. During the preliminary examination, victims and human rights organizations, including Al-Haq: Law in the Service of Man ("Al-Haq"), Al Mezan Center for Human Rights ("Al Mezan"), and the Palestinian Centre for Human Rights ("PCHR"), to which Plaintiff CCR provided legal support and advice, submitted information and potential evidence to the Prosecutor in support of establishing that there existed a reasonable basis to open an investigation. *Id.* ¶115; CCR Decl. ¶ 16.

In December 2019, the Prosecutor filed a request for the Pre-Trial Chamber to confirm the ICC's jurisdiction. The court received more than 30 *amicus curiae* briefs, including from the Israeli and Palestinian Bar Associations, human rights organizations, legal scholars, former high-level officials in the U.S. State Department, and eight States or groups of States, expressing views both supporting and opposing the exercise of jurisdiction. *Id.* ¶118. Victims made written submissions, including through an attorney from Plaintiff CCR. *Id.*; CCR Decl. ¶12, 21.

In 2021, following authorization by the Pre-Trial Chamber, the OTP opened an investigation. In May 2024, the Prosecutor announced the submission of applications for arrest warrants for three Palestinian nationals holding senior positions in Hamas, and two Israeli nationals, including Prime Minister Benjamin Netanyahu and Yoav Gallant, former Minister of

Defense of Israel. Following a request by the United Kingdom to make a submission challenging the ICC's jurisdiction, over 60 *amicus curiae* briefs were submitted, including from Plaintiffs OSI and HRW, as well as the U.S.—its first legal submission to the ICC. *Id.* ¶122; Declaration of James Goldston ("OSI Decl.") ¶11(f); HRW Decl. ¶16(b). Victims also made submissions related to the arrest warrants and ICC jurisdiction, including through Plaintiff CCR attorneys, as LRVs. CCR Decl. ¶12(b), 21(a).

In November 2024, the ICC issued an arrest warrant for Mohammed Al-Masri, the highest-ranking commander of the military wing of Hamas, for alleged crimes, including murder, extermination, torture, rape and other forms of sexual violence, hostage-taking, and outrages upon personal dignity. The OTP had also requested arrest warrants for two other senior Hamas leaders, Ismail Haniyeh and Yahya Sinwar. All three proceedings were terminated upon confirmation of their deaths. Compl. ¶123. Arrest warrants were also issued for Prime Minister Netanyahu and former Defense Minister Gallant, for the alleged war crimes of starvation as a method of warfare and intentionally directing an attack against the civilian population, and the alleged crimes against humanity of murder, persecution, and other inhumane acts. *Id.* ¶124. Israel is participating in the proceedings and has raised challenges to the investigation in both the Pre-Trial and Appeals Chambers, including a jurisdictional challenge and a request to disqualify the Prosecutor. These challenges have been denied or are pending. *Id.* ¶127.

The U.S.'s opposition to the Afghanistan and Palestine proceedings is based on its long-standing, albeit inconsistently applied, objection to the prospect of the ICC exercising jurisdiction over nationals of non-State Parties. *Id.* ¶77; *see, e.g., supra* (describing U.S. support for the ICC's investigation of crimes allegedly committed by Russian nationals in Ukraine). When the U.S. signed the Rome Statute, President Clinton expressed concern that the ICC "will not only exercise

authority over personnel of states that have ratified the Treaty, but also claim jurisdiction over personnel of states that have not." Statement on the Rome Treaty. *See also* Compl. ¶148.

To address this concern, in 2002, Congress enacted ASPA. *See* Compl. ¶78. Congress imposed certain restrictions on the ICC's activities in the U.S. and authorized the President to undertake a limited set of actions to assist U.S. or allied persons who are subject to ICC proceedings, such as providing legal representation, participating in legal proceedings, or presenting exculpatory evidence. 22 U.S.C. § 7427. Imposing sanctions is *not* an authorized action. Indeed, ASPA *prohibits* the type of coercive inducements that the Sanctions Regime employs, even in circumstances of a U.S. or allied person being detained. *Id.* § 7427(d). Further, Congress included provisions in ASPA to permit support for ICC investigations under certain circumstances, including with respect to "foreign nationals accused of genocide, war crimes or crimes against humanity" and "investigations and prosecutions of foreign nationals related to the Situation in Ukraine." *Id.* § 7433(a).

## II. The Sanctions Regime

### A. The Executive Order and Its Purported Exercise of Presidential Authority

On February 6, 2025, President Trump issued EO 14,203. The Order invokes authority Congress delegated to the President in IEEPA, a statute that permits the President to exercise certain powers once he has declared a "national emergency" under the National Emergencies Act ("NEA"), 50 U.S.C. §§ 1601 *et seq.*, with respect to "any unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States." 50 U.S.C. § 1701(a). IEEPA's powers "may not be exercised for any other purpose." *Id.* § 1701(b).

Congress intended this to be a meaningful constraint on the President's powers: "A national emergency should be declared and emergency authorities employed only with respect to a specific

set of circumstances which constitute a real emergency, and for no other purpose." H.R. Rep. No. 95-459, at 10 (1977). Congress stressed that "emergencies are by their nature rare and brief" and "not to be equated with normal, ongoing problems"; "emergency authorities" should be "employed only" for "a real emergency." *Id.*; H.R. Rep. No. 94-238, at 2 (1975) (noting NEA makes "it possible for our Government to function in accordance with regular and normal provisions of law rather than through special exceptions and procedures which were intended to be in effect for limited periods during specific emergency conditions"); H.R. Rep. No. 95-459, at 11 ("authority for routine, nonemergency regulation of international economic transactions which has heretofore been conducted under the [IEEPA precursor] Trading With the Enemy Act should be transferred to other legislation"). Congress therefore authorized the President to act in *unforeseen crises* when it does not have time to legislate.

Congress later modified IEEPA to deny the President the right to block (or impose punishment for engaging in) personal communications and transactions in information and informational materials, forbidding him from regulating or prohibiting the import or export of "publications, films, posters, phonograph records, photographs, microfilms, microfiche, tapes, or other informational materials." 50 U.S.C. § 1702(b)(3).

Subject to these constraints, IEEPA permits the President to:

> block … regulate ... void, prevent or prohibit, any acquisition, holding, withholding, use transfer, withdrawal, ... dealing in, or exercising any right, power or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest by any person, or with respect to any property, subject to the jurisdiction of the United States.

*Id.* § 1702(a)(1)(B).

EO 14,203 declares a national emergency with respect to "any effort by the ICC to investigate, arrest, detain, or prosecute protected persons," defined as any U.S. person or "any foreign person that is a citizen or lawful resident of an ally of the United States" that has not

consented to ICC jurisdiction. EO 14,203, Preamble & § 8(d). It asserts that the ICC has "engaged in illegitimate and baseless actions" and "without a legitimate basis, asserted jurisdiction over and opened preliminary investigations concerning personnel of the United States and certain of its allies, including Israel," referencing the arrest warrants for Prime Minister Netanyahu and former Defense Minister Gallant. *Id.*, Preamble.

EO 14,203 declares this putative emergency notwithstanding that: (1) the Rome Statute authorizes the ICC to exercise jurisdiction where crimes are committed by non-State Party nationals on the territory of an ICC State Party; (2) for a quarter-century, Congress has been aware of, and legislated to address, the prospect of the ICC exercising such territorial jurisdiction and has not authorized sanctions related to the ICC; (3) the U.S. has supported the exercise of ICC jurisdiction over crimes allegedly committed by nationals of States that are not party to the Rome Statute, including by Russian nationals in Ukraine and Georgia; and (4) the ICC's Afghanistan and Palestine investigations have been ongoing for more than 18 and 11 years, respectively.

Section 1 of EO 14,203 "block[s]" "the property and interests in property that are in the United States, that hereafter come within the United States, or that are or hereafter come within the possession or control of any United States person, of" the then-Prosecutor of the ICC, Mr. Karim Khan KC, *see* EO 14,203, Annex,[7] and "any foreign person determined by the Secretary of State, in consultation with the Secretary of the Treasury and the Attorney General," *inter alia*, "to have directly engaged in any effort by the ICC to investigate, arrest, detain, or prosecute a protected person." EO 14,203, § 1. Those whose property is blocked are included on the Specially

[7] On July 24, 2026, the ASP removed Mr. Khan as the ICC's Prosecutor. ICC ASP, Statement of the ASP President following the conclusion of disciplinary proceedings involving Karim Khan, July 24, 2026, available at: https://www.icc-cpi.int/news/statement-asp-president-following-conclusion-disciplinary-proceedings-involving-prosecutor.

Designated Nationals List ("SDN List") maintained by the Department of the Treasury's Office of Foreign Assets Control ("OFAC").

As relevant to the penalties that Plaintiffs and others face, Section 3 prohibits "the making of any contribution or provision of funds, goods, or services by, to, or for the benefit of any person whose property and interests in property are blocked pursuant to section 1 of this order." Neither the Order nor its implementing regulations define key terms, including: "services to or in support of," and "services by, to, or for the benefit of." EO 14,203, § 3. The effect is to prohibit virtually any interaction with sanctioned persons. Those who violate these prohibitions face penalties, including civil fines the greater of $377,700 or twice the value of a violative transaction, and criminal penalties in the form of fines up to $1,000,000, and up to 20 years' imprisonment. 31 C.F.R. § 548.701 (2026).

### B. The Designations

Subsequent to the blocking of the then-ICC Prosecutor via the Executive Order, Secretary Rubio sanctioned four categories of persons: (1) ICC judges; (2) ICC prosecutors; (3) human rights organizations; and (4) a U.N. Human Rights Special Rapporteur. He designated each for having purportedly "directly engaged in an[] effort by the ICC to investigate, arrest, detain, or prosecute a protected person without consent of that person's country of nationality." EO 14,203, § 1(a)(ii)(A). Previously, Plaintiffs have engaged with each designated person and challenge their designations in this action.

***ICC Judges.*** Secretary Rubio designated nine ICC judges, each a distinguished jurist with decades of service in international courts and national legal systems. Compl. ¶152. Three of them—Judges Kimberly Prost, Solomy Balungi Bossa and Luz del Carmen Ibáñez Carranza—were designated for participating in the *Situation in Afghanistan* proceedings. *Id.* ¶153.

According to the State Department, these judges were sanctioned for ruling, as members of the Appeals Chamber, to authorize an investigation into U.S. personnel. *Id.* ¶¶155, 157, 159.

Secretary Rubio designated five others—Judges Reine Adélaïde Sophie Alapini-Gansou, Beti Hohler, Nicolas Yann Guillou, Gocha Lordkipanidze, and Erdenebalsuren Damdin—for their participation in the *Situation in Palestine* proceedings. Judges Alapini-Gansou, Hohler, and Guillou were sanctioned for ruling to authorize the issuance of arrest warrants for Prime Minister Netanyahu and former Defense Minister Gallant; Judges Lordkipanidze and Damdin were sanctioned for their Appeals Chamber ruling that rejected Israel's jurisdictional challenge.[8]

***ICC Prosecutors.*** Secretary Rubio designated the ICC's Deputy Prosecutors—Ms. Nazhat Shameem Khan, a former Fijian diplomat who had served as President of the U.N. Human Rights Council, and Mr. Mame Mandiaye Niang, a veteran Senegalese prosecutor with extensive experience in the U.N. system—for "continuing to support illegitimate ICC actions against Israel." Compl. ¶¶178, 180.[9]

***Human Rights Organizations***. Secretary Rubio designated three Palestinian human rights organizations: Al-Haq, Al Mezan, and PCHR. Each is a globally recognized human rights and advocacy organization that enjoys consultative status with the U.N. Economic and Social Council, and is an active and well-regarded member of global human rights networks. Each was designated for having "directly engaged in efforts by the International Criminal Court (ICC) to investigate, arrest, detain, or prosecute Israeli nationals, without Israel's consent." Compl. ¶184.

---

[8] Judges Prost, Bossa, and Alapini-Gansou are challenging their designations through litigation in this Court. *Prost v. Trump*, No. 1:26-cv-05305 (S.D.N.Y. June 24, 2026). On August 18, 2026, the President of the ICC, Judge Tomoko Akane, was sanctioned as well. Press Release, U.S. Department of State, Advancing the United States' Campaign to Address the Threat Posed by the International Criminal Court (Aug. 18, 2026), https://www.state.gov/releases/office-of-the-spokesperson/2026/08/advancing-the-united-states-campaign-to-address-the-threat-posed-by-the-international-criminal-court.

[9] On August 18, 2026, Abdoulaye Seye, an ICC Senior Trial Lawyer, was sanctioned as well. *Id.*

***U.N. Special Rapporteur***. Secretary Rubio designated Ms. Francesca Albanese, an international lawyer serving as the U.N. Special Rapporteur on the situation of human rights in the Palestinian territory occupied since 1967, a position to which she was appointed by the U.N. Human Rights Council. *Id.* ¶225. An independent expert, she is mandated to investigate and report on human rights conditions in the Occupied Palestinian Territory.[10]

## III. Plaintiffs' Interactions with the ICC and Sanctioned Persons

Plaintiffs are U.S.-headquartered non-governmental organizations whose missions and programmatic work are directly harmed by the Sanctions Regime. Each Plaintiff has a history of engagement with international criminal justice mechanisms, including the ICC, and with the sanctioned persons, including in the context of the Afghanistan and Palestine situations, as well as other situations that the U.S. supports. The Sanctions Regime has caused each Plaintiff to discontinue or alter activities it was previously performing prior to the designations, and to abandon or reconsider activities each had planned to undertake, significantly impairing each Plaintiff's ability to carry out its core mission.

### A. American Friends Service Committee

AFSC engages in human rights advocacy and humanitarian activities in the Occupied Palestinian Territory. Declaration of Joyce Ajlouny ("AFSC Decl.") ¶¶7, 8. AFSC regards its work there as an exercise of Quaker religious convictions. *Id*. ¶8. AFSC has been internationally recognized for its humanitarian efforts, jointly receiving the Nobel Peace Prize with the British Friends Service Council on behalf of Quakers worldwide in 1947. *Id*. ¶9.

AFSC's work depends on partnerships with Palestinian civil society organizations that possess local presence, knowledge, and expertise. *Id*. ¶11. These include AFSC's decades-long

[10] Ms. Albanese's designation is the subject of pending litigation. *L.C. v. Trump*, No. 26-688 (RJL), 2026 U.S. Dist. LEXIS 106000, at *5 (D.D.C. May 13, 2026).

relationships with Al-Haq and Al Mezan. *Id*. ¶¶12-15. Through these partnerships, AFSC obtained information for its research and advocacy; organized conferences and educational workshops; collaborated on reports; participated in advocacy coalitions; and obtained introductions to others. *Id*. AFSC also maintained a relationship with Ms. Albanese, contributing research and information for her reports. *Id*. ¶16.

The Sanctions Regime has caused AFSC to discontinue those activities and abandon or reconsider activities it had planned to undertake. AFSC Decl. ¶19. Among other impacts, AFSC has discontinued planning initiatives and hosting events in collaboration with Al-Haq or Al Mezan; ceased collaborating with Ms. Albanese and contributing to her reports; and been unable to maintain the connections that Al-Haq and Al Mezan had facilitated with other organizations, human rights defenders, and victims. *Id*. ¶¶19-21. This has prevented AFSC from carrying out its mission and exercising the religious beliefs that motivate its mission. *Id*.

**B. Center for Constitutional Rights**

CCR is a non-profit legal, educational, and advocacy organization dedicated to advancing and protecting rights guaranteed by the Constitution and international law. CCR Decl. ¶5. CCR has a storied history of litigating cases on behalf of victims and survivors of serious violations, including the landmark human rights case, *Filártiga v. Peña-Irala*, 630 F.2d 876 (2d Cir. 1980). *Id.* ¶7. CCR participated in the Preparatory Committee on the Establishment of the International Criminal Court as a member of the Coalition for the International Criminal Court ("CICC") and has actively engaged with the ICC for many years. *Id.* ¶6, 8. CCR is also a member of other human rights networks through which it carries out its mission and work. *Id.* ¶6, 22.

CCR's engagement with the ICC has centered on its representation of victims and related advocacy. *Id.* ¶8. Since 2011, CCR attorneys have served as counsel to victims and made legal submissions on their behalf to the OTP and ICC judges. *Id.* ¶9, 10, 12. CCR attorneys are admitted

to the ICC's List of Counsel and serve as LRVs. *Id.* ¶9. In that capacity, CCR attorneys have, *inter alia*, met and exchanged information with victims and potential clients; counseled victims regarding ICC jurisdiction, procedures, and legal developments; and gathered information from clients in anticipation of meetings with, or making submissions to, the ICC, including the OTP. *Id.* ¶¶12(a)-12(c). CCR attorneys have also made legal filings and oral submissions to the ICC, including supporting and calling for the investigation and, where appropriate, the prosecution of U.S. and Israeli citizens for the commission of crimes falling within the jurisdiction of the ICC; shared legal analysis and factual information with the OTP in support of pending or contemplated investigations and prosecutions; and met with the OTP to discuss its investigations and prosecutions, including advising of real-time or time-sensitive developments. *Id.* ¶¶12(d)- 12(h), 19(a)-19(c). To successfully fulfill their obligations as LRVs, CCR attorneys have also worked with other LRVs and civil society groups, including by engaging in joint advocacy, to advance the views and interests of victims; and advanced the position of clients or potential clients in public fora where members of the OTP, including the Prosecutor, were present. *Id*. ¶¶12(i), 12(j), 18, 21(a), 22.

Since at least 2015, CCR's work has involved advancing investigations and prosecutions in the ICC's Afghanistan and Palestine proceedings, the former with a focus on U.S. torture allegations and with the latter often in coordination with Al-Haq, Al Mezan, and PCHR, including for joint activities for which CCR has covered expenses. *Id*. ¶¶12, 21. CCR regularly engaged in advocacy with or directed at the OTP and ICC judges, including, *inter alia*, providing input on thematic, strategic, and policy documents, such as the OTP's *Policy on Children*. *Id.* ¶19(b), 19(d).

Prior to their designations, CCR enjoyed close, longstanding relationships with Al-Haq, Al Mezan, and PCHR. *Id*. ¶20. CCR attorneys regularly met with their staffs to discuss, develop,

and execute litigation strategies and joint advocacy focused on working to end impunity for grave violations of international law, including before the ICC. *Id.* ¶21. All three organizations served as liaisons between CCR and victims to facilitate representation of victims at the ICC. *Id.* CCR contributed to, or made joint legal submissions with, all three organizations before the ICC and represented some as legal counsel, including serving as counsel for Al-Haq in *Defense for Children International-Palestine v. Biden* (No. 23-cv-05829-JSW (N.D. Cal.)) and Case No. 24-704 (9th Cir.). *Id.* ¶¶21(a)-21(c). CCR attorneys acted as LRVs for Al-Haq and Al Mezan before the ICC. *Id.* ¶21(d). In addition, CCR engaged with Ms. Albanese, making submissions, holding bilateral meetings, and appearing on panels with her. *Id.* ¶¶24, 25.

The Sanctions Regime has caused CCR to discontinue activities it was previously performing before the designations, and to abandon, alter or reconsider activities it had planned to undertake. *Id.* ¶27, 28, 34. Among other things, CCR has ceased or limited its activities with respect to the ICC, causing it to forego a prominent forum to pursue justice and accountability for victims, including, but not limited to, in the Afghanistan and Palestine proceedings. *Id.* ¶29, 31-32. For instance, CCR attorneys have been forced to withdraw as counsel or cease actively representing clients at the ICC, including as LRVs. *Id.* CCR has also foregone opportunities to represent new clients at the ICC and otherwise expand its ICC-related work. *Id.* CCR has stopped engaging with the OTP, including ceasing to attend meetings with OTP staff, or provide it with information or make submissions to or in support of the OTP's positions. *Id.* ¶30.

CCR has also ceased engaging in communications with Al-Haq, Al Mezan, and PCHR that may be prohibited by the Sanctions Regime and no longer works with them to prepare cases or represent the organizations. *Id.* ¶34, 35. For example, CCR ceased making joint filings with PCHR attorneys as LRVs on behalf of victims at the ICC; stopped accepting referrals from the

designated organizations for cases to be litigated by CCR in U.S. courts; ended years-long—and in the case of PCHR, nearly 40 years long—collaborations concerning ongoing litigation and advocacy; ceased participating in joint strategy sessions with the three organizations; ceased inviting the designated organizations to participate in advocacy efforts on any topic, including those unrelated to the ICC; and ceased reposting or otherwise amplifying social media posts or advocacy from them, regardless of whether the content is related to the ICC, impairing CCR's ability to contribute to and influence public discourse. *Id*. ¶35. And, with respect to Ms. Albanese, CCR has ceased providing her with information on human rights violations in the Occupied Palestinian Territory. *Id*. ¶38. CCR's programmatic resources have been diverted as a result of sanctions to focus on navigating the sanctions regime and advocacy or litigation efforts to challenge it. *Id*. ¶39.

**C. Human Rights Watch**

HRW is a research and advocacy organization that investigates and reports on violations of international human rights and humanitarian law. HRW Decl. ¶5. HRW was a leading advocate for the establishment of the ICC and founding member of the CICC. *Id*. ¶¶8, 14.

Since the ICC's establishment, HRW has conducted research and advocacy aimed at supporting independent, impartial, and meaningful justice by the ICC. *Id*. ¶10. HRW regularly engaged with the OTP, including consultations with its staff and the Prosecutor's special advisors for the development of thematic policies. HRW also communicated with the OTP, *inter alia*, to receive updates and share information relevant to its investigations and examinations and discuss the OTP's investigative priorities; and participated in joint NGO meetings with OTP staff. *Id*. ¶15. Further, HRW interacted with ICC judges by participating in roundtables organized for NGOs and ICC staff to share information and discuss topics of mutual interest; submitting *amicus curiae* briefs in ICC proceedings, including in regard to the Afghanistan and Palestine situations; and

organizing, participating in, or attending panel discussions or other events that included ICC judges among the speakers. *Id*. ¶16. *See also id.* ¶21.

Prior to their designations, HRW maintained close relationships with Al-Haq, Al Mezan, and PCHR. *Id*. ¶17. Its interactions with these organizations included, among other things, liaising with and obtaining information from them—including local insights and victim interviews—to facilitate HRW's research; working in partnership with the organizations, as fellow members of the CICC, to advocate to ICC States Parties and ICC organs for strengthened support and policy and practical changes; participating in joint strategic meetings with them and other partners in the movement, and coordinating joint advocacy efforts; and promoting each other's work on social media. *Id*. ¶¶17(a)-(c).

The Sanctions Regime has caused HRW to discontinue activities it was previously performing, and to abandon or reconsider activities it had planned to undertake. *Id*. ¶20. HRW has, *inter alia,* discontinued, abandoned, or reconsidered: engaging substantively with OTP staff on its investigations and preliminary examinations; accepting invitations to events hosted by the OTP and designated NGOs; hosting side-events at the ASP session in December 2025; and fully participating in activities at the annual ICC-NGO roundtable in June 2026 where designated parties were involved. *Id.* ¶21. HRW has also stopped collaborating with the designated NGOs, including undertaking joint research and coordinating victim/witness interviews, joint statements, advocacy meetings, and public appearances. HRW also no longer briefs Ms. Albanese on HRW's research. *Id.* ¶21(d), 21(f). *See also id*. ¶18(a).

**D. Open Society Institute**

OSI is a private foundation and charitable trust. OSI Decl. ¶5. The Open Society Justice Initiative ("OSJI"), created in 2003 as a program of OSI, acts as a U.S.-based public interest law center dedicated to advancing human rights and the rule of law through litigation, advocacy, grant-

giving, and convening. *Id*. ¶8. OSJI litigates on behalf of itself and others to provide justice to victims and survivors of transnational and international legal violations; provides grants and technical assistance to individuals and organizations engaged in strategic litigation and associated activities; consults with interested parties about issues of international concern, such as international justice for the commission of grave crimes; and speaks publicly about these international issues. *Id*. OSJI is a member of and participates in the broader advocacy efforts of network organizations like the CICC. *Id*. ¶9.

As part of its work combating international crimes, OSJI has engaged with the ICC on a broad range of issues since the court's founding. *Id*. ¶10. OSJI's work has required routine engagement with the ICC and its officials, including judges and the OTP, in addition to local and international civil society organizations working on the same issues. *Id*. ¶11. This has included advising the OTP on prosecutorial strategy and use of emerging technologies to analyze evidence of international crimes; organizing meetings with ICC judges and other officials to advise on the development of performance indicators; meeting with ICC staff to assist the ICC in strengthening the effectiveness of its communications; and contributing to the process known as the "ICC review," organized by the ASP, aimed at improving the Court's operations. In addition, OSJI has engaged in discussions with ICC officials and civil society partners on the implementation and execution of ICC arrest warrants; filed a brief as *amicus curiae* in the *Situation in Palestine* regarding the ICC's jurisdiction; and engaged with the OTP regarding its investigation into the *Situation in Afghanistan*, with a specific focus on the Taliban's perpetration of crimes against Afghan women and girls. *Id*. ¶¶11(a)-(i).

OSJI has engaged in joint activities with the designated organizations. For example, OSJI traveled to Ramallah, met with local civil society organizations, and conducted a multi-day training

for the staff of Al-Haq about the Rome Statute, ICC procedures, strategic choices facing NGOs engaging with the ICC, and methodology to document atrocities. *Id.* ¶21. OSJI provided input on one of Al-Haq's submissions to the OTP regarding alleged crimes committed in the West Bank. *Id.* In addition, since 2023 and until the organization's designation, OSJI held discussions with Al-Haq concerning strategic litigation opportunities. *Id.* ¶22. OSJI also participated in a strategy session with the three designated organizations during the ASP in 2024, and, at the time of their designations, was actively considering partnering with two of them on litigation opportunities not involving the ICC. *Id*. OSJI engaged as well with Ms. Albanese, including participating in a call with her to discuss potential strategic litigation opportunities concerning human rights abuses in the Occupied Palestinian Territory. *Id*. ¶23.

The Sanctions Regime has caused OSI to discontinue, abandon, or reconsider activities that it had planned to undertake through OSJI. *Id.* ¶¶24, 25. OSJI has, *inter alia*, ceased initiating or accepting meetings with the ICC's former Prosecutor or Deputy Prosecutors or anyone operating directly under their control or acting for them or on their behalf; limited its participation in meetings between civil society and the ICC, including the annual ICC-NGO Roundtables; and significantly restricted its participation in ASP side-events. *Id*. ¶26(a)-(c). OSJI has also discontinued plans to share legal resources and analysis to facilitate implementation of ICC warrants; abstained from supporting local partners in making submissions to the OTP regarding alleged atrocity crimes; and refrained from filing briefs as *amicus curiae* in ICC proceedings concerning any ICC situations. *Id*. ¶26(d)-(g). *See also id*. ¶30.

OSI likewise severed its connections to, and communications with, the three designated organizations, including through OSJI. *Id.* ¶27. These included, *inter alia*, ceasing to recommend funding and making grants to Al-Haq and Al Mezan; bringing to a halt discussions with Al-Haq

about potential strategic litigation collaboration; refraining from engaging with Al-Haq and Al Mezan on advocacy related to accountability for human rights violations occurring in the Occupied Palestinian Territory; and canceling, at significant financial cost, a convening of civil society groups working on strategic litigation concerning the Occupied Palestinian Territory that included representatives from the designated organizations and subsequently rescheduling the convening excluding those organizations. *Id.* ¶¶28-30. OSI also discontinued engaging in communications or meetings with Ms. Albanese. *Id.* ¶31.

## ARGUMENT

A plaintiff seeking a preliminary injunction must establish that: (1) they are "likely to succeed on the merits"; (2) they are "likely to suffer irreparable harm in the absence of preliminary relief"; (3) "the balance of equities tips in [the plaintiff's] favor"; and (4) "an injunction is in the public interest." *Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008); ***see also*** *Open Soc'y*, 510 F. Supp. 3d at 207. When the government is a party to the suit, "the final two factors merge." *New York v. U.S. Dep't of Homeland Sec.*, 969 F.3d 42, 59 (2d Cir. 2020) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)). All criteria are satisfied here.

### I. Plaintiffs Are Likely to Succeed on the Merits.

Plaintiffs are likely to prevail on the merits. First, the Sanctions Regime is *ultra vires* under IEEPA because there is no "national emergency" within the meaning of that statute and the Sanctions Regime conflicts with acts of Congress and international law. Such a finding is required under the constitutional avoidance doctrine to avoid the serious constitutional issues that would arise from a different interpretation. Second, the designations of the sanctioned persons violate the APA because they are arbitrary and capricious, abuses of discretion, and contrary to law. Third, the restrictions on Plaintiffs' First Amendment rights to free speech and association are

unconstitutional because they cannot survive strict scrutiny and, as applied to AFSC, violate RFRA. Fourth, key parts of EO 14,203 are unconstitutionally vague.

### A. The Sanctions Regime Is *Ultra Vires* under IEEPA.

The President wields executive, not legislative, power; he is entrusted with enforcing, not making, law. *See* U.S. Const. art. II, § 1; *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 633 (1952). For an exercise of presidential authority to be lawful, it must be made pursuant to the President's express constitutional powers under Article II, the President's independent constitutional authority, or by express or implicit congressional delegation of power. *See Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803). Where, as with EO 14,203, the President enjoys no inherent authority to impose the challenged measures, he must "point to clear congressional authorization" to justify his assertion of power. *Learning Res., Inc. v. Trump*, 607 U.S. 229, 231 (2026).

Here, the Sanctions Regime exceeds Congress' delegation of authority under IEEPA in three respects: (1) there is no "national emergency" within the meaning of IEEPA; (2) the regime is otherwise contrary to other acts of Congress; and (3) it violates international law, which Congress has not authorized the President to do. Not only is construing IEEPA in this manner faithful to its text, it is necessary to avoid the serious constitutional problems that would arise were it to be interpreted otherwise. *INS v. St. Cyr*, 533 U.S. 289, 299-300 (2001) (holding "if an otherwise acceptable construction of a statute would raise serious constitutional problems, and where an alternative interpretation of the statute is fairly possible, we are obligated to construe the statute to avoid such problems") (internal citations omitted). *See also, e.g.*, *Clark v. Suarez Martinez*, 543 U.S. 371, 380-81 (2005) (construing statute to avoid constitutional issues).

1. There Is No "National Emergency."

The Sanctions Regime is *ultra vires* because there is no underlying "national emergency," which is required for imposing sanctions under IEEPA. IEEPA does not contain a "sweeping delegation[]" of power. *Learning Res. Inc.*, 607 U.S. at 230-31. Rather, Congress' delegation of authority is "defined and limited." *U.S. v. Dhafir*, 461 F.3d 211, 217 (2d Cir. 2006). The President's sanctions authority under IEEPA "may not be exercised for any … purpose" other than "deal[ing] with an unusual and extraordinary threat" to the foreign policy interests of the United States "with respect to which a national emergency has been declared." 50 U.S.C. § 1701(b).

This is a "'meaningful[] constrain[t] [on] the President's discretion.'" *V.O.S. Selections, Inc. v. U.S.*, 772 F. Supp. 3d 1350, 1379 (Ct. Int'l Trade 2025) (quoting *Dhafir*, 461 F.3d at 216), *aff'd V.O.S. Selections, Inc., v. Trump*, 149 F.4th 1312 (Fed. Cir. 2025); *see also* U.S. v. *Amirnazmi*, 645 F.3d 564, 576 (3d Cir. 2011) (same). Congress has underscored that the "main … substantive restriction[]" on the exercise of IEEPA authority "stems from a recognition that emergencies are by their nature rare and brief, and are not to be equated with normal, ongoing problems." H.R. Rep. No. 95-459, at 10 (1977). Congress explained that "[a] national emergency should be declared and emergency authorities employed only with respect to a specific set of circumstances which constitute a real emergency, and for no other purpose"; put simply, "a national emergency should not be a normal state of affairs." *Id.* These limits are critical; "as the Framers understood, emergencies can 'afford a ready pretext for usurpation' of congressional power." *Learning Res., Inc.*, 607 U.S. at 247 (quoting *Youngstown*, 343 U.S. at 650 (Jackson, J., concurring)).

Here, the Sanctions Regime is *ultra vires* under IEEPA because the ICC's exercise of jurisdiction over alleged international crimes, including with respect to nationals of non-States Parties to the Rome Statute, is neither "unusual" nor "extraordinary."

The term "unusual" means rare and different from ordinary practice. *Black's Law Dictionary* (rev. 4th ed., 1968) (defining "unusual" as "[u]ncommon; not usual, rare"). *See also, e.g.*, *Harmelin v. Michigan*, 501 U.S. 957, 976 (1991) (defining "unusual" as "such as [does not] occur in ordinary practice"). Further, "unusual" exigencies must be temporary. *See Filtration Dev. Co., LLC v. United States*, 60 Fed. Cl. 371, 383 (2004) ("[T]he court is unwilling to condone an indefinite extension of the unusual and compelling urgency … exception."). This accords with Congress' admonition that IEEPA powers are only unlocked by threats that are "rare and brief." H.R. Rep. No. 95-459, at 10 (1977).

There is nothing "unusual" about the ICC's ability to exercise jurisdiction over alleged international crimes occurring on the territories of States Parties, including Afghanistan and Palestine, both of which have acceded to the Rome Statute and both of which have been the subject of ICC proceedings for many years. *See* Compl. ¶147.

Since the Rome Statute's entry into force more than two decades ago, the ICC has been authorized to exercise jurisdiction where "[t]he State on the territory of which the conduct in question occurred" is a party thereto or has accepted jurisdiction of the ICC. Rome Statute, art. 12(2)(a). The ICC has always been able to do so, regardless of whether the "[s]tate of which the person accused of the crime is a national" of a State that is a party to the Rome Statute or has otherwise accepted ICC jurisdiction. *Id*. art. 12(2)(b). The exercise of such jurisdiction accords with long-standing principles of territorial jurisdiction. *See, e.g.*, Restatement (Fourth) of Foreign Relations Law § 408 cmt. a (Am. L. Inst. 2018) ("A state may exercise prescriptive jurisdiction with respect to persons, property, and conduct within its territory"). *See also id.* § 402(1)(a) (describing U.S. practice with respect to jurisdiction to prescribe).

The ICC has routinely exercised such territorial jurisdiction since its inception. It has done so, for instance, in regard to crimes alleged to have been committed on the territories of Ukraine, Georgia, Bangladesh, and the Democratic Republic of the Congo, all States Parties to the Rome Statute, by nationals of States that are not parties to the Rome Statute, such as Russia, Myanmar, and Rwanda. Compl. ¶¶95-98. The United States supported *all* of these exercises of territorial jurisdiction. *Id.* There is thus nothing "unusual" about the possibility that the ICC might exercise jurisdiction over persons alleged to have committed crimes on the territories of non-States Parties to the Rome Statute.

Nor is the ICC's exercise of jurisdiction in this way "extraordinary." Whether a threat is "extraordinary" turns on whether Congress anticipated the relevant circumstance. *U.S. v. Yoshida Int'l, Inc.*, 526 F.2d 560, 578 (C.C.P.A. 1975) (Congress "has said what may be done with respect to *unforeseeable* events in the TWEA"—the predecessor to IEEPA) (emphasis added); *V.O.S. Selections*, 772 F. Supp. 3d at 1375 (quoting *Yoshida Int'l, Inc.*, 526 F.2d at 578); *see also Emergency*, *Webster's New Collegiate Dictionary* 372 (9th ed. 1976) (defining "emergency" as "an *unforeseen* combination of circumstances or the resulting state that calls for immediate action") (emphasis added). A circumstance expressly foreseen and specifically addressed by Congress, namely the possible exercise of ICC jurisdiction over nationals of non-States Parties to the Rome Statute concerning alleged crimes taking place on the territory of States Parties, cannot be characterized as the kind of extraordinary emergency for which IEEPA is reserved. From the time the ICC began operations a quarter-century ago, Congress understood that the ICC could exercise jurisdiction over nationals of non-States Parties to the Rome Statute who are accused of committing certain international crimes on the territory of States Parties.[11] As the U.S. Mission to

[11] *See, e.g.*, U.S. Dep't of State, Bureau of Political-Military Affs., Fact Sheet: U.S. State Department Fact Sheet on the International Criminal Court (Aug. 2, 2002), https://2001-2009.state.gov/t/pm/rls/fs/23426.htm (noting that "[t]he

the United Nations put it in January 2026: "*None of these concerns are new; indeed, the United States has been making the same point for nearly three decades*."[12] Accordingly, there was no "rare and brief" "emergency" to warrant invocation of IEEPA.

Based on its awareness of this issue, Congress "crafted a specific legislative response," *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 157 (2000), in the form of ASPA, 22 U.S.C. §§ 7421 *et seq.*, addressing the concern that "United States armed forces operating overseas could be conceivably prosecuted by the international court even if the United States has not agreed to be bound by the treaty," *id*. § 7421(5). Congress created this scheme as the means for balancing protection against the risk of the ICC exercising jurisdiction over U.S. and allied persons with U.S. support for ICC investigations and prosecutions.

Indeed, Congress legislated against the backdrop of contemporaneous U.S. military engagements that exposed U.S. personnel to the very ICC jurisdiction it sought to address. ASPA was enacted on August 2, 2002, less than a year after the commencement of U.S. and allied military operations in Afghanistan, and a month after the Rome Statute entered into force. Congress took care to invoke the risks to "[m]embers of the Armed Forces" who are "stationed or deployed around the world," *id*. § 7421(8), in connection with their participation "in multinational operations" abroad as the predicate for its legislation, *id*. § 7421(5).

The bottom line is that years ago, Congress addressed the risk that the ICC could exercise jurisdiction over the very persons defined as "protected persons" in EO 14,203, and did not

ICC purports to have jurisdiction over certain crimes committed in the territory of a state party, including by nationals of a non-party").

[12] U.S. Mission to U.N., Remarks at a U.N. Security Council Briefing on the International Criminal Court's Investigation of the Situation in Darfur, Sudan (Jan. 19, 2026), https://usun.usmission.gov/remarks-at-a-un-security-council-briefing-on-the-international-criminal-courts-investigation-of-the-situation-in-darfur-sudan/?repeat=w3tc (emphasis added). *See also* Compl. ¶148.

characterize it as an emergency. The putative "threat" identified in the Executive Order thus cannot be characterized as "extraordinary."

2. The Sanctions Regime Conflicts with Acts of Congress.

The Sanctions Regime is also *ultra vires* because it conflicts with how Congress decided to address concerns relating to the ICC. In *Brown & Williamson*, the Supreme Court held that the FDA was precluded from regulating tobacco products under the Food, Drug, and Cosmetic Act, 21 U.S.C. §§ 301 *et seq.*, because Congress had "creat[ed] a distinct regulatory scheme to address the problem of tobacco and health," thereby "directly sp[eaking] to the issue." As with tobacco, Congress has created a scheme that balances protecting against the risk of the ICC exercising jurisdiction over U.S. and allied persons with U.S. support for ICC investigations and prosecutions.

Congress codified that scheme in ASPA, which it enacted to address this precise concern. 22 U.S.C. § 7423. The "Findings" section of ASPA makes clear that Congress sought to address the risk of the ICC exercising jurisdiction over U.S. nationals. *Id.* § 7421(5). *See also id.* § 7421(8) (declaring a policy that "Members of the Armed Forces … should be free from the risk of prosecution by the [ICC], especially when they are stationed or deployed around the world to protect the [U.S.] national interests").

However, despite enacting ASPA, and amending the statute multiple times,[13] Congress never saw fit to adopt or authorize a sanctions regime for the ICC. That is not surprising; doing so would undermine the very ICC investigations and prosecutions that Congress (and the Executive Branch) has repeatedly praised and sought to support. *See* Compl. ¶¶87-100.

[13] Foreign Operations, Export Financing, and Related Programs Appropriations Act, 2005, Pub. L. No. 108-447, div. D, § 574, 118 Stat. 2809, 3027 (2004); Consolidated Appropriations Act, 2023, Pub. L. No. 117-328, div. K, tit. VII, § 7073(b), 136 Stat. 4459, 5092 (2022).

Indeed, Section 7433 of ASPA provides that "nothing in this title shall prohibit the United States from rendering assistance to international efforts to bring to justice … foreign nationals accused of genocide, war crimes or crimes against humanity, or from rendering assistance to the International Criminal Court to assist with investigations and prosecutions of foreign nationals related to the Situation in Ukraine, including to support victims and witnesses." 22 U.S.C. § 7433(a). Section 7433, and its recent expansion to cover the Russia-Ukraine conflict, reinforces Congress' decision that the ICC should continue to be used to advance international criminal justice, *even when* it involves the investigation and prosecution of nationals of a country that has not consented to ICC jurisdiction. Put simply, Congress has made clear that the U.S. has an ongoing interest in not crippling or dismantling, and certainly not punishing, the ICC or its officials and supporters, as the Sanctions Regime seeks to do, but in maintaining support for its investigations and prosecutions.[14]

ASPA's text confirms that Congress was not only aware of the concerns the Sanctions Regime purportedly seeks to address but chose to address them through a narrow, enumerated set of restrictions related to the ICC's operations in the U.S. and a narrow grant of specific authorities to the President. Crucially, Congress did not provide the President sanctions authority to mitigate the risk that it had identified. Instead, it imposed specific restrictions on cooperation with the ICC and declined to go further absent an actual detention of a U.S. person, and even then, Congress did not permit coercive sanctions. 22 U.S.C. §§ 7423, 7427(a), (d). Every restriction and presidential authority in the statute is tied to a defined trigger and a corresponding defined response; the statute

[14] In 2022, Congress passed legislation to facilitate the United States's assistance to the ICC's investigation of crimes in Ukraine, H.R. 2617, 117th Cong. § 7073(b) (2022), and the Senate unanimously passed a resolution expressing support for the ICC, S. Res. 546, 117th Cong. (2022). Further, in 2024, Congress appropriated funds to support the ICC. Further Consolidated Appropriations Act, 2024, § 7034(r), Pub. L. No. 118-47, 138 Stat. 460, 793 (2024).

nowhere authorizes or contemplates the use of sanctions against the Court's judges or prosecutors or those who cooperate with it.

In fact, ASPA explicitly provides the President legal avenues to assist protected persons "arrested, detained, investigated, prosecuted, or imprisoned by" the ICC, including providing "legal representation and other legal assistance," "exculpatory evidence," and "defense … through appearance before the [ICC]." 22 U.S.C. § 7427(c). That deliberate restraint reflects a legislative judgment about the outer limits of an appropriate U.S. response to the ICC in the very circumstances that purport to form the basis for the Executive Order here. To the extent the President wants to protect U.S. interests or support U.S. allies before the ICC, Congress has specified the avenues the President may use. Compl. ¶15. In contrast, sanctions are not included in this catalog of authorized responses. Under the canon *expressio unius est exclusio alterius*, that omission must be given effect. *Estras v. U.S.*, 606 U.S. 185, 186 (2025).

Section 7423 further illustrates the narrowness of Congress' chosen response. Entitled "Prohibition on investigative activities of agents," it provides only that "[n]o agent of the International Criminal Court may conduct, in the United States or any territory subject to the jurisdiction of the United States, any investigative activity relating to a preliminary inquiry, investigation, prosecution, or other proceeding at the International Criminal Court."[15] 22 U.S.C. § 7423(h)(1). That is the *entirety* of the restraint Congress imposed on ICC investigative conduct: a bar on the physical entry of ICC investigators into the United States, except as to investigations relating to Ukraine, 22 U.S.C. § 7433(a) (2024). Despite Congress' full awareness of the ICC's potential reach over U.S. personnel, Section 7423 does not identify sanctions as a permissible tool.

[15] *See also* 22 U.S.C. § 7433(a) (2024) (amending ASPA to include a carve-out for Ukraine: "Nothing in this [subchapter] shall prohibit the United States from … rendering assistance to the International Criminal Court to assist with investigations and prosecutions of foreign nationals related to the Situation in Ukraine, including to support victims and witnesses[.]").

The specificity of ASPA's restrictions and directions to the President makes that omission both conspicuous and instructive. Congress legislated with granular precision. It barred U.S. courts and state and local agencies from "cooperat[ing] with the International Criminal Court in response to a request for cooperation," *id*. § 7423(b); prohibited the "transfer" of any U.S. citizen or permanent resident alien to the Court, *id*. § 7423(d); forbade the obligation of appropriated funds for "assisting the investigation, arrest, detention, extradition, or prosecution" of such persons, *id.* § 7423(f); required the President to invoke treaty provisions "to prevent the transfer to, or other use by, the International Criminal Court" of U.S. mutual-legal-assistance materials, *id.* § 7423(g); and directed the establishment of "appropriate procedures" to prevent the "direct or indirect transfer" of "classified national security information and law enforcement information" to the ICC, *id*. § 7425(a)-(b). Congress' decision not to include sanctions as an authorized response to precisely the situation here is thus dispositive: the use of such power is not allowed. Notably, Congress recently revisited whether to sanction the ICC for taking actions that the U.S. did not support, and declined to adopt such legislation,[16] instead maintaining the existing ASPA framework.

Even in the circumstance of an actual detention by the ICC of a national of the U.S. or certain allied nations—which is not the case here—Congress *prohibited* the type of sanction that EO 14,203 imposes. While Congress authorized the President "to use all means necessary and appropriate to bring about the release of [a protected person] who is being detained or imprisoned by, on behalf of, or at the request of the [ICC]," *id*. § 7427(a), it provided that the all-necessary-

[16] Illegitimate Court Counteraction Act, H.R. 23, 119th Cong. (2025) (passed House Jan. 9, 2025; cloture motion failed in Senate, 54–45, Jan. 28, 2025), https://www.congress.gov/bill/119th-congress/house-bill/23.

means language "does *not* authorize the payment of bribes or the provision of other such *incentives to induce* the release of a [protected person]," *id.* § 7427(d) (emphasis added).

This carveout reinforces the point. Even in the most extreme circumstance contemplated by ASPA—detention by the ICC—Congress' considered decision is that incentives to induce behavior are prohibited. Congress withheld authority to use inducements to influence ICC-related action. Yet, the use of incentives to induce decisions by ICC judges and prosecutors—specifically the threat to their personal, including financial, interests by the imposition of sanctions—is precisely what EO 14,203 seeks to effect: offer forbearance of imposing personal economic and other harm as an incentive to induce them to render decisions to the administration's liking. This is a classic form of improper inducement. *See* *U.S. v. Sturm*, 870 F.2d 769, 773 (1st Cir. 1989) (holding defendant can be found guilty of wrongfully obtaining property through use of legitimate economic threat); *U.S. v. Kattar*, 840 F.2d 118 (1st Cir. 1988) (affirming conviction for extortion induced by wrongful use of economic fear); *U.S. v. Russo*, 708 F.2d 209, 215 (6th Cir. 1983), *cert. denied*, 464 U.S. 993 (1983) (same); *U.S. v. Clemente*, 640 F.2d 1069 (2d Cir. 1981) (same); *U.S. v. Lisinski*, 728 F.2d 887, 891-92 (7th Cir. 1984) (holding "[t]he wrongful use of fear does not require a threat—although, in the victim's mind, the threat—usually implied—will be present" and "[t]he wrongful use of fear is satisfied if the extortioner exploits the victim's fear of economic loss"). Here, sanctioning ICC judges and prosecutors, freezing their assets, and cutting off their access to the international financial system to coerce favorable official action, is plainly an attempt to influence the ICC's judicial and prosecutorial authorities. In other words, exactly the type of conduct that ASPA bars.

Indeed, the Supreme Court has held that even when Congress establishes a legislative framework to address national security-related issues, the Executive may not engage in conduct

that the framework prohibits. *Hamdan v. Rumsfeld*, 548 U.S. 557 (2006), for example, held that the President's military commission lacked authority to proceed because its structure and procedures were inconsistent with both the Uniform Code of Military Justice ("UCMJ") and Common Article 3 of the Geneva Conventions. Even though the Authorization for the Use of Military Force constituted Congress' response to the September 11 terrorist attack, it did not expand or alter the preexisting constraints of UCMJ Article 21, which conditions the President's use of military commissions on compliance with the law of war, including the Geneva Conventions, or of UCMJ Article 36, which requires procedural uniformity with courts-martial absent demonstrated impracticability. *Id.* at 593-95, 613-25. The Supreme Court so ruled despite invocations of national security and wartime Commander-in-Chief powers. *Id.* at 566-67, 589-90.

Put simply, the President's assertion of authority under IEEPA to implement the Sanctions Regime as a way of addressing a purported threat that Congress has known about for decades and chose to address through ASPA infringes on the powers of Congress. Just as the Supreme Court observed when invalidating the President's decision to provide student loan relief, the Sanctions Regime effectively amounts to "the Executive seizing the power of the Legislature" through an "assertion of administrative authority" that "conveniently enabled [the Executive] to enact a program that Congress has chosen not to enact itself." *Biden v. Nebraska*, 600 U.S. 477, 501, 503 (2023) (internal quotation omitted).

3. IEEPA Does Not Authorize the Violation of International Law.

The Sanctions Regime is *ultra vires* under IEEPA as well because it violates international law and Congress did not authorize such violations. Under the *Charming Betsy* doctrine, "an act of [C]ongress ought never to be construed to violate the law of nations, if any other possible construction remains." *Weinberger v. Rossi*, 456 U.S. 25, 32 (1982) (quoting *Murray v. The Charming Betsy*, 6 U.S. 64, 118 (1804)). *See also* *Filártiga*, 630 F.2d at 887 n.20 (describing the

*Charming Betsy* doctrine as a "long-standing rule of construction first enunciated by Chief Justice Marshall"). This "unbroken line of authority," *U.S. v. Palestine Liberation Org.*, 695 F. Supp. 1456, 1465 (S.D.N.Y. 1988), compels the conclusion that the Sanctions Regime is outside the bounds of Congress' delegated authority under IEEPA. *Cheung v. U.S.*, 213 F.3d 82, 92 (2d Cir. 2000) (applying *Charming Betsy* and reconciling interpretation of "country" to both U.S. law and the U.S.-Hong Kong extradition treaty). *See also* Restatement (Third) of the Foreign Relations Law of the United States § 114 (Am. L. Inst. 1987) ("[W]here fairly possible, a United States statute is to be construed so as not to conflict with international law or with an international agreement of the United States."); *Hamdan*, 548 U.S. at 557 (maintaining preexisting constraints of UCMJ that require compliance with, *inter alia*, law of war, including Geneva Conventions).

The Sanctions Regime violates international law in multiple ways. Compl. ¶¶196-211. This is shown in the Expert Declaration of Professor Koh, who served as the Legal Adviser of the U.S. Department of State, the Government's principal legal adviser on international law and the law of foreign relations. Professor Koh is widely regarded as the American legal academy's leading expert on international law. His evaluation of the Sanctions Regime is categorical: it "places the United States in direct violation of many of its international law obligations." Expert Declaration of Harold Hongju Koh in Support of Plaintiffs ¶¶8-10, 12 ("Koh Decl.").

Professor Koh identifies four categories of international legal obligations, all binding on the U.S., which the Sanctions Regime breaches. *Id*. ¶10. These obligations arise from commitments undertaken by the U.S. in treaties ratified with the advice and consent of the Senate, as well as from equally binding customary international law. *Id.* ¶44; *Abdullahi v. Pfizer, Inc.*, 562 F.3d 163, 180 (2d Cir. 2009) (customary international law is legally binding on States).

*First*, the Sanctions Regime "violate[s] the United States' obligation, under the duly ratified UN Charter, to cooperate with the United Nations by abiding by binding Security Council resolutions." Koh Decl. ¶45. This is because "[t]he ICC is not just a stand-alone international organization: its *raison d'être* is intrinsically related to the work and mission of the UN, with whom it has entered into a 'relationship agreement,' providing for close cooperation between the two organizations." *Id.* ¶46. The inextricably linked role of the U.N. and the ICC is underscored by the Security Council's prerogative, enshrined in the Rome Statute, to refer situations to the ICC when crimes have been committed that represent a threat to international peace and security. Rome Statute, art. 13(b); *see also* U.N. Charter, chapter VII. As Professor Koh highlights, this is "a mechanism that the United States has itself invoked, voting in favor of the Security Council's referral to the ICC in the situation in Libya." Koh Decl. ¶45; *see also* S.C. Res. 1970, ¶4, U.N. Doc. S/RES/1970 (Feb. 26, 2011).

U.N. Member States have "agree[d] to accept and carry out the decisions of the Security Council in accordance with the present Charter." U.N. Charter, art. 25. Resolutions adopted to maintain international peace and security pursuant to the Council's powers under Chapter VII of the U.N. Charter, such as those referring situations to the ICC, are binding. Koh Decl. ¶45. Further, "Members of the United Nations shall join in affording mutual assistance in carrying out the measures decided upon by the Security Council." U.N. Charter, art. 49. The U.S., as a Member of the United Nations, is obligated to "fulfill in good faith the obligations assumed by [it] in accordance with the [U.N.] Charter" and to "give the United Nations every assistance in any action it takes in accordance with the … Charter." *Id.* art. 2 §§ 2, 5.

By targeting ICC judges and prosecutors, as well as victims, their advocates and civil society, the Sanctions Regime "do[es] not assist, but rather impede[s], the ICC's investigation of

situations that were specifically referred to the court by the UN Security Council." Koh Decl. ¶45. In doing so, the U.S. is "directly interfer[ing] with the implementation of the Security Council's binding resolutions to maintain international peace and security," thus breaching the U.S.'s most fundamental obligations under the U.N. Charter. *Id.*

*Second*, the Sanctions Regime violates the privileges and immunities of the UN and the ICC as expressed in the U.N. Charter, other applicable treaties, and customary international law. The U.S. has an "obligation, even as a non-party to the Rome Statute, to respect the privileges and immunities of the ICC and its officials, as provided under customary international law." *Id.* ¶46; *cf. The Paquete Habana*, 175 U.S. 677, 700 (1900) (holding that customary international law is binding). "It is well established under international law that an international organization is entitled to such privileges and such immunity from the jurisdiction of a member state as are necessary for the fulfillment of the purposes of the organization." *Mendaro v. World Bank*, 717 F.2d 610, 615 (D.C. Cir. 1983) (internal quotation omitted). While the U.S. is not a party to the Rome Statute, international organizations, particularly those of a universal character, enjoy privileges and immunities under customary international law that must be respected by all States, even those that are not members of such organizations. *See, e.g.*, James Crawford, *Brownlie's Principles of Public International Law* 174 (9th ed. 2019) ("[I]f the personality of international organizations stems from an objective assessment of their functions and non-parties are required to accept their separate identity, then this personality must be populated with the attributes necessary for the organization to carry out its mandate, including as necessary the immunity of the institution and its personnel.").

In fulfillment of this obligation, foreign courts routinely respect the privileges and immunities of international organizations even in circumstances where that State is not a member

of the organization. *See, e.g.*, *Iran–United States Claims Tribunal v. AS*, 94 ILR 321, 329 (Neth. 1985) (Dutch Supreme Court holding that international organizations, such as the Iran-United States Claims Tribunal, to which the Netherlands is not party, enjoy immunity from jurisdiction in respect of disputes related to the fulfilment of their tasks); *ZM v. Permanent Delegation of the League of Arab States to the U.N.*, 116 ILR 643, 647-649 (Switz. 1993) (Labour Court of Geneva recognizing that Switzerland was required to grant the privileges and immunities normally owed to international organizations to the League of Arab States, despite Switzerland not being a member).

The ICC is an international organization of universal character. Its membership is open to all States, and it already counts 125 States Parties (*i.e.*, almost two-thirds of U.N. Member States). Koh Decl. ¶¶44, 51. Moreover, the ICC has entered into a relationship agreement with the United Nations, which provides for close cooperation between the two organizations. Rome Statute, art. 2; Negotiated Relationship Agreement between the International Criminal Court and the United Nations art. 3, Sept. 13, 2004, 2283 U.N.T.S. 195. Accordingly, by virtue of its universal character and relationship with the United Nations, the U.S. is under an obligation, even as a non-party, to respect the privileges and immunities of the ICC and its officials. Koh Decl. ¶44.

The core privileges and immunities of international organizations and their officials are those that permit them to exercise their functions, such as immunity for words spoken or acts performed in the furtherance of official duties. Thus, as Professor Koh explains,

> [b]y targeting and threatening ICC judges, officials, and other entities that may assist its work, the Executive Order and designations constitute an illegal interference with the ICC's functions. They directly obstruct the ICC's core functions by seeking to influence its judges through coercion, not reason, and by sanctioning members of the Office of the Prosecutor to keep them from assisting the ICC in conducting full and fair independent investigations and prosecutions as their professional judgment directs.

*Id.* ¶47.

The Sanctions Regime also violates "the United States' binding obligations to respect the privileges and immunities of the U.N., its experts on mission, and those on official business at U.N. Headquarters in New York." *Id.* ¶48. The U.N. Charter, a binding treaty on the U.S., provides that the United Nations "shall enjoy in the territory of each of its Members such privileges and immunities as are necessary for the fulfilment of its purposes." U.N. Charter, art. 105 ¶1. The United Nations' privileges and immunities are also guaranteed under the 1946 Convention on the Privileges and Immunities of the United Nations, to which the U.S. is party. Convention on Privileges and Immunities of the United Nations, Feb. 13, 1946, 21 U.S.T. 1418 ("General Convention"). As Professor Koh explains, "together, the General Convention and Article 105(1) of the U.N. Charter prohibit any kind of interference with the United Nations' functions." Koh Decl. ¶48.

In particular, the General Convention provides that U.N. experts on mission "shall be accorded such privileges and immunities as are necessary for the independent exercise of their functions during the period of their missions," including "[i]n respect of words spoken or written and acts done by them in the course of the performance of their mission, immunity from legal process of every kind." General Convention, art. VI, § 22. As Professor Koh explains, "legal process" means "every form of legal process before national authorities, whether judicial, administrative or executive functions according to national law." Koh Decl. ¶49.

The U.S. is also bound by the 1947 Agreement Regarding the Headquarters of the United Nations between the United States and the United Nations. Section 11 provides that "[t]he federal … authorities of the United States shall not impose any impediments to transit to or from the headquarters district of … experts performing missions for the United Nations … or other persons invited to the headquarters district by the United Nations." Agreement Regarding the

Headquarters of the United Nations, U.S.-U.N., June 26, 1947, 11 U.N.T.S. 11.

Special Rapporteurs, like Ms. Albanese, are experts on missions within the meaning of the General Convention. Koh Decl. ¶49; *see also Applicability of Article VI, Section 22, of the Convention on the Privileges and Immunities of the United Nations, Advisory Opinion*, I.C.J. Reports 1989, ¶55 (Dec. 15, 1989). Thus, by targeting Ms. Albanese, the prosecutors, and judges of the ICC—some of whom are called upon to conduct official business at U.N. Headquarters—the U.S. is in breach of its obligations owed to the U.N. under these multiple binding treaties. Koh Decl. ¶51.

*Third*, the Sanctions Regime "impair[s] the United States' obligations under international law to prevent and punish international crimes." *Id.* ¶52. These obligations arise not only from customary international law, but from treaties and conventions ratified by the U.S., including the U.N. Charter, Geneva Conventions, Genocide Convention, and Convention Against Torture. *Id.* ¶¶52-55.

For example, as a party to the Geneva Conventions, the U.S. has "undertake[n] to respect and ensure respect for the [Conventions] in all circumstances." Geneva Convention (IV) art. 1, Aug. 12, 1949, 6 U.S.T. 3516. As explained by the International Committee of the Red Cross, which enjoys a privileged position regarding the Geneva Conventions' interpretation, the duty to ensure respect for the Conventions entails an obligation to prevent violations and stop ongoing violations by other High Contracting Parties.[17] Measures to ensure respect by other States include supporting international efforts to bring suspected perpetrators of serious violations of the Conventions to justice, including through the ICC.[18]

[17] Int'l Comm. of the Red Cross, Commentary on Geneva Convention IV art. 1 (2025), https://ihl-databases.icrc.org/en/ihl-treaties/gciv-1949/article-1/commentary/2025, ¶189.

[18] *Id.* ¶251.

Likewise, under customary international law, all States have a duty to prevent and punish all international crimes, including genocide, crimes against humanity, and war crimes. *See, e.g.*, S.C. Res. 2419, ¶6, U.N. Doc. S/RES/2419 (June 6, 2018); G.A. Res. 67/1, ¶22, U.N. Doc. A/RES/67/1 (Nov. 30, 2012); S.C. Res. 1894, ¶10, U.N. Doc. S/RES/1894 (Nov. 11, 2009); Principles of International Cooperation in the Detection, Arrest, Extradition and Punishment of Persons Guilty of War Crimes and Crimes Against Humanity, G.A. Res. 3074 (XXVIII), annex, U.N. Doc. A/RES/3074(XXVIII) (Dec. 3, 1973) ("Principles of International Cooperation"). This entails a positive duty to cooperate with other States to prevent and punish international crimes and ensure accountability. International Law Commission, Draft Articles on Prevention and Punishment of Crimes Against Humanity, with Commentaries at 61, ¶13, U.N. Doc. A/74/10 (2019); Principles of International Cooperation, annex, ¶3.

Professor Koh emphasizes that, "[l]ike all states, the United States thus has a legal duty to cooperate with other States to bring to an end serious violations of such peremptory norms of international law (or *jus cogens* norms) such as the prohibitions against genocide, crimes against humanity, and serious violations of international humanitarian law." Koh Decl. ¶55; *Estate of Tov v. United Nations Relief & Works Agency*, 807 F. Supp. 3d 208, 224 (S.D.N.Y. 2025) (listing prohibition of genocide, torture, and gross violations of international human rights as *jus cogens* norms). The U.S. is thus under an obligation both under treaty law and customary international law to support international efforts and cooperate with other States to prosecute and punish these crimes and violations.

The obligations to investigate and punish international crimes, including through cooperation with other States, must be performed in good faith. *See* Vienna Convention on the Law of Treaties arts. 26, 31(1), May 23, 1969, 1155 U.N.T.S. 331; *Chubb & Son, Inc. v. Asiana*

*Airlines*, 214 F.3d 301, 309 & n.5 (2d Cir. 2000) (recognizing the Vienna Convention as an "authoritative guide to the customary international law of treaties"). The "United States' positive obligation to prevent and punish international crimes carries with it a negative obligation not to interfere with or hinder ongoing international efforts to investigate and punish those crimes." Koh Decl. ¶56.

At a minimum, the obligation to prevent and punish international crimes implies the negative duty not to interfere with States' efforts to cooperate to punish such international crimes. "Because 125 States have chosen to fulfill their right and duty to investigate and punish international crimes by supporting the work of the ICC, by its institutional actions, the Court thus 'exercises the jurisdiction of all the concerned sovereigns *inter se*, for their overall benefit.'" Koh Decl. ¶57. Since "[t]he Executive Order and its underlying designations are expressly designed to constrain the ICC's ability to pursue certain investigations, and to prevent States from supporting it in doing so," the Sanctions Regime directly thwarts the collective efforts of 125 States to fulfill their most fundamental obligations under international law. Koh Decl. ¶57. The Sanctions Regime thus violates the U.S.'s own legal obligations. *Id*.

*Fourth*, "[b]ecause these sanctions are designed to impede or unduly influence the judicial functions of the ICC and its judges in the administration of those cases, they offend the general principle of law guaranteeing the independence of the judiciary" and are thus "incompatible with the fundamental human right to a fair trial" free from political interference. *Id.* ¶¶62-63. General principles of law, which are recognized by the principal legal systems of the world, are binding rules of international law. *See* Statute of the International Court of Justice art. 38(c) (enshrining general principles of law recognized by nations as a source of international law); Int'l L. Comm'n, *Second Rep. on General Principles of Law*, U.N. Doc A/CN.4/741, ¶¶17, 26 (Apr. 9, 2020). As

Professor Koh notes, "[t]he principle of the independence of the judiciary is enshrined in the vast majority of States' domestic legal systems and is at the heart of the general principle of the rule of law." Koh Decl. ¶59. In the U.S., this "constitutional principle" is "so widely esteemed and so vital to our system of government." *Evans v. Gore*, 253 U.S. 245, 259 (1920).

The independence of the judiciary is "reflected in many treaties and UN resolutions," which is evidence that the principle has been transposed into the international legal system. Koh Decl. ¶59; *see* Int'l L. Comm'n, *Second Rep. on General Principles of Law*, U.N. Doc A/CN.4/741, ¶97 (Apr. 9, 2020) ("[T]reaties[] can be considered as evidence confirming that a principle common to the principal legal systems of the world is transposed to the international legal system."). For its part, the Rome Statute criminalizes "[i]mpeding, intimidating or corruptly influencing an official of the Court for the purpose of forcing or persuading the official not to perform, or to perform improperly, his or her duties." Rome Statute, art. 70(1)(d).

However, contrary to this rule of international law, the "stated purpose of E.O. 14,203 and the designations of senior ICC officials made thereunder is to sanction the designated individuals solely for doing their lawful jobs … Their apparent goal is to influence these individuals to make their decisions based on their personal interests, rather than on the objective facts and law of the cases before them." Koh Decl. ¶62. Indeed, "[u]nlike counterterrorism sanctions, which are directed against financiers for whom there is probable cause … that they are supporters of terrorism, many of the targets of the E.O. 14,203 sanctions are innocent judges and prosecutors being punished for the 'offense' of acting as impartial court officials, without any proffered proof that they are in any way biased, not independent, corrupted, or otherwise unfit to serve." *Id.* ¶60. The Sanctions Regime thus breaches the general principle of judicial and prosecutorial

independence, as well as the independence of lawyers, *id.* ¶61, and is simply incompatible with the rule of law.

As such, the Sanctions Regime "violate[s] the U.S. standing obligation to ensure the right to a fair international trial by interfering with the ICC's judicial independence and capacity to provide a fair process in the situations referred to it, and to the individuals accused and prosecuted by it." *Id.* ¶62. The International Covenant on Civil and Political Rights ("ICCPR"), to which the U.S. is party, guarantees in Article 14(1) "a fair and public hearing by a competent, independent and impartial tribunal established by law." ICCPR art. 14(1), Dec. 16, 1966, 999 U.N.T.S. 171. Interpreting this provision, the U.N. Human Rights Committee has explained that States must ensure "the actual independence of the judiciary from political interference." Human Rights Committee, General Comment No. 32, U.N. Doc. CCPR/C/GC/32 (23 Aug. 2007), ¶19. This "principle does not just apply to domestic courts," but to those appearing before international courts as well. Koh Decl. ¶56. A court whose judges and prosecutors are subject to coercion cannot ensure a fair trial for those appearing before it.

Indeed, the impact of the Sanctions Regime extends far beyond the targeted individuals, and undermines the rights of large groups of stakeholders. As Professor Koh underscores,

> The judges and prosecutors sanctioned under the order are responsible for adjudicating cases on behalf of victims of war crimes, crimes against humanity, and genocide. By subjecting ICC officials to measures that impair their ability to carry out their judicial and prosecutorial functions, the sanctions deprive victims of the legal advocates and adjudicators who give their claims voice. By undercutting the work of the ICC as a whole, the E.O. and its related designations extend beyond their immediate targets to punish victims' advocates and survivors whose cases these sanctions make more difficult to conclude.

*Id.* ¶63.

For all of these reasons, whether taken individually or collectively, the Sanctions Regime violates the U.S.'s binding obligations under treaty and custom alike.

In the absence of a "clear[] and unequivocal[]" congressional statement to the contrary, courts are "under a duty to interpret statutes in a manner consonant with" international law. *Palestine Liberation Org.*, 695 F. Supp. at 1465; *see also* Restatement (Third) of the Foreign Relations Law § 114; *id*. § 115, cmt. a (observing courts "require clear indication that Congress … intended to supersede … [an] international obligation"). Courts thus routinely construe statutes so as not to conflict with international law. *See, e.g.*, *McCulloch v. Sociedad Nacional De Marineros De Honduras*, 372 U.S. 10, 21 (1963) (construing National Labor Relations Act in harmony with the "well-established rule of international law that the law of the flag state ordinarily governs the internal affairs of a ship"); *Cheung*, 213 F.3d at 92 (construing extradition statute "in such a way 'so as to give effect to both' the [Immigration and Nationality Act] and the [Hong Kong Extradition] Agreement") (quoting *Blanco v. U.S.*, 775 F.2d 53, 61 (2d Cir. 1985)); *Khan v. Holder*, 584 F.3d 773, 783 (9th Cir. 2009) ("Under *Charming Betsy*, we should interpret the INA in such a way as to avoid any conflict with the [Refugee] Protocol, if possible."); *Ma v. Ashcroft*, 257 F.3d 1095, 1114 (9th Cir. 2001) (applying *Charming Betsy* to avoid violation of ICCPR).

IEEPA must therefore be interpreted so as not to contravene the U.S.'s international legal obligations, absent a congressional indication to the contrary. Neither the text nor the legislative history of IEEPA contains a "clear[] and unequivocal[]" authorization to violate international law or in any way suggests that Congress bestowed the President with authority to "abrogate[] prior treaties or international obligations entered into by the United States." *Palestine Liberation Org.*, 695 F. Supp. at 1465. IEEPA's delegation of authority must accordingly be construed "in a manner consonant with" international law. *Id*. As the Sanctions Regime is violative of multiple international legal rules, it is necessarily *ultra vires*.

**B. The Designations Violate the Administrative Procedure Act.**

The APA requires "hold[ing] unlawful and set[ting] aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Here, the designations must be set aside for each reason.

1. The Designations Are Arbitrary and Capricious

Agency action is arbitrary and capricious if the agency "relied on factors which Congress" did "not intend[] it to consider." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Here, the designations rest on factors that have no basis in IEEPA. Through ASPA, Congress created a legislative scheme to respond to the very issue the designations purport to address, authorizing specific measures, 22 U.S.C. § 7427, and preserving the ability to render assistance to ICC investigations and prosecutions in specified circumstances, *id*. § 7433, while prohibiting "incentives to induce," *id*. § 7427(d). Despite amending ASPA multiple times, and considering (but not passing) ICC-related sanctions legislation in 2024, Congress never authorized sanctions against ICC personnel or those who support the court's work. By issuing designations to respond to circumstances that Congress chose to address exclusively through ASPA, the designations rely on factors which Congress has not intended it to consider, rendering the designations arbitrary and capricious.

The designations are also arbitrary and capricious because they are not based on "[s]ubstantial evidence." *Al Haramain Islamic Foundation, Inc. v. U.S. Dep't of the Treasury*, 686 F.3d 965, 976 (9th Cir. 2012); *Holy Land Foundation for Relief & Development v. Ashcroft*, 333 F.3d 156, 162 (D.C. Cir. 2003). According to the press statements accompanying the designations, each designated person was designated for having allegedly "directly engaged" in an "effort by the ICC to investigate, arrest, detain, or prosecute a protected person without consent of that person's country of nationality," EO 14,203, § 1(a)(ii)(A). However, none of the announcements

refers to any actual evidence that any of them, in fact, "directly engaged" in any such efforts. Compl. ¶¶151, 168, 170, 184, 187, 190, 194.

The lacunae are unsurprising. ICC judges do not "directly engage[]" in "efforts to investigate, arrest, detain, or prosecute" persons accused of international crimes. Rather, they act as neutral arbiters, adjudicating matters of law and fact that are placed before them by the OTP, defense counsel, and others with standing to present evidence and argument to the Court. Like U.S. judges, ICC judges are required to be "independent in the performance of their functions" and "shall not engage in any activity which is likely to interfere with their judicial functions or to affect confidence in their independence." Rome Statute, art. 40.

With respect to the designation of U.N. Special Rapporteur Albanese, the State Department's announcement makes clear that it is based solely on her publicly "*recommending* that the ICC … issue arrest warrants" for Prime Minister Netanyahu and former Defense Minister Gallant and "*recommending* [that] the ICC pursue investigations and prosecutions of [American] companies and their executives."[19] However, neither allegation, even if true, amounts to direct engagement in ICC efforts to investigate, arrest, detain, or prosecute "protected persons." Ms. Albanese's U.N. mandate is confined to examining, monitoring, and reporting on the human rights situation in the Occupied Palestinian Territory. Compl. ¶193. She has no affiliation or role with the ICC. *L.C.*, 2026 U.S. Dist. LEXIS 106000, at *5 ("Albanese has *no* formal role with the ICC") (emphasis in original).

In regard to the designated human rights organizations, there is no substantial evidence that any of them "directly engaged" in an ICC effort to investigate, arrest, detain, or prosecute Israeli

[19] U.S. Dep't of State, Press Statement, *Sanctioning Lawfare that Targets U.S. and Israeli Persons* (July 9, 2025), https://www.state.gov/releases/office-of-the-spokesperson/2025/07/sanctioning-lawfare-that-targets-u-s-and-israeli-persons/.

nationals within the meaning of Section 1(a)(ii)(A), either. "Directly" means "[i]n a straightforward manner." *Black's Law Dictionary* 577 (11th ed. 2019). "Engage" means "to employ or involve oneself; to take part in; to embark on." *Id.* at 669. A plain reading of Section 1(a)(ii)(A)'s text thus requires the person to be employed by, or personally and directly involved in, the ICC's investigation or prosecution. Merely providing support for or to such an investigation or prosecution does not constitute direct engagement.

The designations are further arbitrary and capricious because they are based on agency action that "entirely failed to consider an important aspect of the problem." *State Farm Mut. Auto. Ins. Co.*, 463 U.S. at 43. Defendants entirely failed to consider the impact that the designations would have on the international regime for accountability for international crimes. The effect of the designations, among other things, is to prevent U.S. persons from providing evidence or other services to the OTP or the designated judges in light of IEEPA's civil and criminal penalties for violating the Executive Order, and to chill non-U.S. persons from doing so, lest they also become designated. The designations thus impede the investigation and prosecution even of crimes concerning which the U.S. has supported ICC engagement, including in Ukraine, Sudan, Uganda, Bangladesh/Myanmar, and the Central African Republic. The failure to consider these consequences renders the designations arbitrary and capricious.

2. The Designations Are an Abuse of Discretion

Agency action that constitutes an abuse of discretion must be set aside under 5 U.S.C. § 706(2)(A). "An abuse of discretion occurs when a … decision represents an unreasonable judgment in weighing relevant factors." *In re Gartside*, 203 F.3d 1305, 1315-16 (Fed. Cir. 2000); *see also Star Fruits S.N.C. v. U.S.*, 393 F.3d 1277, 1281 (Fed. Cir. 2005) (same); *Madison Ltd. v. Ludwig*, 82 F.3d 1085, 1098 (D.C. Cir. 1996) (holding judicial review of agency action under the APA "must go beyond the agency's procedures to include the substantive reasonableness of its

decision."). As the Supreme Court recently underscored, Congress enacted the APA "as a check upon administrators whose zeal might otherwise have carried them to excesses." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 386-87, 391 (2024).

Here, the designations are a textbook abuse of discretion. Their purpose is to target the personal, including financial interests of judges, prosecutors, and U.N. officials as a means of pressuring them into disregarding their oaths of office, and to punish civil society groups and lawyers for supporting victims in accessing justice. That is the antithesis of the rule of law. It is irreconcilable with the Supreme Court's repeated admonition, over more than a century-and-a-half, that it is "'a general principle of the highest importance to the proper administration of justice that a judicial officer, in exercising the authority vested in him, [should] be free to act upon his own convictions without apprehension of personal consequences to himself.'" *Stump v. Sparkman*, 435 U.S. 349, 355 (1978) (quoting *Bradley v. Fisher*, 80 U.S. 335, 347 (1871)). *See also Huminski v. Corsones*, 386 F.3d 116, 136 (2d Cir. 2004) ("judges should be at liberty to exercise their functions with independence and without fear of consequences"). And it is inconsistent with the principles that underpin numerous federal statutes. *See, e.g.*, 18 U.S.C. § 1503 (prohibiting efforts to "influence, intimidate, or impede any … officer in or of any court of the United States"); *id*. § 112 (prohibiting coercion of foreign officials, including "chief executive officer[s] of international organizations").

Indeed, the designations are a gross abuse of the Sanctions Regime more generally. Prior to the designations under EO 14,203 (and its predecessor under the first Trump administration), sanctions had targeted alleged terrorists (Executive Order No. 13,224, *Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten To Commit, or Support Terrorism*, 3 C.F.R. 786 (2001)), narcotics traffickers (Foreign Narcotics Kingpin Designation Act, 21 U.S.C.

§§ 1901 *et seq.*), weapons proliferators (Executive Order 13,382, *Blocking Property of Weapons of Mass Destruction Proliferators and Their Supporters*, 3 C.F.R. 170 (2005)), and corrupt actors and human rights abusers (Global Magnitsky Human Rights Accountability Act, Pub. L. No. 114-328, Subtitle F). The individuals and entities designated for sanctions under these instruments bear no resemblance to the judges, prosecutors, a U.N. official, and human rights organizations who now find themselves subject to the same types of restrictions, which have been rightly likened to the financial death penalty, that have been imposed on such international pariahs. And, the fact that the effect of the designations is to obstruct the investigation and prosecution of the worst crimes known to humankind, including where the U.S. has encouraged the ICC to investigate and prosecute, makes the abuse of discretion undeniable.

3. The Designations Are Contrary to Law

Finally, the designations violate the APA because they are contrary to law. They are *ultra vires* exercises of authority under IEEPA, violate the First and Fifth Amendments, and violate numerous treaties and rules of customary international law. *Supra* Section I(A); *infra* Sections I(C), I(E).

The Sanctions Regime is also contrary to law for an additional reason: to the extent it proscribes activities that involve the provision or receipt of personal communications or information or informational materials, it violates the Information Exceptions to IEEPA, 50 U.S.C. § 1702(b)(1), (3); *supra* Section II(A). *See* H.R. Rep. No. 103-482, at 239 (1994) (Conf. Rep.), reprinted in 1994 U.S.C.C.A.N. 398, 483 ("[The Berman Amendment] established that no embargo may prohibit or restrict directly or indirectly the import or export of information that is protected under the First Amendment.").

Under the Information Exceptions, the President has no authority to regulate the exchange of "personal communication[s]" or "information" and "informational materials." But by

proscribing Plaintiffs from providing "services to, or for the benefit of" designated persons, the Sanctions Regime does just what the Information Exceptions prohibit: regulate the exchange of personal communications, information and informational activities. Given the plain language of EO 14,203—paired with the government's history of an improperly narrow interpretation of the Information Exceptions—which it endorsed just two weeks ago, *see* Gov't's Opp'n to Pls.' Mot. for Prelim. Inj. at 25, *Democracy for the Arab World Now, Inc. v. Trump*, No. 1:26-cv-5957 (S.D.N.Y. Aug. 13, 2026), ECF No. 33 (arguing that § 1702(b)(3) does not extend to "information or informational materials not fully created and in existence at the date of the transactions" and thus allowing the blocking of "bespoke" informational materials)—much of the First Amendment-protected activity from which Plaintiffs have ceased engaging involves the exchange of what should be exempted.[20] This includes the provision of information to the designated judges, the OTP, and Ms. Albanese in the form of research, legal submissions, information, documentation, and legal analysis, as well as the provision of information to or receipt from the designated human rights organizations of research and analysis, documentation, and information. CCR Decl. ¶¶ 28-34, 38; OSI Decl. ¶26, 31; HRW Decl. ¶21; AFSC Decl. ¶20(d); *see also infra* Section I(C)(1)(a). However, as construed by Defendants, EO 14,203 regulates the exchange of "personal communications" and "information" or "informational materials"—which the President cannot do. As such, the designations must be set aside for this reason as well. *New York v. U.S. Dep't of*

[20] *See also, e.g.*, Defs' Opp'n to Mot. for Prelim. Inj. at 21-22, *Rona v. Trump*, No. 1:25-cv-03114-JMF, ECF No. 56 (S.D.N.Y. May 13, 2025) (expressing government's view that the Information Exceptions protect, essentially, only older, previously-written and recorded expressive works, and does not apply to any "bespoke" information and informational materials created contemporaneously with its exchange). Given the government's improperly narrow view of the Information Exceptions and the Order's sweeping breadth in regulating the provision and receipt of speech-based services, OFAC's surface-level claim to incorporate via 31 C.F.R. § 528.205(a) the Information Exceptions into EO 14,203 does not remedy this defect.

*Homeland Sec.*, 408 F. Supp. 3d 334, 345 (S.D.N.Y. 2019) (finding violation of APA when agency action "exceed[ed] DHS's delegated authority under the INA and [was] contrary to law").

**C. The Sanctions Regime Violates the First Amendment**

Plaintiffs are likely to succeed on the merits of their First Amendment claims. Through the Executive Order and concomitant penalties and sanctions, the government seeks "'to achieve the suppression' of disfavored speech" by "the threat of invoking legal sanctions and other means of coercion" against Plaintiffs and their associates, including individual and organizational coalition partners and interlocutors.[21] *NRA of Am. v. Vullo*, 602 U.S. 175, 180, 200 (2024) (quoting *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67 (1963)).

The Sanctions Regime imposes an unconstitutional burden on Plaintiffs as to at least two categories of First Amendment-protected conduct. Plaintiffs' rights: (1) to engage in speech which constitutes "services by, to, or for the benefit of" designated entities themselves and "the receipt" of such speech-based "services from" those entities; and (2) to associate with, and to provide and receive speech to and from, the designated persons *as well as* other individuals or entities who have refrained from engaging in partnerships, convenings, coalitions, and the like with Plaintiffs, due to fear of violating EO 14,203. EO 14,203, § 3.

In addition, the Sanctions Regime is facially overbroad in violation of the First Amendment, given that—not just as applied to Plaintiffs, but universally with respect to speech-based services to and from, and association with, designated persons—a substantial number of its applications are unconstitutional, judged in relation to any legitimate sweep of the restriction (which, here, is nonexistent).

---

[21] These include, for example, coalition members of the CICC. CCR Decl. ¶30, HRW Decl. ¶17(a), OSI Decl. ¶29.

1. The Sanctions Regime Imposes an Unconstitutional Burden on Plaintiffs' First Amendment Rights.

a. Communications and Coordination with Designated Persons

EO 14,203 blocks Plaintiffs from "the making of any contribution or provision of . . . services by, to, or for the benefit of" any designated person or "the receipt of any contribution or provision of . . . services from" them. EO 14,203, § 3(b). These are content-based restrictions because, as the Court held in *Rona*, they "regulate speech based on its function or purpose." 797 F. Supp. 3d at 289 (quoting *TikTok Inc. v. Garland*, 604 U.S. 56, 71 (2025)). Put differently, the restrictions are content-based because whether Plaintiffs may speak "depends on what they say." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 27 (2010). Plaintiffs' speech is restricted "if, and only if, [the speech] has the function or purpose of benefitting" designated persons. *Rona*, 797 F. Supp. 3d at 289 (quoting *Open Soc'y*, 510 F. Supp. 3d at 211); *see also* *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). Similarly, the Order proscribes receipt of speech only from designated persons whose content makes the speech a "service" to Plaintiffs—a necessarily content-based analysis.[22] Such content-based laws are "presumptively unconstitutional" and may be sustained "only if the government proves that they are narrowly tailored to serve compelling state interests"—that is, if they satisfy the demanding strict scrutiny standard. *Reed*, 576 U.S. at 163; *Chiles v. Salazar*, 607 U.S. 627, 692 (2026).

The restrictions also discriminate based on viewpoint—"an egregious form of content discrimination" that poses "even greater dangers" to First Amendment freedoms and from which

[22] The First Amendment's protections of the free exchange of ideas encompasses both the right to speak and the right to receive information. *Martin v. Struthers*, 319 U.S. 141, 143 (1943); *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council*, 425 U.S. 748, 756 (1976) (holding "the protection afforded is to the communication, to its source and to its recipients both"); *Kleindienst v. Mandel*, 408 U.S. 753, 764 (1972) (recognizing First Amendment right of "American academics who . . . invited [Belgian Marxist author and speaker] to participate with them in colloquia, debates, and discussion in the United States," though ultimately holding that government's plenary immigration powers allowed for speaker's exclusion).

"governments in this country must nearly always abstain." *Chiles*, 607 U.S. at 641, 646 (cleaned up); *see also* *NRA of Am.*, 602 U.S. at 187 ("[V]iewpoint discrimination is uniquely harmful to a free and democratic society."); *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995). Because they bar Plaintiffs from providing services "for the benefit of," *inter alia*, the OTP, they prohibit only speech which *advances* the litigation positions of the OTP, including but not only in relation to the disfavored investigations, while allowing speech which *opposes or objects to* such positions. Thus, the restrictions appear to ban Plaintiffs from facilitating the gathering and submission of documentation from victims and witnesses for use by the Prosecutor in a given prosecution but leave persons free to facilitate the gathering and submission of documentation supporting the *defense*.

The restrictions thus apply based not just on the *content* of Plaintiffs' speech, but also on Plaintiffs' expressed *views* about that content. The First Amendment does not tolerate this blatant viewpoint discrimination. *See, e.g.*, *Knight First Amendment Inst. at Columbia Univ. v. Trump*, 928 F.3d 226, 239 (2d Cir. 2019) (holding that President Trump's "block[ing on Twitter of] . . . persons expressing viewpoints he finds distasteful" is impermissible viewpoint discrimination), *vacated on mootness grounds*, *Biden v. Knight First Amendment Inst. at Columbia Univ.*, 141 S. Ct. 1220 (2021); *Ragbir v. Homan*, 923 F.3d 53, 69–70 (2d Cir. 2019) (holding that ordering removal of immigrant for engaging in speech in favor of immigrants' rights is impermissible viewpoint discrimination, in the context of a First Amendment retaliation claim), *vacated and remanded on other grounds*, *Dep't of Homeland Sec. v. Thuraissigiam*, 591 U.S. 103 (2020); *Travis v. Owego-Apalachin School Dist.*, 927 F.2d 688, 693-94 (2d Cir. 1991) (holding that school district's decision to allow Christmas-themed religious program in auditorium but not pro-life religious program is impermissible viewpoint discrimination, in context of First Amendment

free exercise and equal protection claims). As the Supreme Court recently underscored, the First Amendment "safeguards not only popular ideas; it secures, even and especially, the right to voice dissenting views." *Chiles*, 607 U.S. at 646.[23]

Plaintiffs have been seriously harmed by these restrictions and have ceased engaging in First Amendment-protected activities vis-à-vis the designated persons because they reasonably fear enforcement under the Sanctions Regime. Among other things, they have ceased providing *pro bono* legal representation, including through an attorney-client relationship for designated NGOs, and halted making legal arguments and submitting legal filings and *amicus curiae* briefs before the designated judges in ongoing criminal proceedings, including in the *Situation in Palestine* and/or the *Situation in Afghanistan*. CCR Decl. ¶¶28-34; OSI Decl. ¶26. Plaintiffs have stopped engaging with the OTP and providing it with information, documentation, legal analysis, and advice in ongoing criminal investigations and preliminary examinations, including in the *Situation in Palestine* and/or the *Situation in Afghanistan*. CCR Decl. ¶¶29, 30, 33; OSI Decl. ¶¶26(e); HRW Decl. ¶¶21(a). And they have halted providing research to Ms. Albanese for inclusion in her reports to the U.N. Human Rights Council and engaging with Ms. Albanese on potential strategic litigation or advocacy pathways related to her work. AFSC Decl. ¶20(d); CCR Decl. ¶38; HRW Decl. ¶21(d); OSI Decl. ¶31.

Plaintiffs have also been forced to stop engaging in joint or coordinated activities with the designated entities. This includes no longer collaborating and strategizing with the designated

[23] Indeed, as core political speech and legal advocacy, Plaintiffs' speech is afforded the highest level of protection under the First Amendment. *R.A.V. v. City of St. Paul*, 505 U.S. 377, 422 (1992) (Stevens, J., concurring) (observing "[c]ore political speech occupies the highest, most protected position"); *NAACP v. Button*, 371 U.S. 415, 428–29 (1963) (holding litigation-related activities "are modes of expression and association protected by the First and Fourteenth Amendments"); *Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am. v. Nat'l Right to Work Legal Def. & Ed. Found., Inc.*, 590 F.2d 1139, 1147 (D.C. Cir. 1978) ("[A]ny law that adversely affects the exercise of first amendment freedoms in connection with legal aid activity must be necessary to correct a serious and substantive evil and must be precisely drawn to serve that purpose.") (citation omitted).

organizations through litigation- and research-based efforts, including joint litigation, co-counsel relationships, client referrals, victim-witness coordination, and exchange of legal and specialized analysis, evidence, and research. CCR Decl. ¶¶29, 30, 31, 32, 34; HRW Decl. ¶21 (f), (g); OSI Decl. ¶¶26–28; AFSC Decl. ¶20(a-b).

Likewise, Plaintiffs have been forced to curtail participating fully in coordinated advocacy-related discussions, meetings, and other collaborative events involving designated persons, including participation in the ICC's December 2025 Assembly of States Parties, CCR Decl. ¶33(d); HRW Decl. ¶¶21(c) 21(e),(f); OSI Decl. ¶26(c), 28(d); attendance and participation in the June 2026 ICC-NGO Roundtable conference, HRW Decl. ¶21(e); OSI Decl. ¶26(b); and convenings and strategy sessions, including as related to the *Situation in Afghanistan* and/or the *Situation in* Palestine, CCR Decl. ¶ 34(a), 35(e); HRW Decl. ¶21(h), 21(i); OSI Decl. ¶28(d). Plaintiffs have also had to cease hosting and/or planning initiatives, meetings, and collaborative events that would have involved the designated individuals and entities, thereby depriving Plaintiffs and others of the designated entities' unique expertise. AFSC Decl. ¶20(a), 20(c); OSI Decl. ¶28(d), 30; CCR Decl. ¶34(c), (f), 35(a)-(f), 36.

Because the Sanctions Regime is both content- and viewpoint-based, it is "presumptively unconstitutional" and can survive constitutional muster only if it satisfies strict scrutiny. *Reed*, 576 U.S. at 163-64. Strict scrutiny requires Defendants to "prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest." *Id.* at 171 (citation omitted). Pursuant to the narrow tailoring requirement, "[i]f a less restrictive alternative would serve the Government's purpose, the legislature must use that alternative." *U.S. v. Playboy Entm't Grp.*, 529 U.S. 803, 813 (2000) (citation omitted). "Under [the strict scrutiny] test, it is rare that a regulation

will ever be permissible." *Chiles*, 607 U.S. at 640 (citations, quotations, and internal punctuation omitted).

Several federal courts have already examined EO 14,203's restrictions on speech (and those of its materially identical predecessor) and concluded it fails to satisfy strict scrutiny. *See, e.g.*, *Rona*, 797 F. Supp. 3d at 282, 292-93 (finding EO 14,203 "violates Plaintiffs' First Amendment rights because it constitutes a content-based regulation of their speech-based activities and cannot survive strict scrutiny"); *Smith*, 791 F. Supp. 3d at 97-98 (finding EO 14,203 likely "fails even intermediate scrutiny"); *see also* *Open Soc'y*, 510 F. Supp. 3d at 212-13, 212 n.7 (finding EO 13,928 likely fails both intermediate and strict scrutiny). This Court should reach the same conclusion.

*First*, EO 14,203 serves no compelling government interest. The routine work of the ICC over more than twenty years, including in regard to crimes allegedly committed on the territory of a State Party to the Rome Statute by nationals of non-State Parties (such as in Afghanistan or Palestine), about which Congress specifically legislated in 2002, is not a "national emergency" within the meaning of IEEPA. Thus, no compelling interest exists to justify the Executive Order. The restrictions are therefore simply a prohibition on disfavored speech.[24] And, even if there were any governmental interest (there is not), "[t]he First Amendment forbids [...] speech manipulation by the government, even in an arguably national security-related setting." *Jenner & Block LLP v. U.S. Dep't of Justice*, 784 F. Supp. 3d 76, 103 (D.D.C. 2025).

[24] *NRA of Am.*, 602 U.S. at 180, 188 (confirming that "Government officials cannot attempt to coerce private parties in order to punish or suppress views that the government disfavors" and that it is prohibited "to use the power of the State to punish or suppress disfavored expression"); *id.* at 189 (explaining that "the First Amendment prohibits government officials from relying on the threat of invoking legal sanctions and other means of coercion...to achieve the suppression of disfavored speech") (cleaned up). *See also* *Bantam Books, Inc.*, 372 U.S. at 67, 70 (highlighting that the government may not use a "threat of invoking legal sanctions and other means of coercion ... to achieve the suppression" of future disfavored speech).

The absence of a compelling government interest is confirmed by the fact that EO 14,203 is underinclusive in addressing that purported interest. Laws are underinclusive where they prohibit only a subset of the speech that should be prohibited for the government to achieve its purported interest. *See, e.g.*, *Republican Party v. White*, 536 U.S. 765, 780 (2002) (noting that "underinclusiveness diminishes the credibility of the government's rationale for restricting speech" (internal citation omitted)); *Brown v. Entm't Merchs. Ass'n*, 564 U.S. 786, 802 (2011) ("Underinclusiveness raises serious doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint.") (internal citations omitted).

Here, the Sanctions Regime restricts speech that provides a service to those who have been designated in the name of shielding certain "protected persons" from investigation or prosecution by the ICC without their countries' consent. And yet, the same alleged crimes are generally subject to the domestic criminal jurisdiction of the States on whose territory the crimes were allegedly committed, which, as a matter of common practice, may be exercised without the consent of the U.S. or allied countries. EO 14,203, however, does nothing to regulate speech that aids such investigations or prosecutions without the consent of the U.S. or its allies. This underinclusiveness deals "'appreciable damage to [the Government's] supposedly vital interest'" and undermines any pretense that the Order is narrowly tailored. *Cath. Charities Bureau, Inc. v. Wis. Lab. & Indus. Review Comm'n*, 605 U.S. 238, 253 (2025) (quoting *Reed*, 576 U.S. at 172). *See also* *Brown*, 564 U.S. at 805 (holding law restricting sale of violent video games to children underinclusive because it did not prohibit portrayals of violence in other media, undermining the asserted interest of protecting children from portrayals of violence).

*Second*, even assuming *arguendo* that EO 14,203 serves a compelling government interest (it does not), the Order fails strict scrutiny because it is not narrowly tailored. It is vastly overinclusive—prohibiting speech wholly unrelated to the government's asserted interest in shielding "protected persons" from ICC prosecution.[25] Again, courts that have examined this question have found that the Order is not narrowly tailored and thus cannot withstand strict scrutiny (or even intermediate scrutiny). *Rona*, 797 F. Supp. 3d at 282, 291–92 ("The Government's national security argument does not withstand strict scrutiny because it is overinclusive…. Because the [Executive] Order unnecessarily circumscribes Plaintiffs' protected expression, it cannot survive strict scrutiny and violates the First Amendment.") (cleaned up); *Smith*, 791 F. Supp. 3d at 98 ("The Executive Order broadly prohibits any speech-based services that benefit the Prosecutor, regardless of whether those beneficial services relate to an ICC investigation of the United States, Israel, or another U.S. ally. The Government does not explain how its stated interest would be undermined—or even impacted—by the Plaintiffs' services to the OTP related to the ICC's ongoing work in Bangladesh, Myanmar, and Afghanistan.") (cleaned up); *Open Soc'y*, 510 F. Supp. 3d at 212 n.7 (in concluding EO 14,203's materially identical predecessor likely failed both intermediate and strict scrutiny, finding that "the restrictions prohibit or chill significantly more speech than even Defendants seem to believe is necessary to achieve their end," and that, even applying intermediate scrutiny, "Plaintiffs still would likely prevail because the Order and the Regulations burden substantially more speech than necessary") (citations omitted).

[25] Counterspeech, not suppression, is the ordinary and less restrictive response to the speech at issue here. *U.S. v. Alvarez*, 567 U.S. 709, 726–28 (2012) (plurality opinion) (holding statute was not narrowly tailored where the Government "has not shown, and cannot show, why counterspeech would not suffice to achieve its interest," explaining that "[t]he response to the unreasoned is the rational" and that "[s]ociety has the right and civic duty to engage in open, dynamic, rational discourse").

Those courts were correct. EO 14,203 sweeps far wider than its purported government interest, prohibiting *any* kind of services to, for the benefit of, or from a designated person, regardless of whether those services are connected to the proceedings falling within the purported national emergency, or even to the ICC at all. For instance, Plaintiffs are prohibited from providing speech-based services to the designated ICC prosecutors in connection with ICC proceedings that the U.S. has *endorsed*, such as those concerning extrajudicial executions, torture, mass child abductions, and sexual and gender-based violence in Ukraine—investigative work that Congress itself legislated to support, H.R. 2617, 117th Cong. § 7073(b) (2023). It also curtails Plaintiffs' engagement with the designated organizations and the U.N. Special Rapporteur Albanese on justice and accountability outside the work of the ICC, including, for example, litigation efforts in U.S. courts.

EO 14,203 is thus not narrowly tailored to any purported governmental interest. As a result, it fails strict scrutiny.[26] Plaintiffs are therefore likely to succeed on the merits of their claim that the Sanctions Regime violates their right under the First Amendment to engage in speech that constitutes "services to, or for the benefit of" designated persons, as well as their right to receive speech constituting "services *from*" them.

b. Communication and Coordination with Designated Entities, Interlocutors, Partners and Associates

The Sanctions Regime also unconstitutionally burdens Plaintiffs' First Amendment right to associate or otherwise engage with (1) the designated entities and (2) partner organizations and other entities or individuals who, though themselves not designated, nonetheless are chilled from participating in groups or other convenings with Plaintiffs due to concerns that designated persons

[26] Even if intermediate scrutiny applied, EO 14,203 would still fail constitutional muster because it "burden[s] substantially more speech than necessary to further [the Government's] interests." *Smith*, 791 F. Supp. 3d at 97-98; *Open Soc'y*, 510 F. Supp. 3d at 212 n.7.

may also participate, thereby subjecting themselves to designation (if a non-U.S. person) or enforcement (if a U.S. person), and would remain chilled even if the Sanctions Regime was enjoined against Plaintiffs.

The First Amendment protects not just the right to speak but also the right to associate. *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 647 (2000) ("[I]mplicit in the right to engage in activities protected by the First Amendment is a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends.") (quoting *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984)); *Citizens Against Rent Control v. City of Berkeley*, 454 U.S. 290, 295 (1981) (reaffirming "importance of freedom of association in guaranteeing the right of people to make their voices heard on public issues") (citing *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 460 (1958)). As the Supreme Court has found, in a holding that is particularly apt in the context of the justice and humanitarian work Plaintiffs are all engaged in, "the right to speak is often exercised most effectively by combining one's voice with the voices of others." *Rumsfeld v. Forum for Academic and Institutional Rights, Inc.*, 547 U.S. 47, 68 (2006); *see also* *Roberts*, 468 U.S. at 622 (collecting cases) (confirming that "[a]ccording protection to collective effort on behalf of shared goals is especially important"); *Tabbaa v. Chertoff*, 509 F.3d 89 (2d Cir. 2007) (affirming that "the right of expressive association is especially important in preserving political and cultural diversity and in shielding dissident expression from suppression by the majority") (cleaned up).

Plaintiffs, all U.S.-based non-profits, enjoy associational rights because they "associat[e] for the purpose of engaging in those activities protected by the First Amendment—speech, assembly, petition for the redress of grievances, and the exercise of religion." *Roberts*, 468 U.S.

at 617, 618.[27] However, independently and collectively, the Sanctions Regime imposes a severe "direct and substantial" or "significant" burden on Plaintiffs' associational rights, *Tabbaa*, 509 F.3d at 101 (internal citation omitted), met when, for example, a governmental action has "caused its members to suspend or even curtail their associational activities," *Fighting Finest*, 95 F.3d at 228. *See also* *Jacoby & Meyers*, 852 F.3d at 190 (identifying unconstitutional restriction on association as when attorney "risks censure or sanction for soliciting, meeting with, or representing a client—the activities that can be central to initiating and maintaining the attorney-client relationship").

Plaintiffs have had to cease a range of core associational activities and coordinated advocacy in furtherance of their organizational justice-focused missions. These activities include, among other things: the forced reconfiguring of a September 2025 event in New York City, on the sidelines of the U.N. General Assembly meeting, due to the designation of Al-Haq representatives which had been scheduled to speak, AFSC Decl. ¶20(c); ceasing to engage in group discussions about legal strategy concerning the representation of victims in the *Situation in Palestine* and actively participating in the annual ASP, including speaking on panels and side events, CCR Decl. ¶¶34(a), 34(d); restricting participation in events in which members of the OTP or the three designated organizations participate, including side events and strategy discussions during the ASP annual session, the ICC-NGO roundtable, and advocacy meetings or activities coordinated by the CICC, HRW Decl. ¶¶21(b)–(c), (e), (h)–(i); OSI Decl. ¶¶26(b)–(c), 28(d), 29.[28]

---

[27] Compl. ¶¶24-27 (describing Plaintiffs and their organizational missions); AFSC Decl. ¶¶5-6; CCR Decl. ¶5; HRW Decl. ¶5; OSI Decl. ¶ 5. *See also* *Fighting Finest, Inc.*, 95 F.3d 22, 227 (2d Cir. 1996) ("civic, charitable, lobbying, or fundraising activities" are "traditionally associated with the First Amendment"); *Jacoby & Meyers LLP*, 852 F.3d 178, 185, 186 (2d Cir. 2017) (affirming "the expressive value of certain types of associational litigation," finding that "attorneys who, as part of an advocacy group like the ACLU or the NAACP, have recognized associational rights"); *In re Primus*, 436 U.S. 412, 426 (1978) (finding it is established that "collective activity undertaken to obtain meaningful access to the courts is a fundamental right within the protection of the First Amendment").

[28] Plaintiffs' core associational activities and coordinated advocacy include covering expenses for joint activities, AFSC Decl. ¶14; CCR Decl. ¶12, 21. *See* *Button*, 371 U.S. at 428-29; *Buckley v. Valeo*, 424 U.S. 1, 16 (1976); *see also* *Riley v. Nat'l Fed'n of the Blind, Inc.*, 487 U.S. 781, 787-88 (1988).

Additionally, and inextricably linked to Plaintiffs' enjoyment of their right to associate, the speech restrictions have caused a widespread palpable chill not just on Plaintiffs but on the multitude of individuals and entities with reasons and rights to communicate with designated persons in myriad contexts, and with whom Plaintiffs regularly interact and rely upon to further their organizational missions. A recent report authored by the Secretariat of the Coalition for the International Criminal Court describes this "far-reaching chilling effect." It explains that the Sanctions Regime has caused "an immediate halt to all work US organisations and US nationals had been doing with designated individuals and organisations, including on strategic litigation cases, legal representation, research and advocacy."[29] It further reports that "[c]olleagues, researchers, and even victims' advocates" have been compelled to "recalibrat[e] what engagement with the Court feels safe" via "constant risk assessments," with U.S.-based organizations and individuals having "remov[ed] information from their websites and from the internet to erase their links with sanctioned entities" and "disinvit[ed] designated individuals from speaking on panels." In addition, they have "stopped attending meetings and events with designated individuals and organisations, taking part in votes or discussing strategies when those organisations are present, and even left group chats with designated individuals." *Id.* at 57-59. The report further explains that the ICC's December 2025 ASP, *supra* I(B)(1)(a), was a tangible manifestation of this wide chilling effect: "some US [civil society organizations] attended and spoke at meetings where designated entities were present; some attended and did not speak; some avoided such meetings; while others did not attend the Assembly at all." *Id.* at 59.

[29] Coalition for the International Criminal Court, "Criminalising Accountability: The US lawfare against the international justice system," (2026), at 57, available at https://coalitionfortheicc.org/sites/default/files/cicc_documents/Criminalising%20Accountability%20-%202026_0.pdf.

As a direct result of this widespread chill, Plaintiffs cannot fully exercise their First Amendment right to engage with necessary partners, associates, and interlocutors who have also limited their activities or ceased altogether from engaging in coalitions, conferences, and working groups because of the Sanctions Regime.

Since the restrictions on speech are content- and viewpoint-based and impose a severe, direct, and substantial burden on Plaintiffs' associational rights, strict scrutiny applies. *Ashcroft v. ACLU*, 542 U.S. 656, 665 (2004) (a content-based speech restriction that "effectively suppresses a large amount of speech that adults have a constitutional right to receive and to address to one another . . . is unacceptable if less restrictive alternatives would be at least as effective in achieving the legitimate purpose that the statute was enacted to serve") (quoting *Reno v. ACLU*, 521 U.S. 844, 874 (1997)); *Jacoby & Meyers, LLP*, 852 F.3d at 191 ("severe burdens on associational rights" may "survive[] only if [the restriction] is narrowly drawn to advance a compelling state interest"); *Button*, 371 U.S. at 433 ("Because First Amendment freedoms need breathing space to survive, government may regulate in the area only with narrow specificity.").

Just as the Sanctions Regime cannot survive strict or even intermediate scrutiny as to the restraints it imposes on Plaintiffs' speech, so too must it be found unconstitutional as to the burden it places on their associational activities. There is (and can be) no compelling government interest in prohibiting, or otherwise impairing, the ability of civil society organizations to associate in pursuit of a "wide variety of political, social, economic, educational, religious, and cultural ends." *Roberts*, 468 U.S. at 622. As the Supreme Court has observed, "[i]f the government were free to restrict individuals' ability to join together and speak, it could essentially silence views that the First Amendment is intended to protect." *Rumsfeld*, 547 U.S. at 68.

2. The Speech Prohibitions Are Facially Overbroad.

In a facial challenge based on the First Amendment, a law is unconstitutionally overbroad if "a substantial number of the law's applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Moody v. NetChoice, LLC*, 603 U.S. 707, 723 (2024) (quoting *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 615 (2021)) (additional citation and brackets omitted). In other words, a law is unconstitutionally overbroad if its "unconstitutional applications substantially outweigh its constitutional ones." *Id.* at 724. Such is the case here. There are no constitutional applications of EO 14,203, and even if there were (*quod non*), the restrictions on speech are facially overbroad in violation of the First Amendment. The Order should therefore be declared unconstitutional on its face.

The restrictions on speech are vastly overinclusive. *Supra* Section I(C)(1). The "lack of tailoring" to the government's purported interest "is categorical—present in every case—as is the weakness of the [government's stated] interest," *Ams. for Prosperity Found.*, 594 U.S. at 615. Relatedly, EO 14,203's overinclusiveness "creates an unnecessary risk of chilling in violation of the First Amendment," due to its "indiscriminate[] sweeping up" of speech-based services that are protected under the First Amendment and have no nexus to the purported government interests at issue. *Id.* at 616-17 (internal citations omitted). Further, the Order's unconstitutional vagueness, *infra* at I(E), proliferates the reach of its unconstitutional applications. *Farrell v. Burke*, 449 F.3d 470, 499 (2d Cir. 2006) ("The purpose of an overbreadth challenge is to prevent the chilling of constitutionally protected conduct, as prudent citizens will avoid behavior that *may* fall within the scope of a prohibition, even if they are not entirely sure whether it does.") (emphasis in original).

As explained, EO 14,203's expansive restrictions on the making and receipt of speech have imposed a widespread palpable chill not just on Plaintiffs, but also across many individuals and entities with reasons and rights to communicate with designated persons in myriad contexts. That

chill is evident in the fact that no fewer than 21 plaintiffs have commenced actions challenging the Order and its predecessor on First Amendment grounds.

For these reasons, even assuming that the Sanctions Regime's speech restrictions had any "plainly legitimate sweep"—they do not—the number of unconstitutional applications far exceeds any constitutional restrictions. It is therefore facially overbroad in violation of the First Amendment.

### D. The Sanctions Regime Violates the Religious Freedom Restoration Act as to AFSC.

The Sanctions Regime also violates RFRA, 42 U.S.C. § 2000bb-1(a)-(b), because it substantially burdens the exercise of religion by AFSC, a faith-based Quaker organization, AFSC Decl. ¶5, in a way that does not further a compelling governmental interest by the least restrictive means available. *Sabir v. Williams*, 52 F.4th 51, 59 (2d Cir. 2022).[30]

AFSC engages in the exercise of religion through the provision of humanitarian aid and human rights advocacy in the Occupied Palestinian Territory, in fulfillment of the Quaker belief in the "inner light," or the presence of the divine, in every human being, a precept that compels Quakers to bear "social witness" in the world, including through peacebuilding, humanitarian service, advocacy, and the promotion of human dignity. AFSC Decl. ¶¶7-8. *See also Phila. Yearly Meeting of the Religious Soc'y of Friends v. United States Dep't of Homeland Sec.*, No. 25-1512, 2026 U.S. App. LEXIS 24886 at *9, 26 (4th Cir. Aug. 18, 2026) (describing the Quaker "Testimony of Peace" as guiding how Quakers "live and worship," including their "commitment to pacifism

[30] RFRA was enacted to codify a heightened level of protection for freedom of religion, a right enshrined in the First Amendment. 42 U.S.C. § 2000bb(a)(1). The fact that the First Amendment "doubly protects religious speech is no accident," as it is a "natural outgrowth of the framers' distrust of government attempts to regulate religion and suppress dissent." *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 523-524 (2022). As the Supreme Court has observed, the First Amendment's Free Exercise and Free Speech Clauses work in tandem. *See, e.g.*, *Widmar v. Vincent*, 454 U.S. 263, 269, n.6 (1981); *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U. S. 819, 841 (1995).

and non-violence"). Carrying out these religious obligations requires AFSC to communicate and collaborate with the designated human rights organizations. AFSC Decl. ¶¶11-15. The Sanctions Regime, however, "substantial[ly] burden[s]" that exercise of religion because it "impose[s] 'severe' and 'substantial economic consequences' on [AFSC's] adherence to [its] 'sincere religious belief.'" *Kravitz v. Purcell*, 87 F.4th 111, 126 (2d Cir. 2023) (quoting *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 719-20 (2014)).

Defendants cannot meet the "exceptionally demanding" standard of showing that this burden on religious exercise furthers a compelling interest through the least restrictive means. *Burwell*, 573 U.S. at 728; 42 U.S.C. § 2000bb-1(b). No compelling interest is served by the restriction as there is no "national emergency" to be addressed. And, even if there were, the restrictions are overinclusive and thus not narrowly tailored. *Supra* Section I(C)(1). Indeed, the Order fails even intermediate scrutiny. *Smith*, 791 F. Supp. 3d at 97-98; *Open Soc'y*, 510 F. Supp. 3d at 212, n.7. Thus, just as the Sanctions Regime violates Plaintiffs' free speech rights, so too does it violate RFRA.

**E. The Sanctions Regime Violates the Fifth Amendment.**

Plaintiffs are likely to succeed on the merits of their claim that EO 14,203 is unconstitutionally vague in violation of the Fifth Amendment because the Executive Order fails to provide the constitutionally required notice as to what activities it proscribes.

"[C]larity in regulation is essential to the protections provided by the Due Process Clause of the Fifth Amendment." *FCC v. Fox TV Stations, Inc.*, 567 U.S. 239, 253-254 (2012). A law is "unconstitutionally vague if it 'fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement.'" *U.S. v. Schulte*, 436 F. Supp. 3d 747, 752 (S.D.N.Y. 2020) (quoting *U.S. v. Williams*, 553 U.S. 285, 304 (2008)); *see also* *Sessions v. Dimaya*, 584 U.S. 148, 155-156, 175

(2018) ("The void-for-vagueness doctrine… guarantees that ordinary people have 'fair notice' of the conduct a statute proscribes") (quoting *Papachristou v. Jacksonville*, 405 U.S. 156, 162 (1972)).

When a law "threatens to inhibit the exercise of constitutionally protected rights," including First Amendment rights of speech or association, a "more stringent vagueness test" applies. *Hoffman Estates v. Flipside, Hoffman Estates*, 455 U.S. 489, 499 (1982). The "vagueness of [a content-based regulation of speech] raises special First Amendment concerns because of its obvious chilling effect." *FCC*, 567 U.S. at 254-55 (quoting *Reno*, 521 U.S. at 871-72) (alteration in *FCC*)). If a law "is capable of reaching expression sheltered by the First Amendment, the [vagueness] doctrine demands a greater degree of specificity than in other contexts." *VIP of Berlin, LLC v. Town of Berlin*, 593 F.3d 179, 187 (2d Cir. 2010) (cleaned up); *Nichols v. Village of Pelham Manor*, 974 F. Supp. 243, 254 (S.D.N.Y. 1997) (finding phrase unconstitutionally vague where its "indeterminate meaning… might cause the suppression of protected speech").

EO 14,203 plainly implicates constitutionally protected expression and therefore must satisfy this "more stringent vagueness test," *Vill. of Hoffman Ests.*, 455 U.S. at 499 — a standard it cannot meet. The Order prohibits the "provision of . . . services by, to, or for the benefit of" any designated person, as well as "the receipt of any . . . services *from*" such a person. EO 14,203, § 3. None of these terms is defined; nor has the government issued guidance explaining their meanings or the outer bounds of their scope, leaving Plaintiffs to grapple with the Order's vague, imprecise, and altogether confusing text.

Specifically, the meaning of the term "services" is vague and ambiguous, as is the meaning of "for the benefit of." So, too, the distinction between providing services "to" and providing services "for the benefit of" a designated person. The widespread chilling effect on Plaintiffs'

First Amendment-protected conduct is due not just to EO 14,203's overbroad sweep, but also to its failure to provide the constitutionally required notice as to what it proscribes. *Reno*, 521 U.S. at 871-72 ("The vagueness of [] a [content based-] regulation [of speech] raises special First Amendment concerns because of its obvious chilling effect on free speech") (citation omitted); *Citizens United v. FEC*, 558 U.S. 310, 324 (2010) ("The First Amendment does not permit laws that force speakers to… seek declaratory rulings before discussing the most salient political issues of our day… [because they] must necessarily guess at the law's meaning") (alterations in original omitted). As a result, Plaintiffs have been forced to cease engaging in a wide range of First Amendment-protected activities that they reasonably fear may be proscribed. *Supra* Section I(C)(1). EO 14,203 is therefore unconstitutionally vague.

## II. The Sanctions Regime Is Causing Irreparable Harm.

Plaintiffs are suffering irreparable harm from the Sanctions Regime. *First*, as this Court previously found, "'the prospect of enforcement under IEEPA has caused Plaintiffs not to speak, and hence to forgo exercising their First Amendment rights.'" *Rona*, 797 F. Supp. 3d at 294 (quoting *Open Soc'y*, 510 F. Supp. 3d at 216). Courts "presume[]" irreparable harm when a plaintiff "alleges injury from a rule or regulation that directly limits speech." *Bronx Household of Faith v. Bd. of Educ.*, 331 F.3d 342, 349–50 (2d Cir. 2003); *see also* *Agudath Isr. v. Cuomo*, 983 F.3d 620, 636 (2d Cir. 2020) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.") (quoting *Roman Cath. Diocese v. Cuomo*, 520 U.S. 14, 19 (2020)). Here, EO 14,203 forces Plaintiffs to forego the exercise of their First Amendment rights in the ways described above. Thus, Plaintiffs have *ipso facto* demonstrated irreparable harm. *Conn. Dep't of Envtl. Prot. v. OSHA*, 356 F.3d 226, 231 (2d Cir. 2004) (holding "alleged violation of a constitutional right triggers a finding of irreparable injury").

Although Plaintiffs need not do so to obtain injunctive relief, they have also shown irreparable harm by "establishing an actual chilling effect." *Bronx Household*, 331 F.3d at 349. The underlying designations and prospect of enforcement under IEEPA have caused Plaintiffs not to speak and associate with others, and hence to forego exercising First Amendment rights. Vacating the underlying designations and enjoining Defendants from enforcing penalties against Plaintiffs would eliminate this chill and allow them to exercise their right to free speech and expressive association.

Moreover, the Sanctions Regime is inflicting additional harms on Plaintiffs which stem from, and are intertwined with, their First Amendment injuries. This includes causing serious *operational harm and impairment of their core missions and programmatic work.* For instance, AFSC's religious mission has been severely impaired and its work disrupted. Because AFSC "had relied on Al-Haq and Al Mezan to facilitate introductions and coordinate with other Palestinian organizations, human rights defenders, and victims of human rights violations, the inability to maintain these connections prevents AFSC from fulfilling the Quaker religious obligation of bearing witness to conditions on the ground in the communities it serves." AFSC Decl. ¶21.

CCR's core work has been severely impaired as well. Among other things, it has been forced to withdraw as legal counsel for clients at the ICC, ceased engagement with the OTP, refrained from making submissions before designated Pre-Trial and Appeals Chamber judges, ended years-long collaborations and joint filings with the designated organizations, stopped joint advocacy and public amplification of its partners' work, and foregone opportunities to represent new clients or expand its ICC practice. CCR Decl. ¶¶28-36.

HRW's core work has also been severely constrained. It has, among other things, ceased engagement with OTP staff on its investigations and preliminary examinations, including those

unrelated to Palestine or Afghanistan; significantly curtailed its participation in ICC-related events; and ended collaboration with the designated organizations on joint research, victim and witness interviews, joint statements, and public appearances. HRW Decl. ¶21.

OSI's core work has likewise been severely impacted. It has, *inter alia*, discontinued meetings with the ICC Prosecutor and Deputy Prosecutors; restricted its participation in ICC discussions; ceased sharing legal resources to facilitate implementation of ICC arrest warrants; stopped supporting submissions to the OTP and providing strategic advice on victim participation; and severed engagement with the designated organizations. OSI Decl. ¶¶24-31. OSI's absence from these spaces and activities "has deprived it of access to timely information concerning ICC cases and institutional developments, and undermined its ability to produce informed analysis and strategies and carry out effective advocacy on issues core to its mandate. The disruption of relationships with ICC staff and officials as well as civil society partners has further weakened OSI's network and reduced its capacity to both benefit from and contribute to collective knowledge and advocacy efforts." OSI Decl. ¶32.

As a consequence, Plaintiffs are suffering serious *reputational harm*. The Sanctions Regime has damaged their standing in the communities in which they operate. For example, the loss of access to the designated organizations' insights and expertise has negatively impacted CCR's broader human rights advocacy and litigation efforts. CCR Decl. ¶36. Because CCR has ceased engaging with Al-Haq, Al Mezan, and PCHR, its "long-established reputation and widely recognized work on behalf of Palestinian rights, human rights, and the rule of law more broadly has been severely and negatively harmed." CCR Decl. ¶37. Similarly, because HRW did not host side events at the annual ASP session in December 2025 or did not attend side events where representatives of the designated NGOs or designated individuals could be present, "HRW's

reputation among stakeholders who attended the session, including representatives of other human rights organizations and States Parties, suffered." HRW Decl. ¶21(c). Likewise, "OSI has suffered reputational harm as a result of its withdrawal from the forums and spaces it regularly occupied," and its "absence from these spaces has diminished its visibility and influence within the international justice community." OSI Decl. ¶32.

The Sanctions Regime has inflicted direct *financial cost* as well. For instance, OSI had to "cancel[], at great financial cost, a convening of civil society groups working on strategic litigation concerning the Occupied Palestinian Territory—including in forums other than the ICC—that included representatives from the three designated organizations among the invited participants." OSI Decl. ¶30.

Further, the Sanctions Regime has forced Plaintiffs to *divert substantial organizational resources* from their core missions to address the sanctions themselves. For instance, OSI "has dedicated resources to responding to the Executive Order, including by serving as pro bono counsel to plaintiffs in two different cases. OSI has thus expended, and continues to expend, significant time and resources that might otherwise have been dedicated to addressing other urgent human rights crises around the world." OSI Decl. ¶33. Similarly, CCR has diverted programmatic resources, "instead focusing on navigating the sanctions regime and advocacy or litigation efforts to challenge it," CCR Decl. ¶39. HRW has "diverted resources from planned programming to instead focus on advocacy and compliance related to the imposition of sanctions pursuant to EO 14,203 and subsequent designations thereunder." This has included "suspending the conduct of research on the interaction between the court and domestic judicial authorities for the purpose of publishing findings and recommendations aimed at addressing shortcomings and maximizing the positive impact of the ICC on national justice efforts." HRW Decl. ¶23.

**III. The Balance of the Equities and Public Interest Decidedly Favor Plaintiffs**

The balance of equities and public interest decidedly favor an injunction. There is "a substantial public interest 'in having governmental agencies abide by the federal laws that govern their existence and operations.'" *New York v. Noem*, 812 F. Supp. 3d 321, 337 (S.D.N.Y. 2025) (quoting *League of Women Voters of United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016)); *see also* *Washington v. Reno*, 35 F.3d 1093, 1103 (6th Cir. 1994). Because the Sanctions Regime "violates statutes enacted by Congress, including the APA," and is *ultra vires* under IEEPA, the public interest favors an injunction. *Noem*, 812 F. Supp. 3d at 337. Further, "securing First Amendment rights is in the public interest." *N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013); *Am. Civil Liberties Union v. Ashcroft*, 322 F.3d 240, 247 (3d Cir. 2003) (holding "the Government does not have an interest in the enforcement of an unconstitutional law") (cleaned up). Finally, there is no public interest in maintaining an unconstitutional deprivation of due process. *Perkins Coie LLP v. U.S. Department of Justice*, 783 F. Supp. 3d 105, 178-180 (D.D.C. 2025) (finding irreparable harm when plaintiffs demonstrated that EO 14,230 violated, *inter alia*, the firms' rights under the Fifth Amendment); *see also* *Karem v. Trump*, 960 F.3d 656, 668 (D.C. Cir. 2020) ("[A] violation of Fifth Amendment due process rights… support[s] injunctive relief.").

Any appeal to national security is unavailing. As Judge Failla stated in preliminarily enjoining enforcement of EO 14,203's predecessor, "national-security concerns must not become a talisman used to ward off inconvenient claims—a 'label' used to 'cover a multitude of sins.'" *Open Soc'y*, 510 F. Supp. 3d at 211 (quoting *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1862 (2017)) (internal quotes omitted). *See also* *Smith*, 791 F. Supp. 3d at 99; *Rona*, 797 F. Supp. 3d at 207. The equities and public interest thus decisively favor the injunction.

## SCOPE OF INJUNCTIVE RELIEF

The Sanctions Regime must be preliminarily enjoined in its entirety so as to provide "complete relief to the plaintiffs before the court," *Trump v. CASA, Inc.*, 606 U.S. 831, 852 (2025).

An *ultra vires* executive order like EO 14,203 cannot be implemented or enforced. *See* *Youngstown*, 343 U.S. at 584 (affirming preliminary injunction enjoining Secretary of Commerce from implementing executive order that lacked constitutional or statutory authority); *Medellin v. Texas*, 552 U.S. 491, 498 (2008) (holding Presidential Memorandum without constitutional basis not "directly enforceable federal law"). The Sanctions Regime must therefore be enjoined in its entirety. *Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 191 (1999); *Susman Godfrey LLP v. Exec. Office of the President*, 789 F. Supp. 3d 15, 57 n.13 (D.D.C. 2025).

Separately, the sanctions designations made thereunder are arbitrary and capricious, abuses of discretion, and contrary to law, in violation of the APA. The Defendants against whom the APA claim is brought should therefore be enjoined from implementing or enforcing all existing designations or making new ones. *See, e.g.*, *Xiaomi Corp. v. Dep't of Defense*, No. 21-280 (RC), 2021 U.S. Dist. LEXIS 46496, at *2 (D.D.C. Mar. 12, 2021) (preliminarily enjoining defendants from "implementing or enforcing" the designation upon showing of likelihood of success on APA claim); *Loon v. Dep't of Treasury*, No. 1:23-CV-312-RP, 2025 U.S. Dist. LEXIS 80108, at *3 (W.D. Tex. Apr. 28, 2025) *on remand from* *Van Loon v. U.S. Dep't of the Treasury*, 122 F.4th 549, 562 (5th Cir. 2024) (permanently enjoining designation upon finding of APA violation in claim brought by non-designated individuals).

Further, should the Court reach the Sanctions Regime's constitutional infirmities, *St. Cyr*, 533 U.S. at 299-300 (describing constitutional avoidance doctrine), in line with prior decisions concerning EO 14,203 and its predecessor, the Court should enjoin Defendants from "enforcing

IEEPA's civil or criminal penalty provisions against Plaintiffs," *Rona*, 797 F. Supp. 3d at 294. *See also* *Smith*, 791 F. Supp. 3d at 100; *Open Soc'y*, 510 F. Supp. 3d at 217.

However, enjoining enforcement of IEEPA's penalties against Plaintiffs alone would not provide the complete relief necessary to remedy the irreparable harm suffered by Plaintiffs, whose constitutional injuries also stem from impairment of their speech and associational rights in connection with engagement with partners, associates, and interlocutors necessary for the fulfillment of the Plaintiffs' organizational missions. Because of the participation of designated persons in such exchanges, these partners, associates, and interlocutors are themselves prevented or otherwise chilled from engaging in critical speech and associational activities with Plaintiffs owing to the risk of designation for non-U.S. entities or enforcement of criminal penalties for U.S. persons. Those harms are exacerbated by the Order's unconstitutional vagueness "because of its obvious chilling effect." *FCC*, 567 U.S. at 254-55 (quoting *Reno*, 521 U.S. at 871-72 (1997)).

These impediments strike at the heart of Plaintiffs' work and mission and thereby infringe Plaintiffs' constitutional rights to speech and association. Plaintiffs all operate in collaboration with partners, associates, and interlocutors, and their work depends upon their ability to engage in collective advocacy and joint efforts. It would be an empty remedy for Plaintiffs to be able to, for example, attend a roundtable strategy session with designated prosecutors, participate in a strategic litigation convening with designated human rights organizations, or host a panel discussion with designated ICC Judges, if Plaintiffs' partners, associates, and interlocutors are unable to participate due to their own fear of enforcement or designation because of the participation of a designated individual or entity. This would unconstitutionally deprive Plaintiffs of their rights to engage in speech and associational activities with those necessary partners, associates, and interlocutors, thereby harming Plaintiffs' ability to engage in the core advocacy and joint efforts that are central

to their respective missions and programmatic work. As the Supreme Court has held, "Effective advocacy of both public and private points of view, particularly controversial ones, is undeniably enhanced by group association, as this Court has more than once recognized by remarking upon the close nexus between the freedoms of speech and assembly." *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 908 (1982) (citing *NAACP v. Alabama*, 357 U.S. at 460).

Complete relief therefore requires enjoining Defendants from implementing the Sanctions Regime as a whole, including from enforcing its penalties against any U.S. persons, from implementing its existing designations, and from designating anyone else thereunder. *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979) (instructing that "the scope of injunctive relief is dictated by the extent of the violation established"); *CASA, Inc.*, 606 U.S. at 851–54; *L.C.*, 2026 U.S. Dist. LEXIS 106000, at *31 n.5. Such relief, to and for the benefit of Plaintiffs, falls squarely within the traditional limits of this Court's equitable powers. *CASA, Inc.*, 606 U.S. at 863-84 (Thomas, J., concurring).

## CONCLUSION

The Court should preliminarily enjoin the Sanctions Regime in its entirety.

Dated: September 1, 2026

Respectfully submitted,

**AMERICAN FRIENDS SERVICE COMMITTEE,**
**CENTER FOR CONSTITUTIONAL RIGHTS,**
**HUMAN RIGHTS WATCH, and**
**OPEN SOCIETY INSTITUTE,**

By their attorneys,
/s/ *Andrew B. Loewenstein*
Andrew B. Loewenstein (*pro hac vice*)
Amir Farhadi (*pro hac vice*)
FOLEY HOAG LLP
Seaport West
155 Seaport Boulevard

Boston, MA 02210
617-832-1000
aloewenstein@foleyhoag.com
afarhadi@foleyhoag.com

Nicholas M. Renzler (NR1608)
Christina Hernsdorf (5641931)
Hannah E. Sweeney (6202584)
FOLEY HOAG LLP
1301 Avenue of the Americas
New York, NY 10019
212-812-0400
nrenzler@foleyhoag.com
hsweeney@foleyhoag.com

Rawda Fawaz (*pro hac vice*)
FOLEY HOAG LLP
1717 K Street N.W.
Washington, DC 20006
202-223-1200
rfawaz@foleyhoag.com

*Counsel for All Plaintiffs*

**CERTIFICATE OF COMPLIANCE WITH THE COURT'S AUGUST 24, 2026 ORDER GRANTING LEAVE TO EXCEED LOCAL RULE 7.1(c) WORD COUNT LIMITATION**

I, Andrew B. Loewenstein, counsel for Plaintiffs, hereby certify that the foregoing memorandum of law complies with the word count limitation set forth in the August 24, 2026 Order, ECF No. 37. This document contains 25,745 words, excluding the caption, table of contents, table of authorities, signature block, and required certificates, as permitted by Local Rule 7.1(c).

*/s/ Andrew B. Loewenstein*
Andrew B. Loewenstein