September 22, 2026

**VIA ECF**

Hon. Jesse M. Furman
United States District Court for the Southern District of New York
Thurgood Marshall United States Courthouse
40 Foley Square
New York, NY 10007

Re: *American Friends Service Committee v. Trump*, No. 26-cv-6830 (JMF)

Dear Judge Furman:

The Brennan Center for Justice at NYU School of Law respectfully seeks the Court's leave to file the attached brief as *amicus curiae* in support of Plaintiffs' motion for preliminary injunction in the above-captioned case. Plaintiffs consent to the filing of this brief, and Defendants have communicated that they take no position. A proposed order accompanies this letter motion.

The Brennan Center is a nonprofit, nonpartisan law and public policy institute that seeks to strengthen, revitalize, and defend our systems of democracy and justice. The Brennan Center's Liberty and National Security program uses innovative policy recommendations, litigation, and public advocacy to advance effective national security policies that respect the rule of law, constitutional rights, and the separation of powers. Program staff have conducted extensive research and advocacy on presidential emergency powers, including the statutes at issue in this case: the National Emergencies Act (NEA) and the International Emergency Economic Powers Act (IEEPA). *See, e.g.*, Andrew Boyle, Brennan Center for Justice, *Checking the President's Sanctions Powers* (2021), https://perma.cc/V2ZG-573P; *Hearing on Restoring Congressional Oversight over Emergency Powers: Exploring Options to Reform the National Emergencies Act Before the S. Comm. on Homeland Sec. and Governmental Affs.*, 118th Cong. (2024) (statement of Elizabeth Goitein, Brennan Center for Justice), https://perma.cc/4TJL-3QTR.

Although there is "no governing standard, rule or statute prescribing the procedure for obtaining leave to file an amicus brief in the district court" and granting leave to file "lies in the firm discretion of the district court," *SEC v. Ripple Labs, Inc.*, No. 20-cv-10832, 2021 WL 4555352, at *5 (S.D.N.Y. Oct. 4, 2021) (citation and quotation marks omitted), *amicus* briefs will "normally be allowed . . . when the *amicus* has unique information or perspective that can help the court beyond the help that the lawyers for the parties are able to provide," *Auto. Club of N.Y., Inc. v. Port Auth. of N.Y. & N.J.*, No. 11-cv-6746, 2011 WL 5865296, at *2 (S.D.N.Y. Nov. 22, 2011). The brief presented by the Brennan Center draws on the relevant expertise of its Liberty and National Security program to provide a unique perspective on a central question at issue in Plaintiffs' motion for preliminary injunction. The proposed brief provides important context

regarding the purpose behind Congress's enactment of the NEA and IEEPA, and it explains why the sanctions regime that Plaintiffs challenge undermines Congress's intent to rein in presidential uses of emergency powers and ensure that such powers would not be used as substitutes for non-emergency legislation. The proposed brief also discusses the role of the judiciary in checking abuses of emergency powers.

The Brennan Center has a special interest in the subject matter and outcome of this case. Interpreting the NEA and IEEPA to permit the sanctions regime at issue or to bar judicial review of the same could have spillover effects on the 137 other statutory authorities unlocked upon the president's declaration of a national emergency, enabling "rule by emergency power" and posing a serious threat to the constitutional separation of powers.

For the foregoing reasons, the Brennan Center respectfully requests that the Court grant this letter motion and permit counsel to file the accompanying brief of *amicus curiae*.

Dated: September 22, 2026

Respectfully submitted,


*/s/ Katherine Yon Ebright*
Katherine Yon Ebright*
BRENNAN CENTER FOR JUSTICE AT NYU SCHOOL OF LAW
777 6th Street NW, Suite 1100
Washington, DC 20001
Telephone: (202) 249-7196
Fax: (202) 223-2683
ebrightk@brennan.law.nyu.edu

**Admission pro hac vice pending*

*Counsel for Amicus Curiae the Brennan Center for Justice at NYU School of Law*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| AMERICAN FRIENDS SERVICE COMMITTEE; CENTER FOR CONSTITUTIONAL RIGHTS; HUMAN RIGHTS WATCH; and OPEN SOCIETY INSTITUTE,<br><br>Plaintiffs,<br>v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States;<br><br>UNITED STATES DEPARTMENT OF STATE;<br><br>MARCO A. RUBIO, in his official capacity as Secretary of State;<br><br>UNITED STATES DEPARTMENT OF THE TREASURY;<br><br>SCOTT K. H. BESSENT, in his official capacity as Secretary of the Treasury;<br><br>UNITED STATES DEPARTMENT OF JUSTICE;<br><br>TODD BLANCHE, in his official capacity as United States Attorney General;<br><br>OFFICE OF FOREIGN ASSETS CONTROL; and<br><br>BRADLEY T. SMITH, in his official capacity as Director, Office of Foreign Assets Control,<br><br>Defendants. | Civil Action No. 26-cv-6830 |

**[PROPOSED] BRIEF OF AMICUS CURIAE THE BRENNAN CENTER FOR JUSTICE AT NYU SCHOOL OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS


**Page**

INTEREST OF AMICUS .......... 1

SUMMARY OF THE ARGUMENT .......... 1

ARGUMENT .......... 3

I. CONGRESS ENACTED THE NEA AND IEEPA TO CIRCUMSCRIBE PRESIDENTIAL USE OF EMERGENCY POWERS. .......... 3

- A. Congress's Role in Authorizing and Regulating the President's Exercise of Emergency Powers. .......... 4
- B. The Origins and Purpose of the NEA .......... 5
- C. The Origins and Purpose of IEEPA .......... 9
- D. Background to the Informational Materials Exemption .......... 12

II. EXECUTIVE ORDER 14203 AND ITS IMPLEMENTING REGULATIONS EXCEED THE PRESIDENT'S AUTHORITY UNDER THE NEA AND IEEPA. .......... 15

- A. The President Acted Outside a Permissible Range of Discretion in Declaring a National Emergency. .......... 15
- B. The President Acted Outside a Permissible Range of Discretion in Declaring an "Unusual and Extraordinary Threat." .......... 19
- C. Executive Order 14203 and Its Implementing Regulations Violate the Informational Materials Exemption. .......... 22

CONCLUSION .......... 26

## TABLE OF AUTHORITIES

**Page(s)**

### CASES


*Atkins v. Virginia*, 536 U.S. 304 (2002)....................21

*Andrus v. Glover Const. Co.*, 446 U.S. 608 (1980)....................24

*Baker v. Carr*, 369 U.S. 186 (1962)....................16, 19

*Beacon Prods. Corp. v. Reagan*, 633 F. Supp. 1191 (D. Mass. 1986)....................19

*Bostock v. Clayton County*, 590 U.S. 644 (2020)....................3

*Calvary Chapel Dayton Valley v. Sisolak*, 140 S. Ct. 2603 (2020)....................20, 21

*Capital Cities/ABC, Inc. v. Brady*, 740 F. Supp. 1007 (S.D.N.Y. 1990)....................13

*Cernuda v. Heavey*, 720 F. Supp. 1544 (S.D. Fla. 1989)....................13

*Chastleton Corp. v. Sinclair*, 264 U.S. 543 (1924)....................16

*Eldred v. Ashcroft*, 537 U.S. 186 (2003)....................7, 8

*Feliciano v. Dep't of Transp.*, 605 U.S. 38 (2025)....................17

*Filtration Dev. Co. v. United States*, 60 Fed. Cl. 371 (2004)....................21

*INS v. Chadha*, 462 U.S. 919 (1983)....................7

*Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221 (1986)....................20

*Kalantari v. NITV, Inc.*, 352 F.3d 1202 (9th Cir. 2003)....................12, 24

*Learning Resources, Inc. v. Trump*, 607 U.S. 229 (2026)....................25

*Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024)....................7, 25

*Magana-Magana v. Bondi*, 129 F.4th 557 (9th Cir. 2025)....................21

*N.Y.C. Health and Hosp. Corp. v. Perales*, 954 F.2d 854 (2d Cir. 1992)....................23, 24

*Open Society Justice Initiative v. Trump*, 510 F. Supp. 3d 198 (S.D.N.Y. 2021)....................15, 23

*Rona v. Trump*, 797 F. Supp. 3d 278 (S.D.N.Y. 2025)....................23

*Sterling v. Constantin*, 287 U.S. 378 (1932)....................16, 22

*TikTok Inc. v. Trump*, 507 F. Supp. 3d 92 (D.D.C. 2020)....................24, 25

*United States v. Amirnazmi*, 645 F.3d 564 (3rd Cir. 2011)....................25

*United States v. Griffith*, 515 F. Supp. 3d. 106 (S.D.N.Y. 2021) ....................25

*United States v. Hansen*, 599 U.S. 762 (2023) ....................3

*V.O.S. Selections, Inc. v. United States*, 772 F. Supp. 3d 1350 (Fed. Cir. 2025) ....................20

*Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952) ....................5

**CONSTITUTIONAL PROVISION**

U.S. Const. art. II ....................4

**STATUTES**

50 U.S.C. § 1622 ....................12

50 U.S.C. § 1701 ....................11, 19

50 U.S.C. § 1702 ....................12, 24

50 U.S.C. § 1703 ....................11

Act of Dec. 28, 1977, Pub. L. No. 95-223, 91 Stat. 1625 ....................10, 11

American Servicemembers' Protection Act, Pub. L. 107-206, 116 Stat. 820 (2002) ....................17

Emergency Banking Relief Act, ch. 1, 48 Stat. 1 (1933) ....................10

Foreign Relations Authorization Act, Fiscal Years 1986 and 1987, Pub. L. No. 99-93, 99 Stat. 405 (1985) ....................7

Foreign Relations Authorization Act, Fiscal Years 1994 and 1995, Pub. L. No. 103-236, 108 Stat. 382 (1994) ....................13, 14

Further Consolidated Appropriations Act, 2020, Pub. L. No. 116-94, 133 Stat. 2534 (2019) ....................18

International Emergency Economic Powers Act, Pub. L. No. 95-223, 91 Stat. 1625 (1977) .................... *passim*

National Emergencies Act, Pub. L. No. 94-412, 90 Stat. 1255 (1976) .................... *passim*

Omnibus Trade and Competitiveness Act of 1988, Pub. L. No. 100-418, 102 Stat. 1107 (1988) ....................12, 13

**OTHER AUTHORITIES**

123 Cong. Rec. 424 (1977) (statement of Rep. Jonathan B. Bingham, Chairman, Subcomm. on Int'l Econ. Pol'y & Trade of the H.R. Comm. on Int'l Rels.) ....................10

132 Cong. Rec. 6550 (1986) (statement of Sen. Charles Mathias) ....................13

2A Norman Singer & Shambie Singer, Sutherland Statutes and Statutory Construction (7th ed.), Westlaw (database updated April 2025) ....................8

31 C.F.R. § 528 (2026) ....................3, 22, 23

*A Guide to Emergency Powers and Their Use*, Brennan Ctr. for Just. (Jan. 23, 2019), https://perma.cc/QQ43-9TVE....................9

Andrew Boyle, Brennan Ctr. for Just., Checking the President's Sanctions Powers (2021), https://perma.cc/NWD2-VS8K ....................9, 10

Brief for Appellees, *W.M.M. v. Trump*, No. 25-10534 (5th Cir. June 10, 2025)....................15

Def.'s Mem. Opp'n Pls.' Mot. Prelim. Inj., *Open Society Justice Initiative v. Trump*, No. 20-cv-8121, 2020 WL 10352359 (S.D.N.Y. Nov. 9, 2020)....................23

Comparative Constitutions Project, *Constitutions Database*, Constitute, https://perma.cc/GER8-2YPX ....................4

Cuban Assets Control Regulations, 31 C.F.R. § 515 (2026)....................15

Def.'s Mot. to Dismiss, *Prost v. Trump*, No. 26-cv-05305 (S.D.N.Y. July 30, 2026) ....................15

Emergency, American Heritage Dictionary (1st ed. 1969)....................17

Emergency, Webster's New Collegiate Dictionary (9th ed. 1976) ....................17

Esti Tambay, *US Congress Helps Boost Justice in Ukraine: Legislative Fixes Could Promote Cooperation with International Criminal Court*, Human Rights Watch (Jan. 31, 2023), https://www.hrw.org/news/2023/01/31/us-congress-helps-boost-justice-ukraine....................21, 22

*Emergency Controls on International Economic Transactions: Hearing Before the Subcomm. on Int'l Policy and Trade of the H. Comm. on Foreign Affs.*, 95th Cong. (1977) (statement of Rep. Bingham)....................11

Exec. Order No. 14,203, 90 Fed. Reg. 9,369 (Feb. 6, 2025) .................... *passim*

Foreign Assets Control Regulations and Cuban Assets Control Regulations, 54 Fed. Reg. 5,229 (Feb. 2, 1989) ....................13

H.R. Conf. Rep. No. 103-482 (1994)....................14, 24

H.R. Rep. No. 95-459 (1977)....................10, 11, 12, 16

Illegitimate Court Counteraction Act, H.R. 23, 119th Cong. (2025)....................19

Illegitimate Court Counteraction Act, S. 4484, 118th Cong. (2024)....................18, 19

John Ferejohn & Pasquale Pasquino, *The Law of the Exception: A Typology of Emergency Powers*, 2 Int'l J. Const. L. 210 (2004)....................4

L. Elaine Halchin, Cong. Rsch. Serv., 98-505, *National Emergency Powers* (2021), https://perma.cc/NK3V-DLFF ....................5

Press Release, American Civil Liberties Union, ICC Authorizes Investigation into U.S. War Crimes in Afghanistan (Mar. 5, 2020), https://www.aclu.org/press-releases/icc-authorizes-investigation-us-war-crimes-afghanistan ........ 18

Press Release, International Criminal Court, On Opening Preliminary Examinations into the Situations in the Philippines and in Venezuela (Feb. 8, 2018), https://www.icc-cpi.int/news/statement-prosecutor-international-criminal-court-fatou-bensouda-opening-preliminary-0 ........ 17

Press Release, International Criminal Court, ICC Prosecutor Opens Preliminary Examination of Situation in Palestine (Jan. 16, 2015), https://www.un.org/unispal/document/auto-insert-195455/ ........ 18

Proclamation No. 2039, 48 Stat. 1689 (Mar. 6, 1933) ........ 10

*Restoring Congressional Oversight over Emergency Powers: Exploring Options to Reform the National Emergencies Act: Hearing Before the S. Comm. on Homeland Sec. & Governmental Affs.*, 118th Cong. (2024) (statement of Elizabeth Goitein, Brennan Center for Justice), https://perma.cc/4TJL-3QTR ........ 4, 7

S. 977, 94th Cong. (1975) ........ 8

S. Comm. on Gov't Operations & Spec. Comm. on Nat'l Emergencies & Delegated Emergency Powers, 94th Cong., The National Emergencies Act (Public Law 94-412), Source Book: Legislative History, Text, and Other Documents (Comm. Print 1976) ........ 5, 6, 8, 9, 20

S. Res. 242, 93d Cong. (1974) ........ 5

S. Res. 570, 116th Cong. (2020) ........ 18

Saikrishna Bangalore Prakash, *The Imbecilic Executive*, 99 Va. L. Rev. 1361 (2013) ........ 5

Thomas E. Cronin, *A Resurgent Congress and the Imperial Presidency*, 95 Pol. Sci. Q. 209 (1980) ........ 5

## INTEREST OF AMICUS CURIAE[1]

*Amicus curiae* the Brennan Center for Justice at NYU School of Law is a not-for-profit, nonpartisan public interest law institute that seeks to improve systems of democracy and justice. The Center has conducted extensive research on presidential emergency powers, including the statutory emergency powers — such as the International Emergency Economic Powers Act (IEEPA) — that fall within the purview of the National Emergencies Act of 1976 (NEA). Based on this expertise, we seek to provide the court with important background and context for the laws Defendants have invoked in Executive Order 14203, "Imposing Sanctions on the International Criminal Court," and under which Defendants have designated International Criminal Court staff members. 90 Fed. Reg. 9369 (Feb. 6, 2025).

## SUMMARY OF THE ARGUMENT

Emergency powers have a narrow and specific function in our constitutional system. They are meant to provide presidents with a temporary boost in power to deal with sudden, unforeseen crises that require the type of immediate action Congress is ill-suited to provide. They present a significant temptation, however, as they offer a potential means to short-circuit the normal policymaking process in non-emergency circumstances. A pattern of such conduct in the mid-twentieth century led Congress to enact the NEA and IEEPA.

The NEA was intended to rein in presidential use of statutory emergency powers. Although Congress did not define "national emergency," the statute's history makes clear that Congress did not provide an affirmative grant of limitless discretion to the president and that it expected the limits contained within specific emergency powers to be scrupulously observed and enforced.

[1] No counsel for a party authored this brief in whole or in part, and no party or its counsel made a monetary contribution intended to fund its preparation or submission. No person, other than *amicus curiae*, their members, or their counsel, contributed money intended to fund preparing or submitting the brief. This brief does not purport to convey the position of the NYU School of Law.

Congress similarly enacted IEEPA to cabin the president's authority — namely, the authority to regulate economic transactions in response to peacetime emergencies. In addition to predicating the exercise of such powers on a declaration of national emergency, Congress specified that the emergency must constitute an "unusual and extraordinary threat" to the country's national security, foreign policy, or economy, and narrowed the powers available under the law. Congress thus sought to prevent the use of IEEPA to engage in the type of routine policymaking that is and should be governed by non-emergency authorities. And Congress made clear, through language that lawmakers twice amended to ensure its force, that IEEPA may not be used to constrain activities protected by the First Amendment.

The Trump administration's use of the NEA and IEEPA to sanction ICC officials and human rights nonprofits exceeds the authority provided by those statutes. Notwithstanding the deference courts may owe to the president's determinations in some cases involving emergency declarations or foreign policy, courts may intervene when presidents make an obvious mistake or their actions are manifestly unauthorized by law. Here, the president has invoked the NEA and IEEPA not in response to a sudden, unforeseen crisis (the common definition of "emergency") or an "unusual and extraordinary threat" but to address longstanding legal, fact-finding, and advocacy efforts that the United States has known about and engaged with for years. At times, the United States has even contributed to the ICC's efforts to hold non-ICC state parties to account. And in recent years, Congress has considered, debated, and ultimately rejected legislation that would levy the very same ICC sanctions imposed in Executive Order 14203. President Trump is thus misusing these exceptional authorities as an attempted end-run around Congress on a perennial policy question — the scenario that the NEA and IEEPA were enacted to prevent.

Separately, the Trump administration's sanctions run afoul of IEEPA's informational materials exemption, which Congress enacted to protect speech activities and the international exchange of ideas from regulation. The administration has crafted its sanctions broadly enough to prohibit — and demonstrably chill — speech activities ranging from the submission of *amicus* briefs to the ICC to the provision of training to civil society partners. The administration's overly narrow interpretation of the informational materials exemption and overly broad imposition of sanctions have no basis in IEEPA's text or design. They run afoul of Congress's demonstrated intent that limitations contained in emergency powers should be given full effect, and they ignore the Supreme Court's recent admonition that emergency powers must clearly authorize the actions taken under them.

## ARGUMENT

### I. CONGRESS ENACTED THE NEA AND IEEPA TO CIRCUMSCRIBE PRESIDENTIAL USE OF EMERGENCY POWERS.

Executive Order 14203 and its implementing regulations, 31 C.F.R. § 528 (2026), rely on President Trump's invocation of the NEA and IEEPA. Plaintiffs challenge whether the statutory predicates for invoking the NEA and IEEPA have been satisfied, as well as whether the administration has abided by IEEPA's statutory limits. The courts may conclude that the plain language of the NEA and IEEPA forecloses Executive Order 14203 and its implementing regulations. To the extent there is any ambiguity, however, the legislative history and statutory history of the NEA and IEEPA strongly favor the same conclusion. *See Bostock v. Clayton County*, 590 U.S. 644, 674 (2020) ("Members of this Court have consulted legislative history when interpreting *ambiguous* statutory language."); *United States v. Hansen*, 599 U.S. 762, 775 (2023) ("Statutory history is an important part of [the] context" for legislative text.). That history makes clear that the NEA and IEEPA were enacted to circumscribe the president's use of statutory

emergency powers and underscores the importance of strictly construing those powers' limits. Similarly, the legislative and statutory histories of IEEPA's informational materials exemption underscores the breadth of that protection and its limit on IEEPA power.

### A. Congress's Role in Authorizing and Regulating the President's Exercise of Emergency Powers.

Emergency powers play a unique role in our country's constitutional system. By definition, emergencies are sudden and unexpected, and they require immediate action. Because they are sudden and unexpected, Congress may not be able to enact authorities in advance that are tailored to address them. And as a deliberative bicameral body, Congress is ill-suited to act with the necessary immediacy and flexibility once an emergency has occurred. Emergency powers thus are designed to grant the president extraordinary legal leeway to respond to crises that Congress could not have foreseen and that are moving too fast or too unpredictably for Congress to address after the fact. *See Restoring Congressional Oversight over Emergency Powers: Exploring Options to Reform the National Emergencies Act: Hearing Before the S. Comm. on Homeland Sec. & Governmental Affs.*, 118th Cong. 3–5 (2024) (statement of Elizabeth Goitein, Brennan Center for Justice), https://perma.cc/4TJL-3QTR; *see generally* John Ferejohn & Pasquale Pasquino, *The Law of the Exception: A Typology of Emergency Powers*, 2 Int'l J. Const. L. 210 (2004).

Unlike most other countries' constitutions, the U.S. Constitution does not provide the president with any explicit emergency powers. *Compare* U.S. Const. art. II *with* Comparative Constitutions Project, *Constitutions Database*, Constitute, https://perma.cc/GER8-2YPX (database search reflecting that at least 160 countries' constitutions have provisions for emergency rule). Accordingly, since the country's founding, presidents have relied on

Congress to provide them with enhanced authorities in emergency situations.[2] Throughout the eighteenth and early nineteenth centuries, Congress periodically enacted laws giving presidents standby authorities that they could use in their discretion during military, economic, or labor crises. *See* L. Elaine Halchin, Cong. Rsch. Serv., 98-505, *National Emergency Powers* 4–5 (2021), https://perma.cc/NK3V-DLFF.

Beginning in World War I, a new procedure for invoking statutory emergency powers emerged. Presidents would declare a national emergency, which would give them access to statutory authorities that would otherwise lie dormant. *See id*. at 5. That practice continues today. Until the enactment of the NEA, however, there was no overarching statute regulating it, little transparency or congressional oversight with respect to presidents' use of emergency powers, and nothing to prevent states of emergency from lingering indefinitely.

### B. The Origins and Purpose of the NEA

In the 1970s, several scandals involving executive branch overreach prompted Congress to investigate the exercise of executive power in national security matters and to enact laws aimed at reasserting Congress's role as a check on executive authority. *See generally* Thomas E. Cronin, *A Resurgent Congress and the Imperial Presidency*, 95 Pol. Sci. Q. 209 (1980). It was in this context that the Senate formed the Special Committee on National Emergencies and Delegated Emergency Powers (the "Special Committee") to examine presidential use of emergency powers. *See* S. Res. 242, 93d Cong. (1974); Halchin, *supra*, at 7–8.

[2] Presidents have, on occasion, claimed that the Constitution gives them broad *inherent* powers to take emergency action without congressional authorization. The Supreme Court has not endorsed such a reading, *see, e.g.*, *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 587–89 (1952) (rejecting President Truman's claim of inherent constitutional authority to seize control of steel mills during the Korean War), and it finds little support in constitutional history, *see* Saikrishna Bangalore Prakash, *The Imbecilic Executive*, 99 Va. L. Rev. 1361, 1366–68, 1425 (2013).

The Special Committee was alarmed by what it found. Several clearly outdated emergency declarations remained on the books, in effect creating "virtually permanent states of emergencies." 120 Cong. Rec. S15784–94 (daily ed. Aug. 22, 1974) (statement of Sen. Frank Church), *reprinted in S. Comm. on Gov't Operations & Spec. Comm. on Nat'l Emergencies & Delegated Emergency Powers*, 94th Cong., The National Emergencies Act (Public Law 94-412), Source Book: Legislative History, Text, and Other Documents 73 (Comm. Print 1976) [hereinafter NEA Source Book]. These outdated declarations continued to unlock emergency powers despite the fact that "[l]egislation intended for use in crisis situations is by its nature not well suited to normal, day-to-day Government operations." 121 Cong. Rec. H8325–41 (daily ed. Sept. 4, 1975) (statement of Rep. Peter W. Rodino), *reprinted in NEA Source Book, supra,* at 244. The committee warned that the proliferation of emergency powers readily available to presidents had created a "dangerous state of affairs." S. Rep. No. 94-922, at 1 (1976), *reprinted in NEA Source Book, supra,* at 33. It counted more than 470 statutory provisions that delegated extraordinary authority to the executive branch in times of national emergency, allowing the president to:

> seize property and commodities, organize and control the means of production, call to active duty 2.5 million reservists, assign military forces abroad, seize and control all means of transportation and communication, restrict travel, and institute martial law, and, in many other ways, manage every aspect of the lives of all American citizens.

S. Rep. No. 93-1170, at 1–2 (1974), *reprinted in NEA Source Book, supra*, at 19–20.

The Special Committee's work culminated in the introduction and passage of the NEA. *See* National Emergencies Act, Pub. L. No. 94-412, 90 Stat. 1255 (1976). The purpose of the law, evident in every facet of its legislative history, was to limit presidential use of emergency powers. As summarized by the committee in urging passage of the Act:

> While much work remains, none of it is more important than passage of the National Emergencies Act. Right now, hundreds of emergency statutes confer enough authority on the President to rule the country without reference to normal constitutional process. Revelations of how power has been abused by high government officials must give rise to concern about the potential exercise, unchecked by the Congress or the American people, of this extraordinary power. The National Emergencies Act would end this threat and insure that the powers now in the hands of the Executive will be utilized only in time of genuine emergency and then only under safeguards providing for Congressional review.

S. Rep. No. 94-922, at 18, *reprinted in NEA Source Book, supra*, at 50. The law employed various mechanisms to this end. The law included several provisions designed to assert a stronger and more active role for Congress in deciding whether states of emergency should continue. Most notably, it allowed Congress to terminate presidentially declared states of emergency at any time through a concurrent resolution (known in this context as a "legislative veto" because it would take effect without presentment to the president). See National Emergencies Act § 202, 90 Stat. at 1255.[3]

The NEA does not include a definition of "national emergency." However, the relevant committee report — the most salient type of legislative history for understanding congressional intent — makes clear that this omission was not intended as a grant of limitless discretion to the president. *See Eldred v. Ashcroft*, 537 U.S. 186, 209 n.16 (2003) ("In surveying legislative history

[3] The Supreme Court subsequently held that legislative vetoes are unconstitutional. *See INS v. Chadha*, 462 U.S. 919, 954–55 (1983). Congress thus replaced the concurrent resolution mechanism with one for joint resolutions, which must be signed into law by the president. *See* Foreign Relations Authorization Act, Fiscal Years 1986 and 1987, Pub. L. No. 99-93, § 801, 99 Stat. 405, 448 (1985) (codified at 50 U.S.C. § 1622(a)(1)). This development greatly weakened the effectiveness of the NEA as a check on presidential authority, as Congress in most cases will need a veto-proof supermajority to terminate an emergency declaration. *See Restoring Congressional Oversight over Emergency Powers: Exploring Options to Reform the National Emergencies Act: Hearing Before the S. Comm. on Homeland Sec. & Governmental Affs.*, *supra*, at 8 (statement of Elizabeth Goitein, Brennan Center for Justice). The lack of a ready means for Congress to terminate emergency declarations, as originally envisioned in the law, makes it even more important for the judiciary to fulfill its own responsibility to adjudicate the meaning of the law in a manner consistent with congressional intent. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 395 (2024) (recognizing the judiciary's obligation "to independently interpret" statutes "and effectuate the will of Congress subject to constitutional limits").

we have repeatedly stated that the authoritative source for finding the Legislature's intent lies in the Committee Reports on the bill, which represent the considered and collective understanding of those Members of Congress involved in drafting and studying proposed legislation." (alterations and internal quotation marks omitted)); 2A Norman Singer & Shambie Singer, *Sutherland Statutes and Statutory Construction* § 48:6 (7th ed.), Westlaw (database updated April 2025) (collecting cases and noting that if a statute is ambiguous, "courts generally view committee reports as the most persuasive indicia of legislative intent" (internal quotation marks omitted)). An earlier draft of NEA legislation authorized the president to declare a national emergency "[i]n the event the President finds that a proclamation of a national emergency is essential to the preservation, protection and defense of the Constitution or to the common defense, safety, or well-being of the territory or people of the United States." S. 977, 94th Cong. § 201(a) (1975). One committee report, referring to a nearly identical definition in a prior version of the bill, stated that this language "makes it clear that a proclamation of a state of national emergency requires a grave national crisis." S. Rep. No. 93-1193, at 2 (1974), *reprinted in NEA Source Book*, *supra*, at 96. The Senate Committee on Government Operations ultimately removed the language because lawmakers nevertheless feared it to be too broad. As stated in the committee's report:

> [F]ollowing consultations with several constitutional law experts, the committee concluded that section 201(a) is overly broad, and might be construed to delegate additional authority to the President with respect to declarations of national emergency. In the judgment of the committee, the language of this provision was unclear and ambiguous and might have been construed to confer upon the President statutory authority to declare national emergencies, other than that which he now has through various statutory delegations.
>
> The Committee amendment clarifies and narrows this language. The Committee decided that the definition of when a President is authorized to declare a national emergency should be left to the various statutes which give him extraordinary powers. The National Emergencies Act is not intended to enlarge or add to Executive power. Rather the statute is an effort by the Congress to establish clear

> procedures and safeguards for the exercise by the President of emergency powers conferred upon him by other statutes.

S. Rep. No. 94-1168, at 3 (1976), *reprinted in Spec. Comm. on National Emergencies Source Book, supra*, at 292.

The committee's solution proved to be flawed, as the majority of the statutes in place today that confer power on the president during "national emergencies" do not include criteria that must be met beyond the issuance of the declaration. *See A Guide to Emergency Powers and Their Use*, Brennan Ctr. for Just. (July 1, 2025), https://perma.cc/QQ43-9TVE. It is nonetheless significant that Congress believed even a definition limiting national emergencies to grave national crises would be "overly broad." S. Rep. No. 94-1168, at 3, *reprinted in NEA Source Book*, *supra*, at 292. The notion that Congress intended the NEA as an affirmative delegation of unlimited discretion — one that would allow the president to use emergency powers at will rather than of necessity — is contradicted by this and every other aspect of the legislative history. Moreover, where statutes granting emergency powers *do* include criteria beyond the mere declaration of an emergency, this legislative history underscores the importance of strictly interpreting and enforcing those limitations.

### C. The Origins and Purpose of IEEPA

Enacted one year after the NEA and in response to the same concerns over executive branch overreach, IEEPA was Congress's attempt to rein in presidential power to take emergency economic action. In particular, Congress was responding to abuses of the Trading with the Enemy Act of 1917 (TWEA). TWEA originally authorized the president to take economic measures against enemy nations, such as blocking enemy property, during times of war. *See* Andrew Boyle, Brennan Ctr. for Just., *Checking the President's Sanctions Powers* 5 (2021),

https://perma.cc/NWD2-VS8K. In 1933, however, after President Roosevelt invoked TWEA to declare a national bank holiday, see Proclamation No. 2039, 48 Stat. 1689 (Mar. 6, 1933), Congress hastily amended it to apply during national emergencies as well as wartime, see Emergency Banking Relief Act, ch. 1, § 2, 48 Stat. 1, 1–2 (1933). In doing so, "Congress recognized that it was conferring unusual powers on the President which were justified by the g[r]avity of the situation which the country faced, but which should not normally be available to Presidents in peacetime." H.R. Rep. No. 95-459, at 4 (1977).

The NEA's project of reining in overbroad emergency powers originally exempted TWEA from its ambit. Because a small number of emergency powers, including TWEA, were in regular use, Congress temporarily excluded them "to allow for a careful study of how to revise them in accordance with the intent of the [NEA] without disrupting policies currently in effect under their authority." *Id.* at 6–7. The resulting inquiry, conducted by the committees of jurisdiction in both chambers, confirmed that "[s]uccessive Presidents ha[d] seized upon" TWEA's open-ended language to turn it "through usage, into something quite different from what was envisioned in 1917." *Id.* at 8–9; *see also* Boyle, *supra*, at 5. Indeed, TWEA had "become essentially an unlimited grant of authority for the President to exercise, at his discretion, broad powers in both the domestic and international economic arena, without congressional review." H.R. Rep. No. 95-459, at 7. The law's emergency authorities had "in effect become routine authorities used to conduct the day-to-day business of the Government." 123 Cong. Rec. 424 (1977) (statement of Rep. Jonathan B. Bingham, Chairman, Subcomm. on Int'l Econ. Pol'y & Trade of the H.R. Comm. on Int'l Rels.).

In response to these findings, Congress amended TWEA to once again limit its application to instances where Congress had declared war. Act of Dec. 28, 1977, Pub. L. No.

95-223, § 101(a), 91 Stat. 1625, 1625 (codified at 50 U.S.C. § 4305(b)(1)); *see* H.R. Rep. No. 95-459, at 10. At the same time, Congress adopted a new statute — IEEPA — to provide for a more constrained set of economic powers during peacetime emergencies. Pub. L. No. 95-223, §§ 201–208, 91 Stat. 1625, 1626–29 (1977) (codified as amended at 50 U.S.C. §§ 1701–1710).

Congress intended the powers conferred under IEEPA to be subject to significant "substantive restrictions." H.R. Rep. No. 95-459, at 10. The first such restriction was the high bar to invoking the statute. Congress decided that IEEPA invocations should require a preceding national emergency declaration under the NEA, perceiving this as a meaningful limitation given that "emergencies are by their nature rare and brief, and are not to be equated with normal, ongoing problems." *Id*. Congress then added a further constraint, providing that IEEPA's authorities may be used only to deal with an "unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States." 50 U.S.C. § 1701(a). This language is one of the primary distinctions between IEEPA and the corresponding provisions of TWEA, crafted by Congress to check any presidential impulse "to be free to continue to act with an enormous degree of discretion on the basis that an emergency exists, although by no commonsense application of the term could the situation be called an emergency." *Emergency Controls on International Economic Transactions: Hearing Before the Subcomm. on Int'l Policy and Trade of the H. Comm. on Foreign Affs.*, 95th Cong. 113–14 (1977) (statement of Rep. Bingham).

In addition to these new substantive restrictions, Congress drafted IEEPA to include procedural requirements to facilitate congressional oversight. The president must consult with Congress "in every possible instance" before invoking IEEPA and must submit reports to Congress on a regular basis. 50 U.S.C. § 1703(a)–(c). Furthermore, because IEEPA's powers

are exercised pursuant to a national emergency declaration, Congress may block the use of those powers by terminating the declaration on which the IEEPA invocation relies. 50 U.S.C. § 1622(a)(1).

In short, the legislative history of IEEPA — like that of the NEA — reflects a resolute focus on restricting presidential use of emergency powers and ensuring that the law is not used as a substitute for non-emergency legislation.

### D. Background to the Informational Materials Exemption

As originally enacted, IEEPA exempted from regulation "any postal, telegraphic, telephonic, or other personal communication, which does not involve a transfer of anything of value." 50 U.S.C. § 1702(b)(1). This list gestured at Congress's desire to keep First Amendment-protected activity beyond the reach of IEEPA sanctions, but it was far from a comprehensive list of materials protected by the First Amendment's speech guarantees. Lawmakers assessed that the First Amendment itself would be sufficient to protect unenumerated speech interests and "considered further statutory protection of that freedom unnecessary, redundant, and inappropriate." H.R. Rep. No. 95-459, at 15–16.

In the 1980s, however, it became clear that the First Amendment alone would not prevent IEEPA overreach. The government enforced IEEPA sanctions in a manner that directly restricted speech activity, including by seizing books and magazines shipped from countries designated under IEEPA or TWEA. *See Kalantari v. NITV, Inc.*, 352 F.3d 1202, 1205 (9th Cir. 2003). In 1988, Representative Howard Berman introduced and Congress enacted an amendment to IEEPA to more clearly cover First Amendment-protected activity.[4] *See* Omnibus

[4] Speaking in support of an earlier version of the Berman Amendment, one senator explained, "Abstract ideals such as freedom of speech are promoted and articulated in tangible forms and concrete actions. If we deny citizens

Trade and Competitiveness Act of 1988, Pub. L. No. 100–418, § 2502, 102 Stat. 1107 (1988). The Berman Amendment explicitly carved out from IEEPA (and from TWEA) the "authority to regulate or prohibit, directly or indirectly, the importation from any country, or the exportation to any country, whether commercial or otherwise, of publications, films, posters, phonograph records, photographs, microfilms, microfiche, tapes, or other informational materials." *Id.*

In the years following Congress's adoption of the Berman Amendment, the government attempted to narrow or read exceptions into the text. The government excluded from the Berman Amendment's protections whole categories of speech, such as artwork and broadcasts. *See Cernuda v. Heavey*, 720 F. Supp. 1544, 1549 (S.D. Fla. 1989); *Capital Cities/ABC, Inc. v. Brady,* 740 F. Supp. 1007, 1009 (S.D.N.Y. 1990). It asserted continuing power under IEEPA to regulate "informational materials not fully created and in existence at the date of the transaction"; "the substantive or artistic alteration or enhancement of informational materials," and "intangible items, such as telecommunications transmissions." *See, e.g.,* Foreign Assets Control Regulations and Cuban Assets Control Regulations, 54 Fed. Reg. 5229 (Feb. 2, 1989). Fundamentally, the government maintained that the Berman Amendment's protections did not extend to the full range of materials protected by the First Amendment.

These cramped interpretations prompted Congress to amend IEEPA again in 1994 with the Free Trade in Ideas Act (FTIA), Foreign Relations Authorization Act, Fiscal Years 1994 and

---

the right to travel, or hear the views and opinions of others, th[e]n we trample on this ideal. Diversity, dialog, and exchange of ideas are the life-giving elements — the water and air — of American tradition; exclusion, restriction, repression of ideas are the features of far more troubled, less confident nations. As President Reagan has said: Expanding contacts across borders and permitting a free exchange or interchange of information and ideas increase confidence; sealing off one's people from the rest of the world reduce[s] it." 132 Cong. Rec. 6550 (1986) (statement of Sen. Charles Mathias).

1995, Pub. L. No. 103-236, § 525, 108 Stat. 382 (1994), which established the informational materials exemption as it is today, *see* H.R. Conf. Rep. No. 103-482, at 239 (1994) (explaining that the FTIA was necessary because the Department of Treasury had "narrowly and restrictively interpreted the [Berman Amendment] language in ways not originally intended"). The FTIA clarified the scope of the exemption in both IEEPA and TWEA by explicitly extending it to "information," not simply "informational materials"; specifying that the exemption applies "regardless of format or medium of transmission"; enumerating additional examples of protected media; and prefacing the list of protected media with "including but not limited to." Foreign Relations Authorization Act, Fiscal Years 1994 and 1995 § 525. The conference report for the FTIA suggests that Congress made these changes not only to ensure that all First Amendment-protected materials would fall within the informational materials exception but also to establish a penumbra of protection around those materials that would cover activities leading to their creation:

> The committee of conference intends these amendments to facilitate transactions and activities incident to the flow of information and informational materials without regard to the type of information, its format, or means of transmission, and electronically transmitted information, transactions for which must normally be entered into in advance of the information's creation.
>
> The committee of conference further understands that it was not necessary to include any explicit reference in the statutory language to "transactions incident" to the importation or exportation of information or informational materials, because the conferees believe that such transactions are covered by the statutory language.

H.R. Conf. Rep. No. 103-482, at 239.

Notwithstanding Congress's multi-decade effort to prevent IEEPA from being used to regulate First Amendment-protected activity, the government has continued to advance crabbed interpretations of the informational materials exemption — including that the exemption does not

apply to "transactions related to information and informational materials not fully created and in existence at the date of the transactions . . . [or] services to market, produce or co-produce, create or assist in the creation of information and informational materials." *See, e.g.,* Cuban Assets Control Regulations, 31 C.F.R. § 515.206 (2026); *see also Open Society Justice Initiative v. Trump*, 510 F. Supp. 3d 198, 215 (S.D.N.Y. 2021) (asserting extratextual carveouts to informational materials exemption in litigation regarding ICC sanctions).

## II. EXECUTIVE ORDER 14203 AND ITS IMPLEMENTING REGULATIONS EXCEED THE PRESIDENT'S AUTHORITY UNDER THE NEA AND IEEPA.

The history and design of the NEA and IEEPA demonstrate that the president does not have unlimited discretion to declare national emergencies where none exist; that limitations contained within statutes that are available during national emergencies, such as IEEPA, should be strictly construed and enforced; and that such statutes should not be read to include powers beyond those clearly permitted by their text. Executive Order 14203 and its implementing regulations collectively violate these core aspects of the NEA and IEEPA, and the courts have both the authority and the responsibility to enjoin the violation.

### A. The President Acted Outside a Permissible Range of Discretion in Declaring a National Emergency.

In recent litigation, the government has urged categorical deference to what it describes as the president's "foreign policy judgments" and has argued that courts may not "second-guess" invocations of emergency powers. *See, e.g.,* Def.'s Mot. to Dismiss at 15, *Prost v. Trump*, No. 26-cv-05305 (S.D.N.Y. July 30, 2026); Brief for Appellees at 5, *W.M.M. v. Trump*, No. 25-10534 (5th Cir. June 10, 2025) (arguing against judicial review of invocation of Alien Enemies Act of 1798). The Supreme Court, however, has instructed that "it is error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance"

and that the extent of judicial deference owed turns on a "discriminating inquiry into the precise facts and posture of [a] particular case." *Baker v. Carr*, 369 U.S. 186, 211, 217 (1962). When independent judicial inquiry reveals an "obvious mistake" or "manifestly unauthorized exercise of power," *id.* at 214, 217 (citation omitted), courts may check decision-making even in areas that typically involve sensitive or political judgments, *accord Sterling v. Constantin*, 287 U.S. 378, 399 (1932) (acknowledging "a permitted range of honest judgment" in which executive discretion may be exercised). Claims of emergency are not exempt from this rule. The Supreme Court has recognized, for instance, that the judiciary may determine whether "[a] law depending upon the existence of an emergency" remains valid "if the emergency ceases." *Chastleton Corp. v. Sinclair*, 264 U.S. 543, 547 (1924); *see also id*. ("[A] Court is not at liberty to shut its eyes to an obvious mistake, when the validity of the law depends upon the truth of what is declared.").

Executive Order 14203 presents a clear instance of abuse. Above all else, what emerges from the legislative histories of the NEA and IEEPA is that Congress intended to authorize the use of emergency powers to address true emergencies only, not problems that presidents mislabel as emergencies. Although Congress did not define "emergency" in either statute, there are abundant indications of how Congress understood the term — and, in particular, what should not qualify as an emergency under these laws. As described, *see supra* at 5–9, Congress believed that genuine emergencies are "rare and brief, and are not to be equated with normal, ongoing problems." H.R. Rep. No. 95-459, at 10.

Even without these indications, the word "emergency" is not a cipher; it has a well-understood definition. When Congress passed the NEA and IEEPA, the term "emergency" was defined, as it is today, as a sudden, unforeseen circumstance that requires an immediate

response. See Emergency, Webster's New Collegiate Dictionary 372 (9th ed. 1976) ("[A]n unforeseen combination of circumstances or the resulting state that calls for immediate action."); Emergency, American Heritage Dictionary 427 (1st ed. 1969) ("A situation or occurrence of a serious nature, developing suddenly and unexpectedly, and demanding immediate action."). Court should interpret the term in keeping with its ordinary meaning. *See Feliciano v. Dep't of Transp.*, 605 U.S. 38, 45 (2025) (using ordinary meaning of terms to interpret national emergency statute).

The "emergency" cited as the basis for Executive Order 14203 is "any effort by the ICC to investigate, arrest, detain, or prosecute protected persons," including U.S. servicemembers and government officials, as well as foreign servicemembers and government officials from NATO allies and major non-NATO allies that are not state parties to the ICC. Far from being sudden and unforeseen, the possibility that the ICC's work could affect the "protected persons" specified in Executive Order 14203 has long been known to Congress, the president, and the public. Congress has had ample time to respond, and it did so in 2002 by adopting the American Servicemembers' Protection Act, Pub. L. 107–206, 116 Stat. 820, which Executive Order 14203 itself cites and acknowledges.

Furthermore, the ICC has in fact examined, investigated, arrested, detained, or prosecuted "protected persons" for over a decade. Since 2018, the ICC has probed, issued arrest warrants for, and effectuated a detention for putative atrocity crimes in major non-NATO ally (and current non-ICC state party) the Philippines. *See* Press Release, International Criminal Court, On Opening Preliminary Examinations into the Situations in the Philippines and in Venezuela (Feb. 8, 2018), https://www.icc-cpi.int/news/statement-prosecutor-international-criminal-court-fatou-bensouda-opening-preliminary-0. In 2020, the ICC authorized an

investigation into putative atrocity crimes committed not only by the Taliban and Afghan National Security Forces but also by U.S. servicemembers in Afghanistan. *See* Press Release, American Civil Liberties Union, ICC Authorizes Investigation into U.S. War Crimes in Afghanistan (Mar. 5, 2020), https://www.aclu.org/press-releases/icc-authorizes-investigation-us-war-crimes-afghanistan. As for the ICC's work on the Israel-Palestine conflict, although Executive Order 14203 describes the ICC's arrest warrants regarding major non-NATO ally Israel as "illegitimate and baseless actions" and "a dangerous precedent," it does not and could not plausibly describe these actions as sudden and unforeseen. The ICC opened its examination of putative atrocity crimes in Palestine in 2015 and issued arrest warrants against Israeli officials in 2024. *See* Press Release, International Criminal Court, ICC Prosecutor Opens Preliminary Examination of Situation in Palestine (Jan. 16, 2015), https://www.un.org/unispal/document/auto-insert-195455/. Since the ICC began its probe, Congress has debated resolutions, *see, e.g.,* S. Res. 570, 116th Congress (2020) ("opposing and condemning the potential prosecution of United States and Israeli nationals by the International Criminal Court"), and enacted a law, *see* Further Consolidated Appropriations Act, 2020, Pub. L. No. 116-94, § 7041, 133 Stat. 2534 (2019) (limiting assistance to the Palestinian Authority if Palestinians support ICC investigation of Israeli officials), in response.

Indeed, not only has Congress had ample time to respond — and, in fact, responded — to the developments that Executive Order 14203 characterizes as an "emergency," but Congress has also considered and rejected the exact course of action set forth in that order. Within days of the ICC chief prosecutor announcing that he would seek arrest warrants against Israeli officials, lawmakers introduced legislation to impose the very sanctions ultimately leveled through Executive Order 14203. *See, e.g.,* Illegitimate Court Counteraction Act, S.

4484, 118th Cong. (2024). These bills failed to win the support of both the House and Senate. In the following Congress, ICC sanctions legislation was reintroduced in the House but again failed to gain traction in the Senate. *See* Illegitimate Court Counteraction Act, H.R. 23, 119th Cong. (2025). Executive Order 14203, which pulls language verbatim from these failed sanctions bills, is a clear use of emergency powers to implement a policy that Congress has repeatedly considered and refused to enact. *Compare id.* (describing and quoting American Servicemembers' Protection Act and referring to ICC actions as "illegitimate and baseless") *with* Executive Order 14203 (using identical description for and quote from American Servicemembers' Protection Act and referring to ICC actions as "illegitimate and baseless").

Congress adopted the NEA to prevent presidents from using emergency powers to address longstanding issues that can and should be handled through normal legislative frameworks and processes. Executive Order 14203 stands the law on its head, using the NEA as a tool for bypassing debate and deliberation to adopt a controversial policy that Congress has not been willing to support. This is the kind of "manifestly unauthorized exercise of power" that courts may check even if the president asserts his foreign policy judgments are at stake. *Baker*, 369 U.S. at 217.

### B. The President Acted Outside a Permissible Range of Discretion in Declaring an "Unusual and Extraordinary Threat."

The courts have ample authority to review whether IEEPA's criterion of an "unusual and extraordinary threat . . . to the national security, foreign policy, or economy of the United States," 50 U.S.C. § 1701(a), has been met. Although some courts have held that IEEPA invocations implicate the political question doctrine, *see, e.g., Beacon Prods. Corp. v. Reagan*, 633 F. Supp. 1191, 1194–95 (D. Mass. 1986), others have correctly rejected this argument, *see*

*V.O.S. Selections, Inc. v. United States*, 772 F. Supp. 3d 1350, 1377 (Fed. Cir. 2025); *see also Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 229–30 (1986) (emphasizing that "not every matter touching on politics is a political question," and concluding that case under review was justiciable because it "call[ed] for applying no more than the traditional rules of statutory construction, and then applying this analysis to the particular set of facts presented").

Judicial review of whether IEEPA's statutory predicates have been met accords with the text and legislative histories of the NEA and IEEPA. As discussed, *see supra* at 11, Congress, in enacting IEEPA, added the "unusual and extraordinary threat" standard to prevent overuse of the law's exceptional powers. Congress intended for such limiting language in specific emergency powers to serve as key constraints on the executive power presidents retained under the NEA. It is entirely implausible that Congress intended for this critical limitation to be unenforceable. Indeed, shortly before the formation of the Special Committee on National Emergencies and Delegated Emergency Powers, one of its co-chairs expressly faulted the "the courts" for interpreting congressional grants of emergency powers as "creating a virtually unlimited Executive prerogative." 118 Cong. Rec. 18368 (1972) (statement of Sen. Charles Mathias), *reprinted in NEA Source Book, supra,* at 15; *see also id.* (lamenting that "neither Congress nor the courts has set criteria to define the kind of crisis which would justify invocation of these multifarious powers"); *id., reprinted at NEA Source Book, supra,* at 16 (faulting courts for upholding exercises of emergency powers that "clearly represent[ed] an unconstitutional encroachment on legislative authority"); *cf. Calvary Chapel Dayton Valley v. Sisolak*, 591 U.S. 1042, 1058 (2020) (Kavanaugh, J., dissenting) ("This Court's history is littered with unfortunate examples of overly broad judicial deference to the government when

the government has invoked emergency powers . . . . The court of history has rejected those jurisprudential mistakes and cautions us against an unduly deferential judicial approach . . . .”).

Even if courts owe substantial deference to a president’s assessment of whether particular circumstances constitute a threat to national security or foreign policy, no special expertise or political judgment is required for a court to determine whether those circumstances are “unusual” or “extraordinary” — particularly where the frequency and extent of such circumstances are a matter of public record. Courts assess whether circumstances are “unusual” or “extraordinary” in an array of constitutional and statutory contexts, *see, e.g.*, *Atkins v. Virginia*, 536 U.S. 304, 316 (2002) (concluding that execution of intellectually disabled offenders had “become truly unusual” based on infrequency of its application); *Magana-Magana v. Bondi*, 129 F.4th 557, 570 (9th Cir. 2025) (interpreting “extraordinary circumstances” in immigration code and noting that “courts routinely determine whether ‘extraordinary circumstances’ exist”), including those explicitly involving national defense considerations, *see, e.g.*, *Filtration Dev. Co. v. United States*, 60 Fed. Cl. 371, 383, 387 (2004) (interpreting “unusual and compelling urgency” in military procurement statute to require time-bounded, not indefinite, exigency).

As discussed, the potential for the ICC to examine, investigate, arrest, detain, and prosecute “protected persons” has existed and has even been the subject of a congressionally enacted statute for more than two decades. “Protected persons” have been the subjects of ICC work for over a decade, in countries ranging from the Philippines to Afghanistan to Palestine. In recent years, the United States has actively supported efforts by the ICC to exercise jurisdiction over government officials from non-ICC state parties. Esti Tambay, *US Congress Helps Boost Justice in Ukraine: Legislative Fixes Could Promote Cooperation with*

*International Criminal Court*, Human Rights Watch (Jan. 31, 2023), https://www.hrw.org/news/2023/01/31/us-congress-helps-boost-justice-ukraine. Far from being unusual and extraordinary, the ICC actions cited in Executive Order 14203 are based on theories of ICC jurisdiction and investigative, prosecutorial, and judicial prerogatives that the ICC has relied on since its inception.

Whatever forbearance courts might ordinarily show in lawsuits challenging invocations of the NEA and IEEPA, Executive Order 14203 exceeds the "permitted range of honest judgment" in which presidents may act without judicial review in areas normally committed to executive discretion. *Sterling*, 287 U.S. at 399.

### C. Executive Order 14203 and Its Implementing Regulations Violate the Informational Materials Exemption.

Executive Order 14203 prohibits the provision of "services by, to, or for the benefit of" any foreign person designated for sanctions. Its implementing regulations clarify that this language restricts the provision of "services of any nature whatsoever" to those sanctioned. 31 C.F.R. § 528.314. Plaintiffs have provided and would like to continue providing educational, fact-finding, and legal-analytic services to and in support of ICC judges, the ICC's office of the prosecutor, U.N. human rights experts, and human rights nonprofit partners. Compl. ¶¶ 224–28, 230–36, 240–45, 254–59. Plaintiffs, however, have stopped undertaking these speech activities to avoid running afoul of Executive Order 14203 and its implementing legislation. *Id.* There is ample reason to believe that Plaintiffs' speech activities are covered by and could lead to civil or criminal liability under Executive Order 14203 and its implementing regulations. In relevant lawsuits, the government explicitly interpreted the phrase "services of

any nature whatsoever" to include these speech activities. *See, e.g., Rona v. Trump*, 797 F. Supp. 3d 278, 290 (S.D.N.Y. 2025); *Open Society Justice Initiative*, 510 F. Supp. 3d at 210.

Although Executive Order 14203 and its implementing regulations purport to comply with the law, their guarantees of legality are vague enough to allow sanctions enforcement that is inconsistent with the informational materials exemption as designed and repeatedly reinforced by Congress. Executive Order 14203 provides that its terms "shall be implemented consistent with applicable law," and the implementing regulations state that they "do not apply to any transactions that are exempt pursuant to section 203(b)" of IEEPA. *See* 31 C.F.R. § 528.205(a). But these guarantees do nothing to foreclose OFAC's historic and continuing misinterpretation of the informational materials exemption. Indeed, the government has stated in other litigation challenging Executive Order 14203 and its implementing regulations that filing an *amicus* brief would fall outside the protections of the informational materials exemption — and would thus be restricted under Executive Order 14203 and its implementing regulations. *See Rona*, 797 F. Supp. 3d at 290. The government has reiterated its position from 2020, *id.*, that "interactive services provided to a specific recipient over time" and "'bespoke' legal services . . . fall outside of the exemption's scope," *see* Def.'s Mem. Opp'n Pls.' Mot. Prelim. Inj., *Open Society Justice Initiative v. Trump*, No. 20-cv-8121, 2020 WL 10352359 (S.D.N.Y. Nov. 9, 2020). This portends civil and criminal liability if Plaintiffs continue the speech activities they were undertaking before President Trump issued Executive Order 14203.

The stated reach of Executive Order 14203, its implementing regulations, and the government's unduly narrow interpretation of the informational materials exemption violate IEEPA's text and design. *See N.Y.C. Health and Hosp. Corp. v. Perales*, 954 F.2d 854, 858 (2d Cir. 1992) (rejecting agency regulation that "is at odds with the clear intent of the statutes, both

facially and as elaborated by legislative history"). As described and as courts have acknowledged, Congress enacted and repeatedly amended the informational materials exemption to prevent IEEPA from being used to regulate First Amendment speech activities. *See supra* at 12–14; *see also Kalantari*, 352 F.3d at 1205 ("The Berman Amendment was designed to prevent the executive branch from restricting the international flow of materials protected by the First Amendment." (citation omitted)). The language of the exemption is "extremely broad," *TikTok Inc. v. Trump*, 507 F. Supp. 3d 92, 103 (D.D.C. 2020) (citation and internal quotation marks omitted), consistent with Congress's intent that the exemption have "a broad scope" to avoid encroaching on the exchange of ideas across borders, *Kalantari*, 352 F.3d at 1205 (quoting H.R. Conf. Rep. No. 103-482, at 239). To the extent that certain speech activities — relating to nuclear nonproliferation, anti-terrorism, and espionage — fall beyond the protection of the informational materials exemption, IEEPA explicitly identifies and enumerates them. 50 U.S.C. § 1702(b)(3); *see also Andrus v. Glover Const. Co.*, 446 U.S. 608, 616–17 (1980) ("Where Congress explicitly enumerates certain exceptions to a general prohibition, additional exceptions are not to be implied, in the absence of evidence of a contrary legislative intent."). But nothing in IEEPA's text, legislative history, or statutory history suggests that Plaintiffs' speech activities focused on educating ICC officials, sharing legal and fact research, and filing *amicus* briefs fall beyond the broad protection of the informational materials exemption.

The breadth of the informational materials exemption and its concomitant limit on regulatory power is reinforced by the fact that IEEPA is an emergency authority unlocked through an NEA invocation. Not only do the NEA and IEEPA's legislative histories call for strictly construing such authorities and honoring any limits within them, but also the Supreme

Court recently held in *Learning Resources v. Trump* that "it is in precisely such cases" — namely, those involving emergency powers — that courts "should be alert to claims that sweeping delegations . . . lurk in ambiguous statutory text." 607 U.S. 229, 248 (2026) (citation and internal quotation marks omitted). Put another way, "when executive branch officials claim Congress has granted them an extraordinary power, they must identify clear statutory authority for it." *Id*. at 260 (Gorsuch, J., concurring). In view of the informational materials exemption, there is no clear authority in IEEPA to regulate speech activities, even if the speech activities at issue are interactive, provided over time, or bespoke. To the contrary, IEEPA apparently withholds such authority.

To be sure, some courts have previously deferred to and upheld administrations' crabbed interpretation of the informational materials exemption. *United States v. Amirnazmi* held that OFAC's decision to treat "prefabricated or mass-produced informational materials" as protected and "materials crated to suit . . . unique specifications" as unprotected was a "permissible implementation of the statutory exemption" entitled to *Chevron* deference. 645 F.3d 564, 587–88 (3d Cir. 2011); *see also United States v. Griffith*, 515 F. Supp. 3d 106, 117 (S.D.N.Y. 2021) (relying on *Chevron* deference to uphold OFAC regulation); *but see TikTok*, 507 F. Supp. 3d at 104 (holding that OFAC regulations "overstep[] the plain meaning" of the informational materials exemption). These earlier opinions, however, carry little weight after *Loper Bright*, which overturned *Chevron* and directed courts to "exercise their independent judgment in deciding whether an agency has acted within [a] statutory authority" instead of deferring to merely "permissible" agency interpretations. *Loper Bright Enters.*, 603 U.S. at 412. A court exercising its independent judgment to interpret the informational materials exemption should not read into it OFAC's extratextual carveouts — and should instead reject

Executive Order 14203 and its implementing regulations' overbroad prohibition on providing "services of any nature whatsoever" to designated persons.

## CONCLUSION

The NEA, IEEPA, and the limitations written into emergency powers are essential guardrails that Congress enacted to address decades' worth of executive overreach. The courts are empowered to police abuses of these laws that ignore their text and design — and should do so here to strike down Executive Order 14203 and its implementing regulations.

Dated: September 22, 2026

Respectfully submitted,

*/s/ Katherine Yon Ebright*
Katherine Yon Ebright*
BRENNAN CENTER FOR JUSTICE AT NYU SCHOOL OF LAW
777 6th Street NW, Suite 1100
Washington, DC 20001
Telephone: (202) 249-7196
Fax: (202) 223-2683
ebrightk@brennan.law.nyu.edu

**Admission pro hac vice pending*

*Counsel for Amicus Curiae the Brennan Center for Justice at NYU School of Law*

## CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1(c)

I, Katherine Yon Ebright, counsel for *amicus curiae*, hereby certify that the foregoing brief complies with the word count limitation set forth in Local Rule 7.1(c). This document contains 7,857 words, excluding the caption, table of contents, table of authorities, signature block, and required certificates.

/s/ *Katherine Yon Ebright*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| AMERICAN FRIENDS SERVICE COMMITTEE; CENTER FOR CONSTITUTIONAL RIGHTS; HUMAN RIGHTS WATCH; and OPEN SOCIETY INSTITUTE,<br><br>Plaintiffs,<br>v.<br><br>DONALD J. TRUMP, et al.,<br><br>Defendants. | Civil Action No. 26-cv-6830 |

**[PROPOSED] ORDER**

Upon consideration of proposed *amicus curiae* Brennan Center for Justice at NYU School of Law's Motion for Leave to File an *Amici Curiae* Brief in Support of Plaintiffs' Motion for Preliminary Injunction, it is hereby ORDERED that *amicus curiae* Brennan Center for Justice at NYU School of Law's Motion is GRANTED.

The Clerk of Court is directed to terminate ECF No. ___.

**SO ORDERED.**

Dated: ________________ ______________________________

Hon. Jesse M. Furman
United States District Judge