**MASCARENHAS LAW PLLC**

125 Park Avenue, 25th Floor,
New York, NY 10017
viren@mascarenhaslaw.com
O: +1 212 404 1486
C: +1 646 223 0486

www.mascarenhaslaw.com

September 22, 2026

**VIA ECF**

Hon. Jesse M. Furman
United States District Court for the Southern District of New York
Thurgood Marshall United States Courthouse
40 Foley Square
New York, NY 10007

Re: *American Friends Service Committee, et al. v. Trump et al.*, Civil Action No. 26-cv-06830 (JMF)

Dear Judge Furman:

Amnesty International, Fédération Internationale pour les Droits Humains, and thirty-six other civil society organizations (collectively, "proposed *amici*") respectfully seek leave to file a brief as *amici curiae* in support of Plaintiffs' Motion for Preliminary Injunction, which seeks to enjoin the Sanctions Regime established pursuant to Executive Order 14,203, *Imposing Sanctions on the International Criminal Court* ("ICC"). A copy of the proposed *amici* brief is attached as Exhibit A to this letter. Plaintiffs consent to the filing of this brief. Defendants have communicated that they take no position on the proposed submission. A proposed order accompanies this letter-motion as Exhibit B.

**INTERESTS OF PROPOSED *AMICI CURIAE***

Proposed *amici* are Amnesty International, Fédération Internationale pour les Droits Humains, and thirty-six other civil society organizations (CSOs) who work globally on issues of international justice and human rights. A full list of the proposed *amici* is attached to the proposed *amici* brief as Annex A.

Proposed *amici* have a special interest in this case and provide a unique perspective that will aid the Court. The proposed *amici* regularly work with and provide support for the ICC's activities. They are regular actors within the international criminal justice system and are acutely aware of the impact of Executive Order 14203 (the "Order") on non-sanctioned entities within that system. Furthermore, proposed *amici* employ U.S. nationals and collaborate with U.S. organizations that have been impacted by the Order. The proposed *amici* have prepared this brief to show the irreparable harm this Order causes on two grounds. First, by limiting the actions of CSOs, the Order impairs the functioning of the ICC because CSOs are critical to the ICC's work. Second, by imposing and threatening draconian financial and legal penalties on CSOs and

individual actors, the Order violates the CSOs' rights to freedom of expression and association. The proposed *amici* are well-positioned to present these positions, as human rights organizations whose work often puts them in contact with the ICC and impacted entities and individuals.

**LEGAL STANDARD**

No governing standard, rule, or statute informs the procedures required to obtain leave to file an amicus brief in a district court. *Lehman XS Trust, Series 2006-GP2 v. Greenpoint Mortg. Funding, Inc.*, 12 Civ. 7935, 2014 WL 265784, at *1 (S.D.N.Y. Jan. 23, 2014). Accordingly, this Court has broad discretion to determine whether to admit an amicus brief. *City of New York v. United States*, 971 F. Supp. 789, 791 n.3 (S.D.N.Y. 1997), *aff'd*, 179 F.3d 29 (2d Cir. 1999). Granting leave to file an amicus brief is appropriate where the amici have an interest in another case that may be affected by the decision in the present case or where the amici provide "unique information or perspective that can help the court beyond the help that the lawyers for the parties are able to provide." *Auto. Club of N.Y. v. Port Auth. of N.Y. & N.J.*, No. 11-cv-6746 (RJH), 2011 WL 5865296, at *2 (S.D.N.Y. Nov. 22, 2011) (internal quotation omitted). Courts have considered the partiality of a would-be amicus but have not required amici to be totally disinterested. *Id*.

**REQUEST FOR RELIEF**

By this motion, proposed *amici curiae* request leave to file the attached brief (Exhibit A). A proposed order granting leave to file is also attached (Exhibit B).

Respectfully submitted,

By: /s/ Viren Mascarenhas
Viren Mascarenhas (VM1980)
Camille Ramos-Klee (admission pending)
MASCARENHAS LAW
125 Park Ave., FL 25
New York, NY 10017
+1 212 404 1486
viren@mascarenhaslaw.com
cramosklee@mascarenhaslaw.com

*Counsel for Proposed Amici Curiae*

# Exhibit A

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

AMERICAN FRIENDS SERVICE COMMITTEE et al.,

Plaintiff(s),

v.

Civil Action No. 26-cv-6830 (JMF)

DONALD J. TRUMP et al.,

Defendant(s).

**BRIEF OF AMNESTY INTERNATIONAL, FÉDÉRATION INTERNATIONALE POUR LES DROITS HUMAINS, AND THIRTY-SIX OTHER CIVIL SOCIETY ORGANIZATIONS AS AMICI CURIAE IN SUPPORT OF AMERICAN FRIENDS SERVICE COMMITTEE et al.,**

Viren Mascarenhas
Camille Ramos-Klee
**Mascarenhas Law PLLC**
125 Park Avenue, FL 25
New York, NY 10017
+1-212-404-1486
viren@mascarenhaslaw.com
cramosklee@mascarenhaslaw.com

*Counsel for Amici Curiae*

September 22, 2026

## TABLE OF CONTENTS


INTRODUCTION AND INTEREST OF AMICI CURIAE ............................................ 1

ARGUMENT ............................................................................................................. 3

I. EXECUTIVE ORDER 14203 VIOLATES THE RIGHTS TO FREEDOM OF EXPRESSION AND ASSOCIATION OF CIVIL SOCIETY ACTORS AND IN SO DOING DISRUPTS THE GLOBAL SYSTEM OF INTERNATIONAL JUSTICE .............................. 3

A. EO 14203 Burdens Protected Expression and Association ............................... 3

B. The Sanctions Already Implemented Have Gravely Impacted and Isolated Organizations Essential to the Rome Statute System ......................................................... 6

C. The Order's Harms Extend Directly to Victims and Survivors of International Crimes ........................................................................................................................ 9

D. The Order Chills ICC-Related Work by both U.S. and Non-U.S. Actors ........... 11

E. The Order Fractures Civil Society Coalitions and Protected Activity ................. 14

F. The Order Diverts Resources from Accountability Work to Sanctions Compliance. ........................................................................................................ 16

II. CSOs AND HUMAN RIGHTS DEFENDERS ARE CRITICAL TO THE FUNCTIONING OF THE ROME STATUTE SYSTEM ..................................................... 16

A. A vibrant and diverse civil society is essential to the effective operations of the ICC and the Rome Statute system ........................................................................ 16

B. The Rome Statute System is integral to the Distributed Accountability Framework 17

C. CSOs Are a Recurring Channel for Information, Expertise, and Participation in the Rome Statute System ............................................................................... 19

D. The Court and Broader Rome Statute System Rely on CSOs .......................... 20

CONCLUSION ........................................................................................................ 25

**Case**

*Ongwen*, Case No. ICC-02/04-01/15-2022-Red, Public Redacted Version of Judgment on the Appeal (Dec. 15, 2022) ........ 25

**Statute**

Executive Order 14203 ........ 1

**Treatises**

International Covenant on Civil and Political Rights, Dec. 16, 1966, 999 U.N.T.S. 171 .......... 4, 5

Rome Statute of the International Criminal Court, pmbl., July 17, 2998, 2187 U.N.T.S. 90. 17, 22

**International Authorities**

American Association for the International Commission of Jurists, *Siracusa Principles on the Limitation and Derogation Provisions in the International Covenant on Civil and Political Rights*, U.N. Doc. E/CN.4/1985/4 (1985) ........ 5

Assembly of States Parties, *Recognition of the Coordinating and Facilitating Role of the NGO Coalition for the International Criminal Court*, ICC-ASP/2/Res.8 (Sept. 11, 2003).............. 18

Assembly of States Parties, *Rules of Procedure and Evidence*, ICC-ASP/1/3, (Sept. 9, 2002)... 19

Assembly of States Parties, *Rules of Procedure of the Assembly of States Parties*, ICC-ASP/1/3, (Sept. 3–10, 2002) ........ 19

Assembly of States Parties, Strengthening the International Criminal Court and the Assembly of States Parties, ICC-ASP/20/Res.5 (Dec. 9, 2021) ........ 20

Assembly of States Parties, *Strengthening the International Criminal Court and the Assembly of States Parties*, ICC-ASP/24/Res.6 (Dec. 5, 2025) ........ 18

G.A. Res. 53/144, Declaration on the Right and Responsibility of Individuals, Groups and Organs of Society to Promote and Protect Universally Recognized Human Rights and Fundamental Freedoms (Dec.9, 1998). .......... 4

G.A. Res. 53/144, Declaration on the Right and Responsibility of Individuals, Groups and Organs of Society to Promote and Protect Universally Recognized Human Rights and Fundamental Freedoms (Dec. 9, 1998) .......... 5

Human Rights Committee, General Comment No. 34, U.N. Doc. CCPR/C/GC/34 (July 2011)... 4

Human Rights Committee, General Comment No. 37 on Article 21 (Right of Peaceful Assembly), U.N. Doc. CCPR/C/GC/37 (Sept. 2020) .......... 4

Human Rights Council Res. 22/6, Protecting Human Rights Defenders, (Apr. 12, 2013).......... 5

*Independent Expert Review of the International Criminal Court and the Rome Statute System: Final Report* .......... 19, 20, 21

International Criminal Court, *Guidelines Governing the Relations Between the Court and Intermediaries for the Organs and Units of the Court and Counsel Working with Intermediaries* (Mar. 2014) .......... 21

International Criminal Court, *Overall Response of the International Criminal Court to the "Independent Expert Review of the International Criminal Court and the Rome Statute System – Final Report"* .......... 20

Office of the Prosecutor, *International Criminal Court, Policy on Complementarity and Cooperation,* (Apr. 25, 2024) .......... 20, 23

U.N. Human Rights Comm., *Korneenko v. Belarus*, Communication No. 1274/2004, U.N. Doc. CCPR/C/88/D/1274/2004, (Oct. 31, 2006) .......... 5

*U.N. Special Rapporteur on the Rights to Freedom of Peaceful Assembly and of Association, Report,* U.N. Doc. A/HRC/23/39, (Apr. 24, 2013) .................................................................. 5

*U.N. Special Rapporteur on the Rights to Freedom of Peaceful Assembly and of Association, Report: Access to Resources*, U.N. Doc. A/HRC/50/23, (May 10, 2022) ................................ 5

**Other Authorities**

Al-Haq, *Press Release on US Sanctions* (2025). ........................................................................ 11

Alice Speri, *This Palestinian Human Rights Group Was Sanctioned by Trump. Its Chief Wishes US Allies Would Take a Stand*, THE GUARDIAN (Nov. 13, 2025)...................................... 7, 8, 9

AMNESTY INTERNATIONAL & T.M.C. ASSER INSTITUTE, THE ROME STATUTE AT 40 13 (2021).. 17, 20

Amnesty International, *Mongolia: Putin Must Be Arrested and Surrendered to the International Criminal Court* (Sept. 2, 2024). ........................................................................................... 24

Coalition for the International Criminal Court, *Criminalising Accountability: The US Lawfare Against the International Justice System*, (Apr. 23, 2026) .............................. 7, 8, 9, 11, 12, 13

Danya Chaikel, Priya Pillai & Pubudu Sachithanandan, *Civil Society and International Accountability: Mapping the Terrain*, 22 J. Int'l Crim. Just. (2024)....................................... 24

Eurojust et al., *Documenting International Crimes and Human Rights Violations for Criminal Accountability Purposes: Guidelines for Civil Society Organisations* (Sept. 21, 2022). ......... 23

FANNY BENEDETTI, KARINE BONNEAU & JOHN L. WASHBURN, NEGOTIATING THE INTERNATIONAL CRIMINAL COURT: NEW YORK TO ROME, 1994–1998 (2014)......................... 18

FIDH & COALITION FOR THE INTERNATIONAL CRIMINAL COURT, CIVIL SOCIETY AND THE INTERNATIONAL CRIMINAL COURT: PATHWAYS TO COLLABORATIVE AND GENUINE ENGAGEMENT (2024) ........................................................................................... 17, 21, 23, 24

HEIDI NICHOLS HADDAD, THE HIDDEN HANDS OF JUSTICE: NGOS, HUMAN RIGHTS, AND INTERNATIONAL COURTS (2018) ........ 18

Margherita Capacci, *Palestinian NGOs: "We Are Like Outcasts*," JUSTICEINFO.NET (Mar. 20, 2026) ........ 6, 7, 9, 13

MARLIES GLASIUS, THE INTERNATIONAL CRIMINAL COURT: A GLOBAL CIVIL SOCIETY ACHIEVEMENT (2006) ........ 18

Matthew Cannock, *Strengthening International Criminal Court Cooperation: The Role of Civil Society*, in COOPERATION AND THE INTERNATIONAL CRIMINAL COURT: PERSPECTIVES FROM THEORY AND PRACTICE (Olympia Bekou & Daley J. Birkett eds., 2016) ........ 21, 23

Middle East Eye, *Palestinian Rights Groups Vow to Continue Work Despite US Sanctions*, (Dec. 12, 2025) ........ 7

Nosheen Iqbal, *Human Rights Lawyer Francesca Albanese on Life under US Sanctions*, THE GUARDIAN (May 28, 2026) ........ 6

*Prosecutor v. Ongwen*, Case No. ICC-02/04-01/15-1938, Amici Curiae Observations on the Rome Statute's Definition of "Forced Pregnancy" by Dr Rosemary Grey, Global Justice Center, Women's Initiatives for Gender Justice and Amnesty International (Dec. 23, 2021). 24

REDRESS TRUST, "*Its Name Alone Has the Potential to Save Lives": David Yambio on the International Criminal Court*, (YouTube, Feb. 9, 2026) ........ 10

REDRESS TRUST, "*We Demand Justice": Oleksandr Maksymenko on Justice for Ukrainian Survivors*, (YouTube, Feb. 9, 2026) ........ 10

REDRESS TRUST, *Is the ICC the Last Hope of Justice for Survivors?* (YouTube, Feb. 9, 2026) .. 10

Southern Africa Litigation Centre, *News Release: Supreme Court of Appeal Rules on Bashir Case* (Mar. 15, 2016). ........ 24

Victims' Rights Working Group*, Reject ICC-Related Sanctions: A Call to Protect Victims and Uphold Justice, Coalition for the Int'l Criminal Court* (Dec. 1, 2025) .................................... 11

## INTRODUCTION AND INTEREST OF AMICI CURIAE

Amici are thirty-eight civil society organizations (CSOs) who work globally on issues of international justice and human rights. A brief description of each is attached as Annex A. Many of these organizations have offices and employees within the United States and/or employ United States citizens as employees or consultants in international (non-US) offices. Many of them work or have worked closely with the plaintiffs on issues of international justice and human rights, including on issues relating to the International Criminal Court ("ICC"). All of them, whether they are U.S. based CSOs, national CSOs based in other countries or international organizations based outside of the US, have been significantly and adversely affected by Executive Order 14203 (the "Order" or "EO 14203"). This Order authorizes the imposition of financial sanctions and travel restrictions on any designated foreign person or entity deemed by the United States to have directly engaged in any effort by the ICC to investigate, arrest, detain, or prosecute a "protected person" as defined in the EO, without consent of that person's country of nationality. The Order prohibits U.S. persons from providing or receiving funds, goods, or services to or from blocked persons or entities, and subjects them to criminal prosecution and other penalties for violating this prohibition. Exec. Order No. 14203, §§ 1(a), 3(a)–(b), 4.[1]

As set forth more fully below, these CSOs work on issues related to the ICC and the fulfilment of its mandate, or work or have worked on issues related to international justice. US persons working in these CSOs face potential draconian civil and criminal penalties, and non-US persons face the risk of designation under the Order and the crippling institutional or individual sanctions. The Order's adverse impacts on the CSOs are compounded by its vagueness. The Order

[1] *See* EO No. 14,203, 90 Fed. Reg. 9369 (Feb. 6, 2025) (defining "person" as an individual or entity and "entity" as a government or instrumentality of such government, partnership, association, trust, joint venture, corporation, group, subgroup, or other organization).

does not provide clarity on what activity is and is not prohibited As a result, these CSOs are repeatedly forced to seek legal advice, diverting substantial time and resources, to determine the risks associated with activities that previously used to be routine: attending events organized by the Office of the Prosecutor (OTP) or the ICC; providing expert input on issues facing the ICC; collecting and providing evidence, including testimony from individuals who are current or prior staff of sanctioned entities; supporting victims and witnesses; engaging in advocacy or campaigns, including attending advocacy strategy meetings; being part of coalitions or networks; attending conferences that might touch on the ICC or where sanctioned individuals or organizations might attend or speak; attending the annual Assembly of States Parties of the ICC and planning side events; and initiating or supporting litigation concerning human rights violations and international crimes within the United States, in other countries, and before international courts, tribunals, and other accountability mechanisms.

The legal advice CSOs receive about the Order differs, resulting in a wide range of compliance policies, chilling expressive and associative activity and leaving staff dealing with the anxiety and legal uncertainty of engaging in what their lawyers may consider a low-risk activity, where other organizations consider the same activities unlawful or too risky. Judicial decisions to date have compounded this uncertainty, as they are limited to individual plaintiffs and do not clearly provide protection to the multitude of other individuals and organizations engaged in this work. Indeed, a number of CSOs expressed that they would not be able to join this brief despite their essential contribution to international justice and the ICC because of the (varying) legal advice and interpretations they had received as to the sanctions and other legal risks associated with joining the brief.

Amici submit this brief to explain the irreparable harm that this Order causes. It advances two arguments. First, the fracturing of civil society resulting from the Order impairs the functioning of the ICC. CSOs and human rights defenders, who are comprised of, to name a few, lawyers, victim representatives, and survivor-advocates, are not peripheral advocates for the ICC; rather, they are critical to the functioning of the ICC. The ICC was designed to depend on them to connect with victims and witnesses; document crimes; monitor judicial developments; support victim participation and reparations; contribute legal, contextual, cultural and other expertise; and advance cooperation and domestic accountability, particularly in situation countries where the Court has limited access.

Second, by imposing and threatening draconian financial and legal penalties on CSOs and individual actors, EO 14203 is violating their rights to freedom of expression and association and has severely damaged the collaboration and infrastructure upon which the international system of justice depends. EO 14203 already has caused the Designated Entities to lose funding, staff, banking access, and partnerships; deterred CSOs from engaging with the ICC; and fractured relationships between and among many CSOs. The result is measurable and irreparable harm not only to civil society, but to the ICC, to the administration of international criminal justice, and, ultimately, to the victims and survivors the system exists to serve.

## ARGUMENT

## I. EXECUTIVE ORDER 14203 VIOLATES THE RIGHTS TO FREEDOM OF EXPRESSION AND ASSOCIATION OF CIVIL SOCIETY ACTORS AND IN SO DOING DISRUPTS THE GLOBAL SYSTEM OF INTERNATIONAL JUSTICE

### A. EO 14203 Burdens Protected Expression and Association

In addition to the constitutional protections under the U.S. Constitution, international human rights law, through treaties that the United States has ratified, provides a comprehensive and highly

protective framework for the right to freedom of expression, peaceful assembly, and association. International Covenant on Civil and Political Rights arts. 19, 21, 22, Dec. 16, 1966, 999 U.N.T.S. 171 (hereinafter "ICCPR"); *see*, in particular, Human Rights Committee, General Comment No. 34, U.N. Doc. CCPR/C/GC/34 (July 2011); Human Rights Committee, General Comment No. 37 on Article 21 (Right of Peaceful Assembly), U.N. Doc. CCPR/C/GC/37 (Sept. 2020). This framework fully applies to the activities of CSOs in reporting, advocacy, mobilization, and engagement with the ICC and with each other.

CSOs that engage in the protection and promotion of human rights also benefit from protection as human rights defenders. Human Rights and Fundamental Freedoms (also known as the Declaration on Human Rights Defenders, adopted by consensus at the United Nations General Assembly) articulates the scope and protection of the autonomous right to defend human rights, as well as the state's obligations to respect, protect and fulfil this right. G.A. Res. 53/144, Declaration on the Right and Responsibility of Individuals, Groups and Organs of Society to Promote and Protect Universally Recognized Human Rights and Fundamental Freedoms (Dec.9, 1998). Its Article 1 affirms the right "individually and in association with others, to promote and to strive for the protection and realization of human rights." Article 5 sets out the rights of human rights defenders to meet or assemble peacefully; to form, join and participate in non-governmental organizations, associations or groups; and to communicate with non-governmental or intergovernmental organizations. Crucially, Article 12(2) imposes a positive obligation on States to "take all necessary measures to ensure the protection" of defenders against violence, threats, retaliation, discrimination, or pressure resulting from their legitimate exercise of the rights protected within the Declaration. While the Declaration itself is not a legally binding instrument, it records, reinforces and elaborates upon the obligations of States under international law as they

pertain to the protection of human rights defenders, including obligations under the ICCPR, particularly Articles 19, 21 and 22.

The protection afforded to the right to freedom of association relates not only to the right to form an association but also guarantees the right of a CSO to freely carry out its statutory activities. *See* U.N. Human Rights Comm., *Korneenko v. Belarus*, Communication No. 1274/2004, U.N. Doc. CCPR/C/88/D/1274/2004, ¶7.2 (Oct. 31, 2006). The right of association guarantees that CSOs can seek, secure and use resources, including financial resources, from domestic, foreign, and international sources, as necessary or essential to their existence and effective operation. *U.N. Special Rapporteur on the Rights to Freedom of Peaceful Assembly and of Association, Report: Access to Resources*, U.N. Doc. A/HRC/50/23, ¶ 9 (May 10, 2022). *See also U.N. Special Rapporteur on the Rights to Freedom of Peaceful Assembly and of Association, Report,* U.N. Doc. A/HRC/23/39, ¶¶ 8, 20 (Apr. 24, 2013); Human Rights Council Res. 22/6, Protecting Human Rights Defenders, ¶ 9(b) (Apr. 12, 2013); G.A. Res. 53/144, Declaration on the Right and Responsibility of Individuals, Groups and Organs of Society to Promote and Protect Universally Recognized Human Rights and Fundamental Freedoms, art. 13 (Dec. 9, 1998). While the right to freedom of association can be restricted, any such restrictions must be provided by law, and be strictly necessary and proportionate to achieving at least one of the expressly recognized legitimate aims. ICCPR art. 22.2. *See also* American Association for the International Commission of Jurists, *Siracusa Principles on the Limitation and Derogation Provisions in the International Covenant on Civil and Political Rights*, U.N. Doc. E/CN.4/1985/4 (1985).

As explained in detail below, EO 14203 drastically impairs CSOs' ability to organize, collaborate, and participate in collective work, including advocacy, research and litigation related to international criminal justice, severely impacting their rights to freedom of expression and the

right to defend human rights. It has a chilling effect on CSOs, human rights defenders, UN independent experts and other affected stakeholders speaking, reporting, or advocating on issues that may lead to ICC engagement. It also infringes on the right to freedom of association of CSOs. It fragments transnational civil society and advocacy networks, such as the Coalition for the ICC (CICC), and impedes a wide variety of collaborations essential to international justice, including joint submissions and communications to the Court and coordinated victim representation. The First Amendment likewise protects speech and associational activities of the kind described above, as Plaintiffs address in detail in their preliminary injunction memorandum. See Plaintiff's Memorial of Law in Support of Motion for Prelim. Inj. at 57–70, ECF No. 41.

**B. The Sanctions Already Implemented Have Gravely Impacted and Isolated Organizations Essential to the Rome Statute System**

Under EO 14203, CSOs documenting crimes on the ground and a UN independent expert have been designated simply for their documentation and advocacy work, marking a significant escalation by the US government. The effects of sanctions on these designated individuals and organizations have been immediate and systemic, effectively amounting to a "civil death" in the words of the UN Special Rapporteur Francesca Albanese.[2] For those subject to the sanctions, they have radically affected access to information, funding, banking, digital tools, and coalition spaces. These direct and indirect effects have been documented both by media reporting and by CSOs.[3]

[2] Nosheen Iqbal, *Human Rights Lawyer Francesca Albanese on Life under US Sanctions*, THE GUARDIAN (May 28, 2026).

[3] Margherita Capacci, *Palestinian NGOs: "We Are Like Outcasts*," JUSTICEINFO.NET (Mar. 20, 2026) (hereinafter "Capacci"); Alice Speri, *This Palestinian Human Rights Group Was Sanctioned by Trump. Its Chief Wishes US Allies Would Take a Stand*, THE GUARDIAN (Nov. 13, 2025) (hereinafter "Speri"); Middle East Eye, *Palestinian Rights Groups Vow to Continue Work Despite US Sanctions*, (Dec. 12, 2025); Coalition for the International Criminal Court, *Criminalising Accountability: The US Lawfare Against the International Justice System*, (Apr. 23, 2026) (hereinafter "Criminalising Accountability").

Al-Haq, Al Mezan Center for Human Rights (Al Mezan), and the Palestinian Center for Human Rights (PCHR), all designated under EO 14203, are among the few human rights organizations with access to the Occupied Palestinian Territory. They are critical in providing contextual information, evidence, and identifying witnesses of international crimes for UN mechanisms, the ICC, national courts, and international organizations. As underlined by Chris Sidoti, Member of the UN Commission of Inquiry on Palestine and Israel, "Sanctions against these will have an enormous impact because they are critical in providing evidence to UN mechanisms, the ICC and national courts using Universal Jurisdiction. They are intermediaries, they are the ones collecting evidence and having access to witnesses."[4]

Because of the global dependence on the U.S. financial system, information technology and other services, these organizations have lost access to essential banking services. They are unable to receive funds or make payments. Their staff are working pro bono. They have lost up to 60% of their funding, notably all U.S. funding, including direct or sub-grants, and are unable to apply for any US grant, gravely impacting their operations, projects, and ultimately the victims they serve. They have also lost access to several online and social media services including YouTube and MailChimp, which are essential to share information to the broader public, and have been excluded from several networks and coalitions, again impacting the sharing of information with other civil society organizations and the broader public. Their entire operations have been affected as a direct result of the designation, severely isolating them from global human rights networks.[5] By designating and isolating these organizations, the U.S. administration has impaired the ability of actors throughout the international justice system to access essential information and evidence and maintain links to victims.

[4] Criminalising Accountability, *supra*, at 52.
[5] Criminalising Accountability, *supra*, at 51; *see also* Capacci, *supra*.

The sanctions imposed to date have likewise immediately affected the ability of U.S. persons to continue working with Designated Persons on any issue, including ICC investigations across situations, from Ukraine, to Afghanistan, to Palestine, and to the Philippines. Under the Order, U.S. persons, including CSOs, lawyers, prosecutors, and donors, may face civil or criminal penalties if their work is deemed to constitute providing or receiving funds, goods, or services to or from designated entities, including sanctioned individuals at the ICC.

The vagueness of the Order also creates legal uncertainty as to its scope, ambit, and application. Depending on the lawyer interpreting these prohibitions and their divergent legal advice, these penalties could apply to drafting and filing briefs or amicus curiae submissions to the ICC; providing evidence to the OTP; funding the activities and projects of the designated Palestinian human rights organizations; being on committees or panels with designated entities; providing legal representation, or coordinating advocacy with designated persons; and even attending a meeting where a designated person attends or speaks.[6]

Essential work conducted by U.S. nationals and U.S. organizations, including research, strategic litigation and advocacy, has halted, and decade-long partnerships have immediately stopped.[7] This includes legal representation of Designated Entities as victims before the ICC, and the development of collective legal strategies, research, and public advocacy work. U.S. human rights organizations active in litigation efforts on crimes under international law committed in Afghanistan and Palestine are particularly affected.

Shawan Jabarin, the Director of Al-Haq, explained that most U.S.-based organizations, if not all, have "stopped working with us or engaging with us formally and openly." Speri, *supra*. This disengagement also affected the work of the designated UN Special Rapporteur on human

[6] Criminalising Accountability, *supra*, at 57.
[7] Criminalising Accountability, *supra*, at 58; *see* Speri, *supra*.

rights in the Occupied Palestinian Territory, Francesca Albanese, who reported that university research partnerships and U.S. based advisory relationships had ended after the sanctions order, and that there had been attempts to halt the publication of her book.[8]

Moreover, U.S. donors immediately stopped funding Designated Entities, impacting the entirety of their operations and essential work.[9] "We are like outcasts, being closer to us is quite costly", explained Issam Younis, Director of Al Mezan about donors stopping their support for the organization.[10]

**C. The Order's Harms Extend Directly to Victims and Survivors of International Crimes**

Ultimately, EO 14203 negatively impacts victims and survivors of Rome Statute crimes, the very people the Rome Statute system exists to serve. ICC Deputy Prosecutor Nazhat Shameem Khan stated that the OTP had to "deal with anxious victims on the phone, asking if they are safe, if their identity is safe, if the Court's technology is secure. This has an impact on victims and on our work."[11]

The ICC was designed for victims from countries across the world, many of whom turn to the ICC where domestic justice avenues have failed. Venezuelan journalist and human rights defender Luis Carlos Díaz has described the ICC as Venezuelans' "last hope of justice," explaining that with no autonomous or functioning domestic justice system, and after Venezuela's withdrawal from the Inter-American human rights system, victims have placed their remaining hope in the ICC.[12]

[8] Criminalising Accountability, *supra*, at 59.
[9] Criminalising Accountability, *supra*, at 51.
[10] Speri, *supra*; Capacci, *supra*.
[11] *Criminalising Accountability*, supra, at 61.
[12] REDRESS TRUST, *Is the ICC the Last Hope of Justice for Survivors?* (YouTube, Feb. 9, 2026), https://www.youtube.com/watch?v=lu0LRTgMiJw.

In practice, accessing that justice often depends on CSOs and human rights defenders who serve as trusted intermediaries. As David Yambio, a South Sudanese survivor and former detainee in Libya, now a co-founder of Refugees in Libya, has explained, CSOs give victim-centered engagement its practical meaning, describing them as "not only acting as a bridge" but working alongside survivors themselves.[13]

When sanctions sever those channels, victims and survivors lose access to the people and organizations they have come to trust, information about proceedings that concern them, assistance in asserting their rights, and reliable routes to the ICC itself. The impact falls on people who are often the least able to navigate an international legal process alone. Oleksandr Maksymenko, a Ukrainian journalist who endured six months of Russian occupation and civilian captivity, has similarly described the ICC as their "main hope," explaining that justice means seeing both senior officials and military commanders held accountable before the ICC.[14]

Severing the channels through which victims reach the ICC risks eroding the confidence that sustained civil society engagement has helped to build. CSOs across the world have confirmed that this harm is not isolated to any single context. The Philippines Coalition for the ICC has warned that sanctions "do not punish perpetrators," but instead delay truth and accountability for victims who, as in the Philippines, have no domestic path to justice. According to the Afghanistan Organization for Development of Human Rights (AODHR), the sanctions "hindered documentation of atrocities, including gender-based persecution and arbitrary detentions" in Afghanistan. International Community Care ICC e.V., referring to Sudan, has observed that, where local justice has collapsed, "sanctioning the Court forsakes survivors of genocide, sexual violence,

[13] REDRESS TRUST, "*Its Name Alone Has the Potential to Save Lives": David Yambio on the International Criminal Court*, (YouTube, Feb. 9, 2026), https://www.youtube.com/watch?v=29X5Te6wy6A.
[14] REDRESS TRUST, "*We Demand Justice": Oleksandr Maksymenko on Justice for Ukrainian Survivors*, (YouTube, Feb. 9, 2026), https://www.youtube.com/watch?v=aN3JyrYO28Q.

and ethnic cleansing" and undermines their prospects for accountability.[15] The reach of the sanctions has created uncertainty among CSOs and victims' groups well beyond any single Designated Entity or situation, as they assess how to continue supporting the ICC's work without risking retaliation themselves.

These consequences are, at their core, consequences for civil society's capacity to connect victims to justice. By disabling the channels through which victims reach the ICC, the Order burdens both the justice system itself and those who may have no other route to truth, justice and reparations.

**D. The Order Chills ICC-Related Work by both U.S. and Non-U.S. Actors**

Sanctions imposed under EO 14203 have resulted in the immediate loss of employment of all U.S. nationals working with Designated Entities and Individuals, including senior staff members from the three designated Palestinian organizations, as well as researchers with the UN Special Rapporteur, due to the risks of civil and criminal penalties and prosecution.[16] Wesam Ahmed, a U.S. Palestinian dual-national who had to resign due to the sanctions after working for Al-Haq for almost two decades, explained: "As a U.S. citizen, you are forced to take an immediate decision and resign. For me this was a place I have worked for two decades, where I found purpose, a place that I call home. It is devastating. This represents a microcosm of the denial of the right to self-determination."[17] The Secretariat of the CICC made the difficult decision to make redundant all of its U.S. staff to protect them from the risks of civil and criminal penalties in the U.S.,

[15] Victims' Rights Working Group, *Reject ICC-Related Sanctions: A Call to Protect Victims and Uphold Justice, Coalition for the Int'l Criminal Court* (Dec. 1, 2025).
[16] Criminalising Accountability, *supra*, at 58; Al-Haq, *Press Release on US Sanctions* (2025).
[17] Criminalising Accountability, *supra*, at 58.

including staff who had been working in the organization for years, impacting the work of the CICC as a whole.[18]

After years of engagement with the ICC, including by serving as Legal Representatives for Victims (LRVs), attorneys working for the Center for Constitutional Rights (CCR) were forced to cease numerous activities in support of victims in the Situation in Palestine. Much of that work was done in coordination with, or on behalf of, the three Designated Entities, and included communicating with victims, providing legal representation, submitting briefs and submissions to support investigations into Rome Statute Crimes, filings to the ICC, and developing joint legal strategies and advocacy. Following the designations, these LRVs had to immediately cease their work with the Designated Entities, including joint strategy and legal filings, and withdraw as LRVs for Al Haq and Al Mezan, directly impacting victims' access to representation and their pursuit of justice before the ICC.[19] U.S. nationals working with Francesca Albanese, including those working as researchers at European Universities, had to resign.[20] Even non-US nationals have resigned from Designated Entities, citing fear of facing individual sanctions themselves.[21]

The sanctions regime is also reshaping internal staffing decisions within non-designated, non-U.S.-based organizations whose accountability work extends well beyond the ICC. The Berlin-based European Center for Constitutional and Human Rights (ECCHR), a human rights NGO that pursues accountability for international crimes and serious human rights violations through strategic litigation before domestic, regional, and international courts and bodies, has adjusted staff responsibilities in response. As Senior Legal Advisor Chantal Meloni explained,

[18] Criminalising Accountability, *supra*, at 51.
[19] Criminalising Accountability, *supra*, at 58.
[20] Criminalising Accountability, *supra*, at 57.
[21] Criminalising Accountability, *supra*, at 50.

ECCHR had "taken measures to protect our staff who hold American nationality," meaning that "certain members do not handle certain contacts or files."[22]

The fear and uncertainty surrounding the implementation and enforcement of these sanctions has adversely affected the entire human rights sector, particularly in the United States. Shawan Jabarin, explained how civil society perceived the announcement of sanctions: "When they went as far as sanctioning ICC judges, it was like an earthquake, it shocked everyone. Judges who are carrying their mission, defend justice, and act according to the rule of law. After that there is nothing called a red line, there is no limit".[23] Due to this fear and uncertainty, the impact of the designation went far beyond U.S. persons halting their work with designated persons. While the uncertainty of the EO has led to disparate responses, several U.S. organizations have refused to take part in research or speak to the press in relation to sanctions and their historic relations with Designated Entities due to the risks. U.S. organizations have disinvited Designated Persons from speaking on panels, stopped attending meetings and events where Designated Persons and Organizations were present or stopped speaking in these events and meetings, and left group chats with Designated Persons. This has impacted their ability to receive and share information on essential matters pertaining to international law, justice, and receiving updates on the situation across different situations.[24] The entire civil society sector working on international justice has been affected by this chilling effect, fearing that public work, advocacy or speech with designated persons could lead to further designations or other penalties. This has impacted the freedom of speech and civil space far beyond U.S. territory. As explained by Raji Sourani, Director of PCHR, sanctions against Palestinian organizations "gave a lot of other NGOs reason to fear that they

[22] Capacci, *supra*.
[23] Criminalising Accountability, *supra*, at 16.
[24] Criminalising Accountability, *supra*, at 59–60.

would be next. We must not see these sanctions as targeting our organisations per se, but rather as the harshest attack on the very idea of accountability since Nuremberg."[25] "The whole rationale of the sanctions was to silence us, stop us from doing our work, terrify us and terrify others," underlined Issam Younis.[26]

More broadly, the consequences of the Order are not confined to the situations that prompted the sanctions. The ICC is a single institution, not a collection of separate courts for each situation. Its organs and institutional processes operate across the Court's docket, while many civil society networks and forums span multiple situations and cases. By restricting engagement with designated persons and entities wherever that engagement occurs, the Order therefore disrupts civil society participation in the Court's work well beyond the circumstances that gave rise to the designations.

**E. The Order Fractures Civil Society Coalitions and Protected Activity**

In this environment of fear, coalitions, federations and networks have been unable to operate across their entire membership, affecting freedom of association and the sharing of information throughout the world. Because of the sanctions, Designated Entities have been excluded from several networks and coalitions, impacting their ability to work collectively within these networks but also to provide and receive information on international justice and the situation in the Occupied Palestinian Territory. In many spaces where they were not excluded, the sanctions have nevertheless made it impossible to conduct any type of collective work that would include U.S. member organizations and Designated Entities, including holding strategy meetings, conducting joint advocacy, litigation, legal, research or outreach work, across all thematics. During

[25] Criminalising Accountability, *supra*, at 21.
[26] Criminalising Accountability, *supra*, at 59.

the 24th session of the Assembly of States Parties held in December 2025, some U.S. CSOs attended and did not speak in meetings where Designated Entities were present. Some avoided such meetings, including CSO strategy meetings and meetings with Court officials, while others did not attend the ASP at all.[27] Due to the risks, U.S. organizations had to stop participating in strategic discussion pertaining to victims' rights, threats to the ICC, sanctions, withdrawals, Rome Statute amendments, elections and many other thematics when designated organizations have participated in such discussions. This had fractured the work of civil society actors, prevented them from working collectively and receiving and sharing information.

Just as insidious is what cannot be seen – the collaboration and work avoided because of fear of repercussions. Indeed, the greatest risk of sanctions is not to those who have already been sanctioned, but to the hundreds of people who will not take the decisions they need to take because they are afraid.[28] The decision not to file amicus curiae submissions. The decision not to apply to be an ICC judge or independent expert. The decision not to submit critical evidence of international crimes to the ICC. The decision not to engage in human rights investigations.

The resulting harms are shared across the network. When partners withdraw because of fear of enforcement or designation, even organizations that remain able to participate lose the information, expertise, and perspectives those partners would otherwise contribute, undermining their ability to collaborate across advocacy, research, litigation, victim support, and other joint activities. Relief limited to the Plaintiffs would therefore leave this network-wide harm unresolved: their own ability to speak, associate, and work collectively would remain seriously impaired so long as organizations with which they ordinarily collaborate remain unable or unwilling to participate because of the risk of sanctions.

[27] *Id.*
[28] *Id.*

**F. The Order Diverts Resources from Accountability Work to Sanctions Compliance.**

Uncertainty created by EO 14203's vague terms and unclear scope has itself diverted mission-critical time, funding, and staff capacity. CSOs must regularly conduct time-consuming risk assessments, obtain costly legal advice, and restructure their activities to manage potential sanctions exposure. Non-U.S. organizations working directly with Designated Entities and on the targeted investigations have reported greater difficulties in their work, increased time and resources devoted to risk assessments and internal checks, reluctance to publicize their work with Designated Entities, and requests from certain donors to comply with the sanctions in order to maintain funding.[29] Finally, civil society organizations working on international justice had to devote a significant amount of time and resources in conducting advocacy related to sanctions, documenting their impact, and advocating for their revocation. These are resources diverted from the core mandate of these organizations, including supporting victims and survivors.

## II. CSOs AND HUMAN RIGHTS DEFENDERS ARE CRITICAL TO THE FUNCTIONING OF THE ROME STATUTE SYSTEM

### A. A vibrant and diverse civil society is essential to the effective operations of the ICC and the Rome Statute system

By crippling it, as described above, EO 14203 directly threatens operational channels on which the ICC and the wider Rome Statute system depend. Those channels include CSOs, human rights defenders, lawyers, victim representatives, survivor-advocates and other actors who document atrocity crimes; preserve information; connect victims and witnesses to ICC proceedings; support participation and reparations processes; contribute to institutional policy and oversight; and help activate domestic accountability systems.

[29] Criminalising Accountability, *supra*, at 62.

This section explains why these actors are not peripheral advocates, but rather part of the operational infrastructure through which international justice for atrocity crimes committed globally is pursued. As Matias Hellman, Head of Outreach for the ICC's Registry has acknowledged, "the Court would be very alone if it had to face the world without the support of civil society."[30]

**B. The Rome Statute System is integral to the Distributed Accountability Framework**

The ICC is the cornerstone of the Rome Statute system, but it was not designed to function as a self-contained enforcement body. The ICC depends on States Parties for cooperation, including arrest and surrender, protection, access, and enforcement. And it critically depends on CSOs. In that structure, accountability is achieved through a distributed set of legal and institutional relationships, not through the ICC alone. Rome Statute of the International Criminal Court, pmbl., arts. 1, 5, 17, 86–89, and 93, July 17, 1998, 2187 U.N.T.S. 90.

EO 14203 therefore does not operate in a world where the ICC can investigate crimes, communicate with victims, secure cooperation, conduct outreach, and support domestic accountability through its own staff alone. The Rome Statute system depends on a web of interactions between the ICC, States Parties, domestic authorities, victims and affected communities, independent counsel, experts, and civil society.[31] A measure that deters or disables one of those channels therefore affects the administration of international criminal justice as a whole, even when it is only formally directed at specific Designated Persons.

[30] FIDH & COALITION FOR THE INTERNATIONAL CRIMINAL COURT, CIVIL SOCIETY AND THE INTERNATIONAL CRIMINAL COURT: PATHWAYS TO COLLABORATIVE AND GENUINE ENGAGEMENT 9 (2024) (hereinafter, "Civil Society and the ICC").
[31] *See* AMNESTY INTERNATIONAL & T.M.C. ASSER INSTITUTE, THE ROME STATUTE AT 40 13 (2021) (the "Rome Statute at 40").

CSOs were embedded in the Rome Statute system from the outset. Notably, the Coalition for the International Criminal Court (the "CICC"), which is a global civil society network of member organizations in 150 countries, helped create the normative and political conditions for the adoption of the Rome Statute. At its first sessions, the Assembly of States Parties to the Rome Statute (the "ASP"), which is the Court's management oversight and legislative body composed of representatives of the States that have ratified or acceded to the Rome Statute, formally recognized the CICC's role in coordination and facilitation between the CSO community, the ASP, and the Court.[32] Assembly of States Parties, *Recognition of the Coordinating and Facilitating Role of the NGO Coalition for the International Criminal Court*, ICC-ASP/2/Res.8 (Sept. 11, 2003).

The ASP continues to recognize the importance of CSOs to the ICC's functions. Indeed, at its twenty-fourth session in December 2025, the ASP expressly addressed the sanctions against CSOs. Appreciating "the invaluable assistance that has been provided by civil society to the Court," the ASP declared that it was "gravely concerned by the recent reports of sanctions, attacks, threats and intimidation directed at some civil society organizations and those cooperating with the Court." Assembly of States Parties, *Strengthening the International Criminal Court and the Assembly of States Parties*, ICC-ASP/24/Res.6 (Dec. 5, 2025). It further underlined that "attacks, threats and sanctions or measures of a similar effect against Court officials, United Nations independent experts, and civil society organizations, present a significant challenge to the Court's mandate and the global fight against impunity, including access to justice for victims," and called for the lifting of such measures. Id.

[32] *See* MARLIES GLASIUS, THE INTERNATIONAL CRIMINAL COURT: A GLOBAL CIVIL SOCIETY ACHIEVEMENT (2006); FANNY BENEDETTI, KARINE BONNEAU & JOHN L. WASHBURN, NEGOTIATING THE INTERNATIONAL CRIMINAL COURT: NEW YORK TO ROME, 1994–1998 68 (2014); HEIDI NICHOLS HADDAD, THE HIDDEN HANDS OF JUSTICE: NGOS, HUMAN RIGHTS, AND INTERNATIONAL COURTS 116–20, 125 (2018).

### C. CSOs Are a Recurring Channel for Information, Expertise, and Participation in the Rome Statute System

The ICC's governing instruments establish specific, structured roles for Non-Governmental Organizations ("NGOs"), which are a type of CSO, across the Court's investigative, participatory, and institutional functions. The Rome Statute authorizes the Prosecutor to seek information from NGOs. Rome Statute, art. 15(2). It recognizes victims' participation in proceedings; allows NGO representation from or on behalf of victims and other interested persons before reparations orders; and establishes the Trust Fund for Victims, whose assistance and reparations programs are frequently implemented through NGO partners. The ASP Rules of Procedure provide for NGOs to attend ASP and subsidiary-body meetings, receive official documents, and submit oral and written statements in specified circumstances. Assembly of States Parties, *Rules of Procedure of the Assembly of States Parties*, ICC-ASP/1/3, rr. 93, 95 (Sept. 3–10, 2002). Rule 103 of the ICC's Rules of Procedure and Evidence permits organizations and persons to submit amicus curiae observations when a Chamber considers them desirable for the proper determination of a case. Assembly of States Parties, *Rules of Procedure and Evidence*, ICC-ASP/1/3, r. 103 (Sept. 9, 2002).

These Rome Statute provisions establish critical channels through which information, expertise, victim engagement, institutional participation, and assistance may reach the ICC and the ASP from outside the Court's own staff. Official ICC and ASP materials describe the same relationship in operational terms. The Independent Expert Review of the ICC and the Rome Statute system concluded that NGOs are a "force multiplier" for the Court. *Independent Expert Review of the International Criminal Court and the Rome Statute System: Final Report*, ICC-ASP/19/16, 126 ¶380 (Sept. 30, 2020) (hereinafter the "IER Final Report"). ICC officials have consistently stated that strengthening civil society engagement is a priority while the ASP has expressed appreciation

for civil society assistance to the Court. IER Final Report, *supra*, ¶¶ 380–82; International Criminal Court, *Overall Response of the International Criminal Court to the "Independent Expert Review of the International Criminal Court and the Rome Statute System – Final Report"* ¶311 (Apr. 14, 2021); Assembly of States Parties, *Strengthening the International Criminal Court and the Assembly of States Parties*, ICC-ASP/20/Res.5, 2 (Dec. 9, 2021). The Office of the Prosecutor's 2024 Policy on Complementarity and Cooperation also recognizes civil society, particularly community-based CSOs, as "crucial complementarity and cooperation partners" and a bridge between the Office and those who wish to contribute to justice processes. Office of the Prosecutor, *International Criminal Court, Policy on Complementarity and Cooperation,* ¶¶ 82–84 (Apr. 25, 2024) (hereinafter, "OTP Complementarity and Cooperation Policy").

**D. The Court and Broader Rome Statute System Rely on CSOs**

The relationship between the Court and CSOs is widely recognized as institutionalized, and the resulting interaction between the ICC and civil society is both extensive and, in important respects, distinctive.[33] Civil society itself is not monolithic. It spans international, regional, and national CSOs as well as a wide range of other actors, including legal experts, counsel, parliamentarians, human rights defenders, and academics, whose interests range from gender justice to victims' rights to the rights of the defense. [34] The following functions illustrate both that institutionalized relationship and the breadth of actors who sustain it in practice.

First, CSOs connect the Court to victims, affected communities, and potential witnesses. In many countries where the ICC is conducting or has conducted investigations (situation countries), CSOs and human rights defenders are the first, and sometimes the only, actors in

[33] *See* Rome Statute at 40, 14.

[34] Matthew Cannock, *Strengthening International Criminal Court Cooperation: The Role of Civil Society*, in COOPERATION AND THE INTERNATIONAL CRIMINAL COURT: PERSPECTIVES FROM THEORY AND PRACTICE 320-29 (Olympia Bekou & Daley J. Birkett eds., 2016).

sustained contact with communities. Their proximity, language capacity, contextual knowledge, and established trust allow them to explain the ICC's mandate and limits; identify victims who may be eligible to participate in proceedings or reparations processes; support access to legal representation; and assist the Court in understanding risks, expectations, and social dynamics.[35] IER Final Report, *supra*, ¶ 380; International Criminal Court, *Guidelines Governing the Relations Between the Court and Intermediaries for the Organs and Units of the Court and Counsel Working with Intermediaries* 5 (Mar. 2014). Many also function as intermediaries, providing the link between the ICC's organs or counsel and victims, witnesses, beneficiaries of reparations, or affected communities more broadly. National CSOs also organize visits of ICC staff members to their country to train national authorities, such as national prosecutors, as well as facilitating high-level visits of ICC officials.[36] IER Final Report, *supra*, ¶ 380. The OTP has itself acknowledged that NGOs "play an important role in enhancing the reach and effectiveness of the Office's efforts" and can serve as "a critical interface with victim communities." IER Final Report, *supra*, para. 380. Local CSOs are even more important in connecting victims and witnesses to the OTP in situation countries where the office is unable to access the territory, as is the case in the Occupied Palestinian Territory and Afghanistan.

Second, CSOs provide a practical interface through which victim participation and reparations can operate. The formal rights to victim participation and reparations recognized by the Rome Statute are difficult to invoke where victims cannot access information, legal representation, language support, psychosocial assistance, or safe channels of communication with the Court. CSOs have supported victims in identifying themselves to the Registry; participating in consultations with the Victims Participation and Reparations Section; seeking

[35] *See* Rome Statute at 40, 15.
[36] Civil Society and the ICC, 10 (quoting ICC Office of the Prosecutor correspondence).

review of prosecutorial decisions; and pursuing reparations. They also assist in the outreach and implementation of assistance programs, including through the Trust Fund for Victims. These activities are operational conditions that often make the exercise of victims' rights possible in practice, complementary to, rather than a substitute for, the Court's own obligations. Rome Statute, arts. 68(3), 75.[37]

Third, CSOs document, preserve, and transmit information relevant to investigations. Community-based and international CSOs document alleged Rome Statute crimes; preserve open-source and documentary materials; identify potential leads and witnesses; analyze contextual information and applicable national law; and submit Article 15 communications to the OTP. This function is especially important where state authorities are unwilling or unable to investigate; where the Court is not yet present; where security conditions prevent field deployment; or where access to crime scenes is obstructed. The joint Eurojust, Genocide Network, and OTP documentation guidelines recognize that civil society documentation has been invaluable to accountability efforts and that such organizations are often in a privileged position to support investigative authorities.[38] In some situations, CSOs provide the only viable channel for documentation at all. CSOs often preserve information before the competent authorities can act.

Fourth, CSOs contribute to institutional policy, oversight, and reform. They monitor ICC practice and jurisprudence; participate in consultations and ASP governance processes on topics such as state cooperation, budget, and workplace culture; and advocate for adequate resources for outreach, meaningful victim participation, legal aid, and protection.[39] Sustained CSO advocacy was, for instance, pivotal in securing the establishment of a permanent vetting mechanism for

[37] *Id*.
[38] Eurojust et al., *Documenting International Crimes and Human Rights Violations for Criminal Accountability Purposes: Guidelines for Civil Society Organisations* 3 (Sept. 21, 2022).
[39] *Id*., at 12-18; OTP Complementarity and Cooperation Policy.

candidates in ICC judicial, prosecutorial, and registry elections, the first of its kind at any international justice institution. As one civil society representative described it, "tenacious and coordinated civil society advocacy led to the adoption of a permanent vetting process for all ICC elections, including judges, Prosecutor, and Registrar."[40]

Fifth, CSOs support cooperation and complementarity. The ICC has no police force and depends on States Parties to execute arrest warrants, surrender suspects, protect witnesses, facilitate access, and implement other cooperation obligations. CSOs monitor non-cooperation, advocate for arrests and surrender, press states to implement the Rome Statute domestically, conduct trial monitoring and provide information relevant to whether national proceedings are genuine.[41] In domestic universal or extraterritorial jurisdiction proceedings, CSOs often provide documentation, survivor contact, contextual analysis, and legal expertise that allow national prosecutors to identify viable cases. That work is not separate from the Rome Statute system, but rather it gives practical effect to complementarity by ensuring that national authorities can respond to Rome Statute crimes.[42] OTP Complementarity and Cooperation Policy, ¶¶ 82–83.

These efforts have often led to concrete results. For example, CSO litigation secured a 2015 High Court order in South Africa requiring the arrest of then-President of Sudan Omar al-Bashir, later affirmed by the Supreme Court of Appeal, which held the government's failure to arrest him was unlawful.[43] In 2024, CSOs called on Mongolia to execute the ICC's arrest warrant against

[40] Civil Society and the ICC, at 13–14 (quoting Danya Chaikel, FIDH Representative to the ICC).
[41] *See* Cannock*, supra.*
[42] Danya Chaikel, Priya Pillai & Pubudu Sachithanandan, *Civil Society and International Accountability: Mapping the Terrain*, 22 J. Int'l Crim. Just. 287, 288–89, 295–96 (2024).
[43] *See* Southern Africa Litigation Centre, *News Release: Supreme Court of Appeal Rules on Bashir Case* (Mar. 15, 2016).

Russian President Vladimir Putin during his visit.[44] Sustained CSO advocacy contributed to the recent Rome Statute ratifications by Armenia and Ukraine.[45]

Sixth, CSOs contribute legal expertise directly to proceedings and make the Court's work more visible. Rule 103 of the Rules of Procedure and Evidence permits organizations and experts to submit amicus curiae observations on legal, factual, or contextual questions before a Chamber. Rules of Procedure and Evidence, *supra*, r. 103. In the proceedings against Dominic Ongwen, a Ugandan former senior commander of the Lords' Resistance Army, for example, feminist legal experts together with several CSOs, submitted observations on forced marriage, forced pregnancy, sexual slavery, cumulative convictions, duress, and evidentiary standards for sexual violence. *See, e.g.*, *Prosecutor v. Ongwen*, Case No. ICC-02/04-01/15-1938, Amici Curiae Observations on the Rome Statute's Definition of "Forced Pregnancy" by Dr Rosemary Grey, Global Justice Center, Women's Initiatives for Gender Justice and Amnesty International (Dec. 23, 2021). The Appeals Chamber cited several of those interventions in its final judgment.[46] *Ongwen*, Case No. ICC-02/04-01/15-2022-Red, Public Redacted Version of Judgment on the Appeal (Dec. 15, 2022). CSOs also monitor proceedings, report on case law, explain developments to affected communities, and help counter misinformation about the Court's mandate and limits. These functions help make legal proceedings intelligible to those most affected by them.[47] When CSOs are no longer able to fulfill these technical functions, the effects can be tangible and widespread. For example, the Open Society Justice Initiative's trial-monitoring project, which operated until 2021, identified operational issues which might otherwise have gone unnoticed, such as witness interference. With

[44] *See* Amnesty International, *Mongolia: Putin Must Be Arrested and Surrendered to the International Criminal Court* (Sept. 2, 2024).
[45] *See*, Civil Society and the ICC, 16–17.
[46] Chaikel, Pillai & Sachithanandan, *supra*, at 302.
[47] Civil Society and the ICC, at 19.

that project ended and other monitors no longer operating systematically, the loss of independent oversight is itself a vulnerability for the fair administration of the Court's proceedings.[48]

Accordingly, a legal regime that penalizes, or deters assistance to ICC work burdens more than those directly targeted. It interferes with the very channels through which alleged crimes are documented; victims are connected to proceedings; legal expertise is provided to courts; cooperation is mobilized; domestic accountability is advanced; and the Court's work is made accessible and intelligible to its most fundamental constituencies – victims and communities affected by crimes under international law.

## CONCLUSION

For the foregoing reasons, amici respectfully submit that EO 14203 gravely impacts those targeted and extends well beyond the persons it designates, reaching the civil society infrastructure on which the International Criminal Court and the broader Rome Statute system depend. Amici urge the Court to consider these systemic consequences, the impact of sanctions on civic space, freedom of expression and association, and the harm to victims and survivors worldwide, in its assessment of the Order.

Dated: New York, NY, September 22, 2026

Respectfully submitted,

/s/ Viren Mascarenhas
Viren Mascarenhas (VM1980)
Camille Ramos-Klee (admission pending)
Mascarenhas Law
125 Park Avenue, FL 25
New York, NY 10017
+1-212-404-1486
viren@mascarenhaslaw.com
cramosklee@mascarenhaslaw.com

[48] *Id*.

*Counsel for Amici Curiae*

*Amnesty International (International Secretariat)*
*Fédération Internationale Pour Les Droits Humains (FIDH)*
*Action for Justice Reform and the Promotion of Human Rights (AJRPDH)*
*The Arab Center for the Independence of the Judiciary and Legal Profession (ACIJLP) & the Arab Coalition for the International Criminal Court (ACICC)*
*Action for the Reform of Justice and Promotion of Human Rights (ARJPDH)*
*Baltasar Garzón International Foundation (FIBGAR)*
*Center for Development of International Law (CDIL)*
*The Center for Justice and Accountability (CJA)*
*Moroccan Center for Peace and Law*
*Centro de Investigación y Promoción de los Derechos Humanos (CIPRODEH)*
*Chinese Initiative on International Law (CIIL)*
*Clinique de droit international pénal et humanitaire (Faculté de droit, Université Laval)*
*The COMPPART Foundation for Justice and Peacebuilding*
*The Croatian Helsinki Committee for Human Rights (CHC)*
*The Egyptian Initiative for Personal Rights (EIPR)*
*ESCR-Net - International Network for Economic, Social and Cultural Rights*
*European Center for Constitutional and Human Rights (ECCHR)*
*Global Justice Center*
*Human Rights Now*
*HuMENA for Human Rights and Civic Engagement*
*Indonesian Legal Aid Association for Women (APIK)*
*Just Access*
*Kurdish Organizations Network Coalition for the International Criminal Court (KONCICC)*
*Lawyers' Rights Watch Canada (LRWC)*
*Libya Crimes Watch (LCW)*
*The Nuhanovic Foundation*
*No Peace Without Justice (NPWJ)*
*Philippine Alliance of Human Rights Advocates (PAHRA)*
*The Platform for Peace and Humanity*
*Refugees in Libya*
*Rights for Peace*
*The Robert & Ethel Kennedy Human Rights Center*
*StoptheDrugWar.org - DRCnet Foundation*
*Students for Global Democracy Uganda*
*The Syrian Center for Media and Freedom of Expression (SCM)*
*Women's Initiatives for Gender Justice (WIGJ)*
*World Organization Against Torture (OMCT)*
*World Without Genocide*

## APPENDIX

This Appendix lists all of the CSOs making up the *amici* submission and provides a mission statement for each CSO.

### 1. Amnesty International (International Secretariat)

Amnesty International is a non-governmental, non-profit organization with a global support base of more than seven million members, supporters and activists in more than 150 countries and territories, and domestic entities set up in more than seventy countries and territories. Amnesty International's vision is of a world in which every person enjoys all of the human rights enshrined in the Universal Declaration of Human Rights and other international human rights instruments. Amnesty International works independently and impartially to promote respect for human rights. It monitors domestic law and practices in countries throughout the world for compliance with international human rights law and international humanitarian law and standards, and it engages in advocacy, litigation and education to prevent and end human rights violations and to demand justice for those whose rights have been violated, including at international forums, such as the International Criminal Court.

### 2. The International Federation for Human Rights (FIDH)

The International Federation for Human Rights (FIDH) is an international human rights non-governmental organization founded in 1922 and comprising 188 national human rights organizations in 117 countries around the world. Working closely with its member and partner organizations across all regions, FIDH documents serious human rights violations, supports victims and survivors in seeking truth, justice, and reparations, and undertakes strategic litigation before national, regional, and international courts and mechanisms. FIDH has longstanding

expertise in international criminal justice, including supporting victims' participation and legal representation before the ICC, and assisted the victims whose applications resulted in the ICC's first decision recognizing victims' right to participate in proceedings. FIDH regularly engages with the ICC, its States Parties, and civil society on accountability, cooperation, victims' rights, and the effective functioning of the Rome Statute system. FIDH has also participated as amicus curiae before the United States Supreme Court in cases concerning international human rights law.

**3. Action for Justice Reform and the Promotion of Human Rights (ARJPDH)**

Action for Justice Reform and the Promotion of Human Rights (ARJPDH) is a human rights organization committed to promoting justice, combating impunity, and protecting victims of serious human rights violations.

**4. The Arab Center for the Independence of the Judiciary and Legal Profession (ACIJLP) & the Arab Coalition for the International Criminal Court (ACICC)**

The Arab Center for the Independence of the Judiciary and the Legal Profession (ACIJLP) is a regional non-governmental body which works towards strengthening and consolidating the situation of justice in the Arab region, through the establishment of the rule of law, the independence of the judiciary and the legal profession, and respect for human rights and fundamental freedoms. ACIJLP is coordinator of the Arab Coalition for an International Criminal Court (ACICC), which is composed of 63 Arab non-governmental members.

**5. Action for the Reform of Justice and Promotion of Human Rights (ARJPDH)**

Action for the Reform of Justice and the Promotion of Human Rights (ARJPDH) is a human rights organization committed to promoting justice, combating impunity, and protecting

victims of serious human rights violations. ARJPDH has a particular interest in this case because of its connection to justice, the accountability of perpetrators of violations, and the protection of victims' rights.

**6. Baltasar Garzón International Foundation (FIBGAR)**

Baltasar Garzón International Foundation (FIBGAR) is a non-profit organization dedicated to the promotion and protection of human rights, the fight against impunity, and the strengthening of international justice. FIBGAR works on issues including universal jurisdiction, accountability for serious international crimes, and access to justice for victims, while supporting civil society initiatives aimed at advancing these objectives.

**7. Center for Development of International Law (CDIL)**

The Center for Development of International Law (CDIL) is a U.S.-based NGO established to promote the development of international law and strengthen the international legal order, with UN ECOSOC consultative status since 1996. CDIL has a longstanding institutional commitment to the International Criminal Court, including participation in the 1998 Rome Conference at which the ICC Statute was adopted.

**8. The Center for Justice and Accountability (CJA)**

The Center for Justice and Accountability (CJA) is a U.S.-based international human rights organization dedicated to working with communities impacted by international crimes and other human rights abuses worldwide, including genocide, war crimes, crimes against humanity, torture, and extrajudicial killing, to seek truth, justice, and redress using innovative litigation and transitional justice strategies.

**9. Moroccan Center for Peace and Law**

The Moroccan Center for Peace and Law is a member of the Coalition for the International Criminal Court and serves as the regional coordinator for the African Network on International Criminal Justice in North Africa. For twenty years, the Center has participated in the sessions of the Assembly of States Parties to the International Criminal Court and took part in the Kampala Review Conference on the Rome Statute. It also contributed to drafting the Chicago Principles on Combating Impunity.

**10. Centro de Investigación y Promoción de los Derechos Humanos (CIPRODEH)**

Centro de Investigación y Promoción de los Derechos Humanos (CIPRODEH) is a member of a civil society coalition against impunity and for support of the ICC.

**11. Chinese Initiative on International Law (CIIL)**

Chinese Initiative on International Law is an independent non-governmental organization operating within and outline the Greater China Region. CIIL's mission is to engage and support communities in the Region to understand, critique, engage with, and eventually promote international law and international justice.

**12. Clinique de droit international pénal et humanitaire (Faculté de droit, Université Laval)**

Université Laval's International Criminal and Humanitarian Law Clinic offers students hands-on training in ICL, IHL and IHRL through work on real-world projects and cases. As part of the Canadian Partnership for International Justice, the Clinic prepared several reports on

Canada's "no safe haven" policy and contributed to amicus curiae interventions before various jurisdictions, including at the ICC.

**13. The COMPPART Foundation for Justice and Peacebuilding**

The COMPPART Foundation for Justice and Peacebuilding is a Nigerian-based organization established in 2002 to defend citizens' rights through improved justice and security services delivery, equitable and affordable access, and peacebuilding, in order to build confidence in the justice and security sectors.

**14. The Croatian Helsinki Committee for Human Rights (CHC)**

The Croatian Helsinki Committee for Human Rights (CHC) is a leading non-governmental organization in Croatia, established in 1993, dedicated to the promotion and protection of human rights, rule of law, and democratic values. During the war in Croatia, CHC and its president Ivan-Zvonimir Čičak played an active role in lobbying for the establishment of the International Criminal Tribunal for the former Yugoslavia (ICTY), recognizing the critical need for international justice mechanisms to address war crimes and crimes against humanity. CHC subsequently continued its advocacy for the creation of a permanent International Criminal Court (ICC) as part of its long-term commitment to strengthening global accountability for serious violations of international humanitarian law.

**15. The Egyptian Initiative for Personal Rights (EIPR)**

The Egyptian Initiative for Personal Rights (EIPR) is an independent Cairo-based non-governmental organization founded in 2002 by journalist Hossam Bahgat to protect individual freedoms, civil liberties, and bodily autonomy across Egypt. Operating through field research, legal advocacy, and policy reporting, EIPR focuses on key areas including criminal justice reform,

freedom of religion and belief, non-discrimination, and economic and social rights such as health equity and public spending accountability.

**16. ESCR-Net - International Network for Economic, Social and Cultural Rights**

ESCR-Net is a network consisting of more than 350 members, including NGOs, social and feminist movements, Indigenous Peoples, and environmental and human rights defenders spread across various countries. For 20 years and counting, the Network continues to work towards social justice through human rights including economic, social, cultural and environmental rights, the right to self-determination, and the right to development. Freedom of expression and freedom of association are, in our view, essential to the full realization and effective enjoyment of these rights. The same applies to the protection of international justice and the international human rights system, which provide avenues for historically disadvantaged communities to seek justice, effective remedies, and comprehensive reparations.

**17. European Center for Constitutional and Human Rights (ECCHR)**

The European Center for Constitutional and Human Rights (ECCHR) uses legal means to end impunity for those responsible for torture, war crimes, sexual and gender-based violence, corporate exploitation and fortressed borders.

**18. Global Justice Center**

Global Justice Center is a feminist human rights organization that uses international law to advance gender equality. Its key focus is justice for atrocities involving sexual and gender crimes, for which it engages with the ICC and other CSOs in this work.

**19. Human Rights Now**

Human Rights Now is a Tokyo-based international human rights NGO with UN special consultative status and actively engages in the UN decision-making process.

**20. HuMENA for Human Rights and Civic Engagement**

HuMENA for Human Rights and Civic Engagement embodies a deep-rooted commitment to human rights. Established as an autonomous entity for advocacy and activism, HuMENA strives to emerge as a pivotal civic force, addressing the constraints on civic freedoms in the MENA region and harnessing the power of both local and diasporic communities as catalysts for change in both local and international stages. Officially founded in 2020 in Brussels, HuMENA operates as a non-profit, non-partisan global human rights organization with active engagements across the MENA region. HuMENA for Human Rights and Civic Engagement is dedicated to advancing the rights and empowerment of communities across the MENA region through strategic activism, advocacy, and collaboration.

**21. Indonesian Legal Aid Association for Women (APIK)**

Indonesian Legal Aid Association for Women (APIK) is the umbrella organization consisting of a National Secretariat and 17-member legal aid offices throughout Indonesia. The organization provides free legal aid and advocacy for women and vulnerable groups in Indonesia.

**22. Just Access**

Just Access is a human rights NGO based in Germany and a member of the Coalition for the International Criminal Court. Its mission is to promote respect for human rights through strategic litigation, advocacy and education.

**23. Kurdish Organizations Network Coalition for the International Criminal Court (KONCICC)**

Kurdish Organizations Network Coalition for the International Criminal Court (KONCICC) was established in 2013 and is a member of the Coalition for the International Criminal Court (CICC). The network works to promote Iraq's accession to the International Criminal Court (ICC) and to strengthen accountability for genocide, war crimes, and crimes against humanity. To advance these objectives, KONCICC organizes numerous activities each year, including awareness campaigns, public events, seminars, and advocacy initiatives. Most of its member organizations represent or work closely with victims and survivors of genocide and other serious international crimes, particularly in Kurdistan.

**24. Lawyers' Rights Watch Canada (LRWC)**

Lawyers' Rights Watch Canada (LRWC), founded in 2000, is a Canadian organization of lawyers and other human rights defenders who promote the implementation of international law and standards designed to protect the independence and security of lawyers and human rights defenders around the world. LRWC produces legal analyses of national and international laws and standards relevant to human rights violations against lawyers and human rights defenders. LRWC

has held special consultative status with the United Nations Economic and Social Council since 2005.

**25. Libya Crimes Watch (LCW)**

Libya Crimes Watch (LCW) is an independent human rights organization that documents serious human rights violations and international crimes in Libya and works to advance accountability and access to justice for victims.

**26. The Nuhanovic Foundation**

The Nuhanovic Foundation is a Netherlands-based organization dedicated to supporting survivors of international crimes in their pursuit of justice and accountability. The organization works closely with survivors, civil society organizations, lawyers and national authorities to facilitate access to justice, support strategic litigation, and strengthen survivor participation in accountability processes.

**27. No Peace Without Justice (NPWJ)**

No Peace Without Justice (NPWJ) is an international non-governmental organization focused on human rights, international criminal justice, democracy, and the rule of law. It was founded in 1994. NPWJ was heavily involved in the campaign for the establishment of a permanent International Criminal Court, participating in the negotiations leading to the 1998 Rome Conference and providing legal assistance to governmental delegations. It is a founding and steering committee member of the Coalition for the International Criminal Court (CICC) and has UN ECOSOC special consultative status.

**28. Philippine Alliance of Human Rights Advocates (PAHRA)**

Philippine Alliance of Human Rights Organization (PAHRA) is committed to promoting, protecting, and realizing human rights in the Philippines, and to defending human rights in all their dimensions—including civil, political, social, economic, and cultural rights, as well as the rights of women, children, Indigenous peoples, and other marginalized groups.

**29. The Platform for Peace and Humanity**

The Platform for Peace and Humanity exists to promote, advance, and achieve sustainable international peace through the mutual effort, passion, and commitment of like-minded individuals dedicated to our shared humanity, to deliver justice for victims and survivors of conflict-related violence and other human rights violations, and to support institutions, organisations, and individuals that work toward sustainable peace and social justice.

**30. Refugees in Libya**

Refugees in Libya is a refugee-led organization founded by survivors of Libya's detention system. Through documentation, advocacy, strategic litigation, campaigns, and direct support, it works to enhance the protection of refugees and migrants while seeking accountability for abuses committed along the Central Mediterranean migration route.

**31. Rights for Peace**

Rights for Peace is a UK-registered charity, whose aim is to strengthen the rights and resilience of affected communities to prevent mass atrocities.

**32. The Robert & Ethel Kennedy Human Rights Center**

The Robert & Ethel Kennedy Human Rights Center advocates on issues of human rights and pursues strategic litigation to hold governments accountable. The organization works alongside grassroots partners in the US and around the world,

**33. StoptheDrugWar.org - DRCnet Foundation**

StoptheDrugWar.org is a primarily US-based organization that advocates on domestic and international drug policies. The organization was a longtime advocate for the ICC's Philippines situation case, and is an active participant in ICC NGO activities.

**34. Students for Global Democracy Uganda**

Students for Global Democracy Uganda, a member of the Coalition for the International Criminal Court since 2011, is a non-profit, student-focused organisation founded in 2005 that promotes human rights, good governance and leadership, and youth civic.

**35. The Syrian Center for Media and Freedom of Expression (SCM)**

The Syrian Center for Media and Freedom of Expression (SCM) is an independent Syrian human rights organization working to promote human rights, freedom of expression, accountability, and the rule of law. SCM has extensive experience documenting international crimes, supporting victims and witnesses, and pursuing accountability through international and domestic mechanisms, including universal jurisdiction proceedings.

**36. Women's Initiatives for Gender Justice (WIGJ)**

Women's Initiatives for Gender Justice (WIGJ) is an international feminist organization dedicated to advancing gender justice through law, particularly by promoting accountability for gender-based violence, strengthening gender-sensitive approaches to international criminal justice, and ensuring survivor-centred participation in justice and reparations processes.

**37. World Organization Against Torture (OMCT)**

World Organization Against Torture's mission is to strengthen and protect the global movement to eradicate torture and other cruel, inhuman, or degrading treatment or punishment.

**38. World Without Genocide**

World Without Genocide is a human rights organization dedicated to preventing genocide and other mass atrocities, protecting vulnerable and persecuted groups, promoting accountability and prosecution of perpetrators, and advancing human rights through education, advocacy, and support for international justice mechanisms.

**CERTIFICATE OF COMPLIANCE**

Pursuant to Local Civil Rule 7.1(c), the undersigned certifies that this brief complies with the applicable word-count limitation. This brief was prepared with a computer and, excluding the caption, table of contents, table of authorities, signature block, and this certificate, contains 7404 words, as counted by the word-processing system used to prepare it.

/s/ Viren Mascarenhas
Viren Mascarenhas (VM1980)
Camille Ramos-Klee (admission pending)
Mascarenhas Law
125 Park Avenue, FL 25
New York, NY 10017
+1-212-404-1486
viren@mascarenhaslaw.com
cramosklee@mascarenhaslaw.com

**CERTIFICATE OF SERVICE**

I hereby certify that on September 22, 2026, I caused a true and correct copy of the foregoing brief to be filed electronically via the Court's ECF system, which will send notice of such filing to all counsel of record, in accordance with Local Civil Rule 5.2.

/s/ Viren Mascarenhas
Viren Mascarenhas (VM1980)
Camille Ramos-Klee (admission pending)
Mascarenhas Law
125 Park Avenue, FL 25
New York, NY 10017
+1-212-404-1486
viren@mascarenhaslaw.com
cramosklee@mascarenhaslaw.com

# Exhibit B

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------X
AMERICAN FRIENDS SERVICE COMMITTEE, ET AL.,

Plaintiffs,

v. No. 1:26-cv-06830 (JMF)

DONALD J. TRUMP, ET AL.,

Defendants.
-----------------------------------------------------------X

**[PROPOSED] ORDER**

Upon consideration of proposed *amici curiae* Amnesty International, Fédération Internationale pour les Droits Humains, and thirty-six other civil society organizations' Motion for Leave to File an *Amici Curiae* Brief in support of Plaintiffs' Motion for Preliminary Injunction, it is hereby ORDERED that *amici curiae* Amnesty International et. al.'s Motion is GRANTED.

The Clerk of Court is directed to terminate ECF No. __.

**SO ORDERED**

Dated: _________________, 2026 By:________________

HON. JESSE M. FURMAN
United States District Judge