**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| AMERICAN FRIENDS SERVICE COMMITTEE, CENTER FOR CONSTITUTIONAL RIGHTS, HUMAN RIGHTS WATCH, and OPEN SOCIETY INSTITUTE,<br><br>*Plaintiffs*,<br><br>v.<br><br>Donald J. TRUMP, in his official capacity as President of the United States; UNITED STATES DEPARTMENT OF STATE; MARCIO A. RUBIO, in his official capacity as Secretary of State; UNITED STATES DEPARTMENT OF THE TREASURY; SCOTT K. H. BESSENT, in his official capacity as Secretary of the Treasury; UNITED STATES DEPARTMENT OF JUSTICE; TODD BLANCHE, in his official capacity as Attorney General; OFFICE OF FOREIGN ASSETS CONTROL; and BRADLEY T. SMITH, in his official capacity as Director of the Office of Foreign Assets Control.<br><br>*Defendants*. | No. 26-cv-6830 (JMF) |

**BRIEF OF *AMICI CURIAE* INTERNATIONAL LAW SCHOLARS AND PRACTITIONERS IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

Michael R. Noveck (MN1098)
Lawrence S. Lustberg
John J. Gibbons Fellowship in Public Interest and Constitutional Law
**FBT Gibbons LLP**
One Gateway Center
Newark, New Jersey 07102
(973) 596-4500

*Counsel for* Amici Curiae

# TABLE OF CONTENTS

**Page(s)**


TABLE OF AUTHORITIES ........ ii

STATEMENT OF INTEREST OF *AMICI CURIAE* ........ 1

INTRODUCTION AND SUMMARY OF ARGUMENT ........ 2

ARGUMENT ........ 4

I. ACADEMIC AND PRACTICAL ENGAGEMENT WITH THE INTERNATIONAL LEGAL SPHERE, INCLUDING THE INTERNATIONAL CRIMINAL COURT, IS AN INTEGRAL PART OF CONTEMPORARY UNITED STATES LEGAL EDUCATION ........ 4

II. EO 14203 AND THE SANCTIONS REGIME IMPERMISSIBLY CHILL ACADEMIC FREEDOM THROUGHOUT UNITED STATES LAW SCHOOLS. ........ 9

A. *Amici's* Experiences Show How EO 14203 and the Sanctions Regime Constitute Retaliatory, Viewpoint-Based Discrimination. ........ 9

B. *Amici's* Experiences Show How EO 14203 and the Sanctions Regime Are Unconstitutionally Overbroad. ........ 11

CONCLUSION ........ 17

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Baggett v. Bullitt*,
377 U.S. 360 (1964)....................14

*Bantam Books, Inc. v. Sullivan*,
372 U.S. 58 (1963)....................15

*Boy Scouts of Am. v. Dale*,
530 U.S. 640 (2000)....................10

*Broadrick v. Oklahoma*,
413 U.S. 601 (1973)....................12

*Chiles v. Salazar*,
607 U.S. 627 (2026)....................9

*Dombrowski v. Pfister*,
380 U.S. 479 (1965)....................15

*FCC v. Fox Television Stations, Inc.*,
567 U.S. 239 (2012)....................14

*Grayned v. City of Rockford*,
408 U.S. 104 (1972)....................14

*Heim v. Daniel*,
81 F.4th 212 (2d Cir. 2023) .................... 13

*Holder v. Humanitarian Law Project*,
561 U.S. 1 (2010)....................9, 10

*Houston v. Hill*,
482 U.S. 451 (1987)....................11

*Keyishian v. Bd. of Regents*,
385 U.S. 589 (1967)....................13, 17

*Matal v. Tam*,
582 U.S. 218 (2017)....................9

*Open Soc'y Just. Initiative v. Trump*,
510 F. Supp. 3d 198 (S.D.N.Y. 2021)....................11, 16

*Reed v. Town of Gilbert*,
576 U.S. 155 (2015)....................9, 10

*Reno v. ACLU*,
521 U.S. 844 (1997)....................14

*Rona v. Trump*,
797 F. Supp. 3d 278 (S.D.N.Y. 2025) (Furman, J.)....................9, 11, 15, 16

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
515 U.S. 819 (1995)....................9

*Sessions v. Dimaya*,
584 U.S. 148 (2018)....................14

*Smith v. Trump*,
791 F. Supp. 3d 90 (D. Me. 2025)....................11

*Speiser v. Randall*,
357 U.S. 513 (1958)....................15

*Sweezy v. New Hampshire*,
354 U.S. 234 (1957)....................13

*United States v. Davis*,
588 U.S. 445 (2019)....................14, 16

*United States v. Playboy Entm't Grp., Inc.*,
529 U.S. 803 (2000)....................10

*United States v. Stevens*,
559 U.S. 460 (2010)....................16

*Virginia v. Black*,
538 U.S. 343 (2003)....................12

*Virginia v. Hicks*,
539 U.S. 113 (2003)....................12

*W. Va. State Bd. of Educ. v. Barnette*,
319 U.S. 624 (1943)....................10

*Wieman v. Updegraff*,
344 U.S. 183 (1952)....................13

*Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Office of the Pres.*,
784 F. Supp. 3d 127 (D.D.C. 2025)....................16

**Statutes**

50 U.S.C. §§ 1601–1651 ........................................................................................................2

International Emergency Economic Powers Act, Pub. L. No. 95-223, 91 Stat. 1625 (1977) (codified as amended at 50 U.S.C. § 1701 et seq.) ............................................2

National Emergencies Act of 1976, Pub. L. No. 94-412, 90 Stat. 1255 (1976) .............................2

**Regulations**

EO 13928 .......................................................................................................................11, 15, 16

Exec. Order No. 14203, "Imposing Sanctions on the International Criminal Court," 90 Fed. Reg. 9369 (Feb. 6, 2025)...................................................................... *passim*

**Other Authorities**

Alexa Levy, *Rohingya in Myanmar: The United Nations' Failure to Enforce Violations of Crimes Against Humanity and Genocide*, 51 GEO. WASH. INT'L L. REV. 321, 324–25 (2019)...................................................................................7

Deena R. Hurwitz, *Lawyering for Justice and the Inevitability of International Human Rights Clinics*, 28 YALE J. INT'L L. 505 (2003) .........................................................6

Jay Milbrandt, *Tracking Genocide: Persecution of the Karen in Burma*, 48 TEX. INT'L L.J. 63, 100 (2012) ...................................................................................................6

Leila Nadya Sadat & S. Richard Carden, *The New International Criminal Court: An Uneasy Revolution*, 88 GEO. L.J. 381, 405 (2000) ............................................................4

Mark Weston Janis, John E. Noyes, & Leila Nadya Sadat, eds., *International Law: Cases and Commentary* 565–78 (7th ed. 2025).............................................................5

S. Res. 546 (2022).........................................................................................................................5

Leila N. Sadat & Mark A. Drumbl, *The United States and the International Criminal Court: A Complicated, Uneasy, Yet at Times Engaging Relationship* 4–8, Wash. U. in St. Louis Legal Studies Research Paper Series (2016), https://bit.ly/4hDs7TH ...................................................................................................5

**Constitutional Provisions**

First Amendment ..................................................................................................... *passim*

**STATEMENT OF INTEREST OF *AMICI CURIAE***

*Amici Curiae* respectfully submit this brief, and the accompanying Declaration of Michael R. Noveck ("Noveck Decl."), in support of Plaintiffs' Motion for a Preliminary Injunction (ECF No. 40).[1]

*Amici* are law school professors, scholars, and practitioners across thirteen law schools whose teaching, scholarship, and professional engagement focus on international law, international human rights, constitutional law, international criminal law, and related fields. *See* Noveck Decl. ¶¶ 5–20. Many teach doctrinal courses implicating international law in some way; others direct or supervise international human rights law clinics in which students engage directly with international legal institutions and proceedings. *Amici*'s scholarly and professional work involves sustained engagement with numerous international legal institutions, including the International Criminal Court ("ICC"), the United Nations and its associated agencies, and other international and regional tribunals.

*Amici* have a direct professional and pedagogical interest in the resolution of this case. The Sanctions Regime established under Executive Order 14203, "Imposing Sanctions on the International Criminal Court," 90 Fed. Reg. 9369 (Feb. 6, 2025) ("EO 14203" or "the Executive Order"), directly impairs *Amici's* ability to teach, conduct research, collaborate within the international legal sphere, and effectively prepare their students for the practice of law.[2] As well,

[1] This brief is timely filed under the schedule agreed upon by the parties and endorsed by the Court. *See* ECF No. 49. Plaintiffs have consented to the filing of this brief; Defendants take no position on *Amici*'s motion. No party or party's counsel authored this brief in whole or in part, and no person or entity contributed money to fund the preparation or submission of this brief other than *Amici* and their counsel.

[2] As Plaintiffs explain, the Sanctions Regime encompasses EO 14203, the designations of sanctioned individuals and entities thereunder, and the EO's implementing regulations. ECF No. 41 at 1.

the Executive Order chills the academic freedom that lies at the heart of *Amici's* professional mission and threatens to diminish the quality of the legal education they provide at law schools across the country. *Amici* here seek to apprise the Court of their unique perspective as legal educators as it applies to this matter.

**INTRODUCTION AND SUMMARY OF ARGUMENT**

On February 6, 2025, President Trump issued Executive Order 14203, "Imposing Sanctions on the International Criminal Court" ("EO 14203"). EO 14203 declared a national emergency under the National Emergencies Act of 1976 (NEA), Pub. L. No. 94-412, 90 Stat. 1255 (1976) (codified as amended at 50 U.S.C. §§ 1601–1651), and stated that the International Criminal Court ("ICC") poses "an unusual and extraordinary threat to the national security and foreign policy of the United States" under the International Emergency Economic Powers Act (IEEPA), Pub. L. No. 95-223, 91 Stat. 1625 (1977) (codified as amended at 50 U.S.C. § 1701 et seq.). Exec. Order No. 14203, 90 Fed. Reg. 9369 (Feb. 6, 2025). The Executive Order authorized broad sanctions against persons associated with certain investigations by the ICC, targeting ICC judges, prosecutors, a United Nations Special Rapporteur, and human rights organizations. Among other prohibitions, the Sanctions Regime forbids providing "services to, or for the benefit of" these designated persons, under threat of severe criminal and civil penalties. *Id.* § (a).

*Amici* are law professors whose scholarly and professional work involves engagement within the international legal sphere in numerous ways. The Sanctions Regime strikes at the heart of *Amici*'s academic freedom by chilling their ability to engage with international legal institutions, teach about international law, collaborate with United Nations experts and ICC personnel, including any designated persons or entities, and effectively prepare their students for law careers that may implicate international law.

*Amici* participate in this case to emphasize two fundamental ways in which the Sanctions Regime undermines their work specifically and, more broadly, eviscerates certain fundamental constitutional protections. *First*, academic and practical engagement with the international legal sphere is an integral part of contemporary American legal education. Law schools across the country offer courses on international law, operate clinics that engage with international tribunals, and depend on faculty collaboration with international legal actors—including ICC officials and United Nations Special Rapporteurs—as essential components of their pedagogical mission. The Executive Order punishes and chills this activity.

*Second*, the Executive Order impermissibly constrains academic freedom throughout law schools in the United States. The Executive Order constitutes content-based and viewpoint-based discrimination that implicates *Amici's* rights to speak, to associate, and to pursue their scholarly, pedagogical, and advocacy work. The restrictions prevent *Amici* from inviting ICC officials to speak at their law schools, collaborating with designated persons and entities on scholarly publications, supervising student research involving ICC proceedings, and engaging within other international legal institutions. Indeed, the overbreadth and vagueness of the Executive Order's provisions leave *Amici* unable to determine whether even routine academic activities may expose them to criminal and civil liability.

The practical consequences are manifold and profound. Academics throughout United States law schools cannot speak without the threat of United States government sanctions being imposed upon them, as a result of which a generation of lawyers will lose out on important aspects of their legal education, as well as exceptional career opportunities, and will accordingly be less prepared to participate within the international legal order; less equipped to serve in government positions requiring international law expertise; and ultimately less capable of advancing United

States interests abroad. In particular, the EO threatens to set back progress in advancing international human rights—not only today, but for generations to come. And it does so in a way that violates the First Amendment and Due Process, as embodied in the void-for-vagueness doctrine.

For all the reasons described herein, and in Plaintiffs' preliminary injunction brief, this Court should grant Plaintiffs' Motion for a Preliminary Injunction.

## ARGUMENT

### I. ACADEMIC AND PRACTICAL ENGAGEMENT WITH THE INTERNATIONAL LEGAL SPHERE, INCLUDING THE INTERNATIONAL CRIMINAL COURT, IS AN INTEGRAL PART OF CONTEMPORARY UNITED STATES LEGAL EDUCATION.

*Amici*'s institutional affiliations span across thirteen law schools in the United States, albeit only a fraction of the vast majority of American Bar Association-accredited law schools that offer courses involving international law. The study and practice of international law—including international criminal law, public international law, international human rights law, refugee and asylum law, the law of armed conflict, and other related fields—has increasingly become a core component of modern legal education in the United States; indeed, many law schools require students to complete a course in international law to graduate. Faculty research and publishing on these topics is robust. And clinical programs increasingly send students to engage with international courts and tribunals, including the ICC, as an indispensable form of experiential learning.

Certainly, the ICC occupies a central place in the international legal ecosystem. Established by the adoption of the Rome Statute in 1998, the ICC exercises jurisdiction over genocide, crimes against humanity, war crimes, and, in a more limited way, the crime of aggression. *See* Leila Nadya Sadat & S. Richard Carden, *The New International Criminal Court:*

*An Uneasy Revolution*, 88 GEO. L.J. 381, 405 (2000). Understanding the ICC's jurisdiction, procedures, and jurisprudence is critical for students pursuing careers in international law, human rights, national security, diplomacy, or military justice. *See generally* Mark Weston Janis, John E. Noyes, & Leila Nadya Sadat, eds., *International Law: Cases and Commentary* 565–78 (7th ed. 2025). To be sure, the United States voted against the treaty establishing the ICC and has not ratified the Rome Statute. Sadat & Carden, 88 GEO. L.J. at 384. But the U.S. government has itself supported and cooperated with ICC investigations in multiple contexts—including investigations concerning Darfur, Uganda, the Democratic Republic of the Congo, and Ukraine—underscoring the institution's significance to American foreign policy and national security interests. *See, e.g.*, Leila N. Sadat & Mark A. Drumbl, *The United States and the International Criminal Court: A Complicated, Uneasy, Yet at Times Engaging Relationship* 4–8, Wash. U. in St. Louis Legal Studies Research Paper Series (2016), https://bit.ly/4hDs7TH; Lolita C. Baldor, *U.S. doubles effort to search for fugitive warlord Kony*, Associated Press, Mar. 24, 2014, https://bit.ly/4yQHeyO (describing United States effort to find Ugandan war criminal who had been indicted by the ICC); Human Rights Watch, *Q&A: The LRA Commander Dominic Ongwen and the ICC*, Jan. 27, 2021, https://bit.ly/4hG5wFY (describing United States assistance in arresting Congolese rebel leader for prosecution at the ICC); S. Res. 546 (2022) (resolution expressing sense of the Senate "encourag[ing] member states to petition the ICC or other appropriate international tribunal to take any appropriate steps to investigate war crimes and crimes against humanity committed by the Russian Armed Forces" in Ukraine); Press Release, U.S.

Senate Committee on the Judiciary, *Durbin, Graham, Grassley Meet with ICC Chief Prosecutor* (May 10, 2023), https://bit.ly/4hHw1Li.[3]

Accordingly, academic and practical engagement with ICC officials, United Nations Special Rapporteurs (one of whom is a designated person), and human rights organizations (several of which are designated entities), are not peripheral activities, but instead constitute essential parts of the scholarly mission and pedagogical responsibility of law professors who teach in these fields. *Amici* routinely invite international legal actors to deliver guest lectures, participate in panels, and collaborate on scholarly publications. *See* Noveck Decl. ¶¶ 6–20. They work with United Nations Special Rapporteurs, ICC personnel, and other human rights organizations in the course of both their research and their clinical teaching. *See id.*

Clinical legal education, in particular, depends on practical engagement within the international legal sphere. Human rights clinics throughout American law schools represent clients before international tribunals, prepare briefs in international legal proceedings, draft witness statements, assist with victim participation applications, and supervise student participation in sessions of the Assembly of States Parties, which is the ICC's governing body. This type of work is at the heart of experiential learning in this field. *See* Deena R. Hurwitz, *Lawyering for Justice and the Inevitability of International Human Rights Clinics*, 28 YALE J. INT'L L. 505 (2003) (documenting the growth and importance of international human rights clinics in legal education). Not only do these clinics train future lawyers; they also promote United States interests in justice and peace and provide meaningful assistance to victims of war crimes. *See, e.g.*, Jay Milbrandt, *Tracking Genocide: Persecution of the Karen in Burma*, 48 TEX. INT'L L.J. 63, 100 (2012)

[3] *See generally* Am. Soc'y of Int'l Law, *ASIL Task Force on Policy Options for U.S. Engagement with the ICC* 13–25 (2001), https://bit.ly/4yVOJ7S (discussing history of United States engagement with the ICC).

(discussing work of the International Human Rights Clinic at Harvard Law School in Burma); Alexa Levy, *Rohingya in Myanmar: The United Nations' Failure to Enforce Violations of Crimes Against Humanity and Genocide*, 51 GEO. WASH. INT'L L. REV. 321, 324–25 (2019) (discussing work of the International Human Rights Clinic at Yale Law School in Myanmar).

The breadth of academic engagement with the international legal sphere is significant. Law professors across the country collaborate with colleagues at universities abroad, participate in conferences organized by international organizations, contribute to scholarly journals that address—among other things—ICC jurisprudence, and train students to navigate the complex intersections of international and domestic law. *See, e.g.*, Noveck Decl. ¶¶ 6–20. This ecosystem of academic engagement is integral to the mission of American legal education and critical to the nation's ability to produce lawyers capable of operating within the international legal order.

In particular, this engagement is reflected in the varied experiences of *Amici*, whose work is implicated by the Executive Order. For example, *Amici* have held formal positions with the ICC or otherwise directly interacted with the court: Leila Sadat as the Special Adviser on Crimes Against Humanity to two International Criminal Court Prosecutors, and Philip Alston as former United Nations Human Rights Council Special Rapporteur on extrajudicial, summary or arbitrary executions who persuaded the court to take up the cases in Kenya following his mission to the country after the post-election violence in 2007. Noveck Decl. ¶¶ 8, 16. Several *Amici*—Hannah Garry, Michael Scharf, and Milena Sterio—have filed *amicus* briefs and made in-person *amicus* arguments before the ICC. *Id.* ¶¶ 13, 18, 19. Other *Amici*—Susan Akram, Sandra Babcock, Asli Bali, James Cavallaro, Thomas Becker, Hannah Garry, Darryl Li, Michael Scharf, and Milena Sterio—have submitted research briefs and memoranda to the ICC or to other persons or entities sanctioned by EO 14203, often in collaboration with their students. *Id.* ¶¶ 7, 9, 10, 12, 13, 15, 18,

19. These submissions have been sent to the United Nations Special Rapporteur Francesca Albanese (a sanctioned person), the three most prominent Palestinian human rights organizations (sanctioned entities), and the ICC and its staff (also sanctioned persons and entities).

But the EO is interfering with their work. For example, *Amici* have wanted to invite sanctioned individuals to their classes, and to participate in conferences with them, so that students and scholars can learn from them; those efforts are hindered by the Sanctions Regime. *Id.* ¶¶ 6, 10, 14, 15, 16, 17 (discussing experiences of Tendayi Achiume, Asli Bali, Maryam Jamshidi, Darryl Li, Leila Sadat, and Wadie Said in being denied opportunities to appear at conferences with Francesca Albanese, Palestine Centre for Human Rights, and Al-Haq, all of which have been sanctioned). *Amici* Lisa Bhungalia and Chantal Thomas have tried to conduct academic research to avoid conflicts with EO 14203, but Professor Bhungalia's work was blocked by her employer's Institutional Review Board, and Professor Thomas has curtailed the activities of the Clarke Initiative for Law and Development in the Middle East and North Africa, where she is the Faculty Director. *Id.* ¶¶ 11, 20. Several *Amici*—Tendayi Achiume, Sandra Babcock, Hannah Garry, Darryl Li, Leila Sadat, Michael Scharf, and Chantal Thomas—have in the past assisted their students to obtain coveted internships and jobs with the ICC and other sanctioned entities. *Id.* ¶¶ 6, 9, 13, 15, 16, 18, 20. The Sanctions Regime has halted all of this activity.

In short, engagement with the ICC, United Nations mechanisms, and the broader international legal sphere is not a marginal aspect of legal education. It is a core component of the curriculum at law schools across the United States, and is essential to the preparation of the next generation of lawyers, diplomats, policymakers, and military officers who will represent and advance American interests within the international legal order. That conduct cannot continue while EO 14203 and the Sanctions Regime remain in place.

## II. EO 14203 AND THE SANCTIONS REGIME IMPERMISSIBLY CHILL ACADEMIC FREEDOM THROUGHOUT UNITED STATES LAW SCHOOLS.

### A. *Amici's* Experiences Show How EO 14203 and the Sanctions Regime Constitute Retaliatory, Viewpoint-Based Discrimination.

The Sanctions Regime constitutes content-based and viewpoint-based discrimination; it is also unconstitutionally overbroad and vague on its face.

*First*, the EO discriminates on the basis of content and viewpoint. The EO restricts speech only when it constitutes "services . . . to, or for the benefit of" designated persons. EO 14203, § 3. This determination is inherently content-based, requiring the government to examine the substance and purpose of *Amici's* expression. *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015) (a regulation is content-based if it "applies to particular speech because of the topic discussed or the idea or message expressed"); *see also Rona v. Trump*, 797 F. Supp. 3d 278 (S.D.N.Y. 2025) (Furman, J.) (specifically finding EO 14203's restrictions on speech to be content-based).

The restrictions are also viewpoint-based. Because the EO prohibits speech that is "for the benefit of" the ICC's work, it prohibits speech that supports or advances the ICC's work while permitting speech that opposes it. Thus, for example, a law professor may freely publish an article condemning the ICC's exercise of jurisdiction, but may not publish one offering legal analysis that could be characterized as a "service" to the ICC or its designated personnel. This is precisely the kind of viewpoint discrimination that the First Amendment prohibits. *See Chiles v. Salazar*, 607 U.S. 627, 692 (2026); *Holder v. Humanitarian Law Project*, 561 U.S. 1, 26 (2010); *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995). Thus, the government "must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Rosenberger*, 515 U.S. at 829. If the government fails to remain content-neutral, punishment of disfavored viewpoints "can be turned against minority and dissenting views to the detriment of all." *Matal v. Tam*, 582 U.S. 218, 253–54 (2017)

(Kennedy, J., concurring in part and concurring in the judgment); *see also W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943) ("If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion.").

Content- and viewpoint-based discrimination are presumptively unconstitutional and must survive strict scrutiny. *Reed*, 576 U.S. at 163. To prevail, the Government must demonstrate that there is no "less restrictive alternative" that would achieve a compelling interest. *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 813 (2000). Even assuming the Government can establish a compelling national security interest in preventing assistance to the ICC, which *Amici* agree with Plaintiffs it has not done, it cannot meet this constitutional standard. That is, even when the government possesses a compelling interest in restricting support to designated entities of national security concern, the Constitution nonetheless permits the Government to ban "only material support" to a sanctioned entity and prohibits regulation of "[i]ndependent advocacy." *Holder*, 561 U.S. at 31–32; *accord id.* at 36, 39. EO 14203 obliterates this distinction between unlawful support and independent advocacy; to the contrary, it prohibits all advocacy, as well as other interactions with designated persons and entities, regardless of the speaker's coordination with the sanctioned person or entity. Indeed, even benign social relationships may be affected. *See* Noveck Decl. ¶ 15 (discussing how for *amicus* Darryl Li, "[e]ven his personal relationships—expressing concern for families, well wishes for holidays, and so on—have to be managed carefully with an eye to potential IEEPA consequences").[4]

[4] The Sanctions Regime, in this and other ways, also infringes *Amici's* associational rights under the First Amendment. The freedom of association protects the right to join with others in pursuit of shared expressive objectives. *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 647 (2000) ("[I]mplicit in the right to engage in activities protected by the First Amendment is a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational,

District courts, including this one, have accordingly rejected EO 14203 and the Sanctions Regime on this ground. In 2025, two law professors challenged EO 14203 and its application to their interactions with Karim Khan, the Prosecutor of the ICC, on First Amendment grounds. *Rona*, 797 F. Supp. 3d 278. This Court explained that another judge in the Southern District of New York had previously held a similar executive order from President Trump's first term, EO 13928, unconstitutional under the First Amendment. *Id.* at 283–84 (discussing *Open Soc'y Just. Initiative v. Trump*, 510 F. Supp. 3d 198 (S.D.N.Y. 2021)). Analyzing EO 14203, the Court determined that it "regulates speech based on its content" because "whether Plaintiffs may engage in such speech depends on what they say." *Id.* at 288–89 (citation modified). Applying strict scrutiny, the Court concluded that EO 14203 "unnecessarily circumscribes Plaintiffs' protected expression," so it "violates the First Amendment." *Id.* at 292 (citation modified).[5]

### B. *Amici's* Experiences Show How EO 14203 and the Sanctions Regime Are Unconstitutionally Overbroad.

EO 14203 and the Sanctions Regime also fail constitutional scrutiny because they are overbroad.

A facial overbreadth challenge requires a court to determine whether the law reaches "a substantial amount of constitutionally protected speech." *Houston v. Hill*, 482 U.S. 451, 466

religious, and cultural ends."). But the Sanctions Regime impairs *Amici's* ability to associate with students, colleagues, non-governmental organizations, and international actors in pursuit of shared academic and advocacy objectives. It disrupts the collaborative relationships that are the lifeblood of legal scholarship and clinical legal education. For this reason, EO 14203 cannot survive the heightened scrutiny that applies to free association claims, as well as free speech claims. *See id.* at 658–59 (explaining that courts evaluating a free association claim must consider "the associational interest in freedom of expression . . . on one side of the scale, and the State's interest on the other").

[5] In the District of Maine, Judge Torrensen found it unnecessary to determine whether to apply strict scrutiny to EO 14203. She concluded that EO 14203 "fails even intermediate scrutiny" and likely violated the First Amendment because it "appears to burden substantially more speech than necessary." *Smith v. Trump*, 791 F. Supp. 3d 90, 97–98 (D. Me. 2025).

(1987). Specifically, a law may be "invalidated on its face," *Virginia v. Black*, 538 U.S. 343, 375 (2003) (quoting *Houston*, 482 U.S. at 458), where it "punishes a substantial amount of protected free speech, judged in relation to the statute's plainly legitimate sweep." *Virginia v. Hicks*, 539 U.S. 113, 118–19 (2003) (citation modified) (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 615 (1973)). EO 14203 fails this standard.

EO 14203 provides that once a person or entity is designated by the Secretary of State, others cannot engage in any activity "for the benefit of" that person or entity. EO 14203 § 3(a). So conceived, the Executive Order chills a wide range of core academic activities: inviting ICC officials or designated persons to speak at law schools as guest lecturers; collaborating with designated persons on scholarly publications or research projects; presenting research at academic conferences where designated persons or entities participate; engaging with United Nations Special Rapporteurs on matters within their mandates; filing *amicus curiae* briefs in ICC proceedings; and supervising student clinical work that involves interaction with designated persons or entities.

*Amici*'s experience shows how the overbreadth of the Sanctions Regime affects their routine academic, professional, and personal activities. As described above, *Amici* have been forced to stop filing briefs and presenting oral arguments at the ICC, advising the ICC in other ways, submitting materials to the ICC or other sanctioned persons and entities, interacting with sanctioned persons and entities in academic, pedagogical, and social settings, conducting academic research, and advancing students' careers in international criminal and human rights law. *See supra* at 7–8.

And, as is also described above, these activities are essential to *Amici*'s academic freedom and to their pedagogical efforts to educate their students. Such activities, of course, enjoy special

First Amendment protection. *See, e.g.*, *Wieman v. Updegraff*, 344 U.S. 183, 195 (1952) (Frankfurter, J., concurring) (explaining that "unwarranted inhibition upon the free spirit of teachers" though restrictions on their speech and association "has an unmistakeable tendency to chill that free play of the spirit which all teachers ought especially to cultivate and practice"). Indeed, the Supreme Court has identified academic freedom to be "a special concern of the First Amendment." *Keyishian v. Bd. of Regents*, 385 U.S. 589, 603 (1967). As the Court held in *Sweezy v. New Hampshire*, 354 U.S. 234 (1957), "[t]eachers and students must always remain free to inquire, to study and to evaluate" without government interference; "otherwise our civilization will stagnate and die." *Id.* at 250; *see also Heim v. Daniel*, 81 F.4th 212, 226–27 (2d Cir. 2023) ("[P]rofessors at public universities are paid—if perhaps not exclusively, then predominantly—to speak, and to speak freely, guided by their own professional expertise, on subjects within their academic disciplines.").

More generally, though, EO 14203 prescribes draconian punishments based on wholly vague language: it imposes sanctions on foreign persons who are deemed to have "directly engaged" or "materially assisted, sponsored, or provided financial, material, or technological support for, or goods or services to or in support of," or were "owned or controlled by, or . . . have acted or purported to act for or on behalf of, directly or indirectly" the ICC's efforts to "investigate, arrest, detain or prosecute a protected person without consent of that person's country of nationality." EO 14203 § 1. When a person is sanctioned under EO 14203, others are prohibited from "making any contribution or provision of funds, goods, or services . . . for the benefit of" the person. *Amici* now must ask themselves questions like: Can we assign a designated person's published work to students? Can we discuss a designated judge's rulings in class? Can we supervise a student who wishes to prepare an *amicus* brief in an ICC proceeding? Can we invite

a designated prosecutor to deliver a guest lecture by videoconference? The Executive Order provides inadequate guidance with respect to answering these and other questions.

The First Amendment does not, however, tolerate such ambiguity. "Vague laws force potential speakers to 'steer far wider of the unlawful zone' . . . than if the boundaries of the forbidden areas were clearly marked." *Reno v. ACLU*, 521 U.S. 844, 871–72 (1997) (quoting *Baggett v. Bullitt*, 377 U.S. 360, 372 (1964)). And the absence of clear boundaries is itself a First Amendment injury, because it "delegates basic policy matters . . . for resolution on an ad hoc and subjective basis." *Grayned v. City of Rockford*, 408 U.S. 104, 108–09 (1972). More fundamentally, Due Process requires "fair notice of what the law demands." *United States v. Davis*, 588 U.S. 445, 451 (2019). The void-for-vagueness doctrine thus prevents "arbitrary or discriminatory law enforcement by insisting that [the Government] provide standards to govern the actions of" government agents. *Sessions v. Dimaya*, 584 U.S. 148, 156 (2018). And particularly "in the First Amendment context," as in this case, the "need for precision" is at its apex. *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253–54 (2012); *see also Reno*, 521 U.S. at 870–71. By creating an imprecise landscape for compliance, EO 14203 utterly fails these requirements.

The EO's vague and overbroad scope is only amplified by the severe punishments that attach to it. Indeed, the penalties authorized by EO 14203—asset freezes, transactional prohibitions, and potential criminal liability—are among the most powerful weapons in the Government's arsenal, typically reserved for individuals who commit acts of terrorism or other serious crimes, not international civil servants and law professors. When the potential consequences for violations are so significant, it causes rational actors to "steer far wider of the unlawful zone" in fear of potential ramification. *Speiser v. Randall*, 357 U.S. 513, 526 (1958).

But the Supreme Court has consistently held that government actions producing such chilling effects are as constitutionally impermissible as direct censorship. *See Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67 (1963). As the Court recognized in *Dombrowski v. Pfister*, 380 U.S. 479, 487 (1965), "[t]he threat of sanctions may deter . . . almost as potently as the actual application of sanctions," and the "chilling effect upon the exercise of First Amendment rights" created by severe penalties demands judicial intervention.

Here, the sanctions' severity has had a dramatic chilling effect, dissuading faculty and students across the country from engaging in expressive activities constituting the crux of their academic work. Any professor who teaches international criminal law, human rights law, or public international law must now consider whether routine pedagogical activities—assigning readings, inviting guest speakers, supervising clinical work, presenting at conferences—might expose them or their students to sanctions. And the practical consequence of the Sanctions Regime, if left unchecked, is a generation of American lawyers less prepared to participate in the international legal order, less equipped to serve in government positions requiring international law expertise, and less capable of advancing United States interests on the world stage.

For this reason, courts (including this Court) have specifically held EO 14203 (and its predecessor from the first Trump Administration, EO 13928) unconstitutional precisely on First Amendment grounds. In *Rona*, this Court determined that the EO's "broad scope" encompassed actions that were "indisputably speech," including interactions between the law professors and Karim Khan, the then-Prosecutor of the ICC, that closely parallel *Amici*'s interactions with sanctioned individuals and entities. 797 F. Supp. 3d at 289 (finding that interacting with witnesses and victims of international crimes to support ongoing investigations, submitting *amicus curiae* briefs, and communicating with the SDN with respect to internships and jobs were activities that

fell within the scope of EO 14203); *see also Open Society Justice Initiative*, 510 F. Supp. 3d at 210 (noting various speech activities covered by the prior EO 13928). During the *Rona* litigation, the government conceded that under EO 14203, a person who transmitted an *amicus* brief "drafted at the specific request of and in coordination with" a designated person or organization could be subject to sanctions. *See Rona*, 797 F. Supp. 3d at 290. That EO 14203 has been found to extend to the preparation and filing of litigation documents—paradigmatic First Amendment activity—exposes the vast extent of its reach. *See Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Office of the Pres.*, 784 F. Supp. 3d 127, 156 (D.D.C. 2025) ("Filing and pursuing lawsuits are forms of protected petitioning." (citing cases)). The *Rona* Court's conclusions also illustrate the risks to *Amici* should they test the limits of EO 14203 by interacting with others in the ecosystem of international criminal and human rights law—the very core of *Amici*'s work.

Finally, to whatever extent Defendants argue that they will not apply EO 14203's provisions to protected activity, that argument also fails to satisfy the overbreadth doctrine. In *United States v. Stevens*, 559 U.S. 460 (2010), the Government promised that it would exercise "prosecutorial discretion" and "apply [the statute] far more restrictively than its language." *Id.* at 480. The Court rejected the argument that these assurances saved the statute. To the contrary, the Court held that the Government's position was "an implicit acknowledgment of the potential constitutional problems with a more natural reading" of the statute's terms. *Id.* Thus, governmental "professions of good will" are not enough for EO 14203 to survive constitutional scrutiny. *Rona*, 797 F. Supp. 3d at 289.[6]

[6] Indeed, the Supreme Court has declined to adopt a "fairly possible" reading of a statute to save it from being held unconstitutionally vague. *Davis*, 588 U.S. at 463. Specifically, the Supreme Court rejected the Government's invitation to construe the scope of a statute in such a way that would lead the statute to properly reach certain conduct, solely to prevent it from being held unconstitutional by the Court. *See id.* at 464 ("[A] court may not . . . construe a criminal

In sum, EO 14203 and the Sanctions Regime do not merely restrict the speech of a discrete set of individuals; they reshape the landscape of legal education in the United States by deterring an entire field of scholarly and pedagogical activity that is critical not just internationally but also domestically. Here, the sanctions imposed by EO 14203 silence academic and practical engagement with the international legal sphere through the threat of devastating financial and criminal penalties. These restrictions stifle the continued marketplace of ideas that is critical to the academic setting. Those restrictions are the direct result of the Executive Order's vague and overbroad terms. This Court should not permit the Sanctions Regime to continue casting its shadow over the nation's law school classrooms and clinics. The Court should therefore invalidate EO 14203 as violative of the First Amendment's prohibition on overbroad and vague regulation of protected speech.

## CONCLUSION

As scholars, teachers, and practitioners of international law, *Amici* have devoted their professional lives to educating the next generation of lawyers in the principles and practice of international law, human rights, and constitutional governance. The Sanctions Regime established by Executive Order 14203 strikes at the heart of that mission. It chills the academic freedom that the Supreme Court has recognized as "of transcendent value to all of us," *Keyishian*, 385 U.S. at 603, and it threatens to diminish the quality of legal education at law schools across the United States at a time when the need for lawyers trained in international law has never been greater. Accordingly, the stakes of this case extend beyond the individual Plaintiffs. They reach into every law school classroom where international criminal law is taught, every clinic where students

---

statute to penalize conduct it does not clearly proscribe."). Accordingly, neither governmental professions of good will nor judicial construction may cure the unconstitutionality of a statute's vague provisions.

engage with international tribunals, and every faculty office where a professor weighs whether an invitation to a guest speaker, a collaborative research project, or the assignment of a published report might expose her to criminal liability. The Court should not permit such a regime to continue.

Dated: September 23, 2026

Respectfully submitted,

*s/ Michael R. Noveck*
Michael R. Noveck (MN1098)
Lawrence S. Lustberg
**FBT Gibbons LLP**
One Gateway Center
Newark, NJ 07102
(973) 596-4500
mnoveck@fbtgibbons.com
llustberg@fbtgibbons.com