**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

AMERICAN FRIENDS SERVICE COMMITTEE, CENTER FOR CONSTITUTIONAL RIGHTS, HUMAN RIGHTS WATCH, and OPEN SOCIETY INSTITUTE,

Plaintiffs,

v.

DONALD J. TRUMP, et al.,

Defendants.

Civil Action No. 26-cv-6830

Hon. Jesse M. Furman

**BRIEF OF FORMER U.S. AMBASSADORS-AT-LARGE FOR WAR CRIMES ISSUES/GLOBAL CRIMINAL JUSTICE AND PROSECUTORS OF INTERNATIONAL CRIMINAL TRIBUNALS AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

September 24, 2026

Daniel Z. Purisch
DANIEL Z. PURISCH B.V.
Oder 20, Unit A1824
2491 DC The Hague, Netherlands
(949) 482-1089
daniel@danielpurisch.com

Manuela Londoño
INTERNATIONAL JUSTICE COUNSEL
13 rue de Phalsbourg
75017 Paris, France
(954) 330-5232
mlondono@ijusticec.com

*Counsel for Amici Curiae*

# TABLE OF CONTENTS

**TABLE OF AUTHORITIES** ........ iii

**INTERESTS OF *AMICI CURIAE*** ........ 1

**ARGUMENT** ........ 2

- **I. THE PROST AMICUS BRIEF'S ARGUMENTS AND RECORD APPLY WITH EQUAL FORCE IN THE PRESENT CASE** ........ 2
- **II. THE UNITED STATES HAS LONG SUPPORTED, FUNDED, AND WORKED ALONGSIDE CIVIL SOCIETY ORGANIZATIONS LIKE THOSE THE SANCTIONS REGIME NOW TARGETS** ........ 4

**CONCLUSION** ........ 8

# TABLE OF AUTHORITIES

## CASES

*Democracy for the Arab World Now, Inc. v. Trump*, No. 1:26-cv-05957-JMF (S.D.N.Y. July 15, 2026) ........ 1

*Prost v. Trump*, No. 1:26-cv-05305-JMF (S.D.N.Y. June 24, 2026) ........ 1

## STATUTES

American Servicemembers' Protection Act of 2002, 22 U.S.C. §§ 7421-7433 ........ 4

Elie Wiesel Genocide and Atrocities Prevention Act of 2018, Pub. L. No. 115-441, 132 Stat. 5586 (2019) ........ 5, 6

International Emergency Economic Powers Act of 1977, 50 U.S.C. §§ 1701-1707 ........ 4

## OTHER AUTHORITIES

Am. Soc'y Int'l L., *ASIL Task Force on Policy Options for U.S. Engagement with the ICC* 59 (2021) ........ 8

Ambassador Beth Van Schaack, *Statement of the United States at the 22nd Session of the Assembly of States Parties of the International Criminal Court* (Dec. 8, 2023) ........ 6

Ambassador Stephen J. Rapp, *Active U.S. Engagement with the International Criminal Court Can Further the American Commitment to Accountability for Atrocity Crimes While Protecting American Interests*, Testimony Before the Subcomm. on Courts, Intellectual Property, Artificial Intelligence, and the Internet of the H. Comm. on the Judiciary, 119th Cong. (Sept. 15, 2026) 2

Ambassador Stephen J. Rapp, *The ICC is "Not the Threat Rubio Thinks it is," Says Former US Ambassador-at-Large for War Crimes Issues*, CNN (July 27, 2026) ........ 2

David M. Crane, *Only Authoritarians Fear International Justice*, JURIST (July 14, 2026) ........ 2

Executive Order 14,203 of Feb. 6, 2025*, Imposing Sanctions on the International Criminal Court*, 90 Fed. Reg. 9369 (Feb. 12, 2025) ........ 2, 4

Just Security, *What Does the Trump Administration Statement on Dismantling the ICC Really Mean?* (July 14, 2026) ........ 2

U.S. Dep't of State, *2022 Report to Congress Pursuant to Section 5 of the Elie Wiesel Genocide and Atrocities Prevention Act of 2018 (P.L. 115-441)* (July 15, 2022) ........ 6, 7

U.S. Dep't of State, *2024 Report to Congress on Section 5 of the Elie Wiesel Genocide and Atrocities Prevention Act of 2018 (P.L. 115-441) [as amended]* (July 10, 2024) ...................... 7

U.S. Dep't of State, *Supporting Justice and Accountability in Ukraine* (Feb. 18, 2023) ........... 6, 7

## **INTERESTS OF *AMICI CURIAE***

*Amici Curiae* are former United States Ambassadors-at-Large for War Crimes Issues (later renamed Ambassadors-at-Large for Global Criminal Justice) and/or Chief Prosecutors of international criminal tribunals: Ambassador Beth Van Schaack, Ambassador Stephen J. Rapp, Colonel (Ret.) Brenda J. Hollis, and Professor David M. Crane. They are the same *amici* who submitted a brief in support of the Motion for Preliminary Injunction in the related case, *Prost v. Trump*, No. 1:26-cv-05305-JMF (S.D.N.Y. June 24, 2026). *See* Brief of Former U.S. Ambassadors-at-Large for War Crimes Issues/Global Criminal Justice and Prosecutors of International Criminal Tribunals as *Amici Curiae* in Support of Plaintiffs' Motion for Preliminary Injunction, *Prost*, ECF No. 46 ("Prost Amicus Br."), annexed hereto as Annex 1.

This Court has observed the substantial overlap between the claims and arguments raised in this case, in *Prost*, and in *Democracy for the Arab World Now, Inc. v. Trump*, No. 1:26-cv-05957-JMF (S.D.N.Y. July 15, 2026) and has encouraged the parties to incorporate their prior briefing by reference rather than duplicate it. Order, ECF No. 47 (Sept. 3, 2026). *Amici* respectfully take the same approach here. Rather than restate the historical, legislative, and institutional record set out in the Prost Amicus Brief, *amici* annex that brief as Annex 1, and submit this brief to explain why its arguments and record remain directly relevant to the preliminary injunction motion of Plaintiffs American Friends Service Committee ("AFSC"), Center for Constitutional Rights ("CCR"), Human Rights Watch ("HRW"), and Open Society Institute ("OSI"), and to add a discrete point specific to civil society organizations ("CSOs") that *amici* are well positioned to address.

As in *Prost*, *amici* do not repeat Plaintiffs' merits arguments here. Plaintiffs' motion challenges the same sanctions regime (the "Sanctions Regime") under Executive Order 14,203 of Feb. 6, 2025*, Imposing Sanctions on the International Criminal Court*, 90 Fed. Reg. 9369 (Feb.

12, 2025) ("EO 14,203" or the "Executive Order"), levied under the same purported national emergency. *Amici*'s collective experience leading United States engagement with the International Criminal Court ("ICC") and personally prosecuting the gravest international crimes provides them with unique insight into the United States' longstanding efforts *vis-à-vis* the international criminal justice project that the coercive economic measures at issue here directly threaten. Additionally, *amici* can attest to the United States' overall constructive relationship with the ICC in years past and how the United States has funded, supported, and encouraged civil society organizations contributing to international criminal justice, including the very activities that the Administration now alleges are an "unusual and extraordinary" national emergency. *Amici*'s unique perspective is therefore equally relevant to the common questions between this case and *Prost*, regardless of whether the immediate plaintiffs before the Court are ICC judges or the civil society organizations that support the ICC's work.[1]

## ARGUMENT

### I. THE PROST AMICUS BRIEF'S ARGUMENTS AND RECORD APPLY WITH EQUAL FORCE IN THE PRESENT CASE

The Prost Amicus Brief made three main arguments, all of which apply regardless of whether the Plaintiffs challenging the Sanctions Regime are ICC judges or civil society organizations supporting the ICC's work.

First, the Prost Amicus Brief emphasized how judicial and prosecutorial independence is

[1] *Amici* also respectfully point the Court to their recent testimony, interviews, statements, and articles on topics relevant to these proceedings. *See* Ambassador Stephen J. Rapp, *Active U.S. Engagement with the International Criminal Court Can Further the American Commitment to Accountability for Atrocity Crimes While Protecting American Interests*, Testimony Before the Subcomm. on Courts, Intellectual Property, Artificial Intelligence, and the Internet of the H. Comm. on the Judiciary, 119th Cong. (Sept. 15, 2026); Ambassador Stephen J. Rapp, *The ICC is "Not the Threat Rubio Thinks it is," Says Former US Ambassador-at-Large for War Crimes Issues*, CNN (July 27, 2026) (transcript); Just Security, *What Does the Trump Administration Statement on Dismantling the ICC Really Mean?* (July 14, 2026) (including expert statement from Ambassador Beth Van Schaack); David M. Crane, *Only Authoritarians Fear International Justice*, JURIST (July 14, 2026).

the bedrock of international criminal justice, carefully built into the design of the ICC and its predecessor tribunals and long championed by the United States as a matter of law and policy. Prost Amicus Br. § I. That institutional record does not change because the Sanctions Regime is being challenged by CSOs rather than ICC judges. To the contrary, Plaintiffs' motion reiterates that the Sanctions Regime also designates ICC prosecutors and reaches CSOs such as Al-Haq, Al Mezan, and the Palestinian Center for Human Rights, whose work of gathering evidence and advocating for victims has long supported the exercise of that same independent judicial and prosecutorial function. Plaintiffs' Mem. of Law in Supp. of Mot. for Prelim. Inj. at 18-20, ECF No. 41 ("AFSC PI Br."). The institutional interest *amici* identified in *Prost*, that the integrity of independent judicial and prosecutorial decision-making not be compromised by targeting the personal or organizational interests of those who make it possible, is squarely implicated here.

Second, the Prost Amicus Brief highlighted that, for over a quarter century, the United States has engaged extensively and productively with the ICC itself, ICC principals, and ICC member states, notwithstanding its concerns regarding the ICC's jurisdiction in certain matters. During that time, the United States helped create the ICC and its governing law; legislated engagement with and support for the ICC's work; cooperated on operational matters with the ICC; offered diplomatic backing; participated as a non-party in meetings of the ICC's States Parties; contributed its views on prosecutorial policy papers; offered rewards for the capture of ICC fugitives; and submitted written observations in proceedings before the Court. Prost Amicus Br. § II. That record refutes any suggestion that EO 14,203 reflects a consistent or principled U.S. hostile position and directly undercuts any defense premised on the notion that the Sanctions Regime responds to a national emergency. Additionally, as will be further discussed in Section II below, that same quarter-century historical record shows a deliberate and sustained U.S. policy of

empowering civil society organizations that contribute to the ICC's work in the same ways that the Plaintiffs in the present case have done.

Third, the Prost Amicus Brief demonstrated why the ICC's exercise of its judicial and prosecutorial functions is not an "unusual and extraordinary threat" justifying the invocation of emergency economic powers under the International Emergency Economic Powers Act of 1977, 50 U.S.C. §§ 1701-1707 ("IEEPA"), because the alleged threat is neither unusual nor extraordinary, is speculative, was previously rejected by the Executive itself in 2021, and lacks the specificity that IEEPA requires. Additionally, because Congress had already enacted the American Servicemembers' Protection Act of 2002, 22 U.S.C. §§ 7421-7433 ("ASPA") to address the concerns EO 14,203 invokes, reliance on sanctions to target the personal or, as relevant here, organizational interests of those engaged with the ICC was foreclosed. Prost Amicus Br. § III. Plaintiffs advance materially identical *ultra vires*, national emergency, and ASPA arguments here. AFSC PI Br. at 29-39. Thus, *amici*'s institutional perspective on why the asserted emergency does not withstand scrutiny, and on Congress's considered judgment that sanctions are not an available tool for addressing concerns about the ICC's jurisdiction, applies to the Sanctions Regime as a whole and is not limited to its application to any particular category or designee.

For these reasons, *amici* respectfully submit that the arguments and record set out in the Prost Amicus Brief, annexed as Annex 1 and incorporated herein, support Plaintiffs' motion for a preliminary injunction to the same extent that they supported the motion in *Prost.*

## II. THE UNITED STATES HAS LONG SUPPORTED, FUNDED, AND WORKED ALONGSIDE CIVIL SOCIETY ORGANIZATIONS LIKE THOSE THE SANCTIONS REGIME NOW TARGETS

This case presents one dimension of the United States' relationship with the ICC that the Prost Amicus Brief did not address but to which *amici*, from their vantage point leading and coordinating U.S. engagement with international criminal justice, are well placed to speak. For

more than two decades, successive U.S. administrations of both parties have pursued a deliberate policy of supporting CSOs that document atrocity crimes, assist victims, and build the evidentiary record for accountability – the same work that Plaintiffs AFSC, CCR, HRW, and OSI perform today. That policy has included funding such organizations, engaging with them, training their personnel, and promoting their work to advance accountability through domestic and international mechanisms, including the ICC. The Sanctions Regime marks an outright reversal of this established course of conduct, mobilizing the government's economic machinery to attack the very infrastructure it helped build.

Congress codified that policy in the Elie Wiesel Genocide and Atrocities Prevention Act of 2018, Pub. L. No. 115-441, 132 Stat. 5586 (2019) ("Elie Wiesel Act"), which President Trump signed into law in early 2019. The Act declares it "the policy of the United States to . . . regard the prevention of atrocities as in its national interest."[2] In furtherance of this policy, it calls on U.S. government officials to, *inter alia*, (1) "conduct outreach, including consultations . . . with representatives of nongovernmental organizations and civil society dedicated to atrocity prevention and response";[3] (2) pursue a government-wide strategy to identify, prevent, and respond to the risk of atrocities by "strengthening diplomatic response and the effective use of foreign assistance to support appropriate transitional justice measures, including criminal accountability, for past atrocities; [and] supporting and strengthening local civil society, including human rights defenders and others working to help prevent and respond to atrocities";[4] and (3) report on the U.S. government's review and consideration of "analysis, reporting, and policy recommendations to prevent and respond to atrocities produced by civil society, academic, and

---

[2] *See* Elie Wiesel Act, Pub. L. No. 115-441, § 3(1), 132 Stat. 5586, 5586 (2019).

[3] *Id.* § 2(5).

[4] *Id.* §§ 3(3)(C)-(D).

other nongovernmental organizations and institutions."[5]

The Executive has implemented that policy in practice. In December 2023, *amicus* Ambassador Van Schaack described to the ICC's Assembly of States Parties how the United States was pursuing a "broad range of initiatives to strengthen the objectives of the Rome Statute system and support accountability for atrocity crimes globally" by, among other things, "funding comprehensive documentation by civil society organizations."[6]

The U.S. government has likewise relied on and funded civil society documentation in particular atrocity situations. Ukraine provides a clear example. Following its assessment in March 2022 that members of Russia's forces had committed war crimes in Ukraine, the State Department began supporting a range of mechanisms to document and pursue accountability for war crimes and other atrocities, including by providing support to "Ukrainian authorities, journalists, human rights defenders, and civil society actors along with international investigative and accountability-related mechanisms, such as . . . the International Criminal Court."[7] The State Department subsequently identified "[j]ustice and human rights accountability" as central pillars of U.S. policy toward Russia and explained that the United States was focusing on "supporting those efforts most likely to bring perpetrators to justice . . . whether through domestic judicial processes or international mechanisms and institutions."[8] The Department reported that "[s]ince the start of the full-scale invasion, USAID-supported organizations [had] documented 30,698 incidents of war crimes and [had] brought over 70 impact litigation cases against [Russia] and its representatives

---

[5] *Id.* § 5(b).

[6] Ambassador Beth Van Schaack, *Statement of the United States at the 22nd Session of the Assembly of States Parties of the International Criminal Court* (Dec. 8, 2023).

[7] U.S. Dep't of State, *2022 Report to Congress Pursuant to Section 5 of the Elie Wiesel Genocide and Atrocities Prevention Act of 2018 (P.L. 115-441)* (July 15, 2022).

[8] U.S. Dep't of State, *Supporting Justice and Accountability in Ukraine* (Feb. 18, 2023).

in international and regional courts."[9]

Syria provides another example. In 2022, the State Department continued promoting accountability for atrocities committed by the Assad regime, including by supporting civil society and UN-led documentation and investigation efforts, as well as the work of the International, Impartial and Independent Mechanism (IIIM) to "collect, consolidate, preserve, and analyze evidence of violations of international humanitarian law and human rights violations and abuses, and to prepare files to facilitate and expedite fair and independent criminal proceedings in national, regional, or international courts or tribunals."[10]

Sudan provides yet another example. The State Department's 2024 Report to Congress on Section 5 of the Elie Wiesel Act highlighted atrocity prevention as a core U.S. priority in Sudan and reported that the State Department and USAID "funded atrocity prevention and human rights monitoring and documentation programming led by local civil society actors . . . to strengthen accountability and international advocacy efforts" and that the resulting documentation has been used by "the ICC, . . . and other regional human rights bodies" for advocacy and accountability purposes.[11]

The broader record confirms that these were not isolated initiatives. A bipartisan task force convened by the American Society of International Law, whose 2021 report is discussed in the Prost Amicus Brief at the text accompanying nn.30-41, separately catalogued the United States' "commendable track record" of funding civil society groups "to enable vital work documenting atrocity crimes and advocating for accountability," and recommended that the United States

---

[9] *Id.*

[10] U.S. Dep't of State, *2022 Report to Congress*, *supra* note 7.

[11] U.S. Dep't of State, *2024 Report to Congress on Section 5 of the Elie Wiesel Genocide and Atrocities Prevention Act of 2018 (P.L. 115-441) [as amended]* 5-6 (July 10, 2024).

"continue its longstanding support for such efforts," "regardless of the state of U.S.-ICC relations."[12]

The contrast with the present Sanctions Regime is therefore stark. The Regime now restricts organizations that engage in the same forms of documentation, advocacy, victim assistance, fugitive tracking, and cooperation with the ICC that the United States has spent years encouraging and funding, thereby reversing a considered U.S. policy of channeling exactly this kind of civil society engagement into the international justice system as a means of advancing U.S. interests. The Sanctions Regime cannot be reconciled with this record. Activity the United States funded as recently as 2024 does not become, without explanation, an "unusual and extraordinary threat" to the United States in 2025. *See* Prost Amicus Br. § III.

## CONCLUSION

For the reasons set out in the Prost Amicus Brief (annexed hereto as Annex 1 and incorporated by reference) and the additional reasons set out above, *amici* respectfully submit that Plaintiffs are likely to succeed on the merits, and that the Court should grant Plaintiffs' motion for a preliminary injunction.

[12] Am. Soc'y Int'l L., *ASIL Task Force on Policy Options for U.S. Engagement with the ICC* 59 (2021).

Dated: September 24, 2026

Respectfully submitted,

**AMBASSADOR BETH VAN SCHAACK,**
**AMBASSADOR STEPHEN J. RAPP,**
**COLONEL (RET.) BRENDA J. HOLLIS,**
**PROFESSOR DAVID M. CRANE**

By their attorneys,

/s/ Daniel Z. Purisch

Daniel Z. Purisch (DP0706)
DANIEL Z. PURISCH B.V.
Oder 20, Unit A1824
2491 DC The Hague, Netherlands
(949) 482-1089
daniel@danielpurisch.com

Manuela Londoño (admission pending)
INTERNATIONAL JUSTICE COUNSEL
13 rue de Phalsbourg
75017 Paris, France
(954) 330-5232
mlondono@ijusticec.com

*Counsel for Amici Curiae*

## CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1(c)

I, Daniel Z. Purisch, counsel for *Amici Curiae*, hereby certify that the foregoing brief complies with the word count limitation set forth in Local Rule 7.1(c). This document contains 2,397 words, excluding the caption, table of contents, table of authorities, signature block, and required certificates.

/s/ Daniel Z. Purisch

# ANNEX 1

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JUDGE KIMBERLY PROST; JUDGE SOLOMY BALUNGI BOSSA; and JUDGE REINE ADELAIDE SOPHIE ALAPINI-GANSOU,<br><br>Plaintiffs,<br><br>v.<br><br>DONALD J. TRUMP, et al.,<br><br>Defendants. | Civil Action No. 26-cv-5305<br><br>Hon. Jesse M. Furman |

**BRIEF OF FORMER U.S. AMBASSADORS-AT-LARGE**
**FOR WAR CRIMES ISSUES/GLOBAL CRIMINAL JUSTICE**
**AND PROSECUTORS OF INTERNATIONAL CRIMINAL TRIBUNALS**
**AS *AMICI CURIAE* IN SUPPORT OF**
**PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

July 22, 2026

Daniel Z. Purisch
DANIEL Z. PURISCH B.V.
Oder 20, Unit A1824
2491 DC The Hague, Netherlands
(949) 482-1089
daniel@danielpurisch.com

Manuela Londoño
INTERNATIONAL JUSTICE COUNSEL
13 rue Collette
75017 Paris, France
(954) 330-5232
mlondono@ijusticec.com

*Counsel for Amici Curiae*

# TABLE OF CONTENTS


**INTERESTS OF *AMICI CURIAE* ........................................................................................1**

**INTRODUCTION ..........................................................................................................3**

**ARGUMENT..................................................................................................................5**

**I. JUDICIAL AND PROSECUTORIAL INDEPENDENCE IS THE BEDROCK OF INTERNATIONAL CRIMINAL JUSTICE ..................................................................5**

**A. Independence Is Built Into the Foundations of International Criminal Justice ... 5**

**B. The United States Has Long Championed Independence as a Matter of Law and Policy ........................................................................................................... 7**

**II. FOR OVER A QUARTER CENTURY, THE UNITED STATES HAS ENGAGED WITH THE ICC TO ADVANCE GLOBAL CRIMINAL JUSTICE ........................10**

**III. THE ICC'S EXERCISE OF ITS JUDICIAL AND PROSECUTORIAL FUNCTIONS IS NOT AN "UNUSUAL AND EXTRAORDINARY THREAT" JUSTIFYING COERCIVE SANCTIONS AGAINST COURT OFFICIALS ...........16**

**A. The ICC Does Not Pose an "Unusual and Extraordinary Threat"...................... 17**

**B. Congress Has Prescribed Measures to "Deal With" the Asserted Threat .......... 21**

**C. The Sanctions Do Not "Deal With" the Asserted Threat ...................................... 23**

**CONCLUSION ............................................................................................................25**

## TABLE OF AUTHORITIES

### CASES

*Learning Resources, Inc. v. Trump*, 607 U.S. 229 (2026) .................................................... 16, 23

*Evans v. Gore*, 253 U.S. 245 (1920) ................................................................................... 7

*United States v. Hatter*, 532 U.S. 557 (2001) ..................................................................... 7

*V.O.S. Selections, Inc. v. United* States, 772 F. Supp. 3d 1350 (Ct. Int'l Trade 2025)........... 16, 23

### STATUTES

18 U.S.C. § 1503 .................................................................................................................. 7

22 U.S.C. § 2296d(b)(4) ......................................................................................................... 8

22 U.S.C. § 2304(b) ............................................................................................................... 8

22 U.S.C. § 2378b(b)(2)(D) .................................................................................................... 8

22 U.S.C. § 5401(b)(1)(D) ..................................................................................................... 8

22 U.S.C. § 7421 ................................................................................................................... 21

22 U.S.C. § 7427 ...................................................................................................... 14, 21, 22

22 U.S.C. § 7433(a) .............................................................................................................. 12

22 U.S.C. § 2151n(d) .............................................................................................................. 8

22 U.S.C. § 2295(2)(J)(i) ........................................................................................................ 8

28 U.S.C. § 453 ...................................................................................................................... 7

50 U.S.C. § 1701(a)-(b) ........................................................................................................ 16

50 U.S.C. § 3025, amended by Pub. L. No. 119-60, div. F, tit. LXVII, § 6713, 139 Stat. 718, 1649 (2025) ......................................................................................................................... 12

American Servicemembers' Protection Act of 2002, Pub. L. No. 107-206, tit. II, § 2015, 116 Stat. 820, 909 (2002) ........................................................................................................ 11

Consolidated Appropriations Act, 2023, Pub. L. No. 117-328, § 7073(b), 136 Stat. 4459, 5092 (2022) ..................................................................................................................... 12

Department of State Rewards Program Update and Technical Corrections Act of 2012, Pub. L. No. 112-283, 126 Stat. 2492 (2013) ................................................................................ 12

Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, § 7034(r), 138 Stat. 460, 793 (2024) ......................................................................................................................... 12

International Emergency Economic Powers Act of 1977, 50 U.S.C. §§ 1701-1707 ("IEEPA") ... 3

James M. Inhofe National Defense Authorization Act for Fiscal Year 2023, Pub. L. No. 117-263, div. F, tit. LXV, § 6512, 136 Stat. 2395, 3543 (2022) ........................................................... 12

National Defense Authorization Act for Fiscal Year 2008, Pub. L. No. 110-181, § 1212, 122 Stat. 3, 371 (2008) ........................................................................................................................ 12

**LEGISLATIVE AUTHORITIES**

H.R. Rep. No. 95-459 (1977) .... 16, 20

Illegitimate Court Counteraction Act, H.R. 23, 119th Cong. (2025), .... 23

S. Comm. on Foreign Relations, 111th Cong., *International Criminal Court Review Conference: Kampala, Uganda, May 31-June 11, 2010: A Joint Committee Staff Trip Report*, S. Rpt. No. 111-55 (Sept. 2, 2010) .... 13

U.S. Senate, Roll Call Vote No. 22, 119th Cong., 1st Sess. (Jan. 28, 2025) .... 23

**TREATIES**

Convention for the Creation of an International Criminal Court, Nov. 16, 1937, League of Nations Doc. C.547.M.384.1937.V. .... 5

International Covenant on Civil and Political Rights, Dec. 16, 1966, 999 U.N.T.S. 171 .... 8

Rome Statute of the International Criminal Court, July 17, 1998, 2187 U.N.T.S. 90 (2025 consolidated version) .... passim

**FOREIGN AND INTERNATIONAL AUTHORITIES**

Decision Re-sentencing Mr Jean-Pierre Bemba Gombo, Mr Aimé Kilolo Musamba and Mr Jean-Jacques Mangenda Kabongo, ICC-01/05-01/13 (Sept. 17, 2018), *aff'd* ICC-01/05-01/13 A10 (Nov. 27, 2019) .... 7

ICC*, Code of Judicial Ethics*, ICC-BD/02-03-22 (as amended Oct. 7, 2022) .... 6

ICC, *Regulations of the Office of the Prosecutor* (Apr. 23, 2009) .... 6

International Criminal Court [ICC], *Rules of Procedure and Evidence*, ICC-ASP/1/3 & Corr.1, pt. II.A (as amended Dec. 5, 2025) .... 6

Judgment on the Appeal Against the Decision on the Authorisation of an Investigation Into the Situation in the Islamic Republic of Afghanistan, ICC-02/17-138 (Mar. 5, 2020) .... 9

Judgment on the Appeal of the State of Israel Against Pre-Trial Chamber I's "Decision on Israel's Challenge to the Jurisdiction of the Court Pursuant to Article 19(2) of the Rome Statute", ICC-01/18-422 (Apr. 24, 2025) .... 10

Notification on Status of the Islamic Republic of Afghanistan's Article 18(2) Deferral Request, ICC-02/17-142 (Apr. 16, 2021) .... 14

Notification to the Pre-Trial Chamber of the Islamic Republic of Afghanistan's Letter Concerning Article 18(2) of the Statute, ICC-02/17-139 (Apr. 15, 2020) .... 14

Statute of the International Criminal Tribunal for Rwanda, U.N. Doc. S/RES/955, annex (Nov. 8, 1994) .... 6

Statute of the Special Court for Sierra Leone, Jan. 16, 2002, 2178 U.N.T.S. 145 .... 6

United Nations Basic Principles on the Independence of the Judiciary, U.N. Doc. A/CONF.121/22/Rev.1 (Sept. 6, 1985, welcomed by G.A. Res. 40/146) .... 8

United Nations Guidelines on the Role of Prosecutors, U.N. Doc. A/CONF.144/28/Rev.1 (Sept. 7, 1990, welcomed by G.A. Res. 45/166) .... 8

**OTHER AUTHORITIES**

Am. Soc'y Int'l L., *ASIL Task Force on Policy Options for U.S. Engagement with the ICC* (2021) ........ 11, 12, 13

Ambassador Beth Van Schaack, *Statement of the United States at the 22nd Session of the Assembly of States Parties of the International Criminal Court* (Dec. 8, 2023) ........ 13

Ambassador Beth Van Schaack, *Statement on Behalf of the United States of America: 21st Session of the Assembly of States Parties to Rome Statute* (Dec. 6, 2022) ........ 13

Ambassador Stephen J. Rapp, *Special Briefing: Expansion of the War Crimes Rewards Program* (Apr. 3, 2013) ........ 12

Beth Van Schaack et al., *Beyond Kampala: Next Steps for U.S. Principled Engagement With the International Criminal Court* 3 (Am. Soc'y Int'l L. 2010) ........ 14

Christopher A. Casey et al., Cong. Rsch. Serv., R45618, *The International Emergency Economic Powers Act: Origins, Evolution, and Use* (Sept. 1, 2025) ........ 17

Condoleezza Rice, U.S. Sec'y of State, *Trip Briefing: En Route to San Juan, Puerto Rico* (Mar. 10, 2006) ........ 12

David Scheffer, *All the Missing Souls: A Personal History of the War Crimes Tribunals* 175 (2011) ........ 11

Executive Order 14,203 of Feb. 6, 2025, *Imposing Sanctions on the International Criminal Court*, 90 Fed. Reg. 9369 (Feb. 12, 2025) ........ passim

Executive Order No. 13,928 of June 11, 2020, *Blocking Property of Certain Persons Associated With the International Criminal Court*, 85 Fed. Reg. 36139 (June 15, 2020) ........ 14

Executive Order No. 14,022 of Apr. 1, 2021, *Termination of Emergency With Respect to the International Criminal Court*, 86 Fed. Reg. 17895 (Apr. 7, 2021) ........ 14

Gustave Moynier, *Note sur la création d'une institution judicaire internationale propre à prévenir et à réprimer les infractions à la convention de Genève*, Bulletin International des Sociétés de Secours aux Militaires Blesses, No. 11, 122 (1872) ........ 5

ICC, *Judge Kimberly Prost* ........ 23, 24

ICC, *Situation in the State of Palestine: ICC Pre-Trial Chamber I Rejects the State of Israel's Challenges to Jurisdiction and Issues Warrants of Arrest for Benjamin Netanyahu and Yoav Gallant* (Nov. 21, 2024) ........ 10

Jennifer K. Elsea, Cong. Rsch. Serv., RL31495, *U.S. Policy Regarding the International Criminal Court (ICC)* (Aug. 29, 2006) ........ 18

Michael A. Weber, Cong. Rsch. Serv., IF10795, *Global Human Rights: The Department of State's Country Reports on Human Rights Practices* (Dec. 2, 2025) ........ 8

Nicole M. Argentieri, Acting Ass't Att'y Gen., *Remarks at the German Federal Ministry of Justice's International Conference on International Criminal Law* (Feb. 23, 2024) ........ 12

Request for Leave to File Amicus Curiae Submission on Behalf of David J. Scheffer, ICC-02/17-79 (Oct. 15, 2019) ........ 9

Robert H. Jackson, *Rule of Law Among Nations*, 39 Am. Soc'y Int'l L. Proc. 10 (1945) ............ 6

Statement of the ICC Office of the Prosecutor on the Issuance of Arrest Warrants in the Situation in Afghanistan (July 8, 2025)........................................................................................ 15

*Statement of the Prosecutor of the International Criminal Court, Karim A. A. Khan QC, Following the Application for an Expedited Order Under Article 18(2) Seeking Authorisation to Resume Investigations in the Situation in Afghanistan* (Sept. 27, 2021)............................. 15

Statute of the International Criminal Tribunal for the Former Yugoslavia, U.N. Doc. S/25704, annex (May 3, 1993, adopted by S.C. Res. 827, May 25, 1993) ............................................... 6

Transcript of Appeals Hearing, ICC-02/17-T-003-ENG (Dec. 6, 2019)....................................... 9

U.S. Dep't of Justice, *Justice Manual* (updated June 2023).......................................................... 7

U.S. Dep't of State, Antony J. Blinken Press Statement*, Ending Sanctions and Visa Restrictions Against Personnel of the International Criminal Court* (Apr. 2, 2021) .................................. 14

U.S. Dep't of State, *Imposing Further Sanctions in Response to the ICC's Ongoing Threat to Americans and Israelis* (Aug. 20, 2025)........................................................................ 4

U.S. Dep't of State, *Imposing Sanctions in Response to the ICC's Illegitimate Actions Targeting the United States and Israel* (June 5, 2025)................................................................... 4

U.S. Dep't of State, *State Department Launches Campaign to Dismantle International Criminal Court's Threat to American Sovereignty* (July 13, 2026).................................................... 4, 21

U.S. Dep't of the Treasury, *Treasury Sanctions Two Judges Who Penalize Iranians for Exercising Freedoms of Expression and Assembly* (Dec. 19, 2019) ....................................... 17

U.S. Mission to the U.N., *Remarks at a U.N. General Assembly Meeting on a Report of the International Criminal Court* (Oct. 28, 2024) ........................................................... 13

William J. Clinton, *Remarks at the University of Connecticut in Storrs*, 31 Weekly Comp. Pres. Doc. 1840 (Oct. 15, 1995) ......................................................................................... 11

William J. Clinton, *Statement on the Rome Treaty on the International Criminal Court*, 37 Weekly Comp. Pres. Doc. 4 (Dec. 31, 2000)........................................................................ 11

Written Observations by the United States of America Pursuant to Rule 103, ICC-01/18-300 (Aug. 6, 2024)........................................................................................................... 14

## INTERESTS OF *AMICI CURIAE*

*Amici Curiae* are former United States Ambassadors-at-Large for War Crimes Issues (later renamed Ambassadors-at-Large for Global Criminal Justice) and/or Chief Prosecutors of international criminal tribunals with first-hand experience in the establishment and operation of the International Criminal Court ("ICC") and the *ad hoc* and hybrid tribunals that preceded it. The ambassador *amici* led or coordinated United States support for those international criminal tribunals under the legal frameworks Congress has enacted to govern its relationship with them; the prosecutor *amici* have personally exercised the independent prosecutorial authority that, alongside judicial independence, is now targeted by the sanctions at issue in this case.

**Beth Van Schaack** served as the United States Ambassador-at-Large for Global Criminal Justice from 2022 to 2025. During her tenure, she oversaw U.S. policy regarding the prevention of and accountability for mass atrocities, including in Belarus, the Central African Republic, Colombia, Liberia, Myanmar, South Sudan, Sudan, Syria, The Gambia, Uganda, and Ukraine; led U.S. engagement with international criminal courts and tribunals; and coordinated interagency efforts to support accountability mechanisms worldwide. Prior to her appointment, Ambassador Van Schaack was the Leah Kaplan Visiting Professor of Human Rights at Stanford Law School and co-chaired the American Society of International Law's Task Force on Policy Options for U.S. Engagement with the ICC. Earlier in her career, Ambassador Van Schaack served in the Office of the Prosecutor of the International Criminal Tribunals for Rwanda ("ICTR") and the former Yugoslavia ("ICTY") in The Hague. She is currently a Distinguished Fellow at Stanford's Center for Human Rights and International Justice.

**Stephen J. Rapp** served as the United States Ambassador-at-Large for War Crimes Issues from 2009 to 2015. During his tenure, he organized efforts that successfully brought major fugitives to justice at international tribunals and strengthened the capacity of civil society groups

to provide evidence to support the prosecution of perpetrators of international crimes, including in Syria. Prior to his ambassadorship, Ambassador Rapp served as the Chief Prosecutor of the United Nations Special Court for Sierra Leone ("SCSL") from 2007 to 2009, where he led the prosecution of former Liberian President Charles Taylor, and as Chief of Prosecution and Senior Trial Attorney at the ICTR from 2001 to 2007. Since leaving the State Department, Ambassador Rapp has been a Genocide Prevention Fellow at the U.S. Holocaust Memorial Museum.

**Brenda J. Hollis** served as the Chief Prosecutor of the SCSL and its residual mechanism from 2010 to 2019, where she led the prosecution of former Liberian President Charles Taylor at trial and on appeal. She also served as the International Co-Prosecutor of the Extraordinary Chambers in the Courts of Cambodia from 2019 until 2022, having been the Reserve International Co-Prosecutor from April 2015. From 2022 to 2025, Hollis served as the Principal Trial Lawyer in charge of the ICC's Ukraine investigation; she also led the Palestine investigation from January to June 2024, during which time the Palestine team prepared the arrest warrant applications for Hamas and Israeli leaders which she recommended that the ICC Prosecutor submit to the Pre-Trial Chamber. Prior to these appointments, she served as a Senior Trial Attorney at the ICTY, where she prosecuted cases involving war crimes and crimes against humanity, including the Tadić case – the first litigated case in an international tribunal since Nuremberg. While in public service for the U.S., Hollis served in the U.S. Air Force for 22 years, first as an Air Intelligence Officer and later in the Judge Advocate General's Corps, retiring with the rank of Colonel.

**David M. Crane** is a global leader in international criminal justice and the founding Chief Prosecutor of the SCSL. He has spent decades shaping accountability mechanisms around the world, including serving as a driving architect behind the Special Tribunal for the Crime of Aggression against Ukraine. Crane is a distinguished scholar of international law, a former senior

U.S. national security official, and a leading voice on the rule of law, state responsibility, and the legal limits on the use of force.

*Amici*'s collective experience leading United States engagement with the ICC, and personally prosecuting the gravest international crimes, provides them with unique insight into the United States' longstanding efforts to safeguard the judicial and prosecutorial independence that the coercive economic measures at issue here directly threaten. Additionally, the *amici* can attest to the U.S.'s overall relationship with the ICC and how it has successfully managed its concerns about the scope of the ICC's jurisdiction using the tools Congress specifically created for that purpose.

**INTRODUCTION**

Executive Order 14,203 of Feb. 6, 2025, *Imposing Sanctions on the International Criminal Court*, 90 Fed. Reg. 9369 (Feb. 12, 2025) (the "EO") is an unprecedented use of emergency economic powers against sitting judges and prosecutors of an international court for exercising their core juridical functions. In the nearly fifty-year history of the International Emergency Economic Powers Act of 1977, 50 U.S.C. §§ 1701-1707 ("IEEPA") – enacted in order to create economic tools to address "unusual and extraordinary" threats to the United States – no administration has attempted anything comparable (with the exception of the EO's earlier iteration). *Amici*, whose careers span the modern history of international criminal justice from the ICTY to the present, can attest to this from institutional memory and direct experience.

The inclusion of ICC judges in the Specially Designated Nationals and Blocked Persons List ("SDN List") responds to, and seeks to influence, judicial decisions. Judges Kimberly Prost and Solomy Balungi Bossa were designated for participating in the ICC Appeals Chamber's unanimous 2020 decision authorizing the Afghanistan investigation; Judge Reine Adelaide Sophie Alapini-Gansou for participating in the ICC Pre-Trial Chamber I's 2024 decision to issue arrest warrants in the Palestine situation against Israeli Prime Minister Benjamin Netanyahu and former

Minister of Defense Yoav Gallant.[1] Each decision was an exercise of the independent judicial function the Court's Statute prescribes and which all ICC judges solemnly undertake to perform honorably, faithfully, impartially, and conscientiously.

The distance between those decisions and any concrete threat to any U.S. person is vast. The ICC Prosecutor announced in 2021 the deprioritization of any consideration of the conduct of international forces in Afghanistan, including U.S. personnel, and no arrest warrant has ever been sought against any U.S. national. No U.S. national is implicated in the Palestine situation. The sanctions thus not only penalize independent judicial decision-making, but do so under circumstances that fall far short of a genuine national emergency.

Nor does the EO stand alone. On July 13, 2026, the State Department announced a "sweeping campaign" featuring "a whole-of-government response to systematically disable the ICC's ability to operate."[2] The Executive's avowed objective thus now sweeps beyond procuring its preferred outcome in ongoing judicial proceedings, to the dismantling of the Court itself.

*Amici* do not repeat Plaintiffs' merits arguments; rather, they supply the historical, legislative, and institutional record that gives those arguments their force. In the sections that follow, *amici* discuss how judicial and prosecutorial independence has been the bedrock of international criminal justice and especially of the ICC (**Section I**); they also detail how the U.S. has engaged with the ICC for over a quarter century to advance the international criminal justice project (**Section II**); and finally, they emphasize why the ICC's exercise of its judicial and prosecutorial functions cannot constitute an "unusual and extraordinary threat" warranting the use

[1] U.S. Dep't of State, *Imposing Sanctions in Response to the ICC's Illegitimate Actions Targeting the United States and Israel* (June 5, 2025); U.S. Dep't of State, *Imposing Further Sanctions in Response to the ICC's Ongoing Threat to Americans and Israelis* (Aug. 20, 2025).

[2] U.S. Dep't of State, *State Department Launches Campaign to Dismantle International Criminal Court's Threat to American Sovereignty* (July 13, 2026).

of emergency economic powers against Court officials (**Section III**).

## ARGUMENT

## I. JUDICIAL AND PROSECUTORIAL INDEPENDENCE IS THE BEDROCK OF INTERNATIONAL CRIMINAL JUSTICE

Judicial and prosecutorial independence is the foundation on which international criminal justice is built, just as it is the basis for any legitimate domestic system of law. That independence is guaranteed by the design of the international criminal tribunals themselves and has long been championed by the United States as a matter of law and policy.

### A. Independence Is Built Into the Foundations of International Criminal Justice

For more than a century, the effort to address the commission of grave international crimes through the rule of law has centered on the creation of independent and impartial courts. The first serious proposal for a permanent international court – put forward by the co-founder of the International Committee of the Red Cross in 1872 – rested on the insight that national courts "may, at a given moment, be unwittingly influenced by their surroundings," while an international authority "would offer better guarantees of impartiality."[3] The first Convention for the Creation of an International Criminal Court, negotiated in 1937 under the League of Nations, would have required judges to give a solemn undertaking to exercise their powers "impartially and conscientiously" and insulated judges from influence by granting them diplomatic privileges and immunities.[4]

The international criminal tribunals that were established from the aftermath of the Second World War onwards held to the same condition. Justice Jackson, before taking up his appointment as chief prosecutor for the United States at the International Military Tribunal at Nuremberg,

---

[3] Gustave Moynier, *Note sur la création d'une institution judicaire internationale propre à prévenir et à réprimer les infractions à la convention de Genève*, Bulletin International des Sociétés de Secours aux Militaires Blesses, No. 11, 122 (1872) at 125-126 (translation by counsel).

[4] Convention for the Creation of an International Criminal Court arts. 8-9, Nov. 16, 1937, League of Nations Doc. C.547.M.384.1937.V.

demanded an authentic criminal process, emphasizing that "the world yields no respect to courts that are organized merely to convict."[5] The statutes of the ICTY, ICTR, and SCSL – institutions created with U.S. support, in which *amici* held prosecutorial offices and Judges Prost and Bossa served as judges – each guaranteed independent judges and a prosecutor taking instructions from no government.[6]

The promulgation of the ICC's Rome Statute ("Rome Statute") entrusting "the most serious crimes of concern to the international community as a whole" to "an independent permanent International Criminal Court" marks a signature achievement of the international criminal justice project, and its guarantees of independence and impartiality are comprehensive. Judges must have "high moral character, impartiality and integrity," "be independent in the performance of their functions," refrain from "any activity which is likely to interfere with their judicial functions or to affect confidence in their independence," solemnly undertake to exercise their powers "honourably, faithfully, impartially and conscientiously,"[7] and have adopted a Code of Judicial Ethics governing their judicial independence, impartiality, and integrity.[8] Similar provisions apply to the prosecution: members of the Office of the Prosecutor must act independently, may not "seek or act on instructions from any external source," and are likewise prohibited from engaging in any activity which is likely to interfere with their prosecutorial functions or to affect confidence in their independence.[9] The Statute makes it a criminal offence against the administration of justice

---

[5] Robert H. Jackson, *Rule of Law Among Nations*, 39 Am. Soc'y Int'l L. Proc. 10, 16 (1945).

[6] Statute of the International Criminal Tribunal for the Former Yugoslavia arts. 12, 13(1), 16(2), U.N. Doc. S/25704, annex (May 3, 1993, adopted by S.C. Res. 827, May 25, 1993); Statute of the International Criminal Tribunal for Rwanda arts. 11, 12(1), 15(2), U.N. Doc. S/RES/955, annex (Nov. 8, 1994); Statute of the Special Court for Sierra Leone arts. 12(1), 13(1), 15(1), Jan. 16, 2002, 2178 U.N.T.S. 145.

[7] Rome Statute of the International Criminal Court arts. 36(3)(a), 40(1)-(2), 45, July 17, 1998, 2187 U.N.T.S. 90 (2025 consolidated version) [hereinafter "Rome Statute"]; International Criminal Court [ICC], *Rules of Procedure and Evidence* r. 5, ICC-ASP/1/3 & Corr.1, pt. II.A (as amended Dec. 5, 2025).

[8] ICC, *Code of Judicial Ethics* arts. 3-5, ICC-BD/02-03-22 (as amended Oct. 7, 2022).

[9] Rome Statute, *supra* note 7, art. 42; ICC, *Regulations of the Office of the Prosecutor* reg. 13 (Apr. 23, 2009).

to "[i]mped[e], intimidat[e] or corruptly influenc[e] an official of the Court for the purpose of forcing or persuading the official not to perform, or to perform improperly, his or her duties," or to "[r]etaliat[e] against an official of the Court on account of duties performed by that or another official."[10] Taken as a whole, these provisions seek to insulate judicial and prosecutorial decision-making from outside influence and ensure that cases are decided objectively on the law and facts rather than for political objectives.

### B. The United States Has Long Championed Independence as a Matter of Law and Policy

The United States' own commitment to judicial and prosecutorial independence runs through every layer of its law and policy toward the administration of justice at home and abroad. Domestically, judicial independence is a recognized "constitutional principle" that the Supreme Court has described as "widely esteemed and so vital to our system of government,"[11] and federal judges are oath-bound to "administer justice without respect to persons" and to "faithfully and impartially discharge and perform" their duties.[12] Prosecutorial independence rests on an equivalent foundation, with federal prosecutors categorically prohibited from allowing their charging decisions to be influenced by "the possible effect of the decision on the attorney's own professional or personal circumstances."[13] Federal law criminalizes efforts to improperly influence judges and prosecutors, obstruct the due administration of justice, and injure court officers on account of the performance of their official duties.[14]

---

[10] Rome Statute, *supra* note 7, art. 70(1)(d)-(e). The Court has prosecuted, convicted, and imposed custodial sentences for Article 70 offenses, for example with respect to witness tampering. *See* Decision Re-sentencing Mr Jean-Pierre Bemba Gombo, Mr Aimé Kilolo Musamba and Mr Jean-Jacques Mangenda Kabongo, ICC-01/05-01/13 (Sept. 17, 2018), *aff'd* ICC-01/05-01/13 A10 (Nov. 27, 2019).

[11] *Evans v. Gore*, 253 U.S. 245, 259 (1920), *overruled on other grounds by United States v. Hatter*, 532 U.S. 557 (2001).

[12] 28 U.S.C. § 453.

[13] U.S. Dep't of Justice, *Justice Manual* § 9-27.260 (updated June 2023).

[14] 18 U.S.C. § 1503.

Internationally, the United States has affirmed its commitment to judicial and prosecutorial independence through both treaty obligations and its support for international standards. As a party to the International Covenant on Civil and Political Rights ("ICCPR"), the United States recognizes the right to adjudication by "a competent, independent and impartial tribunal."[15] It has also endorsed the United Nations Basic Principles on the Independence of the Judiciary and the Guidelines on the Role of Prosecutors, which prohibit improper interference with judges and prosecutors in the discharge of their functions.[16] These instruments represent global standards that the United States has championed and undertaken to uphold.

Congress has likewise directed U.S. foreign policy to promote judicial independence abroad, for example by conditioning foreign assistance on, or directing it toward, the development of an independent judiciary.[17] For decades, the State Department's annual Country Reports on Human Rights Practices, mandated by Congress under 22 U.S.C. §§ 2151n(d) and 2304(b), evaluated each country's judicial independence as a component of the right to a fair trial.[18]

These are not abstractions to *amici*, who all have either been nominated by the United States to prosecute the world's gravest crimes before international tribunals or have been entrusted, as U.S. Ambassadors-at-Large for War Crimes/Global Criminal Justice, with carrying out the nation's policy towards international criminal tribunals and justice for atrocities. From their vantage point, *amici* can confirm the vital importance of judicial and prosecutorial independence

[15] International Covenant on Civil and Political Rights art. 14(1), Dec. 16, 1966, 999 U.N.T.S. 171.

[16] United Nations Basic Principles on the Independence of the Judiciary, U.N. Doc. A/CONF.121/22/Rev.1, at 58 (Sept. 6, 1985, welcomed by G.A. Res. 40/146); United Nations Guidelines on the Role of Prosecutors, U.N. Doc. A/CONF.144/28/Rev.1, at 188 (Sept. 7, 1990, welcomed by G.A. Res. 45/166).

[17] *See* 22 U.S.C. §§ 2295(2)(J)(i), 2296d(b)(4), 2378b(b)(2)(D), 5401(b)(1)(D).

[18] Although the State Department's human rights reports historically included a section addressing fair trial rights, this material was dropped from the reports covering 2024, released in August 2025 after significant revision by the State Department. *See* Michael A. Weber, Cong. Rsch. Serv., IF10795, *Global Human Rights: The Department of State's Country Reports on Human Rights Practices* (Dec. 2, 2025).

to the functioning of international criminal justice, and that safeguarding it has long been a consistent thread of U.S. policy, whatever disagreements the United States has separately pressed over the ICC's jurisdictional reach in particular situations.

Against that backdrop, the specific rulings for which Plaintiffs were designated cannot fairly be characterized as abuses of judicial power. Rather, they reflect the exercise of independent judgment in the ordinary discharge of the judicial function.

*With respect to Afghanistan*, the ruling for which Judges Prost and Bossa were designated resolved a simple question of statutory interpretation: whether the Pre-Trial Chamber, when reviewing the Prosecutor's request to open a *proprio motu* investigation, may refuse to authorize the investigation on "interests of justice" grounds, notwithstanding that Article 15(4) of the Rome Statute provides that the Pre-Trial Chamber "shall authorize the commencement of the investigation" if the statutory requirements are met.[19] The Appeals Chamber unanimously held that the Statute reserved the discretion to refuse to open an investigation on "interests of justice" grounds to the Prosecutor under Article 53(1), and that no similar discretion could be read into the provisions governing the Pre-Trial Chamber's "reasonable basis" review under Article 15(4).[20] That legal conclusion was not an outlier: it was the same position that David Scheffer, the United States' chief negotiator at the Rome Conference, personally urged the same Chamber to adopt.[21]

*With respect to Palestine*, Judge Alapini-Gansou was designated for joining Pre-Trial Chamber I's decision issuing arrest warrants against Israeli Prime Minister Benjamin Netanyahu and former Minister of Defense Yoav Gallant. In doing so, the Chamber applied the "reasonable

---

[19] Rome Statute, *supra* note 7, art. 15(4). Under a compromise reached at the Rome Conference, the ICC Prosecutor may only open investigations on his own initiative (*proprio motu*) following approval by the Pre-Trial Chamber. *Id*.

[20] Judgment on the Appeal Against the Decision on the Authorisation of an Investigation Into the Situation in the Islamic Republic of Afghanistan, ICC-02/17-138, ¶ 45 (Mar. 5, 2020).

[21] Request for Leave to File Amicus Curiae Submission on Behalf of David J. Scheffer, ICC-02/17-79 (Oct. 15, 2019); Transcript of Appeals Hearing, ICC-02/17-T-003-ENG, at 24-31, 57-59 (Dec. 6, 2019).

grounds to believe" standard prescribed by Article 58(1) of the Rome Statute, which provides that the Pre-Trial Chamber "shall … issue a warrant of arrest" if the statutory requirements are met.[22] The Chamber concluded that those requirements were satisfied for some, but not all, of the crimes charged by the Prosecutor.[23] Since then, one of Israel's challenges to the Court's jurisdiction has been remanded by the Appeals Chamber to Pre-Trial Chamber I, where it remains under review.[24]

## II. FOR OVER A QUARTER CENTURY, THE UNITED STATES HAS ENGAGED WITH THE ICC TO ADVANCE GLOBAL CRIMINAL JUSTICE

Despite its well-known concerns about the scope of the ICC's jurisdiction in certain situations, the U.S. has engaged extensively and productively with the Court since its outset. That engagement has taken many forms.

*Creating the Court and shaping its governing law*: The United States built momentum toward the creation of a permanent international court through its leadership of the ICTY and ICTR, as well as through public commitments, including President Clinton's October 1995 call for "nations all around the world who value freedom and tolerance" to "establish a permanent international court to prosecute, with the support of the United Nations Security Council, serious

---

[22] Rome Statute, *supra* note 7, art. 58(1).

[23] ICC, *Situation in the State of Palestine: ICC Pre-Trial Chamber I Rejects the State of Israel's Challenges to Jurisdiction and Issues Warrants of Arrest for Benjamin Netanyahu and Yoav Gallant* (Nov. 21, 2024) (finding reasonable grounds for war crimes of starvation and intentionally directing attacks against civilians and crimes against humanity of murder, persecution, and other inhumane acts, but unable to establish all elements of crime against humanity of extermination).

[24] Judgment on the Appeal of the State of Israel Against Pre-Trial Chamber I's "Decision on Israel's Challenge to the Jurisdiction of the Court Pursuant to Article 19(2) of the Rome Statute", ICC-01/18-422 (Apr. 24, 2025). The theoretical basis for the Court's territorial jurisdiction over non-party nationals is that states may delegate to an international tribunal their inherent criminal jurisdiction over crimes occurring within their territory. Israel has challenged the application of that principle in the case of Palestine on the ground that Article XVII of the 1995 Interim Agreement (Oslo II) excludes Israelis from the Palestinian Authority's criminal jurisdiction, and Palestine cannot delegate a power it does not have (*nemo dat quod non habet*). In approving the warrants, the Pre-Trial Chamber determined that Israel's *nemo dat* argument was to be addressed at a subsequent stage of the proceedings; the Appeals Chamber disagreed and remanded the question to the Pre-Trial Chamber for substantive determination at the current stage, where it remains pending. *Id.*, ¶ 64.

violations of humanitarian law."[25] Leading up to and at the 1998 Rome Conference, the U.S. worked with NATO allies to develop more precise definitions of war crimes that were consistent with the laws of war, and it also spearheaded the formulation of the principle of complementarity, which establishes the ICC as a court of last resort.[26] It also secured several safeguards in the procedural framework governing the Court.[27] Although unsatisfied with aspects of the Rome Statute when it finally opened for signature, the U.S. remained engaged to finalize the Elements of Crimes, as well as the Rules of Procedure and Evidence, joining consensus on both in June 2000; in the U.S. negotiator's words, "we returned to the talks and ensured that the rules of procedure and evidence met our interests."[28] President Clinton then signed the Statute on December 31, 2000, invoking the United States' "long history of commitment to the principle of accountability," and explaining that, despite concerns about "significant flaws in the treaty" including jurisdiction over non-party nationals, the United States would achieve more by remaining engaged with the Court and working to "influence [its] evolution."[29]

*Legislating engagement*: Congress has built support for the Court's work directly into its own legislation: the Dodd Amendment, part of the American Servicemembers' Protection Act ("ASPA") as enacted in 2002, preserved U.S. "assistance to international efforts to bring to justice … foreign nationals accused of genocide, war crimes or crimes against humanity."[30] In 2008, Congress repealed ASPA's restrictions on military assistance to states parties to the Rome Statute

---

[25] William J. Clinton, *Remarks at the University of Connecticut in Storrs*, 31 Weekly Comp. Pres. Doc. 1840, 1843 (Oct. 15, 1995).

[26] David Scheffer, *All the Missing Souls: A Personal History of the War Crimes Tribunals* 175, 180-88, 202, 205 (2011).

[27] *Id*. *See also* Compl., ECF No. 1, ¶¶ 51-58; Pls.' Mem. of Law in Supp. of Mot. for Prelim. Inj., ECF No. 37, at 6-7.

[28] Scheffer, *supra* note 26, at 231–32.

[29] William J. Clinton, *Statement on the Rome Treaty on the International Criminal Court*, 37 Weekly Comp. Pres. Doc. 4 (Dec. 31, 2000). *See* Scheffer, *supra* note 26, at 243-247.

[30] American Servicemembers' Protection Act of 2002, Pub. L. No. 107-206, tit. II, § 2015, 116 Stat. 820, 909 (2002); Am. Soc'y Int'l L., *ASIL Task Force on Policy Options for U.S. Engagement with the ICC* 8-10 (2021) [hereinafter "2021 ASIL Report"]).

after it became clear that these provisions were – in Secretary of State Rice's words – like "shooting ourselves in the foot."[31] In 2013, it expanded the State Department's War Crimes Rewards Program ("WCRP") to cover ICC fugitives.[32] Following Russia's full-scale invasion of Ukraine, Congress amended the Dodd Amendment in December 2022 to authorize assistance to the Court's investigation of the situation in Ukraine;[33] its FY2024 appropriations directed funding to the Court's Trust Fund for Victims and Ukraine investigation.[34]

*Operational cooperation*: The United States has provided the Court's investigators with field intelligence, including information on the Lord's Resistance Army in support of the ICC's Uganda investigation.[35] It facilitated the surrender of two of the Court's highest-profile fugitives: Bosco Ntaganda – a national of Rwanda (a non-party State), who turned himself in at the U.S. Embassy in Kigali in 2013 following his listing under the State Department's expanded WCRP – and Dominic Ongwen – whose transfer in 2015 was facilitated by U.S. forces operating in Central Africa.[36] Pursuant to the 2022 authorization to assist the Court's investigation in Ukraine, the United States began sharing war crimes evidence with the Office of the Prosecutor ("OTP") and appointed a senior figure to coordinate information sharing pursuant to a congressional mandate.[37] And the U.S. has provided direct input to the OTP's own policy development, including

[31] Condoleezza Rice, U.S. Sec'y of State, *Trip Briefing: En Route to San Juan, Puerto Rico* (Mar. 10, 2006); National Defense Authorization Act for Fiscal Year 2008, Pub. L. No. 110-181, § 1212, 122 Stat. 3, 371 (2008).

[32] Department of State Rewards Program Update and Technical Corrections Act of 2012, Pub. L. No. 112-283, 126 Stat. 2492 (2013); 2021 ASIL Report, *supra* note 30, at 11; Ambassador Stephen J. Rapp, *Special Briefing: Expansion of the War Crimes Rewards Program* (Apr. 3, 2013) (announcing the program's first ICC-related designations).

[33] Consolidated Appropriations Act, 2023, Pub. L. No. 117-328, § 7073(b), 136 Stat. 4459, 5092 (2022); 22 U.S.C. § 7433(a).

[34] Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, § 7034(r), 138 Stat. 460, 793 (2024).

[35] 2021 ASIL Report, *supra* note 30, at 21.

[36] *Id.* at 22.

[37] Nicole M. Argentieri, Acting Ass't Att'y Gen., *Remarks at the German Federal Ministry of Justice's International Conference on International Criminal Law* (Feb. 23, 2024); James M. Inhofe National Defense Authorization Act for Fiscal Year 2023, Pub. L. No. 117-263, div. F, tit. LXV, § 6512, 136 Stat. 2395, 3543 (2022) (set out as a note at 50 U.S.C. § 3025), *amended by* Pub. L. No. 119-60, div. F, tit. LXVII, § 6713, 139 Stat. 718, 1649 (2025).

commentary on its policy papers.[38]

*Diplomatic backing*: The United States used its seat on the Security Council to enable the Court's jurisdiction over the commission of atrocities in non-party states by abstaining on the 2005 referral of Darfur and voting affirmatively for the 2011 referral of Libya.[39] It has also issued public statements of support across nearly every situation before the Court, as extensively documented by Plaintiffs at Compl., ECF No. 1, ¶¶ 68-80. In 2022, 2023, and 2024, the United States reiterated that support directly to the Court's Assembly of States Parties (in a statement delivered by *amicus* Ambassador Van Schaack) and before the U.N. General Assembly.[40]

*Securing favorable terms at the 2010 Kampala Review Conference*: The United States participated as a non-party in the 2010 Review Conference in Kampala, sending an inter-agency delegation (including *amici* Ambassadors Rapp as the delegation's co-lead, and Van Schaack as the delegation's Academic Advisor) to negotiate amendments to the Rome Statute's definition of the crime of aggression. A bipartisan Senate Foreign Relations Committee staff report found that such engagement was likely indispensable to resolving ambiguities in the definition and barring the Court from exercising jurisdiction over the crime as to U.S. and other non-party nationals.[41] The United States was also the only delegation from a non-member state to join the pledging exercise that took place at Kampala, committing support for bringing the Lord's Resistance

[38] Ambassador Beth Van Schaack, *Statement of the United States at the 22nd Session of the Assembly of States Parties of the International Criminal Court* 2 (Dec. 8, 2023) [hereinafter "2023 Van Schaack ASP Statement"].

[39] 2021 ASIL Report, *supra* note 30, at 14-16.

[40] Ambassador Beth Van Schaack, *Statement on Behalf of the United States of America: 21st Session of the Assembly of States Parties to Rome Statute* (Dec. 6, 2022); 2023 Van Schaack ASP Statement, *supra* note 38; U.S. Mission to the U.N., *Remarks at a U.N. General Assembly Meeting on a Report of the International Criminal Court* (Oct. 28, 2024).

[41] 2021 ASIL Report, *supra* note 30, at 19 (citing S. Comm. on Foreign Relations, 111th Cong., *International Criminal Court Review Conference: Kampala, Uganda, May 31-June 11, 2010: A Joint Committee Staff Trip Report*, S. Rpt. No. 111-55, at 12 (Sept. 2, 2010)).

Army's leadership to justice.[42]

*Participating in Court Proceedings*: In August 2024, the United States submitted written observations under Rule 103 regarding the ICC's jurisdiction over Israeli nationals.[43] This "appearance before the … Court" was consistent with the steps Congress had authorized in response to ICC proceedings against covered U.S. or allied persons.[44] Some of the matters addressed in the United States' observations have been remanded by the Appeals Chamber and are pending before the Pre-Trial Chamber.[45]

*The One Departure*: In June 2020, the United States sanctioned the ICC in response to the Appeals Chamber's decision to authorize an investigation into alleged crimes committed in Afghanistan.[46] The investigation had in fact already been on hold following Afghanistan's earlier invocation of Article 18(2) in light of its intention to pursue national proceedings.[47] In April 2021, the sanctions were withdrawn, with the Secretary of State announcing that U.S. concerns "would be better addressed through engagement with all stakeholders in the ICC process rather than through the imposition of sanctions."[48] Five months later, the Prosecutor announced his decision to focus the resumed investigation on the Taliban and ISIS-Khorasan and to "deprioritise other

---

[42] *Id.*; Beth Van Schaack et al., *Beyond Kampala: Next Steps for U.S. Principled Engagement With the International Criminal Court* 3, 6 (Am. Soc'y Int'l L. 2010).

[43] Written Observations by the United States of America Pursuant to Rule 103, ICC-01/18-300 (Aug. 6, 2024).

[44] 22 U.S.C. § 7427(c). *See* Section III.B below.

[45] *See supra* n.24.

[46] Executive Order No. 13,928 of June 11, 2020, *Blocking Property of Certain Persons Associated With the International Criminal Court*, 85 Fed. Reg. 36139 (June 15, 2020).

[47] Notification to the Pre-Trial Chamber of the Islamic Republic of Afghanistan's Letter Concerning Article 18(2) of the Statute, ICC-02/17-139 (Apr. 15, 2020); Notification on Status of the Islamic Republic of Afghanistan's Article 18(2) Deferral Request, ICC-02/17-142 (Apr. 16, 2021).

[48] Executive Order No. 14,022 of Apr. 1, 2021, *Termination of Emergency With Respect to the International Criminal Court*, 86 Fed. Reg. 17895 (Apr. 7, 2021); U.S. Dep't of State, Antony J. Blinken Press Statement, *Ending Sanctions and Visa Restrictions Against Personnel of the International Criminal Court* (Apr. 2, 2021).

aspects of this investigation"[49] – universally understood to mean that the investigation would not address U.S. personnel or the former Afghan government's security forces. That determination has held: the only warrants issued for Afghanistan have been against Taliban leaders in relation to the systemic gender persecution of women and girls since the Taliban's return to power in 2021;[50] no warrant has ever been sought or issued against any U.S. national.

Two conclusions follow from this record. *First*, the United States has engaged with the Court extensively to achieve accountability and advance global justice, and its objection to the Court's jurisdiction over non-party nationals with respect to two situations under consideration has not prevented it from doing so – indeed, that objection has been neither principled nor consistent, given how often the United States has itself supported, and even referred, proceedings against non-party nationals.[51] That same engagement has also served the United States' own interests, securing important protections in the Court's governing documents and rules. *Second*, sanctions and other forms of hostility to the Court have failed to achieve their intended results, despite coming at significant diplomatic cost to the U.S. The Court has continued its work regardless, and the sole narrowing of an investigation sought by the United States – deprioritizing any focus on U.S. nationals in Afghanistan – came only after the prior sanctions regime was rescinded, not because of it.

---

[49] *Statement of the Prosecutor of the International Criminal Court, Karim A. A. Khan QC, Following the Application for an Expedited Order Under Article 18(2) Seeking Authorisation to Resume Investigations in the Situation in Afghanistan* (Sept. 27, 2021).

[50] Statement of the ICC Office of the Prosecutor on the Issuance of Arrest Warrants in the Situation in Afghanistan (July 8, 2025) ("The investigation in the Situation in Afghanistan continues, *focusing on alleged crimes by individual members of the Taliban and the Islamic State – Khorasan Province*.") (emphasis added).

[51] Details of this support was provided by Plaintiffs at Compl., ECF No. 1, ¶ 69(c) (support for arrest of non-party Rwandan national for crimes committed in DRC territory); ¶ 74 (abstention permitting Security Council referral of non-party Sudan/Darfur situation to the ICC and subsequent support); ¶ 76 (vote in favor of referring non-party Libya situation to ICC and subsequent support); ¶ 78 (support for arrest warrants against non-party Russian nationals, including President Putin, for crimes committed in Ukrainian territory); ¶ 79(b) (support of arrest warrants against non-party Russian nationals for crimes committed in Georgian territory); ¶ 80(a) (support for referring non-party Myanmar situation to the ICC). Territorial jurisdiction over non-party nationals was also a feature of the Special Court for Sierra Leone (where *amici* Crane, Rapp, and Hollis served as chief prosecutors), which indicted, convicted, and sentenced Charles Taylor, the sitting President of Liberia, though Liberia was not a party to the Special Court's founding agreement.

## III. THE ICC'S EXERCISE OF ITS JUDICIAL AND PROSECUTORIAL FUNCTIONS IS NOT AN "UNUSUAL AND EXTRAORDINARY THREAT" JUSTIFYING COERCIVE SANCTIONS AGAINST COURT OFFICIALS

IEEPA was enacted in 1977 to constrain the broad emergency powers that presidents had been exercising under the Trading With the Enemy Act (TWEA) of 1917.[52] Under IEEPA, the President may exercise emergency economic powers "only … to deal with an unusual and extraordinary threat" to the national security, foreign policy, or the economy of the United States, and "not … for any other purpose."[53] The emergency economic measure must bear a "direct link" to the asserted threat.[54]

The EO applies that framework to the speculative premise that "any effort by the ICC to investigate, arrest, detain, or prosecute protected persons" is an IEEPA threat to be dealt with through the imposition of sanctions against Court officials.[55] That premise is one *amici* are well placed to assess, and it is wrong.

As set out in Sections I and II above, the ICC operates under comprehensive guarantees of judicial and prosecutorial independence, and the United States has engaged with it in ways that are consistent with the rule of law for over a quarter century, including to protect its interests with respect to the very jurisdictional concerns the EO invokes. Against that record, there is no unusual and extraordinary threat (**A**). Moreover, Congress has expressly prescribed measures to deal with the concerns the EO asserts and has not left them to be dealt with through the exercise of

---

[52] H.R. Rep. No. 95-459, at 7 (1977) (identifying the "need for this legislation" as the concern that, "through usage and amendment, [TWEA] has become essentially an unlimited grant of authority for the President to exercise, at his discretion, broad powers . . . without congressional review[,] … whether or not the situation with respect to which the emergency was declared bears any relationship to the situation with respect to which the President is using the authorities").

[53] 50 U.S.C. § 1701(a)-(b).

[54] *V.O.S. Selections, Inc. v. United* States, 772 F. Supp. 3d 1350, 1381 (Ct. Int'l Trade 2025), *aff'd on other grounds sub nom. Learning Resources, Inc. v. Trump*, 607 U.S. 229 (2026).

[55] Executive Order 14,203 of Feb. 6, 2025, *Imposing Sanctions on the International Criminal Court*, 90 Fed. Reg. 9369, 9370 (Feb. 12, 2025) [hereinafter "EO 14,203"], Preamble.

emergency economic powers (**B**), and, in any event, the sanctions imposed do not "deal with" the asserted threat (**C**).

### A. The ICC Does Not Pose an "Unusual and Extraordinary Threat"

As noted, the EO declares a national emergency with respect to "any effort by the ICC to investigate, arrest, detain, or prosecute protected persons," and determines that such efforts constitute an "unusual and extraordinary threat to the national security and foreign policy of the United States."[56] That determination does not withstand scrutiny.

*The declared emergency is unlike any in IEEPA's history*: For nearly fifty years, IEEPA has been reserved for the gravest dangers confronting the nation from abroad. Presidents have invoked it to deal with hostile governments, terrorism, weapons proliferation, narcotics trafficking, transnational criminal organizations, and gross human rights abuses.[57] Each involved actors and conduct operating through force, concealment, or defiance of law – *e.g.*, the taking of hostages, the financing of terror, the clandestine spread of weapons – and harms that economic pressure could reach and influence. The EO stands apart from that entire history. It targets core judicial and prosecutorial functions – investigation, arrest, detention, and prosecution – and does so for a court whose mandate covers the most serious crimes of concern to the international community as a whole. Apart from the EO's prior iteration, no IEEPA emergency declaration has ever rested on such a predicate. Even where U.S. sanctions have reached foreign judges – as with two Iranian Revolutionary Court judges designated in 2019 – the stated basis was corruption of the judicial function in service of state repression, not the independent exercise of it.[58]

---

[56] *Id*.

[57] *See* Christopher A. Casey et al., Cong. Rsch. Serv., R45618, *The International Emergency Economic Powers Act: Origins, Evolution, and Use* 79 (Sept. 1, 2025).

[58] U.S. Dep't of the Treasury, *Treasury Sanctions Two Judges Who Penalize Iranians for Exercising Freedoms of Expression and Assembly* (Dec. 19, 2019).

*The asserted circumstances are neither unusual nor extraordinary*: The EO asserts that the ICC "has engaged in illegitimate and baseless actions targeting America and our close ally Israel"[59] but identifies no bias, bad faith, procedural irregularity, or departure from the Court's governing law in any proceeding – no showing, that is, that the Court has acted outside of its mandate or abused it. Its objection is rather that the Court has exercised – or potentially may exercise – jurisdiction over nationals of certain states not party to the Rome Statute. But that jurisdiction is precisely what the Statute provides: since its entry into force, Article 12 has conferred jurisdiction over crimes committed on the territory of a state party, regardless of the accused's nationality.[60] The concern invoked by the EO is thus as old as the Statute itself.[61] Moreover, it is a concern that Congress has already addressed. As discussed further in Section III.B below, Congress has, through ASPA and subsequent legislation, prescribed the measures available to the Executive should the Court act against U.S. or allied persons, and it has authorized the United States to engage productively with the Court notwithstanding that concern – an authority successive administrations have extensively exercised in furtherance of American interests and the cause of international justice alike.[62] Having managed the concern about U.S. or allied persons coming within the ICC's jurisdiction through ordinary legislation for over two decades, Congress cannot have regarded this potentiality as the kind of "unusual and extraordinary threat" that would warrant the invocation of

[59] EO 14,203, *supra* note 55, Preamble.

[60] Rome Statute, *supra* note 7, art. 12(2)(a). As noted above at n.24, the theoretical basis for the Court's territorial jurisdiction is that states may delegate to an international tribunal their inherent criminal jurisdiction over crimes occurring within their territory.

[61] The Statute itself contains various provisions addressing U.S. concerns about the potential reach of the Court's jurisdiction over U.S. servicemembers stationed abroad. For example, Article 98(2) prohibits the Court from proceeding with a surrender request if it would require the requested state "to act inconsistently with its obligations under international agreements pursuant to which the consent of a sending State is required to surrender a person of that State to the Court." *Id.* art. 98(2). The Bush administration subsequently negotiated approximately 100 such agreements (known as "Article 98 Agreements") in the early 2000s. *See* Jennifer K. Elsea, Cong. Rsch. Serv., RL31495, *U.S. Policy Regarding the International Criminal Court (ICC)* 22-24 (Aug. 29, 2006).

[62] *See* Section II above.

emergency powers under IEEPA.

*The asserted threat is speculative*: The EO's own description of the purported emergency rests on a series of contingent possibilities rather than any concrete or imminent harm. The declared emergency extends to "any effort by the ICC to investigate, arrest, detain, or prosecute protected persons,"[63] yet of those four juridical activities, only investigations have ever occurred: no protected person has been arrested, detained, or prosecuted by the Court in its history. The acts the EO does identify – the opening of preliminary investigations and the issuance of arrest warrants against two Israeli officials – are said to threaten the United States only by creating the possibility of future harm: they "set a dangerous precedent," "endanger[]" U.S. personnel by "exposing them to harassment, abuse, and possible arrest," and "threaten[] to infringe upon the sovereignty of the United States."[64] And the sole authority the EO invokes in support is ASPA's finding that the Rome Statute "creates a risk" that U.S. officials "may be prosecuted"[65] – yet, once again, this is a risk Congress identified, and legislated for, in 2002. The EO fails to note that the one investigation that might have encompassed U.S. personnel has been re-focused away from U.S. personnel since September 2021, and that Israel's jurisdictional objections to the warrants have been heard and remain under review by the Pre-Trial Chamber.[66] The asserted emergency thus rests on a chain of contingencies: future action by the Court, the failure of pending legal challenges, and the independent cooperation of states, without which the Court cannot arrest anyone because it has no police force and cannot execute its own warrants.

*The Executive itself previously concluded these circumstances did not warrant emergency*

---

[63] EO 14,203, *supra* note 55, Preamble.

[64] *Id*.

[65] *Id*.

[66] *See* Sections I.B. and II above.

*measures*: As recounted in Section II, President Trump declared a materially identical emergency in June 2020 – in response to the same Afghanistan decision for which Judges Prost and Bossa have now been designated – and his successor terminated it in April 2021, concluding that U.S. concerns "would be better addressed through engagement with all stakeholders in the ICC process rather than through the imposition of sanctions."[67] The intervening developments do not call that judgment into question; to the contrary, the ICC prosecutor has since deprioritized the aspects of the investigation concerning U.S. personnel.[68] Circumstances the Executive determined were appropriately addressed through engagement rather than emergency measures cannot, without a material change in circumstances, become an "unusual and extraordinary threat" five years later.

*The declared emergency lacks the specificity IEEPA requires*: The declared emergency is confined to no specific investigation, no identified person, and no concrete act of harm. By its terms, it extends indefinitely and in advance to any effort by the Court to exercise its ordinary judicial functions with respect to protected persons. Congress specified that IEEPA's authorities may be employed "only with respect to a specific set of circumstances which constitute a real emergency," because emergencies "are by their nature rare and brief, and are not to be equated with normal, ongoing problems."[69] A declaration that treats the continuing operation of a standing judicial institution – along with the possibility of future exercises of its ordinary functions – as an ongoing national emergency does not satisfy that standard.

Moreover, the asserted emergency has now outgrown the EO's already expansive formulation. The State Department's recent announcement that it has begun a "sweeping campaign" to "systematically disable the ICC's ability to operate" is no longer premised on any

---

[67] *See supra* nn.46, 48.
[68] *See supra* n.49.
[69] H.R. Rep. No. 95-459, at 10 (1977).

efforts by the ICC to investigate or otherwise proceed against protected persons, but on the supposed "intolerable threat to U.S. sovereignty" posed by the existence of the Court itself.[70] This significant escalation in the government's approach underscores that the emergency declared in the EO cannot be construed as limited to any particular ICC proceedings or specific set of circumstances, but instead encompasses the Court's continued operation as an institution.

### B. Congress Has Prescribed Measures to "Deal With" the Asserted Threat

Congress enacted ASPA to address the precise contingency the EO invokes – ICC investigation or prosecution of covered U.S. and allied persons.[71] In so doing, Congress established a specific framework governing Executive responses to such circumstances, reflecting a judgment that those concerns should be addressed through the authorities and limitations Congress prescribed rather than through the open-ended and expansive exercise of emergency powers.

ASPA calibrates the authorized response to the severity of the ICC's actions, distinguishing between proceedings in which a covered person is subject to the Court's jurisdiction and the far more extreme circumstance in which a covered person is actually in the Court's custody.

Where a covered person "is arrested, detained, investigated, prosecuted, or imprisoned" by the Court, ASPA authorizes the provision of legal representation and other legal assistance, exculpatory evidence, and appearance before the Court in defense of U.S. interests.[72] Consistent with this authority, and as discussed above, the United States submitted Rule 103 observations to the Pre-Trial Chamber in connection with its consideration of the Prosecutor's application for arrest warrants in the Palestine proceedings.

Where a covered person is actually "being detained or imprisoned by, on behalf of, or at

---

[70] U.S. Dep't of State, *State Department Launches Campaign to Dismantle International Criminal Court's Threat to American Sovereignty* (July 13, 2026).

[71] 22 U.S.C. §§ 7421, 7427.

[72] *Id.* § 7427(c).

the request of" the Court, ASPA provides considerably broader authority, authorizing the President to take "all means necessary and appropriate to bring about the release" of that person.[73] This provision is what earned ASPA its "Hague Invasion Act" moniker. To date, those circumstances have never arisen.

Yet even in that extreme scenario – with an American or allied person in the Court's custody and the President authorized the use of all necessary means – Congress determined that there was a line that the President should not cross. ASPA expressly "does not authorize the payment of bribes or the provision of other such incentives to induce the release" of a detained person.[74] Whatever else the President may do to free such a person, he may not appeal to the private financial interests of Court officials in a way that risks displacing their official duties.

In imposing this limitation, Congress recognized that the integrity of judicial and prosecutorial office is not a bargaining chip of American foreign policy. ASPA reflects a value judgment that even in conditions of acute confrontation with the Court, the United States may not seek to achieve compliance by corrupting or privately incentivizing the officials charged with administering justice.

Given these choices, Congress cannot plausibly be understood to have left open the use of IEEPA sanctions against individual Court officials as a means of influencing their official conduct. Congress established a specific regime governing Executive responses to ICC action and rejected reliance on personal financial leverage even in the most extreme circumstances. That judgment cannot be reconciled with an interpretation of IEEPA that permits the Executive to exert equivalent pressure through sanctions targeting those officials' personal interests and assets.

---

[73] *Id.* § 7427(a).

[74] *Id.* § 7427(d) (titled "Bribes and other inducements not authorized").

Congress has, moreover, had the opportunity to reconsider this judgment, most recently through H.R. 23 in January 2025, which would have required the President to impose IEEPA sanctions and visa restrictions on the ICC and its officials.[75] That effort failed.[76] Nonetheless, nine days later, President Trump issued the EO imposing those very measures.

### C. The Sanctions Do Not "Deal With" the Asserted Threat

Even assuming IEEPA authority were available, it permits measures only to "deal with" the declared threat, requiring, as noted above, "a direct link between an act and the problem it purports to address."[77] The measures at issue fail that requirement in multiple respects.

*Disconnected from the asserted threat*: The designations of Judges Prost and Bossa respond to a unanimous appellate ruling completed in March 2020 – more than five years before the sanctions were imposed – regarding the Afghanistan investigation whose U.S.-personnel aspects have been deprioritized since 2021. A sanction cannot undo a judicial decision already rendered, and there is no ongoing ICC action against U.S. personnel for it to address. Moreover, Judge Prost's assignment to the Appeals Chamber was temporary and ended with the unanimous March 2020 ruling; she has not had competence over any Afghanistan matter since.[78] Rather than preventing, mitigating, or remedying harm, the designations punish judges for a completed adjudicatory act.

Judge Alapini-Gansou was similarly designated for joining Pre-Trial Chamber I's decision issuing the Palestine arrest warrants in November 2024. Israel's jurisdictional objections have since been remanded for further consideration and will be decided with the benefit of full briefing and the United States' written observations already on record. The Court's own procedures are

---

[75] Illegitimate Court Counteraction Act, H.R. 23, 119th Cong. § 3 (2025), ("Not later than 60 days after the date of enactment of this Act … the President shall impose [various sanctions]").

[76] U.S. Senate, Roll Call Vote No. 22, 119th Cong., 1st Sess. (Jan. 28, 2025).

[77] *V.O.S. Selections, Inc. v. United States*, 772 F. Supp. 3d 1350, 1381 (Ct. Int'l Trade 2025), *aff'd on other grounds sub nom. Learning Resources, Inc. v. Trump*, 607 U.S. 229 (2026).

[78] ICC, *Judge Kimberly Prost* (last visited July 22, 2026); Decl. of Judge Kimberly Prost ¶¶ 33-34, ECF No. 38.

therefore addressing the very jurisdictional concerns the EO invokes. By imposing sanctions while that adjudication remains ongoing, the EO does not "deal with" any threat arising from it; it seeks instead to corrupt it by substituting financial pressure for legal argument.

*Overbroad*: The sanctions are not limited to conduct identified by the EO, or even to the designated officials themselves. The blocking provisions apply to all property and interests in property of a designated person, without distinction between work connected to the asserted threat and the official's other judicial functions. They also authorize derivative designations of foreign persons who "materially assist[]" or provide "financial, material, or technological support" or "goods or services" to the activities the EO covers, as well as any designated person. Additionally, they prohibit U.S. persons from providing anything "for the benefit of" a designated person.[79] The result is a sanctions regime that reaches beyond the officials alleged to have engaged in the conduct identified by the EO and chills engagement by the persons, organizations, and service providers whose assistance, information, and support enable the entirety of the Court's judicial and prosecutorial functions.

The sanctions likewise impair the designated judges' work across the Court's entire docket, including proceedings the United States has supported and helped make possible. Judge Prost, for example, presides over proceedings arising from Darfur and Mali – concerning attacks on peacekeepers, torture, persecution, and other atrocity crimes – and oversees reparations for tens of thousands of victims in the Ongwen and Ntaganda cases, which the United States facilitated by helping deliver both defendants to the Court.[80] At the appellate level, the designations now encumber four of the five judges who constitute the ICC's sole Appeals Chamber, the single body

[79] EO 14,203, *supra* note 55, §§ 1, 3.

[80] ICC, *Judge Kimberly Prost* (last visited July 22, 2026); Decl. of Judge Kimberly Prost ¶¶ 27-28, ECF No. 38.

through which every appeal in every situation must pass. The EO's visa restrictions are broader still, restricting entry to the United States not only of designated officials and their family members but also of all persons determined by the Secretary of State to be employed by, or acting as agents of, the ICC, regardless of any connection to the matters identified in the EO.[81]

*Incompatible with judicial and prosecutorial independence*: Finally, the sanctions are directed not at the asserted threat itself but at the judges and prosecutors with statutory authority over the ICC's proceedings. They punish those officials for adhering to their judicial and prosecutorial mandates, which require an objective and impartial assessment of the law and evidence without regard to the nationality, political status, or perceived favored status of any potential perpetrator. They also seek to pressure those officials to carry out their functions based on political objectives and the identity of the persons who may be subject to proceedings, rather than on the conduct forming the basis for potential liability.

As addressed above, Congress has repeatedly emphasized the importance of judicial independence in foreign policy legislation, and ASPA specifically rejected the use of personal financial leverage against ICC officials even in the most extreme circumstances. Measures designed to punish officials for exercising independent judicial and prosecutorial authority, or to influence the performance of those functions through personal consequence, do not "deal with" any threat; they compromise the institutional integrity and independence on which the administration of justice depends.

## CONCLUSION

For these reasons, Plaintiffs are likely to succeed on the merits, and the Court should grant their motion for preliminary injunction.

[81] EO 14,203, *supra* note 55, § 4.

Dated: July 22, 2026

Respectfully submitted,

**AMBASSADOR BETH VAN SCHAACK,**
**AMBASSADOR STEPHEN J. RAPP,**
**COLONEL (RET.) BRENDA J. HOLLIS,**
**PROFESSOR DAVID M. CRANE**

By their attorneys,

/s/ Daniel Z. Purisch

Daniel Z. Purisch (DP0706)
DANIEL Z. PURISCH B.V.
Oder 20, Unit A1824
2491 DC The Hague, Netherlands
(949) 482-1089
daniel@danielpurisch.com

Manuela Londoño (*pro hac vice* to be submitted)
INTERNATIONAL JUSTICE COUNSEL
13 rue Collette
75017 Paris, France
(954) 330-5232
mlondono@ijusticec.com

*Counsel for Amici Curiae*

**<u>CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1(c)</u>**

I, Daniel Z. Purisch, counsel for *Amici Curiae*, hereby certify that the foregoing brief complies with the word count limitation set forth in Local Rule 7.1(c). This document contains 8,744 words, excluding the caption, table of contents, table of authorities, signature block, and required certificates.

/s/ Daniel Z. Purisch