**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

AMERICAN FRIENDS SERVICE COMMITTEE; CENTER FOR CONSTITUTIONAL RIGHTS; HUMAN RIGHTS WATCH; and OPEN SOCIETY INSTITUTE,

Plaintiffs,

-v-

DONALD J. TRUMP, in his official capacity as President of the United States; UNITED STATES DEPARTMENT OF STATE; MARCO A. RUBIO, in his official capacity as Secretary of State; UNITED STATES DEPARTMENT OF THE TREASURY; SCOTT K. H. BESSENT, in his official capacity as Secretary of the Treasury; UNITED STATES DEPARTMENT OF JUSTICE; TODD BLANCHE, in his official capacity as United States Attorney General; OFFICE OF FOREIGN ASSETS CONTROL; and BRADLEY T. SMITH, in his official capacity as Director, Office of Foreign Assets Control,

Defendants.

No. 26 Civ. 6830 (JMF)

# MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

JAMES M. MCDONALD
United States Attorney for the
Southern District of New York
86 Chambers Street, 3rd Floor
New York, New York 10007
Tel.: (212) 637-2689/2713/2768
Email: danielle.marryshow@usdoj.gov
mark.osmond@usdoj.gov
kamika.shaw@usdoj.gov

DANIELLE J. MARRYSHOW
MARK OSMOND
KAMIKA S. SHAW

Assistant United States Attorneys
– Of Counsel –

## TABLE OF CONTENTS

**PAGE(S)**

PRELIMINARY STATEMENT ..... 1
BACKGROUND ..... 3
I. The International Emergency Economic Powers Act ..... 3
II. International Criminal Court ..... 3
III. Executive Order 13928 ..... 4
IV. Executive Order 14203 ..... 4
V. Plaintiffs' Lawsuit ..... 6
LEGAL STANDARD ..... 9
ARGUMENT ..... 9
I. Plaintiffs Are Unlikely to Succeed on the Merits ..... 9
A. Plaintiffs Fail to Show a Likelihood of Success on Their *Ultra Vires* Claim ..... 9
B. Plaintiffs Fail to Show a Likelihood of Success on Their First Amendment Claim ..... 11
1. The Executive Order Is Content and Viewpoint Neutral ..... 11
2. Plaintiffs' Associational Rights Are Not Unduly Burdened by the Executive Order ..... 13
C. AFSC Fails to Show a Likelihood of Success on Its RFRA Claim ..... 16
D. Plaintiffs Fail to Show a Likelihood of Success on Their Fifth Amendment Claim ..... 19
E. Plaintiffs Fail to Show a Likelihood of Success on Their APA Claim ..... 22
II. Plaintiffs Do Not Meet the Remaining Requirements to Establish Entitlement to Injunctive Relief ..... 24
III. Scope of Relief ..... 25
CONCLUSION ..... 28

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abdulhaseeb v. Calbone*,
600 F.3d 1301 (10th Cir. 2010) ....................17

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*,
591 U.S. 430 (2020) ....................14, 27

*Baaghil v. Miller*,
1 F.4th 427 (6th Cir. 2021) ....................14

*Biden v. Nebraska*,
600 U.S. 477 (2023) ....................10

*Brown v. Ent. Merchants Ass'n*,
564 U.S. 786 (2011) ....................13

*Burwell v. Hobby Lobby Stores, Inc.*,
573 U.S. 682 (2014) ....................16

*Cali v. Trump*,
No. 26-5172, 2026 WL 1765953 (D.C. Cir. June 15, 2026) ....................24, 25, 27

*Cath. Charities Bureau, Inc. v. Wisconsin Lab. & Indus. Rev. Comm'n*,
605 U.S. 238 (2025) ....................12, 13

*Cent. Me. Power Co. v. Me. Comm'n on Governmental Ethics & Election,*
*Pracs.*, 144 F.4th 9 (1st Cir. 2025) ....................15

*City of New York v. Mickalis Pawn Shop, LLC*,
645 F.3d 114 (2d Cir. 2011)....................28

*Doran v. Salem Inn, Inc.*,
422 U.S. 922 (1975) ....................26

*Fazaga v. FBI*,
965 F.3d 1015 (9th Cir. 2020) ....................16

*Ford v. McGinnis*,
352 F.3d 582 (2d Cir. 2003) ....................................................................................17

*Franklin v. Massachusetts*,
505 U.S. 788 (1992) ................................................................................................23

*Fulmen Co. v. Off. of Foreign Assets Control*,
547 F. Supp. 3d 13 (D.D.C. 2020)............................................................................15

*Grand River Enter. Six Nations, Ltd. v. Pryor*,
481 F.3d 60 (2d Cir. 2007) ..........................................................................9, 11, 14

*Haig v. Agee*,
453 U.S. 280 (1981) ................................................................................................25

*Henderson v. Kennedy,*
253 F.3d 12 (D.C. Cir. 2001)....................................................................................18

*Hernandez v. Mesa*,
589 U.S. 93 (2020) ..................................................................................................25

*Holder v. Humanitarian L. Project*,
561 U.S. 1 (2010) ...................................................................................19, 20, 21

*Holy Land Found. for Relief & Dev. v. Ashcroft*,
333 F.3d 156 (D.C. Cir. 2003)..................................................................................17

*In re Gliner*,
133 F.4th 927 (9th Cir. 2025) ..................................................................................15

*Open Soc'y Just. Initiative v. Trump*,
510 F. Supp. 3d 198 (S.D.N.Y. 2021)...................................................4, 22, 27

*Jolly v. Coughlin*,
76 F.3d 468 (2d Cir. 1996) ......................................................................................16

*Kadi v. Geithner,*
42 F. Supp. 3d 1 (D.D.C. 2012)...........................................................................21, 22

*Karadzic v. Gacki*,
602 F. Supp. 3d 103 (D.D.C. 2022)..........................................................................15

*KindHearts for Charitable Humanitarian Dev., Inc. v. Geithner*,
647 F. Supp. 2d 857 (N.D. Ohio 2009) ..........21

*Kinney-Coastal Oil Co. v. Kieffer*,
277 U.S. 488 (1928) ..........26

*Lyng v. Nw. Indian Cemetery Protective Ass'n*,
485 U.S. 439 (1988) ..........17

*Patel v. Garland*,
596 U.S. 328 (2022) ..........23

*Rona v. Trump*,
797 F. Supp. 3d 278 (S.D.N.Y. 2025) ..........4, 26

*Sec. & Exch. Comm'n v. Ripple Labs, Inc.*,
682 F. Supp. 3d 308 (S.D.N.Y. 2023) ..........19

*Sherbert v. Verner*,
374 U.S. 398 (1963) ..........16

*Smith v. Trump*,
791 F. Supp. 3d 90 (D. Me. 2025) ..........4, 22, 26

*Smith v. Trump*,
No. 1:25-CV-158-JAW, 2026 WL 2905302 (D. Me. Sept. 28, 2026) ..........4

*Students for Fair Admissions v. U.S. Mil. Acad. at West Point*,
709 F. Supp. 3d 118 (S.D.N.Y. 2024) ..........9

*Terebesi v. Torreso*,
764 F.3d 217 (2d Cir. 2014) ..........24

*Thiry v. Carlson*,
78 F.3d 1491 (10th Cir. 1996) ..........17

*Thomas v. Review Bd. of the Ind. Emp't Sec. Div.*,
450 U.S. 707 (1981) ..........16

*TikTok Inc. v. Garland*,
604 U.S. 56 (2025) ..........15

*Trump v. CASA, Inc.*,
606 U.S. 831 (2025) ....................3, 25, 26, 27

*United States v. Homa Int'l Trading Corp.*,
387 F.3d 144 (2d Cir. 2004) ....................21

*United States v. Williams*,
553 U.S. 285 (2008) ....................21

*Veiga v. World Meteorological Organisation*,
368 F. App'x 189 (2d Cir. 2010) ....................15

*Vermont Right to Life Comm., Inc. v. Sorrell*,
758 F.3d 118 (2d Cir. 2014)....................20

*VIP of Berlin, LLC v. Town of Berlin*,
593 F.3d 179 (2d Cir. 2010) ....................21

*We The Patriots USA, Inc. v. Hochul*,
17 F.4th 266 (2d Cir. 2021) ....................9

*Westchester Day Sch. v. Village of Mamaroneck*,
504 F.3d 338 (2d Cir. 2007) ....................16

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008) ....................passim

**Statutes**

42 U.S.C. § 2000bb-1(a)-(b) ....................16

50 U.S.C. § 1701(b) ....................10

50 U.S.C. § 1702(b)(1)....................22

50 U.S.C. § 1702(b)(3)....................3, 11

Defendants Donald J. Trump, United States Department of State, Marco A. Rubio, United States Department of the Treasury, Scott K. H. Bessent, United States Department of Justice, Todd Blanche, Office of Foreign Assets Control, and Bradley T. Smith (collectively, the "Government") respectfully submit this memorandum of law in opposition to the motion for a preliminary injunction, Dkt. No. 41 ("Pl. Br."), filed by plaintiffs American Friends Service Committee, Center for Constitutional Rights, Human Rights Watch, and Open Society Institute (collectively, "Plaintiffs"). As encouraged by the Court (Dkt. No. 47), the Government has sought to incorporate by reference the briefs that it recently filed in two related cases: *Democracy for the Arab World Now, Inc. ("DAWN") v. Trump*, Case No. 26-cv-5957 (JMF), Dkt. No. 33 ("*DAWN* Gov't Br.") and *Prost v. Trump*, Case No. 26-cv-5305 (JMF), Dkt. No. 51 ("*Prost* Gov't Br.") and Dkt. No. 62 ("*Prost* Gov't Reply Br.").

**PRELIMINARY STATEMENT**

The International Criminal Court ("ICC") has asserted jurisdiction to investigate, arrest, and prosecute the personnel of the United States and of allies—including Israel—that have never consented to its jurisdiction. Invoking the broad authority Congress conferred through the International Emergency Economic Powers Act ("IEEPA"), the President determined that those efforts constitute an unusual and extraordinary threat to the national security and foreign policy of the United States and issued Executive Order 14203. Pursuant to the Executive Order, the President and the Secretary of State have sanctioned several foreign persons.

Plaintiffs are four U.S.-based nonprofit organizations that wish to continue collaborating with those sanctioned foreign persons. They are not themselves designated under Executive Order 14203, nor do they assert that they—or any other U.S. national or U.S.-based entity—have ever faced an IEEPA-based penalty for engaging with a person designated under Executive Order

14203. None has applied for a license under 31 C.F.R. § 501.801 or sought guidance from the U.S. Department of the Treasury's Office of Foreign Assets Control ("OFAC") about whether its intended conduct would be prohibited. Instead, more than eighteen months after Executive Order 14203 was issued, Plaintiffs ask this Court to preliminarily enjoin the Executive Order and "all designations thereunder" in their entirety, to direct OFAC to strike every foreign person designated under the Executive Order from the List of Specially Designated Nationals and Blocked Persons ("SDN List") within one business day, and to bar the Executive Branch from making any future designation under the Executive Order.

Plaintiffs cannot carry their heavy burden of showing a likelihood of success on any of their claims. Their *ultra vires* claim fails because Executive Order 14203 satisfies IEEPA's statutory prerequisites and does not conflict with the American Servicemembers' Protection Act ("ASPA"), and because Plaintiffs' invocation of the *Charming Betsy* canon fails.

They are not likely to succeed on the merits of their First Amendment claim because the Executive Order is content- and viewpoint-neutral, restricts transactions in property rather than expression, and is appropriately tailored to compelling national-security and foreign-policy interests. Moreover, Plaintiffs may not vindicate First Amendment rights that foreign citizens and entities abroad do not possess. The Religious Freedom Restoration Act ("RFRA") claim brought by the American Friends Service Committee likewise fails because the Executive Order restricts at most only one of many means by which that organization may pursue its humanitarian and advocacy work, which is not a substantial burden on religious exercise.

Plaintiffs' vagueness claim fails because the terms "services" and "for the benefit of" are longstanding and commonly understood terms used in OFAC regulations, and have been repeatedly upheld by courts. And their Administrative Procedure Act ("APA") claim fails for want

of final agency action, because the President is not an agency, because their exemption-based theory is unripe, and because the aforementioned designations easily satisfy the extremely deferential review that governs sanctions decisions.

The remaining factors confirm that relief is unwarranted. Plaintiffs' delay in seeking emergency relief undercuts their asserted irreparable harm, and the broad scope of requested relief underscores the significant foreign policy interests that tip the equities in the Government's favor.

Finally, the requested relief sweeps far beyond Plaintiffs' asserted injuries and beyond what *Trump v. CASA, Inc.*, 606 U.S. 831 (2025) permits: It would result in the delisting of foreign persons who are not before this Court, hand dispositive victories to litigants in other cases—including relief that has been stayed by the D.C. Circuit—and enjoin future exercises of the President's foreign-affairs authority. Any relief granted by this Court should be tailored only to Plaintiffs. The motion for a preliminary injunction should be denied.

## BACKGROUND

### I. The International Emergency Economic Powers Act

A discussion of the statutory and regulatory framework governing IEEPA-based sanctions is set out in the Government's briefs in *DAWN* and *Prost*. *Prost* Gov't Br. 3–4; *DAWN* Gov't Br. 3–5. The *DAWN* brief discusses the IEEPA exemptions at issue—namely, the "informational materials" exemption (50 U.S.C. § 1702(b)(3)) and the "personal communication" exemption (*id.* § 1702(b)(1)). *DAWN* Gov't Br. 3–4. As encouraged by the Court (Dkt. No. 47), the Government incorporates these parts of the briefs by reference.

### II. International Criminal Court

A discussion of the ICC and the United States' relationship to it, including its refusal to submit to the ICC's jurisdiction, is set out in the Government's briefs in *Prost* and *DAWN*. *See*

*Prost* Gov't Br. 4; *DAWN* Gov't Br. 5. Again, as encouraged by the Court (Dkt. No. 47), the Government incorporates these parts of these briefs by reference.

## III. Executive Order 13928

A discussion of Executive Order 13928, including Judge Failla's ruling in *Open Soc'y Just. Initiative ("OSJI") v. Trump*, 510 F. Supp. 3d 198 (S.D.N.Y. 2021), is set out in the Government's brief in *DAWN*. *See DAWN* Gov't Br. 5–6 & n.3. The Government incorporates this part of the brief by reference.

## IV. Executive Order 14203

A discussion of Executive Order 14203 is set out in the Government's briefs in *Prost* and *DAWN*. *See Prost* Gov't Br. 4–6; *DAWN* Gov't Br. 6–8. As the *DAWN* brief explains, Executive Order 14203 makes clear that it "'shall be implemented consistent with applicable law'"; regulations implementing Executive Order 14203 incorporate IEEPA's exemptions, including the "informational materials" and "personal communication" exemptions; and the Government has expressly and publicly stated that OFAC "'does not sanction persons for their engagement in activities subject to U.S. constitutional protection, such as protected speech.'" *DAWN* Gov't Br. 7–8 (citations omitted). The *DAWN* brief also discusses this Court's decision in *Rona v. Trump*, 797 F. Supp. 3d 278 (S.D.N.Y. 2025) and a decision issued by Judge Nancy Torresen of the U.S. District Court for the District of Maine in *Smith v. Trump*, 791 F. Supp. 3d 90 (D. Me. 2025).[1] *See DAWN* Gov't Br. 2 n.1, 13 n.6, 18 n.7, 23. The Government incorporates these parts of these briefs by reference.

---

[1] Judge John A. Woodcock of the same court recently denied the Government's motion to dismiss First Amendment and APA claims in that case. *Smith v. Trump*, No. 1:25-CV-158-JAW, 2026 WL 2905302 (D. Me. Sept. 28, 2026). The Government respectfully disagrees with that decision for the reasons set forth below and notes that the decision was governed by the Rule 12(b)(6) plausibility standard, which does not apply to motions for preliminary injunctions.

The relief Plaintiffs request here, however, is broader than what was sought in *DAWN* and *Prost*, which requires further discussion of designations made under Executive Order 14203. Plaintiffs never allege that they—or, for that matter, any U.S.-based person—have faced IEEPA-based penalties for engaging with foreign persons sanctioned under Executive Order 14203. Nonetheless, Plaintiffs seek to enjoin "all designations" issued under Executive Order 14203 and to compel the removal of all designated foreign persons sanctioned pursuant to the Executive Order from the SDN List, *see* Dkt. No. 40-1; Compl., Prayer for Relief ¶ F. For that reason, a brief description of these designations follows:

- On February 6, 2025, President Trump sanctioned Karim Khan, then-Prosecutor of the ICC, by including his name in an annex to Executive Order 14203. 90 Fed. Reg. 9369, 9373 (Feb. 6, 2025); Compl. ¶ 174.

- On June 5, 2025, Secretary of State Marco Rubio designated ICC Judge Solomy Balungi Bossa of Uganda and ICC Judge Luz del Carmen Ibáñez Carranza of Peru for "directly engaged in efforts by the [ICC] to investigate, arrest, detain, or prosecute nationals of the United States" because they ruled to authorize the ICC's investigation of U.S. personnel in Afghanistan. Compl. ¶¶ 157, 159.[2] On the same day, ICC Judge Reine Adélaïde Sophie Alapini-Gansou of Benin and ICC Judge Beti Hohler of Slovenia were designated for "directly engaged in efforts by the [ICC] to investigate, arrest, detain, or prosecute nationals of . . . Israel" because they ruled to authorize the issuance of arrest warrants for Israeli Prime Minister Benjamin Netanyahu and former Israeli Minister of Defense Yoav Gallant. Compl. ¶¶ 162, 164; *supra* n.2.

- On July 9, 2025, Secretary Rubio designated U.N. Special Rapporteur Francesca Paola Albanese ("Albanese"), an Italian lawyer, for having "'directly engaged with the [ICC] in efforts to investigate, arrest, detain, or prosecute nationals of the United States or Israel, without the consent of those two countries.'" Compl. ¶ 194.

- On August 20, 2025, Secretary Rubio designated ICC Judge Kimberly Prost of Canada for ruling to authorize the ICC's investigation into U.S. personnel in Afghanistan, Compl. ¶ 155[3]; ICC Judge Nicolas Yann Guillou of France for ruling to authorize the issuance of arrest warrants for Israeli Prime Minister Netanyahu and former Israeli

---

[2] *Imposing Sanctions in Response to the ICC's Illegitimate Actions Targeting the United States and Israel*, U.S. Dep't of State (June 5, 2025).

[3] *Imposing Further Sanctions in Response to the ICC's Ongoing Threat to Americans and Israelis*, U.S. Dep't of State (Aug. 20, 2025).

Minister of Defense Gallant, Compl. ¶ 166; *supra* n.3; and ICC Deputy Prosecutors Nazhat Shameem Khan of Fiji and Mame Mandiaye Niang of Senegal "'for continuing to support illegitimate ICC actions against Israel, including upholding the ICC's arrest warrants targeting Prime Minister Netanyahu and former Defense Minister Gallant since [they] assumed leadership for the ICC's Office of the Prosecutor,'" Compl. ¶¶ 178, 180; *supra* n.3.

- On September 4, 2025, Secretary Rubio designated three foreign non-governmental organizations—Al-Haq: Law in the Service of Man ("Al-Haq"), Al Mezan Center for Human Rights ("Al Mezan"), and Palestinian Centre for Human Rights ("PCHR")—because they were "directly engaged in efforts by the [ICC] to investigate, arrest, detain, or prosecute Israeli nationals, without Israel's consent." Compl. ¶¶ 10, 184, 187, 190; Katherine Gallagher Decl., Dkt. No. 43 ("CCR Decl.") ¶ 16 (investigation); *DAWN* Compl. ¶ 82 & nn.58, 61 (arrest).

- On December 18, 2025, Secretary Rubio designated ICC Judge Gocha Lordkipanidze of Georgia and ICC Judge Erdenebalsuren Damdin of Mongolia for having "'directly engaged in efforts by the ICC to investigate, arrest, detain, or prosecute Israeli nationals, without Israel's consent, including voting with the majority in favor of the ICC's ruling against Israel's appeal on December 15.'" Compl. ¶¶ 168, 170.[4] In that appeal, Israel had requested another opportunity to ask the ICC to defer to Israel's own investigations of its nationals. Compl. ¶¶ 126, 128.

- On August 18, 2026, Secretary Rubio designated current ICC President Tomoko Akane of Japan and ICC Senior Trial Lawyer Abdoulaye Seye of Senegal for "directly engag[ing] in efforts by the ICC to investigate, arrest, detain, or prosecute officials whose government has not consented to ICC jurisdiction." Pl. Br. 19 nn.8–9.[5]

## V. Plaintiffs' Lawsuit

Plaintiffs are four U.S.-based nonprofit organizations. Compl. ¶¶ 24–27. Again, no Plaintiff alleges that it—or any U.S.-based party—has ever faced penalties for interacting with foreign persons designated under Executive Order 14203. And no Plaintiff alleges that it has applied for a license under 31 C.F.R. § 501.801 or sought guidance from OFAC concerning whether its conduct could result in penalties under IEEPA.

---

[4] *Sanctioning ICC Judges Directly Engaged in the Illegitimate Targeting of Israel*, U.S. Dep't of State (Dec. 18, 2025).

[5] *Advancing the United States' Campaign to Address the Threat Posed by the International Criminal Court*, U.S. Dep't of State (Aug. 18, 2026).

American Friends Service Committee ("AFSC") is a Philadelphia-based Quaker nonprofit that engages in human rights advocacy and humanitarian activities. Compl. ¶ 24; Joyce Ajlouny Decl., Dkt. No. 42 ("AFSC Decl.") ¶¶ 5–6. AFSC alleges that its work, including as it relates to conditions in the Palestinian territories, is an exercise of Quaker religious conviction. Compl. ¶¶ 24, 216, 218; AFSC Decl. ¶¶ 7–8, 11. Before Executive Order 14203 was issued, AFSC's work with the designated persons included, among other things, engaging in advocacy with Al-Haq and Al Mezan and contributing research to Albanese's reports. Compl. ¶¶ 224–26; AFSC Decl. ¶¶ 15–17. After Executive Order 14203 was issued, AFSC "discontinued, abandoned, or reconsidered" these and other activities, which AFSC says prevents it from fulfilling its Quaker religious obligations. Compl. ¶¶ 227–28; AFSC Decl. ¶¶ 20–21.

The Center for Constitutional Rights ("CCR") is a New York-based nonprofit organization that engages in legal advocacy. Compl. ¶ 25; CCR Decl. ¶ 5. Some CCR attorneys are admitted to the ICC's List of Counsel, which allows them to practice before the ICC, including as Legal Representatives of Victims in *Situation in Afghanistan* and *Situation in Palestine*. CCR Decl. ¶¶ 9–12; Compl. ¶ 230. Before Executive Order 14203 was issued, CCR collaborated with Al-Haq, Al Mezan, and PCHR on litigation and other advocacy, it represented Al-Haq and Al Mezan in ICC proceedings, and it made submissions to and met with Albanese. CCR Decl. ¶¶ 20–22; Compl. ¶¶ 232–35. After Executive Order 14203 was issued, CCR allegedly refrained from, among other things, representing Al-Haq and Al Mezan and other clients before the ICC, *see* CCR Decl. ¶¶ 29, 33; engaging with the ICC's Office of the Prosecutor, *id.* ¶ 30; making submissions to ICC judges, *id.* ¶¶ 31–32; collaborating with Al-Haq, Al Mezan, and PCHR, *id.* ¶¶ 34–35; and submitting information to Albanese, *id.* ¶ 38. *See also* Compl. ¶ 236.

Human Rights Watch ("HRW") is a New York-based advocacy and research nonprofit organization. Compl. ¶ 26; Elizabeth Evenson Decl., Dkt. No. 45 ("HRW Decl.") ¶ 5. Before Executive Order 14203 was issued, HRW regularly communicated with the ICC's Office of the Prosecutor on policy and investigative matters. Compl. ¶ 240; HRW Decl. ¶ 15. HRW also interacted with ICC judges, including by participating in roundtable events and submitting amicus briefs to the ICC. Compl. ¶ 241; HRW Decl. ¶ 16. HRW also collaborated with Al-Haq, Al Mezan, and PCHR on policy, research, and advocacy, and it had an ongoing relationship with Albanese. Compl. ¶¶ 242–43; HRW Decl. ¶¶ 17–18. Since Executive Order 14203 was issued, HRW alleges that it has curtailed activities like these, including by not substantively engaging with the Office of the Prosecutor, briefing Albanese on HRW's research, or collaborating with Al-Haq, Al Mezan, and PCHR. Compl. ¶ 245; HRW Decl. ¶ 21.

Open Society Institute ("OSI") is a New York-based private foundation and charitable trust, which includes the Open Society Justice Initiative ("OSJI"). Compl. ¶ 27; James Goldston Decl., Dkt. No. 44 ("OSI Decl.") ¶¶ 5, 8. Before Executive Order 14203 was issued, OSJI worked with the ICC on various matters, including advising the Office of the Prosecutor on prosecutorial strategy, meeting with ICC judges and staff, filing an amicus brief in ICC proceedings, and attending ICC-organized roundtable discussions. Compl. ¶ 250; OSI Decl. ¶ 11. OSJI also advised organizations that work on ICC-related matters, and OSI gave grants to organizations (including Al Mezan and PCHR) that collect and submit evidence to the ICC. Compl. ¶¶ 251–52, 254; OSI Decl. ¶¶ 12, 16, 19. OSJI collaborated with and helped train Al-Haq's staff on ICC-related matters and was considering partnering with Al-Haq and Al Mezan on non-ICC litigation. Compl. ¶¶ 255–56; OSI Decl. ¶¶ 21–22. OSJI also engaged with Albanese on litigation matters related to the Palestinian territories. Compl. ¶ 257; OSI Decl. ¶ 23. Since Executive Order 14203 was issued,

OSI and OSJI have allegedly, among other things, stopped engaging with Al-Haq, Al Mezan, PCHR, and Albanese (Compl. ¶¶ 260, 262; OSI Decl. ¶¶ 27–28, 31) and incurred expenses from cancelling a meeting at which Al-Haq, Al Mezan, and PCHR were invited participants (Compl. ¶ 261; OSI Decl. ¶ 30).

Plaintiffs commenced this action on August 11, 2026, Dkt. No. 1, and moved for a preliminary injunction on September 1, 2026, Dkt. No. 40—more than eighteen months after Executive Order 14203 issued.

## LEGAL STANDARD

"A preliminary injunction 'is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion.'" *Students for Fair Admissions v. U.S. Mil. Acad. at West Point*, 709 F. Supp. 3d 118, 129 (S.D.N.Y. 2024) (quoting *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007)). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). "When the government is a party to the suit, [the] inquiries into the public interest and the balance of the equities merge." *We The Patriots USA, Inc. v. Hochul*, 17 F.4th 266, 295 (2d Cir. 2021).

## ARGUMENT

### I. Plaintiffs Are Unlikely to Succeed on the Merits

#### A. Plaintiffs Fail to Show a Likelihood of Success on Their *Ultra Vires* Claim

Plaintiffs' *ultra vires* claim fails largely for the same reasons that the Government has set forth in its *Prost* briefing.

*First*, Plaintiffs' argument that Executive Order 14203 exceeds the authority delegated to the President under 50 U.S.C. § 1701(b) fails because the Executive Order satisfies the statutory prerequisites for the exercise of IEEPA authority, and whether the invoked emergency is sufficiently unusual or extraordinary is not susceptible to judicial review. *See* *Prost* Gov't Br. 13–15; *Prost* Gov't Reply Br. 5–6.

*Second*, Plaintiffs' argument that Executive Order 14203 conflicts with the "statutory scheme" set forth in ASPA fails because there is no such conflict: Both the President's exercise of authority under IEEPA and ASPA, while overlapping, can coexist. *See* *Prost* Gov't Br. 12–13; *Prost* Gov't Reply Br. 3–5. Plaintiffs' citation to *Biden v. Nebraska* (Pl. Br. 39) does nothing to strengthen Plaintiffs' arguments because that case did not resolve a statutory conflict. Instead, the Supreme Court held that the Secretary's student loan forgiveness program exceeded his statutory authority, because the relevant statute delegated only the authority to "waive" or "modify" certain student-loan related statutory and regulatory provisions, and "that language cannot authorize the kind of exhaustive rewriting of the statute" that marked the student loan forgiveness program. *Biden v. Nebraska*, 600 U.S. 477, 499–500 (2023). As the Government has previously explained, Executive Order 14203 falls within the authority delegated to the President in IEEPA. *See Prost* Gov't Br. 13–15.

*Finally*, Plaintiffs' invocation of the *Charming Betsy* doctrine fails because the doctrine does not apply here; Plaintiffs inappropriately invoke the doctrine not to resolve any purported ambiguity in IEEPA, but in an effort to establish a free-standing mechanism to enforce their own chosen interpretations of international law. *See* *Prost* Gov't Br. 8–12; *Prost* Gov't Reply Br. 1–3.

### B. Plaintiffs Fail to Show a Likelihood of Success on Their First Amendment Claim

#### 1. The Executive Order Is Content and Viewpoint Neutral

Plaintiffs claim Executive Order 14203 imposes content- and viewpoint-based restrictions that are presumptively unconstitutional and subject to strict scrutiny. Pl. Br. 58–65. They also contend that the Executive Order serves no compelling government interest, nor is it narrowly tailored to do so. *Id*. In support of this proposition, Plaintiffs claim that the Executive Order is both under- and over-inclusive. *Id.* at 63–64. These arguments fail for substantially the same reasons the Government set forth in *DAWN*.

As an initial matter, for the reasons set forth in *DAWN*, intermediate, rather than strict, scrutiny properly applies to Plaintiffs' claims related to speech because the contents of the Executive Order are content and viewpoint neutral. *DAWN* Gov't Br. 17. The restrictions imposed by the Executive Order are both content and viewpoint neutral, as the restrictions, on their face, do not implicate speech. *Id.* at 13–16. Further, the restrictions do not distinguish between the restricted activities based on content or message. *Id*. at 14. Plaintiffs also claim, similar to the plaintiffs in *DAWN*, that Executive Order 14203 would prevent them from engaging in conduct in support of certain causes. Pl. Br. 61. Just as in *DAWN*, Plaintiffs' mere speculation about activities they would not be able to engage is not enough to overcome the Government's clear statement that sanctions pursuant to the Executive Order do not reach protected speech or the prohibitions articulated in the Berman Amendment to IEEPA, 50 U.S.C. § 1702(b)(3). *DAWN* Gov't Br. 14–16.

Even if the Court credits Plaintiffs' contention that Executive Order 14203 impacts speech, any such impact is incidental. *DAWN* Gov't Br. 15–16. Regulations that impose an incidental burden on First Amendment rights are, as the Government explained in *DAWN*, permissible. *Id*. Lastly, contrary to Plaintiffs' assertions, even if strict scrutiny were the applicable standard of

review, Pl. Br. 58, the Executive Order is narrowly tailored to the government interest it intends to vindicate such that it would survive strict scrutiny. As the Government asserted in *DAWN*, the Executive Order serves compelling national security and foreign policy interests. Further, the Executive Order is neither over- nor underinclusive. *DAWN* Gov't Br. 18–20. The Executive Order targets certain ICC activities; to accomplish this goal, it permits the Secretary of State to designate foreign persons if and when there is information showing that such designations are appropriate. *Id.* at 20.

In addition to asserting the arguments raised by the plaintiffs in *DAWN*, Plaintiffs also argue that Executive Order 14203 is underinclusive in part because it "does nothing to regulate speech that aids" in the "domestic criminal jurisdiction of the States on whose territory the crimes were allegedly committed, which, as a matter of common practice, may be exercised without the consent of the U.S. or allied countries." Pl. Br. 63. This argument is unavailing because it raises a separate concern that is neither contemplated by Executive Order 14203 nor within the scope of the governmental interest the Executive Order protects. The aim of Executive Order 14203 is to protect U.S. and other persons from ICC prosecutions, arrests, or investigations to which the U.S. and allies have not consented. Plaintiffs point to no similar threat from other states that might fall within the scope of the government interest articulated here.

Plaintiffs' cited cases in support of this proposition are inapposite. Plaintiffs first cite *Cath. Charities Bureau, Inc. v. Wisconsin Lab. & Indus. Rev. Comm'n*, 605 U.S. 238 (2025), which involved a challenge to a Wisconsin statute that exempted religious employers from contributing to the state's unemployment compensation funds. The Supreme Court concluded that the exemption regime was underinclusive in its stated aim of providing unemployment coverage for its citizens because it exempted a number of employers, which belied its claim that the exemption

was narrowly tailored. *Id.* at 253. Plaintiffs also cite *Brown v. Ent. Merchants Ass'n*, 564 U.S. 786 (2011), which involved a challenge to a California regulation restricting the sale of violent video games to minors. The Supreme Court concluded that the regulation was underinclusive in part because it excluded other forms of media without explaining why it delineated video games from other content. *Id.* at 802. The stated goals of the statute and regulation challenged in *Catholic Charities* and *Brown* are different in kind and scope from the aim of the Executive Order at issue here. Unlike here, the challenged prohibitions were in service of broader interests relative to the prohibitions. In contrast, Executive Order 14203 explicitly states that its aim is to protect against "any effort *by the ICC* to investigate, arrest, detain, or prosecute" protected persons. 90 Fed. Reg. at 9370 (emphasis added). It does not purport to vindicate any other interest. Given that the Executive Order's aim is to curb ICC action to which the United States has not consented, Plaintiffs' contention that it excludes potential actions by states does not support the assertion that the Executive Order is underinclusive. It is appropriately tailored to vindicate the government's stated interest.

**2. Plaintiffs' Associational Rights Are Not Unduly Burdened by the Executive Order**

Plaintiffs' claim that the Executive Order 14203 places an unconstitutional burden on their right to association also fails. First, Plaintiffs assert, like the plaintiffs in *DAWN*, that the Executive Order impinges on their right to associate with designated persons because they may no longer coordinate with designated persons. Pl. Br. 65–67. As the Government explained in *DAWN*, the Executive Order does not proscribe associational activity; it merely restricts Plaintiffs from certain transactions with designated persons. *DAWN* Gov't Br. 16–17. To the extent this prohibition has any impact on Plaintiffs' associational rights, it is incidental. *Id.* at 17–20. Burdens on the right to

association must be more than incidental to run afoul of the First Amendment. *Id.* Plaintiffs have not demonstrated that they face any substantial or significant burden here.

In addition to raising the associational arguments made in *DAWN*, Plaintiffs here also appear to seek relief based on the chilling effect they allege the Executive Order 14203 has on speech by persons located abroad. Even though they have not been and cannot be designated themselves, Plaintiffs ask this Court to enjoin "all designations" pursuant to Executive Order 14203 and to compel the removal of all foreign persons designated under the Executive Order from the SDN List, *see* Dkt. No. 40-1; Compl., Prayer for Relief ¶ F. Further, in their brief, Plaintiffs cite an alleged chill on the speech of non-U.S. persons who are not currently subject to designations. Pl. Br. 65–66. Specifically, Plaintiffs claim that the Executive Order burdens their associational rights because it prevents them from communicating with foreign persons who are not designated because they are "chilled from participating in groups or other convenings with Plaintiffs due to concerns that designated persons may also participate, thereby subjecting themselves to designation (if a non-U.S. person)." *Id.* at 65–66, 68. Plaintiffs cite a report authored by the Secretariat of the Coalition for the ICC in support of their claim that the Executive Order has had a "far-reaching chilling effect" beyond Plaintiffs. *Id.* at 68. To the extent that Plaintiffs are in fact attempting to do so, challenging a regulation as violative of the First Amendment based on conduct or speech by foreign persons outside of the United States is impermissible.

Plaintiffs cannot mount a First Amendment challenge based on speech or association by noncitizens outside of the United States because "it is long settled as a matter of American constitutional law that foreign citizens outside U.S. territory do not possess rights under the U.S. Constitution." *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 591 U.S. 430, 433 (2020); *Baaghil v. Miller*, 1 F.4th 427, 433 (6th Cir. 2021) ("[n]oncitizens living abroad do not have any

American constitutional rights"). In keeping with this, courts have consistently found that noncitizens located abroad cannot invoke the First Amendment to protect speech that occurs abroad. *TikTok Inc. v. Garland*, 604 U.S. 56, 69 n.2 (2025) ("To the extent that ByteDance Ltd.'s asserted expressive activity occurs abroad, that activity is not protected by the First Amendment"); *Karadzic v. Gacki*, 602 F. Supp. 3d 103, 111 (D.D.C. 2022) (a Serbian national's challenge to an OFAC sanction did "not implicate First Amendment principles because [Plaintiff had] no constitutional rights"); *In re Gliner*, 133 F.4th 927, 934 (9th Cir. 2025) ("[f]oreign citizens outside U.S. territory do not possess rights under the U.S. Constitution, including those under the First Amendment." (quotation marks and citations omitted)); *Cent. Me. Power Co. v. Me. Comm'n on Governmental Ethics & Election Pracs.*, 144 F.4th 9, 26 (1st Cir. 2025) (concluding that a foreign company did "not have any First Amendment rights"). Plaintiffs cannot use their First Amendment claims as a back door for doing so.

In some circumstances, noncitizens are afforded constitutional protections "once they have come within the territorial boundaries of the United States, and have established connections with this country." *Veiga v. World Meteorological Org.*, 568 F. Supp. 2d 367, 372 (S.D.N.Y. 2008), *aff'd sub nom. Veiga v. World Meteorological Organisation*, 368 F. App'x 189 (2d Cir. 2010). However, "a foreign national is not entitled to constitutional protection absent substantial connections to the United States." *Fulmen Co. v. Off. of Foreign Assets Control*, 547 F. Supp. 3d 13, 22 n.1 (D.D.C. 2020). Plaintiffs make no argument that the unidentified individuals and organizations that reside outside of the United States have come within the country or have connections to this country that would afford them any protections under the First Amendment. As such, to the extent Plaintiffs attempt to assert associational claims on behalf of non-U.S. persons, those claims must fail.

### C. AFSC Fails to Show a Likelihood of Success on Its RFRA Claim

RFRA prohibits the government from placing a "substantial[] burden" on "a person's exercise of religion" unless "application of the burden . . . (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1(a)-(b). To establish a *prima facie* RFRA violation, a plaintiff must show that he attempted to engage in the exercise of religion and that the defendants substantially burdened that exercise. *See* *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 728 (2014). Where a plaintiff successfully alleges that a government action placed a substantial burden on his or her religious exercise, a defendant may not be liable if it can demonstrate that "the application of the burden to the individual furthers a compelling state interest and is the least restrictive means of furthering that interest." *Jolly v. Coughlin*, 76 F.3d 468, 477 (2d Cir. 1996).

"[A] substantial burden exists where the state 'put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs.'" *Id.* (quoting *Thomas v. Review Bd. of the Ind. Emp't Sec. Div.*, 450 U.S. 707, 718 (1981)). "Supreme Court precedents teach that a substantial burden on religious exercise exists when an individual is required to 'choose between following the precepts of her religion and forfeiting benefits, on the one hand, and abandoning one of the precepts of her religion . . . on the other hand.'" *Westchester Day Sch. v. Village of Mamaroneck*, 504 F.3d 338, 348 (2d Cir. 2007) (quoting *Sherbert v. Verner*, 374 U.S. 398, 404 (1963)); *see also* *Fazaga v. FBI*, 965 F.3d 1015, 1061 (9th Cir. 2020) (plaintiffs may establish that they face a substantial burden "when individuals are forced to choose between following the tenets of their religion and receiving a governmental benefit," or are "coerced to act contrary to their religious beliefs by the threat of civil or criminal sanctions" (quotation marks and citation omitted)), *rev'd on other grounds*, 595 U.S. 344, 142 S. Ct. 1051 (2022). The question of whether a particular

practice is mandated by the tenets of an individual's religion, while not dispositive, can be relevant to determining if a specific burden is substantial. *See* *Ford v. McGinnis*, 352 F.3d 582, 593–95 (2d Cir. 2003). "The substantial burden test . . . presupposes that there will be cases in which it comfortably could be said that a belief or practice is so peripheral to the plaintiff's religion that any burden can be aptly characterized as constitutionally de minimis." *Id.* at 593.

Plaintiffs fail to articulate a plausible claim that Executive Order 14203 substantially burdened their religious exercise. In enacting RFRA, Congress "only sought to provide process and standards for the protection of religious exercise." *Holy Land Found. for Relief & Dev. v. Ashcroft*, 333 F.3d 156, 167 (D.C. Cir. 2003). RFRA's protections do not mean that "every infringement on a religious exercise will constitute a substantial burden." *Abdulhaseeb v. Calbone*, 600 F.3d 1301, 1316 (10th Cir. 2010). The "incidental effects of otherwise lawful government programs 'which may make it more difficult to practice certain religions but which have no tendency to coerce individuals into acting contrary to their religious beliefs' do not constitute substantial burdens on the exercise of religion." *Thiry v. Carlson*, 78 F.3d 1491, 1495 (10th Cir. 1996) (quoting *Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 450 (1988)).

Plaintiffs contend that, for AFSC, providing humanitarian aid and human rights advocacy in Palestine is part of fulfilling the Quaker belief in the inner light. Pl. Br. 71. Plaintiffs fail to explain how designations under Executive Order 14203 prevent AFSC from carrying out this work. The Executive Order imposes no restrictions on humanitarian work or advocacy for Palestine; rather, it proscribes specific, unrelated conduct—to include providing or receiving "funds, goods, or services" to or from designated persons—for the explicit purpose of preventing attempts by the ICC to investigate, arrest, detain, or prosecute protected persons without consent. 90 Fed. Reg. at

9370. Plaintiffs' wish to engage specifically with designated persons in ways that are proscribed by the Executive Order does not establish a substantial burden on their religious exercise.

*Henderson v. Kennedy*, 253 F.3d 12 (D.C. Cir. 2001), is particularly instructive. Plaintiffs, evangelical Christians, sought to sell t-shirts on the National Mall. *Id.* at 13. A National Park Service regulation prohibited the sale of certain items, including the plaintiffs' shirts, in designated sections of the National Mall. *Id.* at 14. Plaintiffs contended that the ban on the sale of shirts violated RFRA because they "hold the sincere religious belief that [they] are obligated by the Great Commission to preach the good news, the gospel, of salvation through Jesus Christ to the whole world . . . by all available means," and selling the shirts was part of effecting that belief. *Id.* at 16. The D.C. Circuit concluded that plaintiffs' religious beliefs did not demand that they sell t-shirts at every possible location, nor did the regulation preventing them from doing so prevent them from undertaking conduct that manifested a central tenet of their beliefs. *Id.* Crucially, the court concluded that "[b]ecause the Park Service's ban on sales on the Mall is at most a restriction on one of a multitude of means, it is not a substantial burden on their vocation." *Id.* at 17. Plaintiffs' argument here faces the same defects. Plaintiffs do not allege any facts demonstrating how engaging in conduct proscribed by the Executive Order with the aforementioned designated persons "significantly inhibit[s] or constrain[s] conduct or expression that manifests some central tenet of [AFSC's] individual beliefs," nor do they contend that engaging with designated individuals in ways the Executive Order prohibits is the only way of manifesting their belief in the inner light. *Id.* at 16. Plaintiffs allege that providing humanitarian aid and human rights advocacy in Palestine is part of fulfilling a Quaker belief. Pl. Br. 71. They do not, however, articulate how AFSC's religious beliefs demand that they provide or receive aid, goods, funds, or services from

designated persons specifically or that there are no other means for them to do so. As such, AFSC cannot succeed on its RFRA claim.

### D. Plaintiffs Fail to Show a Likelihood of Success on Their Fifth Amendment Claim

Plaintiffs contend that Executive Order 14203 is unconstitutionally vague under the Fifth Amendment because the terms "services" and "for the benefit of" and the distinction between providing services "to" and providing services "for the benefit of" "fail[] to provide the constitutionally required notice as to what activities [the Executive Order] proscribes." Pl. Br. 72–74. Plaintiffs' vagueness challenge fails for a multitude of reasons.

Statutes or regulations are vague when "they fail[] to provide a person of ordinary intelligence fair notice of what is prohibited, or (2) are so standardless that they authorize or encourage seriously discriminatory enforcement." *Sec. & Exch. Comm'n v. Ripple Labs, Inc.*, 682 F. Supp. 3d 308, 331–32 (S.D.N.Y. 2023) (quotation marks and citations omitted). Plaintiffs here appear to bring both a facial and as-applied challenge. They cannot succeed on either. As an initial matter, Plaintiffs seem to suggest that because they believe the Executive Order is overbroad, it follows that it is also vague in violation of the First Amendment. Pl. Br. 74. Plaintiffs misunderstand the relevant inquiry for vagueness under the Fifth Amendment. "[P]recedents make clear that a Fifth Amendment vagueness challenge does not turn on whether a law applies to a substantial amount of protected expression." *Holder v. Humanitarian L. Project*, 561 U.S. 1, 20 (2010). Plaintiffs cannot conflate their overbreadth claim with their vagueness claim.

Next, Plaintiffs' contention—that a more stringent test applies because the Executive Order threatens protected speech—is incorrect. Pl. Br. 73. While courts have concluded that "when a statute 'interferes with the right of free speech or of association, a more stringent vagueness test

should apply,'" that more stringent standard is not applicable here. *Humanitarian Law Project*, 561 U.S. at 19. As set out in the Government's brief in *DAWN*, and in Section VI.B of this brief, Plaintiffs fail to demonstrate that the Executive Order burdens any speech protected by the First Amendment. *DAWN* Gov't Br. 11–20. Even if this more stringent standard applies, Plaintiffs have not demonstrated that the Executive Order is unconstitutionally vague. First, to the extent Plaintiffs seek to bring a facial vagueness challenge, that challenge must fail. "A facial vagueness challenge will succeed only when the challenged law can never be validly applied." *Vermont Right to Life Comm., Inc. v. Sorrell*, 758 F.3d 118, 128 (2d Cir. 2014). Plaintiffs have not, and cannot, demonstrate that the Executive Order would be void for vagueness in all of its applications.

Plaintiffs certainly cannot succeed on a claim that the Executive Order is vague as applied to them. As an initial matter, Plaintiffs themselves are not designated under the Executive Order. The terms Plaintiffs identify as vague appear in the section explaining what property interests the Executive Order blocks for designated persons. 90 Fed. Reg. at 9370. Further, as a general matter, the terms that Plaintiffs claim are vague have been frequently used in executive orders issued pursuant to IEEPA across administrations. *See, e.g.*, Exec. Order 13,224, Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten To Commit, or Support Terrorism, 66 Fed. Reg. 49079 § 2(a) (Sept. 23, 2001) ("services to or for the benefit of"); Exec. Order 13,818, Blocking the Property of Persons Involved in Serious Human Rights Abuse or Corruption, 82 Fed. Reg. 60839 § 4(a) (Dec. 20, 2017) ("services . . . , to or for the benefit of"); Exec. Order 13,551, Blocking Property of Certain Persons With Respect to North Korea, 75 Fed. Reg. 53837 § F(c)(i) (Aug. 30, 2010) ("services . . . , to or for the benefit of").

More importantly, each of these terms "provide[s] a person of ordinary intelligence fair notice of what is prohibited" and the Executive Order is not "so standardless that it authorizes or

encourages discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008); *see VIP of Berlin, LLC v. Town of Berlin*, 593 F.3d 179, 186–87, 191 (2d Cir. 2010). That these terms are not defined in the Executive Order does not, as Plaintiffs contend, mean they are unconstitutionally vague. Pl. Br. 73. Indeed, "perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity." *Williams*, 553 U.S. at 304. In determining whether a statute or regulation is impermissibly vague, courts may turn to other sources, including other statutes and case law, to ascertain an undefined term's meaning.

Plaintiffs' contention that the term "services" is ambiguous and vague is unavailing. Pl. Br. 73. Courts have routinely rejected vagueness challenges to the term because "services" has a commonly understood meaning. *See Humanitarian Law Project*, 561 U.S. at 23–24 (concluding that a person of ordinary intelligence would understand the meaning of the term "service"); *KindHearts for Charitable Humanitarian Dev., Inc. v. Geithner*, 647 F. Supp. 2d 857, 895 (N.D. Ohio 2009) (concluding that the term "service" was not unconstitutionally vague because "[t]he common meaning of the word sufficiently constrains executive discretion."); *Kadi v. Geithner*, 42 F. Supp. 3d 1, 40–41 (D.D.C. 2012); *see also United States v. Homa Int'l Trading Corp.*, 387 F.3d 144, 146 (2d Cir. 2004) (per curiam) (executing money transfers from the U.S. to Iran violated a trading embargo against Iran because "[t]he term 'services' is unambiguous").

Plaintiffs' attempt to mischaracterize "services to" and "for the benefit of" as vague also fails. Courts have found that persons of ordinary intelligence would understand similar phrasing in other IEEPA-based Executive Orders. In *Humanitarian Law Project*, the Supreme Court explained that "[t]he use of the word 'to' indicates a connection between the service" and the designated group or individual and concluded that "a person of ordinary intelligence would understand that independently advocating for a cause is different from providing a service to a

group that is advocating for that cause." *Id.* at 24. *Humanitarian Law Project*'s analysis of the term "services to" also makes clear that a person of ordinary intelligence would understand that services for "the benefit of," in contrast to "services to," relates to indirect provision of services to designated persons. In light of the foregoing, Plaintiffs cannot succeed on their claim that the Executive Order is vague in violation of the Fifth Amendment.

**E. Plaintiffs Fail to Show a Likelihood of Success on Their APA Claim**

Plaintiffs' APA claim fails largely for the same reasons that the Government has already briefed. *First*, to the extent Plaintiffs' APA claim rests on prospective OFAC action against them, the claim fails for lack of a final agency action, because there has been no such action as to Plaintiffs. *DAWN* Gov't Br. 21–23. *Second*, to the extent Plaintiffs argue that any of the designations under Executive Order 14203 violate the APA because they are *ultra vires* or because they violate RFRA, the First Amendment, or the Fifth Amendment (Pl. Br. 51, 55), those arguments miss the mark for the reasons set forth above and in the Government's briefs in *Prost* and *DAWN*. *Supra* Argument, Sections I.A–D; *DAWN* Gov't Br. 10–20; *Prost* Gov't Br. 15–20; *Prost* Gov't Reply Br. 6–8. *Third*, to the extent Plaintiffs argue that Executive Order 14203 unlawfully regulates their "personal communications, information and informational activities" in violation of IEEPA's exemptions, *see* 50 U.S.C. § 1702(b)(1), (3) (Pl. Br. 55–56), the claim is unripe. *DAWN* Gov't Br. 24. Executive Order 14203 provides that it "shall be implemented consistent with applicable law" (90 Fed. Reg. at 9372), and regulations implementing that order expressly incorporate IEEPA's exemptions. 31 C.F.R. § 528.205(a). Plaintiffs' argument that they will nonetheless be penalized for exempt activity is therefore speculative, as the Government has explained. *DAWN* Gov't Br. 24 (citing *OSJI*, 510 F. Supp. 3d at 213–16; *Smith*, 791 F. Supp. 3d at 96). *Fourth*, to the extent Plaintiffs purport to challenge Executive Order 14203 or any presidential directive, "'the President

is not an agency within the meaning of the [APA]'" and his conduct is therefore not subject to APA review. *DAWN* Gov't Br. 21 (quoting *Franklin v. Massachusetts*, 505 U.S. 788, 796, 802–03 (1992)). *Fifth*, to the extent Plaintiffs argue that past Executive Order 14203 designations violate the APA because the Government did not consider the impact "on the international regime for accountability for international crimes" (Pl. Br. 53), this argument fails for the reasons explained in the Government's brief in *Prost*. *Prost* Gov't Br. 24–25; *Prost* Gov't Reply Br. 11. *Sixth*, to the extent Plaintiffs argue that the sanctions are an "abuse of discretion" because the designations pressure ICC actors (Pl. Br. 53–55), this argument likewise fails for the reasons previously briefed. *Prost* Gov't Br. 25–26; *Prost* Gov't Reply Br. 11–12.

As in *Prost*, Plaintiffs argue that the designations are "arbitrary and capricious because they are not based on '[s]ubstantial evidence.'" Pl. Br. 51. They reason that "each designated person was designated for having allegedly 'directly engaged' in an 'effort by the ICC to investigate, arrest, detain, or prosecute a protected person'" but that "none of the announcements refers to any actual evidence that any of them, in fact, 'directly engaged' in any such efforts." *Id.* at 51–52 (quoting Executive Order 14203, 90 Fed. Reg. at 9370). The Government incorporates by reference its prior arguments on this point (*Prost* Gov't Br. 23–24; *Prost* Gov't Reply Br. 10–11) but elaborates briefly.

Plaintiffs advance a narrow—and incorrect—reading of the phrase "directly engaged in any effort by the ICC to investigate, arrest, detain, or prosecute a protected person." 90 Fed. Reg. at 9370. Their position appears to be that only persons who personally "investigate, arrest, detain, or prosecute a protected person" can be designated under Executive Order 14203's terms. *Id.* But this is not what the order says: The word "directly" modifies "engaged in any effort," *id.*, meaning efforts "of 'whatever kind.'" *See* *Patel v. Garland*, 596 U.S. 328, 338 (2022) (the word "'any'"

has "'expansive meaning'"). "[D]irectly" does not modify "investigate, arrest, detain, or prosecute." 90 Fed. Reg. at 9370. Foreign persons may therefore be properly designated under Executive Order 14203 if they themselves engage in an effort—"any effort"—to have protected persons investigated, arrested, detained, or prosecuted, even if they personally do not carry out these acts. *Id.*; *cf. Terebesi v. Torreso*, 764 F.3d 217, 234 (2d Cir. 2014) ("In this Circuit, a 'direct participant' includes a person who authorizes, orders, or helps others to do the unlawful acts, even if he or she does not commit the acts personally."). Foreign persons who advocate for, request, or authorize an arrest or investigation of a protected person—which is what all the designated persons that Plaintiffs cite did (Pl. Br. 52)—fall within Executive Order 14203's scope. *See Cali v. Trump*, No. 26-5172, 2026 WL 1765953, at *4 (D.C. Cir. June 15, 2026) (Katsas, J., concurring) (Albanese "'directly engaged' [in] ICC efforts to arrest and prosecute Israeli government officials" by filing an amicus brief with the ICC). Even if there are other possible constructions of Executive Order 14203, the Secretary of State's interpretation is reasonable and withstands the "'extremely deferential'" level of review to which it is subject. *Prost* Gov't Br. 21–22; *Prost* Gov't Reply Br. 9–10.

## II. Plaintiffs Do Not Meet the Remaining Requirements to Establish Entitlement to Injunctive Relief

Plaintiffs seek the vacatur of all designations made under Executive Order 14203 within a single business day. *See infra* Argument, Section III. But Plaintiffs' delay in seeking emergency relief—more than eighteen months after Executive Order 14203 was issued—nullifies any assertion of irreparable harm. *See Prost* Gov't Br. 26–28. And for the same reasons that the *DAWN* plaintiffs failed to show irreparable harm or that the balance of equities tips in their favor, Plaintiffs have not established that these factors weigh in their favor either. *See DAWN* Gov't Br. 26–27. The expansive relief sought by Plaintiffs further underscores the Government's significant national-

security and foreign-policy interests that weigh strongly against an injunction. *See infra* Argument, Section III.

### III. Scope of Relief

Even if the Court concludes that Plaintiffs are entitled to relief (they are not), Plaintiffs' requested relief sweeps far beyond what their purported injuries could justify. Plaintiffs do not merely seek protection from Executive Order 14203 being enforced against them. They also ask the Court to categorically enjoin the Government from "implementing or enforcing Executive Order 14,203, its implementing regulations, and all designations thereunder" and to direct OFAC to strike all persons designated under the Executive Order from the SDN List "within 1 business day." Dkt. No. 40-1. This relief would run to multiple sanctioned foreign persons—none of whom is a Plaintiff here—and any individual who would transact with those designated persons. Three designated persons are litigating their own designations in another related case (*Prost v. Trump*, Case No. 26-cv-5305 (JMF)), and the designation of a fourth person (Albanese) is being litigated by family members in the District of Columbia. *See Cali*, 2026 WL 1765953, at *1. Plaintiffs would also have the Court categorically bar the Executive Branch from designating other foreign persons under Executive Order 14203 in the future. Dkt. No. 40-1. That would be a significant intrusion on the Executive's handling of foreign affairs, which is "so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference." *Hernandez v. Mesa*, 589 U.S. 93, 104 (2020) (quoting *Haig v. Agee*, 453 U.S. 280, 292 (1981)).

The requested relief is also squarely at odds with Supreme Court precedent. Courts have traditionally "issued injunctions prohibiting executive officials from enforcing a challenged law or policy only against the plaintiffs in the lawsuit." *Trump v. CASA, Inc.*, 606 U.S. 831, 837 (2025). The Supreme Court has "consistently rebuffed requests for relief that extended beyond the parties."

*Id.* at 843. Indeed, "[n]either declaratory nor injunctive relief . . . can directly interfere with enforcement of contested statutes or ordinances except with respect to the particular federal plaintiffs." *Id.* at 844 (quoting *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 931 (1975)).

Plaintiffs respond that anything short of universal relief would not be "complete." Pl. Br. 80. But "'[c]omplete relief' is not synonymous with 'universal relief.'" *CASA*, 606 U.S. at 851. "It is a narrower concept: The equitable tradition has long embraced the rule that courts generally 'may administer complete relief *between the parties*.'" *Id.* (quoting *Kinney-Coastal Oil Co. v. Kieffer*, 277 U.S. 488, 507 (1928)). Moreover, "to say that a court *can* award complete relief is not to say that it *should* do so." *Id.* at 853–54. "Complete relief is not a guarantee—it is the maximum a court can provide." *Id.* at 854.

Plaintiffs' asserted injuries take the form of allegedly chilled speech and association, claiming they have stopped or curtailed certain activities out of fear of IEEPA-based penalties. *See, e.g.*, Compl. ¶¶ 228, 236, 245, 259. But Plaintiffs do not allege that they have faced OFAC penalties for engaging with foreign persons designated under Executive Order 14203. In any event, a court order barring the Government from imposing such penalties against Plaintiffs would eliminate any fear that they have. This is what courts, including this Court, have done when adjudicating similar challenges to Executive Orders 14203 and 13928. *See Rona*, 797 F. Supp. 3d at 294 (enjoining defendants "from enforcing IEEPA's civil or criminal penalty provisions *against Plaintiffs* for the conduct specifically addressed in Plaintiff's Complaint and in this Opinion and Order, to the extent that such conduct is alleged to have been committed in violation of [Executive Order 14203]" (emphasis added)); *Smith*, 791 F. Supp. 3d at 100 ("The Government is hereby enjoined from imposing civil or criminal penalties *on the Plaintiffs* under Executive Order 14203 and the IEEPA based on the Plaintiffs' provision of speech-based services to the ICC." (emphasis

added)); *OSJI*, 510 F. Supp. 3d at 217 (enjoining defendants from "enforcing IEEPA's civil or criminal penalty provisions *against Plaintiffs* for conduct specifically addressed in Plaintiff's Complaint and in this Opinion and Order, to the extent that such conduct is alleged to have been committed in violation of Executive Order 13,928" (emphasis added)).

Plaintiffs' position is that an injunction tailored to them would be insufficient because third parties with whom they wish to collaborate would remain "chilled." Pl. Br. 80. Party-specific injunctions may "'advantag[e] nonparties'" but "only incidentally." *CASA*, 606 U.S. at 851. Removing foreign persons from the SDN List—and preventing any foreign person from ever being designated under Executive Order 14203 again—would hardly be incidental. Indeed, it would grant dispositive relief to three designated foreign nationals who challenged their designations in a separate lawsuit. *See Prost v. Trump*, Case No. 26-cv-5305 (JMF). It would also grant relief to a fourth designee (Albanese) whose family members' lawsuit resulted in an injunction that the D.C. Circuit stayed after the Government had "satisfied the stringent requirements for a stay pending appeal." *Cali*, 2026 WL 1765953, at *1. Plaintiffs invite this Court to award these parties relief they have not themselves obtained in these other cases and, for Albanese, relief that the D.C. Circuit prevented from going into effect. *Id.* Plaintiffs would also effectively be vindicating constitutional rights that foreign persons generally do not possess. *Agency for Int'l Dev.*, 591 U.S. at 433 ("it is long settled as a matter of American constitutional law that foreign citizens outside U.S. territory do not possess rights under the U.S. Constitution" and "foreign organizations operating abroad possess no rights under the U.S. Constitution").

Finally, an "injunction is a matter of equitable discretion; it does not follow from success on the merits as a matter of course." *Winter*, 555 U.S. at 32. When courts do grant relief, "district courts must take care to ensure that injunctive relief is not overbroad," and an "injunction may not

enjoin all possible breaches of the law." City of New York v. Mickalis Pawn Shop, LLC, 645 F.3d 114, 144 (2d Cir. 2011) (quotation marks omitted). Even though no U.S. national or U.S.-based entity has been subject to IEEPA-based penalties under Executive Order 14203 for the activities they wish to engage in, Plaintiffs allege that they have refrained from speaking and associating with certain foreign persons given their fear of such penalties. *See supra* Background, Section V. If any relief to Plaintiffs were appropriate (none is), that relief would be limited to ensuring that they can speak and associate without facing such penalties. Appropriate relief would not dismantle a sanctions program based on a declared national emergency. Should the Court grant any preliminary relief (and it should not), the Court should only enjoin enforcement of IEEPA's penalty provisions as to Plaintiffs for the activities identified in the Complaint and accompanying declarations.

## CONCLUSION

For these reasons, the Court should deny Plaintiffs' motion for a preliminary injunction.

Dated: New York, New York
October 1, 2026

Respectfully submitted,

JAMES M. MCDONALD
United States Attorney for the
Southern District of New York
*Attorney for Defendants*

By: */s/ Danielle J. Marryshow*
DANIELLE J. MARRYSHOW
MARK OSMOND
KAMIKA S. SHAW
Assistant United States Attorneys
86 Chambers Street, 3rd Floor
New York, New York 10007
Tel: (212) 637-2689/2713/2768

## CERTIFICATE OF COMPLIANCE

The undersigned counsel hereby certifies that this memorandum complies with the Court's August 24, 2026 Order, Dkt. No. 37, granting the parties leave to exceed Local Rule 7.1(c)'s word-count limitation. As measured by the word processing system used to prepare it, this memorandum contains 8,898 words.

*/s/ Danielle J. Marryshow*
Assistant United States Attorney