**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| AMERICAN FRIENDS SERVICE COMMITTEE; CENTER FOR CONSTITUTIONAL RIGHTS; HUMAN RIGHTS WATCH; and OPEN SOCIETY INSTITUTE,<br><br>Plaintiffs,<br><br>v.<br><br>DONALD J. TRUMP, et al.,<br><br>Defendants. | Civil Action No. 26-cv-6830<br><br>Hon. Jesse M. Furman |

**BRIEF OF THE NEW YORK CITY BAR ASSOCIATION AS *AMICUS CURIAE* IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

October 28, 2026

Lauren G. Axelrod (LA1978)
General Counsel and Deputy Director
New York City Bar Association
42 West 44th Street
New York, NY 10036
(212) 382-6674
laxelrod@nycbar.org

Jonathan Hafetz (JH0843)
Member, City Bar Council on International Affairs
Seton Hall Law School
One Newark Center
Newark, NJ 07102
(917) 355-6896
jonathan.hafetz@shu.edu

*Counsel for Amicus Curiae New York City Bar Association*

## CORPORATE DISCLOSURE STATEMENT

*Amicus curiae* the New York City Bar Association ("City Bar") is a not-for-profit membership corporation organized under the laws of the State of New York. It has no parent corporation, it issues no stock, and no publicly held corporation owns any interest in it.

# TABLE OF CONTENTS


**INTERESTS OF AMICUS CURIAE ... 1**

**INTRODUCTION ... 5**

**ARGUMENT ... 6**

**I. THE PUBLIC INTEREST WEIGHS AGAINST SANCTIONS THAT PUNISH ADJUDICATIVE FUNCTIONS AND UNDERMINE JUDICIAL INDEPENDENCE AND INTERNATIONAL ADMINISTRATION OF JUSTICE ... 6**

**II. THE ORDER BURDENS PROTECTED LEGAL ADVOCACY AND DISRUPTS THE WORK OF LAWYERS AND CIVIL SOCIETY ORGANIZATIONS ... 8**

**III. U.S. JURISDICTIONAL AND SOVEREIGNTY CONCERNS CAN BE PURSUED THROUGH THE LEGAL MECHANISMS PRESERVED BY CONGRESS AND THE ROME STATUTE ... 11**

**CONCLUSION ... 15**

# TABLE OF AUTHORITIES

**Cases**

*Bradley v. Fisher*, 80 U.S. (13 Wall.) 335, 347 (1872) ........ 6
*Goldstein v. Hochul*, 2022 WL 22915988, at *1 (S.D.N.Y. Oct. 19, 2022) ........ 2
*Huminski v. Corsones*, 396 F.3d 53, 75 (2d Cir. 2005) ........ 6
*In re Primus*, 436 U.S. 412, 426–32 (1978) ........ 9
Model Rules of Prof'l Conduct r. 1.2(b), 1.2(d) (Am. Bar Ass'n 2020); Restatement (Third) of the Law Governing Lawyers §§ 56, 57(3) (Am. L. Inst. 2000) ........ 10
*Nat'l Ass'n for Advancement of Colored People v. Button*, 371 U.S. 415, 429–31 (1963) ........ 9
*Onondaga Indian Nation v. State of New York,* 1997 WL 369389, at *2 (S.D.N.Y. June 25, 1997) ........ 2
*Open Society Justice Initiative v. Trump* ........ 9
*Pierson v. Ray*, 386 U.S. 547, 553–56 (1967) ........ 6
*Rona v. Trump*, ........ 9
*S.S. Lotus* (Fr. v. Turk.), 1927 P.C.I.J. (ser. A) No. 10, at 20 (territorial jurisdiction over conduct within a state's territory is a settled attribute of sovereignty) ........ 12
*SEC v. Ripple Labs, Inc.*, 2021 WL 4555352, at *5 (S.D.N.Y. Oct. 4, 2021 ........ 2
*See, e.g.*, N.Y. Rules of Prof'l Conduct r. 1.2(b), 22 N.Y.C.R.R. § 1200.0; ........ 10
*Stump v. Sparkman*, 435 U.S. 349, 368 (1978) ........ 6
*Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637–38 (1952) ........ 14

**Statutes**

22 U.S.C. § 7433 ........ 14
American Servicemembers' Protection Act of 2002, 22 U.S.C. §§ 7421–7433 ........ 3, 12, 13
Consolidated Appropriations Act, 2023, Pub. L. No. 117-328, div. K, § 7073, 136 Stat. 4459. ........ 14
IEEPA ........ 3, 5, 14

**Other Authorities**

New York City Bar Ass'n, *Letter to IC Prosecutor Regarding Investigating Crimes Against Humanity in Nigeria* (Apr. 30, 2015), https://www.nycbar.org/reports/letter-to-icc-prosecutor-regaring-investigating-crimes-against-humanity-in-nigeria/ ........ 2
New York City Bar Ass'n, *Statement in Opposition to Retaliatory Measures Against the ICC or Its Personnel* (June 7, 2024), https://www.nycbar.org/reports/statement-in-opposition-to-retaliatory-measures-against-the-icc-or-its-personnel/; New York City Bar Ass'n, *Statement on Proposed Sanctions by the United States Government Against the International Criminal Court* (Jan. 16, 2025) https://www.nycbar.org/reports/statement-on-proposed-sanctions-by-the-united-states-government-against-the-icc/ ........ 3, 8
New York City Bar Ass'n, *Statement Opposing U.S. Sanctions on Persons Working with or for the International Criminal Court* (July 2020), https://www.nycbar.org/reports/statement-opposing-u-s-sanctions-on-persons-working-with-or-for-the-international-criminal-court/?utm_source=chatgpt.com ........ 2
Homepage, New York City Bar Ass'n, https://www.nycbar.org/ (last visited Sept. 19, 2026 ........ 1
New York City Bar Ass'n, *Report on the Proposed International Criminal Court* (July 1, 2002), https://www.nycbar.org/reports/report-on-the-proposed-international-criminal-court/. 1, 2

**Rules**

Federal Rule of Appellate Procedure 29 .......... 3
Local Civil Rule 7.1 .......... 3
Local Rule 7.1(c) .......... 16

**Executive Orders**

Executive Order 14,203 ("the Order") .......... passim

**Treaties and International Materials**

Basic Principles on the Independence of the Judiciary, princ. 2, *endorsed by* G.A. Res. 40/32, U.N. Doc. A/RES/40/32 (Nov. 29, 1985), *and* G.A. Res. 40/146, U.N. Doc. A/RES/40/146 (Dec. 13, 1985). .......... 7, 10
Exec. Order No. 13224 § 1, 66 Fed. Reg. 49,079 (Sept. 25, 2001); .......... 7
Exec. Order No. 13382 § 1, 70 Fed. Reg. 38,567b (July 1, 2005) .......... 7
Exec. Order No. 13694 § 1, 80 Fed. Reg. 18,077 (Apr. 2, 2015) .......... 7
Exec. Order No. 13818 § 1, 82 Fed. Reg. 60,839 (Dec. 26, 2017) .......... 7
International Covenant on Civil and Political Rights, .......... 7
Rome Statute of the International Criminal Court, July 17, 1998, 2187 U.N.T.S. 90 .......... passim

**INTERESTS OF AMICUS CURIAE**

*Amicus curiae* is the New York City Bar Association ("City Bar"), a voluntary professional association of more than 20,000 attorneys and judges dedicated to promoting the rule of law, the fair administration of justice, and the sound development of domestic and international legal principles. Founded in 1870, the City Bar has long served as a leading voice on legal policy matters affecting both domestic and international law.

Through its committees and task forces – including its Council on International Affairs, International Law Committee, International Human Rights Committee, Task Force on the Rule of Law, and Task Force on the Independence of Lawyers and Judges – the City Bar monitors and reports[1] on issues concerning international institutions, human rights, judicial independence, and U.S. constitutional and statutory law, as well as the development and enforcement of international law. These bodies publish policy reports, engage with governmental and international organizations, and convene members of the legal, diplomatic, and international communities.

The City Bar also regularly participates as *amicus curiae* before this Court and other courts in cases presenting questions of substantial jurisprudential importance.

The City Bar has a particular and longstanding interest in the International Criminal Court ("ICC" or the "Court"), the system of international criminal justice it serves, and the independence of its judges, prosecutors, and counsel. More than two decades ago, the City Bar strongly endorsed the creation of a permanent international criminal court and urged the United States to support the Court's establishment and eventual ratification of its founding treaty.[2] The City Bar explained that "[t]he most compelling reason for establishing an ICC" was that perpetrators of the gravest

---

[1] *See* Homepage, New York City Bar Ass'n, https://www.nycbar.org/ (last visited Sept. 19, 2026).

[2] *See* New York City Bar Ass'n, *Report on the Proposed International Criminal Court* (July 1, 2002), https://www.nycbar.org/reports/report-on-the-proposed-international-criminal-court/.

international crimes might otherwise escape accountability.[3] A permanent court, it reasoned, would promote the consistent application of international criminal law while preserving the primary authority and responsibility of national courts.[4] The ICC accordingly operates as a court of last resort: under the principle of complementarity, it acts only when States with jurisdiction are unwilling or unable genuinely to investigate or prosecute, thereby providing a forum when the alternative may be impunity for genocide, crimes against humanity, war crimes, and other crimes within the Court's jurisdiction.[5]

Since the Court's establishment, the City Bar has continued to support international criminal accountability and to monitor the ICC's work. It has communicated directly with the ICC's Office of the Prosecutor concerning alleged crimes against humanity;[6] urged the United States to provide appropriate assistance to the Court's investigation of alleged war crimes in Ukraine;[7] and repeatedly opposed sanctions and other retaliatory measures directed at the Court, its personnel, and those who support its work. In 2020, the City Bar warned that sanctions against persons working with or for the ICC would impede the Court's operations and undermine the rule of law.[8] It renewed that concern in 2024 and 2025, emphasizing that the ICC is an independent judicial institution and that disagreements with its decisions should be addressed through lawful

---

[3] *Id*.

[4] *Id*.

[5] *Rome Statute of the International Criminal Court* art. 17(1)(a), July 17, 1998, 2187 U.N.T.S. 90; 37 I.L.M 1002 (1998) (*hereinafter* "Rome Statute"); *see also* Int'l Crim. Ct., *About the Court*, https://www.icc-cpi.int/about/the-court (last visited Sept. 23, 2026).

[6] *See* New York City Bar Ass'n, *Letter to ICC Prosecutor Regarding Investigating Crimes Against Humanity in Nigeria* (Apr. 30, 2015), https://www.nycbar.org/reports/letter-to-icc-prosecutor-regaring-investigating-crimes-against-humanity-in-nigeria/.

[7] *See* New York City Bar Ass'n, *United States Support for the International Criminal Court* (Apr. 5, 2023), https://www.nycbar.org/reports/united-states-support-for-the-international-criminal-court/.

[8] *See, e.g.*, New York City Bar Ass'n, *Statement Opposing U.S. Sanctions on Persons Working with or for the International Criminal Court* (July 29, 2020), https://www.nycbar.org/reports/statement-opposing-u-s-sanctions-on-persons-working-with-or-for-the-international-criminal-court/?utm_source=chatgpt.com.

procedures rather than measures punishing the judges, prosecutors, lawyers, witnesses, and others engaged in its proceedings.[9]

The City Bar's support for the ICC does not imply endorsement of every investigation, arrest warrant, jurisdictional ruling, or other decision of the Court. Nor does the City Bar take a position here on the merits of the proceedings that prompted the challenged Executive Order 14,203, *Imposing Sanctions on the International Criminal Court* ("the Order"). Its concern is institutional: international courts must remain free to exercise their lawful functions without economic coercion, and lawyers and other participants must be able to engage with judicial institutions without fear of retaliation.

The City Bar has a substantial interest in safeguarding the ability of lawyers, scholars, advocates, and civil-society organizations – including its own members – to provide legal services, conduct research, communicate with international judicial institutions, and participate in proceedings concerning the interpretation and enforcement of international law without fear of economic retaliation or criminal penalty. By threatening those activities, the Order undermines judicial independence, interferes with the work of the legal profession, and impairs the administration of justice. The City Bar's interest is particularly significant given New York City's role as a global center of international law and the host city of the United Nations and other international institutions.

The City Bar therefore submits this brief to offer its institutional perspective on judicial independence, the role of lawyers in international legal proceedings, and the rule-of-law

---

[9] *See, e.g.*, New York City Bar Ass'n, *Statement in Opposition to Retaliatory Measures Against the ICC or Its Personnel* (June 7, 2024), https://www.nycbar.org/reports/statement-in-opposition-to-retaliatory-measures-against-the-icc-or-its-personnel/; New York City Bar Ass'n, *Statement on Proposed Sanctions by the United States Government Against the International Criminal Court* (Jan. 16, 2025), https://www.nycbar.org/reports/statement-on-proposed-sanctions-by-the-united-states-government-against-the-icc/.

consequences of imposing economic sanctions on judges, prosecutors, lawyers, and civil-society actors for carrying out or supporting lawful legal work.

## INTRODUCTION

On February 6, 2025, the President issued Executive Order 14,203, *Imposing Sanctions on the International Criminal Court*, 90 Fed. Reg. 9369 (Feb. 6, 2025) (*hereinafter* "Exec. Order No. 14,203" or the "Order"). Invoking the International Emergency Economic Powers Act ("IEEPA") and declaring a national emergency, the Order authorizes sanctions against foreign persons who directly participate in an ICC effort to investigate, arrest, detain, or prosecute a "protected person" without the consent of that person's country of nationality.[10] *Id*. § pmbl., § 1(a)(ii)(A). It also reaches foreign persons who materially assist, sponsor, or provide financial, material, or technological support, goods, or services for such ICC activity or for a person blocked under the Order, as well as persons owned or controlled by, or acting on behalf of, a blocked person. *Id*. §§ 1(a)(ii)(B)–(C).

Designation carries sweeping consequences. The Order blocks property and interests in property subject to U.S. jurisdiction; prohibits U.S. persons from providing funds, goods, or services to, or receiving them from, a designated person; and suspends entry into the United States for designated persons, certain ICC personnel, and their immediate family members, subject to limited exceptions. *Id*. §§ 1–3. Its reach, therefore, extends beyond ICC judges and prosecutors to lawyers, investigators, experts, witnesses, scholars, and civil-society organizations whose work supports ICC proceedings. As explained below, this sanctions regime implicates the public interest by subjecting adjudicative and legal activity to economic coercion, burdening protected advocacy

[10] Pursuant to this Executive Order, a "protected person" is (i) any U.S. person, including current or former servicemembers, current or former elected or appointed federal officials, and anyone else currently or formerly employed by or working on behalf of the U.S. government, unless the United States formally consents to ICC jurisdiction over that person or joins the Rome Statute; and (ii) any citizen or lawful resident of a U.S. ally, in the same categories, where that ally has not consented to ICC jurisdiction over the person and is not a Rome Statute party. *Id.* § 8(d).

and professional relationships, and circumventing the legal mechanisms available for contesting the ICC's jurisdiction and decisions.

## ARGUMENT

### I. THE PUBLIC INTEREST WEIGHS AGAINST SANCTIONS THAT PUNISH ADJUDICATIVE FUNCTIONS AND UNDERMINE JUDICIAL INDEPENDENCE AND INTERNATIONAL ADMINISTRATION OF JUSTICE

The challenged Order reaches a broad range of participants in the ICC proceedings and directly undermines the principle of judicial independence. Section 1(a)(ii)(A) authorizes the blocking of property belonging to any foreign person determined to have "directly engaged in any effort by the ICC to investigate, arrest, detain, or prosecute a protected person without consent of that person's country of nationality." *Id*. § 1(a)(ii)(A).

The Order directly undermines the principle of judicial independence. Judicial independence is a foundational feature of the American conception of the rule of law. The Supreme Court has long recognized that a judge must be "at liberty to exercise their functions with independence and without fear of consequences." *Stump v. Sparkman*, 435 U.S. 349, 368 (1978) (quoting *Bradley v. Fisher*, 80 U.S. (13 Wall.) 335, 347 (1872)); *see also* *Huminski v. Corsones*, 396 F.3d 53, 75 (2d Cir. 2005). That principle protects more than the personal interests of individual judges. It preserves the integrity of the adjudicative process and public confidence that legal disputes will be resolved according to law rather than external pressure.

The American judicial immunity doctrine gives practical effect to the principle of judicial independence. Judges are protected from personal liability for judicial acts—even when those acts are alleged to have been erroneous, procedurally improper, or undertaken in excess of authority—because the prospect of personal consequences could distort independent decision-making. *See* *Stump*, 435 U.S. at 360-62; *Pierson v. Ray*, 386 U.S. 547, 553–56 (1967).

International legal authorities recognize and establish the same conception of judicial independence that is embedded in American law. The United Nations Basic Principles on the Independence of the Judiciary provide that judges must decide matters impartially, "without any restrictions, improper influences, inducements, pressures, threats or interferences, direct or indirect, from any quarter or for any reason."[11] Similarly, the International Covenant on Civil and Political Rights, ratified by the United States, recognizes the right to adjudication by a "competent, independent and impartial tribunal established by law."[12] The Rome Statute of the ICC reflects the same principle by treating the obstruction or intimidation of a Court official, when undertaken to influence the official's performance of duties, as an offense against the administration of justice.[13]

The Order, however, makes participation in an investigative or adjudicative process the basis for severe personal economic consequences. That is materially different from conventional conduct-based sanctions regimes directed at terrorism, weapon proliferation, or illicit financing. *See, e.g.*, Exec. Order No. 13224 § 1, 66 Fed. Reg. 49,079 (Sept. 25, 2001); Exec. Order No. 13382 § 1, 70 Fed. Reg. 38,567b (July 1, 2005); Exec. Order No. 13694 § 1, 80 Fed. Reg. 18,077 (Apr. 2, 2015); Exec. Order No. 13818 § 1, 82 Fed. Reg. 60,839 (Dec. 26, 2017). Those regimes employ sanctions to deny resources to, disrupt, or impose consequences upon the underlying harmful activity. The Order employs the same machinery—asset blocking, prohibitions on transactions and services, and restrictions on entry—but attaches it to a fundamentally different predicate. The conduct identified in the Order is not corruption, violence, illicit financing, evidence tampering, or abuse of judicial office. The Order makes the exercise of adjudicative authority itself the

---

[11] Basic Principles on the Independence of the Judiciary, princ. 2, *endorsed by* G.A. Res. 40/32, U.N. Doc. A/RES/40/32 (Nov. 29, 1985), *and* G.A. Res. 40/146, U.N. Doc. A/RES/40/146 (Dec. 13, 1985).

[12] International Covenant on Civil and Political Rights art. 14(1), Dec. 19, 1966, S. Exec. Doc. E, 95-2 (1978), 999 U.N.T.S. 171.

[13] Rome Statute art. 70(1)(d).

triggering conduct. It penalizes ICC personnel because they investigate cases, seek warrants, issue judicial decisions, or otherwise perform functions assigned to them by the Court's constituent instrument. It substitutes economic coercion for legal argument and places the personal interests of adjudicators in direct conflict with their obligation to decide cases independently. The City Bar has repeatedly warned against this form of retaliation.[14]

Normalizing such measures also would have consequences extending beyond the ICC. If a state's government may sanction judges because they disapprove of jurisdictional rulings or warrants, other states could invoke the same rationale not only against other international jurists but also against American judges hearing transnational cases, as well as against prosecutors, lawyers, witnesses, and experts participating in those proceedings. The public interest does not favor establishing that precedent.

## II. THE ORDER BURDENS PROTECTED LEGAL ADVOCACY AND DISRUPTS THE WORK OF LAWYERS AND CIVIL-SOCIETY ORGANIZATIONS

Furthermore, the Order directly threatens the work of lawyers and civil-society organizations participating in ICC proceedings. Section 1(a)(ii)(B) authorizes the designation of any foreign person who materially assists or provides financial, material, or technological support, goods, or services in support of covered ICC activity or a blocked person. Exec. Order No. 14,203, § 1(a)(ii)(B). Once a person is designated, the Order restricts U.S. persons from providing funds, goods, or services to or for the benefit of that person, or receiving them from that person, absent authorization. *Id*. §§ 1(a), 3. The Order thus exposes foreign lawyers, witnesses, and organizations to designation while restricting their U.S. counterparts from assisting them.

[14] *See* New York City Bar Ass'n, *Statement on Proposed Sanctions by the United States Government Against the ICC* (Jan. 16, 2025); New York City Bar Ass'n, *Statement in Opposition to Retaliatory Measures Against the ICC or Its Personnel* (June 7, 2024).

That burden is particularly acute for non-governmental and civil-society organizations, which document alleged crimes, preserve evidence, identify and assist victims and witnesses, and transmit information to the Court—functions expressly contemplated by the Rome Statute.[15] By deterring foreign organizations from performing that work and restricting U.S. organizations from collaborating with designated partners, the Order disrupts the cross-border networks through which evidence reaches the Court and affected communities gain access to justice.

Those restrictions implicate protected expression and association. In *Open Society Justice Initiative v. Trump*, this Court preliminarily enjoined enforcement of materially similar ICC sanctions against lawyers and scholars whose advice, training, and other assistance had been chilled. 510 F. Supp. 3d 198, 209–15, 220–21 (S.D.N.Y. 2021). More recently, in *Rona v. Trump*, this Court held that the Order imposed an unconstitutional content-based restriction when applied to speech-based services provided to the ICC. 797 F. Supp. 3d 278, 288–93 (S.D.N.Y. 2025).

These rulings follow the Supreme Court's recognition that litigation undertaken by lawyers and civil-society organizations to vindicate legal rights may constitute protected political expression and association. *See* *Nat'l Ass'nNat'l Ass'n for Advancement of Colored People v. Button*, 371 U.S. 415, 429–31 (1963); *In re Primus*, 436 U.S. 412, 426–32 (1978). Although those protections do not immunize independently unlawful conduct, they establish that advocacy does not lose constitutional protection merely because it is conducted through litigation or coordinated with a nonprofit organization.

International professional standards reinforce the same principle with respect to lawyers. The United Nations Basic Principles on the Role of Lawyers call on governments to ensure that lawyers can perform their professional functions "without intimidation, hindrance, harassment or

---

[15] *See* Rome Statute art. 15(2).

improper interference" and do not suffer "administrative, economic or other sanctions" for conduct consistent with recognized professional duties and ethics.[16] They further provide that lawyers must not be identified with their clients or their clients' causes merely because they discharge their professional responsibilities.[17] These principles parallel the understanding under U.S. law that representation neither makes counsel responsible for a client's alleged conduct nor signifies counsel's endorsement of the client's position.[18]

The Order burdens precisely these protected professional functions. Its broad references to "material assistance," "support," and "services" reach activities central to legal representation and civil-society participation, including advising clients, investigating and documenting alleged crimes, evaluating evidence, preparing submissions, communicating with Court personnel, and coordinating with co-counsel and experts. The Order does not limit sanctions to independently unlawful conduct such as obstruction, evidence tampering, or illicit financing. It targets participation in ICC proceedings. These activities, moreover, are not peripheral commercial transactions. They are the means through which counsel discharge basic professional obligations, civil-society organizations advance legal claims and communicate relevant information, clients obtain access to justice, and tribunals receive the evidence and argument necessary for informed adjudication. By attaching severe economic consequences to such participation because it supports proceedings disfavored by the Executive, the Order burdens protected advocacy and disrupts attorney–client relationships, thus disserving the public interest in the fair and informed administration of justice.

---

[16] Basic Principles on the Role of Lawyers, princ. 16, *welcomed by* G.A. Res. 45/166, U.N. Doc. A/RES/45/166 (Dec. 18, 1990).

[17] *Id*. princ. 18.

[18] *See*, *e.g.*, N.Y. Rules of Prof'l Conduct r. 1.2(b), 22 N.Y.C.R.R. § 1200.0; Model Rules of Prof'l Conduct r. 1.2(b), 1.2(d) (Am. Bar Ass'n 2020); Restatement (Third) of the Law Governing Lawyers §§ 56, 57(3) (Am. L. Inst. 2000).

## III. U.S. JURISDICTIONAL AND SOVEREIGNTY CONCERNS CAN BE PURSUED THROUGH THE LEGAL MECHANISMS PRESERVED BY CONGRESS AND THE ROME STATUTE

The availability of legal mechanisms for contesting ICC action further demonstrates why coercion of judges and lawyers is neither necessary nor appropriate. The United States has long objected to the ICC's exercise of jurisdiction over nationals of States that have not joined the Rome Statute. It may maintain that position, decline to become a party to the Statute, withhold cooperation where the law permits, and defend its legitimate sovereign interests. But disagreement with the scope of a tribunal's jurisdiction does not justify imposing personal economic sanctions on the judges, prosecutors, lawyers, and other participants responsible for resolving that legal question. The rule-of-law response to disputed jurisdiction is a legal challenge, not coercion of the adjudicative process.

The Rome Statute provides mechanisms for raising those objections. The ICC prosecutes natural persons, not States.[19] Under Article 12(2), the Court ordinarily may exercise jurisdiction when either the State on whose territory the alleged conduct occurred or the State of the accused's nationality is a party to the Statute or has accepted its jurisdiction.[20] Article 12(3) permits a nonparty State to accept jurisdiction over specified conduct, and Article 13(b) permits the U.N. Security Council to refer a situation to the Court.[21] Under the Statute's terms, therefore, the Court may assert jurisdiction over a national of a nonparty State for conduct allegedly committed on the territory of a State Party or a State that has accepted its jurisdiction.

---

[19] Rome Statute, arts. 1, 25.
[20] *Id*. art. 12(2)
[21] *Id*. arts. 12(3), 13(b).

That jurisdictional theory rests on the familiar principle of territorial criminal jurisdiction. A State ordinarily may prosecute a foreign national for conduct committed on its territory without obtaining the consent of the individual's State of nationality.[22] The Rome Statute rests on the proposition that States Parties may confer such territorial jurisdiction on the ICC.

The United States disputes the application of that principle to an international court exercising jurisdiction over nonparty nationals. The Rome Statute, however, provides legal mechanisms for presenting that dispute. Article 19 permits challenges to jurisdiction or admissibility by an accused or person for whom a warrant or summons has issued; by a State with jurisdiction over the case that is investigating or prosecuting it, or has investigated or prosecuted it; and by a State whose acceptance of jurisdiction is required under Article 12.[23] Article 18 permits a State, subject to the provision's procedures and time limits, to inform the Court that it is investigating relevant persons or conduct and to request that the Prosecutor defer to that investigation.[24]

Congress preserved those means even while expressing substantial concern about ICC proceedings involving U.S. nationals. In the American Servicemembers' Protection Act of 2002 ("ASPA"), Congress directly considered how the United States should protect its personnel and interests in relation to the ICC when it enacted ASPA. 22 U.S.C. §§ 7421–7433. The Order itself relies on ASPA, quoting Congress's finding that the Rome Statute exposes United States personnel and officials to the risk of international prosecution. *See id*. § 7421(9). Having invoked ASPA's findings, the Executive cannot disregard what ASPA's operative provisions do.

---

22 *See S.S. Lotus* (Fr. v. Turk.), 1927 P.C.I.J. (ser. A) No. 10, at 20 (territorial jurisdiction over conduct within a state's territory is a settled attribute of sovereignty).
23 Rome Statute, art. 19(2).
24 *Id*. art. 18(2).

ASPA reflects substantial congressional concern regarding ICC proceedings involving U.S. nationals. *See id*. §§ 7421, 7423. But it also demonstrates that Congress did not treat every form of participation before the ICC as categorically impermissible. Section 7427(c) expressly authorizes the President to direct federal agencies to provide:

1. legal representation and other legal assistance to eligible U.S. persons involved in ICC proceedings;
2. exculpatory evidence on their behalf; and
3. representation of United States interests through appearances before the ICC under Articles 18 and 19 of the Rome Statute. *Id.* § 7427(c).

ASPA also separately addresses the distinct circumstance in which a covered U.S. or allied person has actually been detained or imprisoned by or at the request of the ICC, authorizing the President to take measures to secure that person's release. *Id.* § 7427(a). https://www.westlaw.com/Browse/Home/StatutesCourtRules/UnitedStatesCodeAnnotatedUSCA?guid=N5336A8942E0F47679B2843774BA6E282&transitionType=Default&contextData=(sc.Default)&VR=3.0&RS=cblt1.0Yet even that broad grant contains an express limitation: § 7427(d) provides that the statute does not authorize the payment of bribes or similar incentives to induce a person's release. *Id*. § 7427(d).

Read together, these provisions reflect a differentiated statutory framework. Congress restricted specified forms of cooperation with the ICC; expressly authorized legal representation, evidentiary submissions, and jurisdictional and admissibility challenges when covered persons are investigated or prosecuted; and authorized broader measures when such persons are actually detained or imprisoned, while expressly declining to authorize certain forms of inducement even in that circumstance.

The Order takes a materially different approach. It imposes economic sanctions based on participation in specified ICC investigative, prosecutorial, and adjudicative activities, rather than relying on the mechanisms Congress expressly contemplated for protecting U.S. interests in ICC proceedings. That departure is particularly significant where no covered U.S. person has been detained or imprisoned—a circumstance that Congress addressed separately by authorizing measures to secure the release of covered persons. *Id.* § 7427(a).

Congress's specific treatment of ICC proceedings bears directly on the scope of Executive authority. Where presidential action is incompatible with the expressed or implied will of Congress, presidential authority is "at its lowest ebb." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637–38 (1952) (Jackson, J., concurring).

The United States' practice confirms that engagement with the ICC can serve national interests. Congress has authorized assistance to ICC investigations involving foreign nationals, and the United States has supported the Court's efforts to investigate alleged war crimes in Ukraine. 22 U.S.C. § 7433; Consolidated Appropriations Act, 2023, Pub. L. No. 117-328, div. K, § 7073, 136 Stat. 4459. That selective cooperation does not require the United States to accept every assertion of ICC jurisdiction. It demonstrates, however, that the Court's processes are not inherently a threat and that U.S. objections can be addressed through legal and diplomatic channels.

In light of this statutory framework and practice, the Executive's resort to economic sanctions in place of available legal and diplomatic mechanisms reinforces Plaintiffs' argument that the Order exceeds the authority conferred by IEEPA.

## CONCLUSION

For the foregoing reasons, amicus respectfully submits that plaintiffs are likely to succeed on their statutory claim, and that the public interest weighs against permitting the performance of adjudicative functions and the provision of legal representation to serve as predicates for economic sanction. The motion for preliminary injunction should be granted.

Respectfully submitted,

**NEW YORK CITY BAR ASSOCIATION**

*/s/ Lauren G. Axelrod*__________
Lauren G. Axelrod (LA1978)
General Counsel & Deputy Director
New York City Bar Association
42 West 44th Street
New York, NY 10036
(212) 382-6674
laxelrod@nycbar.org

Jonathan Hafetz (JH0843)
Member, City Bar Council on International Affairs
Seton Hall Law School
One Newark Center
Newark, NJ 07102
(917) 355-6896
jonathan.hafetz@shu.edu

*Counsel for Amicus Curiae New York City Bar Association*

**CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1(c)**

I, Lauren G. Axelrod, counsel for *amicus curiae* New York City Bar Association, hereby certify that the foregoing brief complies with the word count limitation set forth in Local Rule 7.1(c). This document contains 3,839 words, excluding the caption, table of contents, table of authorities, signature block, and required certificates.

*/s/ Lauren G. Axelrod*
Lauren G. Axelrod (LA1978)
General Counsel & Deputy Director
New York City Bar Association
42 West 44th Street
New York, NY 10036
(212) 382-6674
laxelrod@nycbar.org

**CERTIFICATE OF SERVICE**

I hereby certify that on October 28, 2026, I electronically filed a copy of the attached amicus curiae brief, using the CM/ECF System for the United States District Court for the Southern District of New York, which will send notification of that filing to all counsel of record in this litigation.

*/s/ Lauren G. Axelrod*
Lauren G. Axelrod (LA1978)
General Counsel & Deputy Director
New York City Bar Association
42 West 44th Street
New York, NY 10036
(212) 382-6674
laxelrod@nycbar.org