**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| AMERICAN FRIENDS SERVICE COMMITTEE; CENTER FOR CONSTITUTIONAL RIGHTS; HUMAN RIGHTS WATCH; and OPEN SOCIETY INSTITUTE,<br><br>*Plaintiffs*,<br><br>v.<br><br>DONALD J. TRUMP, *et al*.,<br><br>*Defendants*. | No. 26-cv-6830-JMF |

**REPLY IN SUPPORT OF**
**MOTION FOR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS


I. The Sanctions Regime Is *Ultra Vires* .....2

A. Absence of National Emergency .....2

B. Conflict with ASPA .....4

C. Violation of International Law .....5

II. APA .....7

III. First Amendment .....8

IV. RFRA .....10

V. Fifth Amendment .....11

VI. Remaining Requirements for Injunctive Relief .....12

VII. Scope of Relief .....13

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Agudath Isr. of Am. v. Cuomo*,
983 F.3d 620 (2d Cir. 2020)....................12

*Allstate Ins. Co. v. Landow*,
No. 24-cv-2010-DLI-JRC, 2026 U.S. Dist. LEXIS 67824 (E.D.N.Y. Mar. 30, 2026)....................12

*Borecky v. Cnty. of Nassau*,
No. 26-cv-2049-SJB-ST, 2026 U.S. Dist. LEXIS 136424 (E.D.N.Y. June 18, 2026)....................9

*Boy Scouts of Am. v. Dale*,
530 U.S. 640 (2000)....................10

*Califano v. Yamasaki*,
442 U.S. 682 (1979)....................14

*Cath. Legal Immigr. Network, Inc. v. Rubio*,
No. 26-cv-00858-JAV, 2026 U.S. Dist. LEXIS 189086 (S.D.N.Y. Aug. 21, 2026)....................13

*Chi. Women in Trades v. Trump*,
No. 25 C 2005, 2025 U.S. Dist. LEXIS 214127 (N.D. Ill. Oct. 30, 2025)....................15

*Comey v. U.S. DOJ*,
No. 25-cv-7625-JMF, 2026 U.S. Dist. LEXIS 244266 (S.D.N.Y. Oct. 26, 2026)....................2

*Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*,
603 U.S. 799 (2024)....................7, 13

*Doe v. Reed*,
561 U.S. 186 (2010)....................9

*Doe v. Trump*,
157 F.4th 36 (1st Cir. 2025)....................16

*Etienne v. Ferguson*,
791 F. Supp. 3d 1226 (W.D. Wash. 2025)....................16

*Exxon Mobil Corp. v. Mnuchin*,
430 F. Supp. 3d 220 (N.D. Tex. 2019) ....................12

*Fazaga v. FBI*,
965 F.3d 1015 (9th Cir. 2020) ....................10

*FCC v. Fox Television Stations, Inc.*,
567 U.S. 239 (2012)....................11

*FDA v. Brown & Williamson Tobacco Corp.*,
529 U.S. 120 (2000)....................4

*Fighting Finest v. Bratton*,
95 F.3d 224 (2d Cir. 1996)....................9

*Griffin v. HM Florida-ORL, LLC*,
144 S. Ct. 1 (2023) ....................14

*Henderson v. Kennedy*,
253 F.3d 12 (D.C. Cir. 2001)....................11

*Holder v. Humanitarian Law Project*,
561 U.S. 1 (2010)....................3, 12

*Humanitarian Law Project v. Reno*,
205 F.3d 1130 (9th Cir. 2000) ....................1

*INS v. St. Cyr*,
533 U.S. 289 (2001)....................2

*Jackson Federation of Teachers v. Fitch*,
799 F. Supp. 3d 571 (S.D. Miss. 2025)....................16

*Kisor v. Wilkie*,
588 U.S. 558 (2019)....................8

*Learning Res., Inc. v. Trump*,
607 U.S. 229 (2026)....................1

*Ma v. Ashcroft*,
257 F.3d 1095 (9th Cir. 2001) ....................6

*In re Maxwell Commc'n Corp.*,
93 F.3d 1036 (2d Cir. 1996)....................6

*McCulloch v. Sociedad Nacional De Marineros De Honduras*,
372 U.S. 10 (1963)....................6

*Moody v. NetChoice, LLC*,
603 U.S. 707 (2024)....9

*N.Y. Progress & Prot. PAC v. Walsh*,
733 F.3d 483 (2d Cir. 2013)....13

*NAACP v. Ala. ex rel. Patterson*,
357 U.S. 449 (1958)....9, 10

*New York v. Noem*,
812 F. Supp. 3d 321 (S.D.N.Y. 2025)....13

*Newsom v. Trump*,
No. 25-3727, slip op. (9th Cir. Oct. 23, 2026)....5

*Open Soc'y. Justice Initiative v. Trump*,
510 F. Supp. 3d 198 (S.D.N.Y. 2021)....8

*In re Primus*,
436 U.S. 412 (1978)....9

*Roberts v. U.S. Jaycees*,
468 U.S. 609 (1984)....9, 10

*Rona v. Trump*,
797 F. Supp. 3d 278 (S.D.N.Y. 2025)....8, 12

*Rumsfeld v. Forum for Academic and Institutional Rights, Inc.*,
547 U.S. 47 (2006)....9, 14

*Shaw v. Hunt*,
517 U.S. 899 (1996)....14

*The Babylon Bee, LLC v. Lopez*,
818 F. Supp. 3d 1181 (D. Haw. 2026)....9

*Tolbert v. Queens Coll.*,
242 F.3d 58 (2d Cir. 2001)....5

*Trump v. CASA, Inc.*, 606 U.S. 831 (2025)....1, 13, 14, 16

*U.S. v. Carvajal*,
924 F. Supp. 2d 219 (D.D.C. 2013)....6

*U.S. v. Palestine Liberation Org.*,
695 F. Supp. 1456 (S.D.N.Y. 1988)....7

*U.S. v. Yousef*,
327 F.3d 56 (2d Cir. 2003)....6

*V.O.S. Selections, Inc. v. U.S.*,
772 F. Supp. 3d 1350 (Ct. Int'l Trade 2025) ....................1

*Van Loon v. U.S. Dep't of the Treasury*,
122 F.4th 549 (5th Cir. 2024) ....................1

*VIP of Berlin, LLC v. Town of Berlin*,
593 F.3d 179 (2d Cir. 2010)....................11

*In re Vitamin C Antitrust Litig.*,
8 F.4th 136 (2d Cir. 2021) ....................6

*Washington v. Trump*,
145 F.4th 1013 (9th Cir. 2025) ....................16

*Welty v. Dunaway*,
Nos. 25-2738/5739, 2026 U.S. App. LEXIS 29403 (6th Cir. Sept. 25, 2026) ....................14

*Zadvydas v. Davis*,
533 U.S. 678 (2001)....................2

**Statutes**

22 U.S.C. §7421....................3

22 U.S.C. §7423....................5

22 U.S.C. §7425....................5

22 U.S.C. §7427....................4, 5

29 U.S.C. §152(6) ....................6

42 U.S.C. §2000bb-2(4)....................10

42 U.S.C. §2000cc-5(7)(A)....................10

50 U.S.C. §1701(a)-(b) ....................2

50 U.S.C. §1702(b)(3) ....................7

**Rules and Regulation**

31 C.F.R. §528.101....................12

**Constitutional Authorities**

U.S. Const. amend. I .................... *passim*

U.S. Const. amend. V........................................................................................................11

**Other Authorities**

*Black's Law Dictionary* (rev. 4th ed. 1968)..................................................................................3

H.R. Rep. No. 95-459 (1977)..............................................................................................3

H. Res. 1328, 118th Cong. (2024) .......................................................................................4

Restat. 4th of Foreign Relations Law, §309 ..........................................................................7

S. Res. 188, 116th Cong. (2019).........................................................................................4

S. Res. 546, 117th Cong. (2022).........................................................................................4

S. Res. 570, 116th Cong. (2020).........................................................................................3

Defendants provide no cogent reason for not enjoining the Sanctions Regime in its entirety. They ask the Court to treat EO 14,203 as effectively unreviewable and the designations thereunder subject only to "extremely deferential" review. ECF 69 at 10, 24, 26. But whether the regime is *ultra vires* is "a justiciable question of statutory construction," *V.O.S. Selections, Inc. v. U.S.*, 772 F. Supp. 3d 1350, 1377 (Ct. Int'l Trade 2025), that simply requires the Court to "determine the best reading of IEEPA and apply it," *Van Loon v. U.S. Dep't of the Treasury*, 122 F.4th 549, 562-63 (5th Cir. 2024).

Nor does Defendants' handwaving about national security confer upon them "unfettered discretion," *Humanitarian Law Project v. Reno*, 205 F.3d 1130, 1137 (9th Cir. 2000), lest emergencies become "a ready pretext for usurpation." *Learning Res., Inc. v. Trump*, 607 U.S. 229, 247 (2026). Nothing about IEEPA's Congress-imposed requirements places them beyond judicial scrutiny. "Courts assess whether circumstances are 'unusual' or 'extraordinary' in an array of constitutional and statutory contexts." ECF 56 at 21 (collecting cases).

With respect to the scope of relief, Defendants fail to engage with the undisputed facts. ECF 69 at 31-34. Plaintiffs are prominent and active members of civil society. Their work involves—requires—engaging in collective advocacy, convening with others, and working in coalitions. ECF 41 at 20-28. Advancing Plaintiffs' missions depends on pursuing such activities collectively. ECF 67 at 3-6, 14-16.

Recognizing that at least some form of injunction is all-but a foregone conclusion, Defendants argue that any injunctive relief should be limited to Plaintiffs alone. But such a narrow injunction comes nowhere near the "complete relief" *CASA* requires. ECF 41 at 79. Even if the Court prohibited enforcement of IEEPA's penalties against Plaintiffs, their speech and associational rights would still be grossly impaired. Interlocutors and partners would remain

chilled from engaging with Plaintiffs, for fear of IEEPA penalties or to avoid being designated under the EO, all the more so given the ICC's recent designation. The consequence is to deprive Plaintiffs of their rights to speak and associate with others. The only way to remove that First Amendment burden is to enjoin the Sanctions Regime entirely.

## I. The Sanctions Regime Is *Ultra Vires*.

Defendants do not dispute that the constitutional avoidance doctrine requires interpreting IEEPA and the EO narrowly to avoid their constitutional infirmities. The doctrine applies where a statute may be ambiguous, susceptible to multiple reasonable interpretations, or lead to absurd results. *Comey v. U.S. DOJ*, No. 25-cv-7625-JMF, 2026 U.S. Dist. LEXIS 244266, at *31 (S.D.N.Y. Oct. 26, 2026). "[I]f an otherwise acceptable construction of a statute would raise serious constitutional problems, and where an alternative interpretation of the statute is 'fairly possible,' … [the Court is] obligated to construe the statute to avoid such problems." *INS v. St. Cyr*, 533 U.S. 289, 299-300 (2001). A court will thus "read significant limitations into … statutes in order to avoid their constitutional invalidation." *Zadvydas v. Davis*, 533 U.S. 678, 689 (2001). The Court is accordingly obligated to address Plaintiffs' *ultra vires* claims in the first instance (which were not advanced in the *DAWN* preliminary injunction motion) and should conclude that the Sanctions Regime exceeds the President's authority under IEEPA for the reasons of statutory construction addressed below.

### A. Absence of National Emergency

Whether a national emergency exists under IEEPA is justiciable. ECF 56 at 15-16, 19-21. The Sanctions Regime is *ultra vires* because it does not satisfy IEEPA's requirements—a "national emergency" arising from an "unusual and extraordinary threat," 50 U.S.C. §1701(a)-(b). Congress enacted the NEA precisely to constrain resort to emergency powers, and then conditioned exercise of authority under IEEPA on a threat that is both "unusual" and "extraordinary." These dual

requirements give effect to Congress' view that genuine emergencies are "rare and brief, and are not to be equated with normal, ongoing problems." ECF 56 at 5-11 (quoting H.R. Rep. No. 95-459, at 10 (1977)). Otherwise, the President could usurp Congress' legislative function.

Defendants do not dispute that "unusual" and "extraordinary" are defined as Plaintiffs have described: the former means "[u]ncommon; not usual, rare," *Black's Law Dictionary* (rev. 4th ed. 1968), and does not "occur in ordinary practice"; the latter requires that Congress has not anticipated the putative threat. *Prost* Pls.' Reply 13 (quoting cases).

Nor do Defendants dispute the pertinent facts or offer evidence to substantiate a putative emergency.[1] *Cf. Holder v. Humanitarian Law Project*, 561 U.S. 1, 33-36 (2010) (noting submission of declarations). Congress has known for decades that the ICC can exercise jurisdiction over alleged crimes committed on the territory of a Rome Statute State Party by nationals of a nonparty. Congress referenced this in ASPA; its recognition motivated the statute's enactment. Congress has likewise long known about the ICC's Afghanistan and Palestine investigations. 22 U.S.C. §§7421(5), (8)-(9), (11); S. Res. 570, 116th Cong. (2020) (recognizing Afghanistan investigation); ECF 41 at 32-33; ECF 65 at 14-15 (detailing Executive's engagement with *Afghanistan* and *Palestine* situations).

Indeed, Congress twice *rejected* the sanctions authorized by EO 14,203, which pulls language nearly verbatim from the failed bills. *Prost* Pls.' Reply 14. This includes legislation introduced and rejected *after* the ICC's arrest warrants for Prime Minister Netanyahu and former Defense Minister Gallant. *Id.* Congress knew about the putative "threat" that the EO purports to address and rejected the President's approach to addressing it. The alleged threat is thus neither "unusual" nor "extraordinary." *Id.*

[1] The Government-supporting *amicus* brief recognizes and tries to fill this gap, ECF 72-2 at 2-3, but *amici* cannot serve that function.

### B. Conflict with ASPA

The Sanctions Regime is *ultra vires* because it conflicts with ASPA, which codified Congress' "specific legislative response," *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 157 (2000), to the same concerns that motivated the EO and protects the same U.S. and allied persons. *Prost* Pls.' Reply 9-11; ECF 82 at 12-14.

Defendants agree that conflict between the EO and ASPA would render the former *ultra vires*, ECF 69 at 10 (citing *Prost* Gov't Br. 12-13), but fail to address the conflicts that plainly exist. These include ASPA's prohibition on providing "incentives to induce" actions by the ICC, even where a protected person is in ICC custody, 22 U.S.C. §7427(d). Congress' prohibition conflicts with the EO's use of economic leverage, a classic inducement, *Prost* Pls.' Reply 20-21, to strongarm ICC judges and prosecutors.[2] Further, the EO conflicts with legislation concerning the ICC's prosecution of international crimes in Ukraine, which include arrest warrants for nationals from a non-ICC member state (Russia), and resolutions expressing Congress' approval of that and other ongoing investigations. *See, e.g.*, S. Res. 546, 117th Cong. (2022); S. Res. 188, 116th Cong. (2019); H. Res. 1328, 118th Cong. (2024); ECF 1, ¶¶88(d); 89(b); 95(c); 99(b); *Prost* Pls.' Reply 10-11.

Beyond these conflicts, EO 14,203 falls outside Congress' regime for addressing the possible exercise of jurisdiction over U.S. or allied persons without their countries' consent. The carefully drawn statutory scheme codifies Congress' judgment as to balancing concerns regarding the possible exercise of such jurisdiction with U.S. support for the ICC's work more generally.

---

[2] The administration is expanding use of such threats. On October 22, 2026, the U.S. Ambassador to the U.N. threatened the International Court of Justice and its judges with sanctions to coerce that court into interpreting the Genocide Convention in a manner to the U.S.'s liking: "we'll be watching the ICJ's handling of these proceedings very closely. As our actions against the ICC demonstrate, we will not allow globalist, faux-judges to weaponize the law against our troops, undermine our sovereignty, or put American lives at risk." Renzler Decl. Ex. 1.

ASPA enacts an exhaustive list of authorized Presidential actions where the ICC seeks to investigate or prosecute such persons. These do not include sanctions. Further, Congress preserved two sources of executive authority with respect to two narrow provisions of ASPA. 22 U.S.C. §§7423, 7425 (making clear that the prohibitions on cooperation and transfer of classified information do not constrain President's Article II authority). Congress declined to do the same even in §7427, which governs, *inter alia*, the President's authority to free a detained U.S. or allied person covered by the statute. There is therefore no basis for Defendants' contention that the President retains independent sanctions power beyond the actions authorized in §7427. *See Newsom v. Trump*, No. 25-3727, slip op. at 57-58 (9th Cir. Oct. 23, 2026).

**C. Violation of International Law**

The Sanctions Regime is *ultra vires* because it violates myriad U.S. obligations under international law without clear congressional authorization. Those violations, set out in Professor Harold Koh's Expert Report, are essentially undisputed and must be taken as conceded. ECF 69 at 10; *Prost* Gov't Br. 8-12; *Prost* Gov't Reply 1-3; *Tolbert v. Queens Coll.*, 242 F.3d 58, 75 (2d Cir. 2001); *Prost* Pls.' Reply 1-8.

Beyond incorporating the arguments made in *Prost* Pls.' Reply 5-6 (refuting contention that *Charming Betsy* does not apply to non-self-executing treaties or customary international law, or to claims against the U.S.), Plaintiffs observe the core question is whether the *Charming Betsy* doctrine applies to the interpretation of IEEPA's delegation of authority to the executive. It certainly does. Invoking cases that do not concern *Charming Betsy*, Defendants argue the canon applies only to ambiguous statutes. *Prost* Gov't Br. 8-12. Defendants contend that because IEEPA allows the President to implement sanctions generally, the statute lacks ambiguity and thus no international law restriction can be read into it.

That is wrong. The canon can be applied to "shorten the reach of a statute" to make it comport with international law even where the text would otherwise appear to authorize a specific action. *In re Maxwell Commc'n Corp.*, 93 F.3d 1036, 1047 (2d Cir. 1996); *In re Vitamin C Antitrust Litig.*, 8 F.4th 136, 143 nn.7-8 (2d Cir. 2021). To authorize an international law violation, the statute must "make[] plain Congress's intent" to do so; "ambiguous or 'general' words" do *not* suffice. *U.S. v. Yousef*, 327 F.3d 56, 93 (2d Cir. 2003). *See also* *U.S. v. Carvajal*, 924 F. Supp. 2d 219, 241 (D.D.C. 2013).

*McCulloch v. Sociedad Nacional De Marineros De Honduras*, 372 U.S. 10, n.3 (1963), makes the point clear. It interpreted the National Labor Relations Act's provision authorizing the NLRB to regulate "commerce." The statute defined this general term broadly, as including "trade, traffic, commerce, transportation, or communication … between any foreign country and any State, Territory, or the District of Columbia." *Id.* (citing 29 U.S.C. §152(6)). The law could thus be read "literally" to reach foreign-flag vessels. However, the Supreme Court, applying *Charming Betsy*, held that absent "any specific language in the Act itself" that evinced Congress' intent to regulate such vessels, which would violate international law, the statute must be interpreted as excluding them.

There is thus no merit to the argument that IEEPA's authorization of sanctions means Congress licensed the President to impose any form of sanctions, regardless of whether doing so would violate international law. Such a result would be permissible only if Congress included "specific language in the Act itself" making plain the intention to permit contraventions of international law. *Id.* *See also* *Ma v. Ashcroft*, 257 F.3d 1095, 1104, 1114 (9th Cir. 2001) (interpreting general provision of INA that persons "may be detained beyond the removal period" and applying *Charming Betsy* to limit duration of detention—despite the absence of textual limit—

because "construing the statute to authorize the indefinite detention of removable aliens might violate international law"); Restat. 4th of Foreign Relations Law, §309 (citing *Ma*'s application of *Charming Betsy*); *U.S. v. Palestine Liberation Org.*, 695 F. Supp. 1456, 1469-71 (S.D.N.Y. 1988) (applying *Charming Betsy* to find no congressional "intent to abrogate" treaty obligations).

**II. APA**

Defendants do not dispute Plaintiffs have standing to bring their APA claims. Nor could they—Section 706(2) "authorize[s] vacatur of unlawful agency rules, including in suits by unregulated plaintiffs who are adversely affected by an agency's regulation of others." *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 826 (2024) (Kavanaugh, J., concurring). The APA claims are directed at agency action, not presidential directive, *Prost* Pls.' Reply 15, and are reviewable as final agency action, *DAWN* Pls.' Reply 10-14. Defendants' arguments regarding abuse of discretion, failure to consider an important aspect of the problem, and action contrary to law are flawed. *Prost* Pls.' Reply 15-22. And the Sanctions Regime is "not in accordance with law" because it restricts the exchange of information and informational materials that the Berman Amendment places beyond IEEPA's reach. 50 U.S.C. §1702(b)(3); *DAWN* Pls.' Br. 32-38; *DAWN* Pls.' Reply 16-17.

Defendants have not, and cannot, provide "substantial evidence" that supports designating ICC judges, human rights organizations, and Special Rapporteur Albanese. It is undisputed that the operative word in the section of EO 14,203 under which each was designated—"engage"—means "to do or take part in something," or "to involve oneself; to take part in." Thus, a person "engaged" in an ICC investigation or prosecution must *personally* take part. "Directly" narrows the provision further: it means "without anything intervening; not by secondary, but by direct, means." *Prost* Pls.' Reply 17.

Defendants offer no alternative definitions, relying instead on the modifier "any" to argue the Secretary may designate "[f]oreign persons who advocate for, request, or authorize an arrest or investigation of a protected person." ECF 69 at 23-24. But "any" only addresses the *kinds* of ICC efforts the provision covers; it does not change the meaning of "directly engaged in." Defendants' only answer is that *Loper Bright* does not disturb deference to the Executive on foreign affairs, *Prost* Gov't Reply 9-10, but the meaning of "directly engaged" is a question of legal interpretation, not a foreign-policy judgment. And a construction advanced in litigation to defend designations already made merits no deference. *Kisor v. Wilkie*, 588 U.S. 558, 579 (2019).

None of the designated judges, organizations, or Special Rapporteur Albanese "directly engaged" in an ICC investigation or prosecution. The Pre-Trial Chamber has "no investigative powers of its own, nor is it responsible for directing the investigation of the Prosecutor." Renzler Decl. Ex. 2 ¶20. And, because the effort must be "*by the ICC*," persons external to the ICC—such as NGOs or a Special Rapporteur, who *address* communications *to* the ICC—are by definition not part of it. *See Prost* Pls.' Reply 17.

**III. First Amendment**

The Sanctions Regime imposes impermissible, content-based restrictions on speech that fail strict scrutiny. Defendants provide no reason for concluding the decisions so ruling were wrongly decided, *DAWN*, ECF 40 at 16-22; *Rona v. Trump*, 797 F. Supp. 3d 278, 282, 292-93 (S.D.N.Y. 2025); *Open Soc'y Justice Initiative v. Trump*, 510 F. Supp. 3d 198, 212-13, 212 n.7 (S.D.N.Y. 2021).[3]

Defendants fail to engage with Plaintiffs' facial overbreadth challenge to the speech restrictions, ECF 41 at 70-71, which have disproportionately unconstitutional applications. Any

[3] Beyond not providing reason to second-guess those decisions, Defendants' opposition does not attempt to demonstrate narrow tailoring.

application to non-expressive activities plays no role in the analysis. *Doe v. Reed*, 561 U.S. 186, 194 (2010) (plaintiffs must satisfy standard of a facial challenge "to the extent" their claim reaches "beyond the particular circumstances of [the] plaintiffs"); *DAWN* Pls.' Supp. Br. 5-9 (addressing "hybrid" challenge and explaining how *Reed* defines subset of applications measured under *Moody v. NetChoice, LLC*, 603 U.S. 707, 723-24 (2024)).

Defendants fail to hypothesize any permissible applications of the EO's speech restrictions. Even if there were, *quod non*, the experiences of Plaintiffs and *amici* attest to the "substantially disproportionate" number of unconstitutional applications, *Borecky v. Cnty. of Nassau*, No. 26-cv-2049-SJB-ST, 2026 U.S. Dist. LEXIS 136424, at *65-66 (E.D.N.Y. June 18, 2026) (internal quotation omitted). *See also The Babylon Bee, LLC v. Lopez*, 818 F. Supp. 3d 1181, 1206-07 (D. Haw. 2026) (law facially overbroad where "potential unconstitutional applications would consistently outweigh its constitutional ones").

Defendants' arguments concerning associational rights are equally flawed. Plaintiffs are compelled to cease First Amendment-protected associational activities, including: acting as counsel to designated organizations, *In re Primus*, 436 U.S. 412, 428, 431–32 (1978); convening and engaging in advocacy meetings with designated parties, *Fighting Finest v. Bratton*, 95 F.3d 224, 228 (2d Cir. 1996); and participating in civil society coalition activities, *Rumsfeld v. Forum for Academic and Institutional Rights, Inc.*, 547 U.S. 47, 68 (2006); ECF 41 at 66-67. These harms are compounded by the simultaneous impairment of free speech rights. *NAACP v. Ala. ex rel. Patterson*, 357 U.S. 449, 460 (1958); *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984). Defendants cavalierly dismiss the burdens imposed on Plaintiffs as "incidental," but never attempt to explain why forced abandonment of protected activities is not a "substantial or significant burden." ECF 69 at 14; ECF 42, ¶¶18-22; ECF 43, ¶¶27-39; ECF 44, ¶¶24-33; ECF 45, ¶¶19-23.

Unable to do so, Defendants resort to misdirection, falsely contending that Plaintiffs "assert associational claims on behalf of non-U.S. persons." ECF 69 at 14. Not so. Plaintiffs seek to vindicate their *own* rights to speech and association, on matters of tremendous public interest and import. These protected First Amendment activities include Plaintiffs' "right to associate with others in pursuit of" shared ends, *Roberts*, 468 U.S. at 622; *NAACP*, 357 U.S. at 460 (holding that First Amendment advocacy rights are "undeniably enhanced by group association"). ECF 69 at 14-15. The fact that the impairment concerns in part speech and association with non-U.S. nationals does not negate the infringement of Plaintiffs' rights.

## IV. RFRA

Defendants' insistence that AFSC show how its religious beliefs "demand" partnerships with the designated entities, ECF 69 at 18-19, imposes a centrality test that RFRA forbids. The statute protects "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. §§2000bb-2(4), 2000cc-5(7)(A). Courts "must… give deference to an association's view of what would impair its expression." *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 653 (2000). AFSC's declaration is clear that the sanctions impair its religious expression.

That expression is substantially burdened because AFSC is "coerced to act contrary to [its] religious beliefs." *Fazaga v. FBI*, 965 F.3d 1015, 1061 (9th Cir. 2020). Quaker belief in the inner light imposes a duty to bear social witness in the world. ECF 42, ¶7. The "testimony of integrity" requires this be "grounded in a true understanding of conditions on the ground in the communities it serves." *Id.* ¶11. AFSC has borne social witness in the Occupied Palestinian Territory since 1947, rooting its practice in integrity through local partnerships with leading local organizations that are now sanctioned. *Id.* AFSC obtained information, research, and introductions; covered expenses for joint activities; and organized conferences, workshops, campaigns, and coalition

work with these partners. *Id.* ¶¶13-15. AFSC's partnerships are how it implements its social witness with integrity and it "entirely depend[s]" upon them. *Id.* ¶¶11, 21.

*Henderson v. Kennedy*, 253 F.3d 12 (D.C. Cir. 2001), is inapposite. *Henderson* restricted one commercial avenue of religious expression—selling t-shirts on the Mall. 253 F.3d at 14. Here, Defendants dictate with whom a religious organization may associate, cutting off both what informs AFSC's practice and its communication with the communities it serves. ECF 42, ¶¶11-15, 21. The *Henderson* plaintiffs identified no tenet involving t-shirt sales on the Mall, claiming only a vocation to preach "by all available means." 253 F.3d at 16. By contrast, AFSC's precepts require grounding social witness in local knowledge supplied by its partners, with whom it has decades-long relationships. ECF 42, ¶¶7, 11-14. While the *Henderson* plaintiffs could still distribute shirts on the Mall or sell nearby, 253 F.3d at 17, AFSC has no alternative: the designated organizations are necessary bridges to the broader network of local organizations, human rights defenders, and victims. ECF 42, ¶21. AFSC must therefore either exercise its religion with those partners at the risk of incurring IEEPA's penalties or leave its religious calling unmet. *Id.*, ¶¶19-20.

## V. Fifth Amendment

Defendants fail to show that EO 14,203 is not unconstitutionally vague. That is especially the case given that, as it sweeps in First Amendment-protected speech, "the [vagueness] doctrine demands a greater degree of specificity than in other contexts." *VIP of Berlin, LLC v. Town of Berlin*, 593 F.3d 179, 187 (2d Cir. 2010). *See also* *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253-54 (2012) (vagueness of content-based speech regulation "raises special First Amendment concerns because of its obvious chilling effect").

The EO is not saved because the phrase "services by, to or for the benefit of" a designated person is used in other executive orders. Not only do EO 14,203's implementing regulations fail

to define, or even illustrate, what is captured by the services prohibition, they warn: "Differing foreign policy and national security circumstances may result in differing interpretations of similar language among the parts of this chapter." 31 C.F.R. §528.101. If the regulations caution that identical language in other programs may bear a different meaning, one cannot divine the meaning of undefined terms by reference to those other programs. Nor is any meaningful light shed by *Holder*, 561 U.S. at 8, 21, which construed the narrower term "service[s] to." The statute at issue there did not pair this with the additional phrase "or for the benefit of," as is the case in EO 14,203.

Tellingly, Defendants venture no attempt at explaining what is meant by that additional phrase. If Defendants cannot explain, for instance, whether it prohibits only speech "aimed at benefitting" or any speech conferring "any incidental" benefit, Plaintiffs cannot know either. That inadequacy is what the court found unacceptable in *Exxon Mobil Corp. v. Mnuchin*, where the EO at issue included the phrase "service by, to or for the benefit of." 430 F. Supp. 3d 220, 230-32 (N.D. Tex. 2019).

EO 14,203's vagueness has serious real-world consequences, made worse by the ICC's designation, forcing Plaintiffs to choose between engaging in activities that could result in IEEPA's penalties and avoiding exercising constitutional rights. Because the EO "does not provide clarity on what activity is and is not prohibited," Plaintiffs, like civil society writ large, are at sea as to whether once-routine activities are prohibited. ECF 67 at 2, 6-9, 11-14.

## VI. Remaining Requirements for Injunctive Relief

Defendants argue that Plaintiffs cannot show irreparable harm due to supposed "delay" in seeking relief. ECF 69 at 24 (citing *Prost* Gov't Br. 26-28). However, First Amendment harms are *ipso facto* irreparable. *Rona*, 797 F. Supp. 3d at 293; *Agudath Isr. of Am. v. Cuomo*, 983 F.3d 620, 636 (2d Cir. 2020). Regardless, "delay, standing alone[,] is insufficient to demonstrate the absence of irreparable harm." *Allstate Ins. Co. v. Landow*, No. 24-cv-2010-DLI-JRC, 2026 U.S.

Dist. LEXIS 67824, at *15 (E.D.N.Y. Mar. 30, 2026) (internal citation omitted); *Prost* Pls.' Reply 28-29. Nearly all the cases cited by Defendants arise in the wholly inapplicable trademark context. *Prost* Pls.' Reply 29. None concerns constitutional harms. Nor do Defendants contest that, since EO 14,203, Plaintiffs have faced the designations' mounting impacts, now heightened by the ICC's designation. ECF 42, ¶¶13, 19-21; ECF 43, ¶¶28-35, 38-39; ECF 44, ¶¶22, 25-31; ECF 45, ¶¶10, 20-23.

The balance of the equities favors injunctive relief. There is "substantial public interest" in the government complying with federal law, *New York v. Noem*, 812 F. Supp. 3d 321, 337 (S.D.N.Y. 2025); national security does not trump the rule of law, *Prost* Pls.' Reply 30; ECF 41 at 78; and "securing First Amendment rights is in the public interest," *N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013); ECF 41 at 78.

## VII. Scope of Relief

Plaintiffs are entitled to complete relief. The APA claims are unaffected by *CASA*'s approach to equitable remedies. *Trump v. CASA, Inc.*, 606 U.S. 831, 847 n.10 (2025). The Court may "grant or deny the functional equivalent of a universal injunction" by "preliminarily setting aside … an agency rule under the APA." *Id.* at 873 (Kavanaugh, J., concurring). Set-aside relief operates "directly against the challenged agency action" and is not confined to the parties. *Corner Post*, 603 U.S. at 826-28 (Kavanaugh, J., concurring). Post-*CASA* APA decisions have thus set aside and enjoined agency actions universally. *E.g.*, *Cath. Legal Immigr. Network, Inc. v. Rubio*, No. 26-cv-00858-JAV, 2026 U.S. Dist. LEXIS 189086, at *65-66 (S.D.N.Y. Aug. 21, 2026).[4]

Regarding the constitutional and *ultra vires* claims, the equitable power to afford complete relief reaches non-parties. *CASA*, 606 U.S. at 851-52 & n.12. A remedy's scope "is dictated by

[4] Unlike in *DAWN*, Plaintiffs' motion argued that complete relief requires enjoining the Sanctions Regime as a whole. *Cf.* *DAWN*, ECF 40 at 28-29.

the extent of the violation established." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). Where injuries rise or fall with treatment of others, equitable relief can reach beyond the plaintiffs. *CASA*, 606 U.S. at 851-52 & n.12. *CASA* cites as examples nuisance relief benefiting neighbors and *Shaw v. Hunt*, 517 U.S. 899 (1996), which overturned a racial gerrymander beyond its effect on named plaintiffs. Such relief is appropriate in First Amendment overbreadth challenges. *Welty v. Dunaway*, Nos. 25-2738/5739, 2026 U.S. App. LEXIS 29403, at *42 (6th Cir. Sept. 25, 2026) (holding where a law is facially overbroad, "the overwhelming weight of Supreme Court precedent counsels that the court should issue an injunction that vindicates the rights of non-parties"); *Griffin v. HM Florida-ORL, LLC*, 144 S. Ct. 1, 2 (2023) (Kavanaugh, J., concurring).

As Plaintiffs' full exercise of speech and associational rights depends on engaging with non-parties, an order protecting only Plaintiffs would not provide complete relief. It is through collective engagement, information-sharing, and joint advocacy that Plaintiffs' missions are furthered. ECF 43 ¶6; ECF 44 ¶¶9, 12; ECF 45 ¶14; *Rumsfeld*, 547 U.S. at 68 ("[t]he right to speak is often exercised most effectively by combining one's voice with the voices of others"). Yet the Sanctions Regime chills non-parties' speech and association in the same manner as it chills Plaintiffs, deterring Plaintiffs' partners, including their clients and fellow coalition members, from engaging with them for fear of IEEPA penalties or their own designation. ECF 41 at 68 (describing the report from the Coalition for the ICC); ECF 67 (*amicus* brief submitted by 38 organizations describing EO's chilling effect); ECF 41 at 95.

This renders relief running only to Plaintiffs hollow. CCR could return to representing victims in ICC proceedings, but those victims would remain chilled from participating in the proceedings. ECF 43, ¶¶9-12, 27-40. HRW's engagement in coalitions cannot proceed if other organizations are chilled. ECF 45, ¶¶12, 21(f), (i). OSI would be unable to engage in expressive

grantmaking, ECF 1, ¶298; ECF 44, ¶¶5-8, 16-19, even if itself cleared to give grants, as recipients would be unwilling to receive disbursements and banks unlikely to transfer funds. AFSC's ability to engage with designated organizations regarding ICC proceedings would be a pyrrhic victory if those organizations were unable to connect AFSC with others, a principal purpose of AFSC's engagement with them.

The inadequacy of plaintiff-specific injunctive relief is illustrated by the ICC's annual governing body meeting, the Assembly of States Parties ("ASP"), soon to begin in late November. Critical issues like election of new judges and the Prosecutor will be discussed. Prior to EO 14,203, Plaintiffs anchored their ICC engagement in ASP-related activities because it provides a uniquely valuable venue for joint advocacy, information-sharing, and collective decision-making among Plaintiffs and their numerous partners. ECF 43 ¶19(c); ECF 44 ¶11(i); ECF 45 ¶12. While a narrow injunction may permit Plaintiffs to engage in advocacy, their partners may be constrained not to participate for fear of running afoul of the Sanctions Regime, depriving Plaintiffs of their First Amendment-protected engagement with them.

These harms are magnified by the designation of the ICC itself. Plaintiffs have described their withdrawal from many ASP-related activities. ECF 43, ¶34(d); ECF 44, ¶¶26(c), 28(d); ECF 45, ¶21(c), (i). Whereas Plaintiffs previously withdrew from activities that could be construed as providing services to designated prosecutors and judges, the ICC's designation now forces them to consider whether *any* engagement with the ICC or its officials would constitute a prohibited transaction. EO 14,203 §3(a). Worse, the same calculation chills Plaintiffs' interlocutors from participating, further burdening Plaintiffs' speech and associational rights.

An injunction running to Plaintiffs alone would therefore fail to provide complete relief. *Chi. Women in Trades v. Trump* recently affirmed a broad injunction where speech and

associational rights were implicated in the face of a *CASA*-based motion for reconsideration, holding it was necessary to "protect[] [plaintiff] from losing its collaborative prospects," and that this harm extended to *all* prospective partners who would be "chilled" from even considering a collaboration. No. 25-C-2005, 2025 U.S. Dist. LEXIS 214127, at *14-17 (N.D. Ill. Oct. 30, 2025).

Other post-*CASA* decisions confirm that relief reaching beyond named plaintiffs is required where injuries cannot otherwise be cured. *Etienne v. Ferguson* extended a free-exercise injunction to protect non-party clergy because doing so was necessary to permit the plaintiffs to fulfill their own religious responsibilities. 791 F. Supp. 3d 1226, 1248-49 (W.D. Wash. 2025). Similarly, *Jackson Federation of Teachers v. Fitch* held that an injunction limiting unconstitutionally vague speech restrictions could not be crafted to apply only to the plaintiffs but must apply statewide. 799 F. Supp. 3d 571, 585 (S.D. Miss. 2025). That was because the "named plaintiffs would, in great likelihood, be harmed and affected through [the act's] enforcement to third parties... Plaintiff students would be deprived of the opportunity to interact with and learn from their fellow students at schools across the state, which is a significant part of education." *Id.* *See also* *Doe v. Trump*, 157 F.4th 36, 81 (1st Cir. 2025) (holding universal relief necessary to afford plaintiffs complete relief); *Washington v. Trump*, 145 F.4th 1013, 1037 (9th Cir. 2025) (same).

Here, the harms are similarly widespread. In this and the related cases alone, scores of plaintiffs and *amici*, many of whom work with Plaintiffs, have shown that their ability to speak and associate is harmed by EO 14,203. A remedy that does not enjoin the Sanctions Regime entirely fails to provide *CASA*-mandated complete relief.

Dated: October 29, 2026

Respectfully Submitted,

**AMERICAN FRIENDS SERVICE COMMITTEE,**
**CENTER FOR CONSTITUTIONAL RIGHTS,**
**HUMAN RIGHTS WATCH, and**
**OPEN SOCIETY INSTITUTE,**

By their attorneys,

/s/ *Andrew B. Loewenstein*
Andrew B. Loewenstein (*pro hac vice*)
Amir Farhadi (*pro hac vice*)
FOLEY HOAG LLP
Seaport West
155 Seaport Boulevard
Boston, MA 02210
617-832-1000
aloewenstein@foleyhoag.com
afarhadi@foleyhoag.com

Nicholas M. Renzler (NR1608)
Christina Hernsdorf (5641931)
Hannah E. Sweeney (6202584)
FOLEY HOAG LLP
1301 Avenue of the Americas
New York, NY 10019
212-812-0400
nrenzler@foleyhoag.com
hsweeney@foleyhoag.com

Rawda Fawaz (*pro hac vice*)
FOLEY HOAG LLP
1717 K Street N.W.
Washington, DC 20006
202-223-1200
rfawaz@foleyhoag.com

*Counsel for Plaintiffs*

**CERTIFICATE OF COMPLIANCE WITH THE COURT'S OCTOBER 20, 2026 ORDER GRANTING LEAVE TO EXCEED LOCAL RULE 7.1(c) WORD COUNT LIMITATION**

I, Andrew B. Loewenstein, counsel for Plaintiffs, hereby certify that the foregoing memorandum of law complies with the word count limitation set forth in the October 20, 2026 Order, ECF No. 75. This document contains 5,000 words, excluding the caption, table of contents, table of authorities, signature block, and required certificates, as permitted by Local Rule 7.1(c).

*/s/ Andrew B. Loewenstein*
Andrew B. Loewenstein